IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC. | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 02-CV-2733 (HB) |
| | : | |
| v. | : | |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| A-VALEY ENGINEERS, INC. AND | : | |
| LOTHAR E.S. BUDIKE, JUNIOR, | : | |
| | : | |
| Defendants. | : | |

**SECOND AMENDED COMPLAINT**

This is a suit by plaintiff Constellation NewEnergy, Inc. (f/k/a AES NewEnergy, Inc.) ("NewEnergy") for damages arising from (1) the breach of a written agreement; (2) fraudulent misrepresentations intended to induce NewEnergy to enter into the written agreement; or in the alternative, (3) for equitable relief in connection with the unlawful and unjust refusal by Powerweb Technologies, Inc. to return funds rightfully belonging to NewEnergy.

In support of its second amended complaint, NewEnergy avers:

**JURISDICTION**

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332 in that it is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

DSB:877270.2/AES003-158567

## THE PARTIES

2. Plaintiff, NewEnergy, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at Two California Plaza, 350 South Grand Avenue, Suite 2950, Los Angeles, California. NewEnergy maintains a regional office at Two Penn Center, Philadelphia, Pennsylvania.

3. During the time period relevant to this action, NewEnergy was the subject of two acquisitions. As a result of the acquisitions, NewEnergy has twice changed its name.

4. Before January 1, 2001, NewEnergy was known as New Energy East, L.L.C.

5. From January 1, 2002, until September 8, 2002, New Energy East, L.L.C. was known as AES NewEnergy, Inc.

6. On September 9, 2002, Constellation Energy Group acquired all of the stock of AES NewEnergy, Inc., from The AES Corporation. Since September 9, 2002, AES NewEnergy, Inc., has been known as Constellation NewEnergy, Inc.

7. Constellation NewEnergy, Inc., is the legal successor in interest to New Energy East, L.L.C.

8. Defendant, Powerweb Technologies, Inc. ("Powerweb"), is a corporation organized and existing under the laws of the State of New Jersey. It maintains its principal place of business at 655 Niblick Lane, Suite 100, Wallingford, Pennsylvania. Powerweb was formed in 1989 as the electrical distribution arm of A-Valey Engineers, Inc. Powerweb claims to be engaged in the design, development, installation, and operation of Internet-based information services and control systems.

9. Defendant, A-Valey Engineers, Inc. ("A-Valey"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania. It maintains its principal place

of business at 506 Georgetown Road, Wallingford, PA 19086.  A-Valey claims to be a mechanical and environmental contracting company.

10. Defendant, Lother Budike, Jr. ("Budike"), is Powerweb's president and chief executive officer.  Upon information and belief, Budike is an officer of A-Valey, or has authority to act on behalf of A-Valey.

## RELEVANT FACTS

11. On November 24, 1999, Budike sent NewEnergy a letter congratulating NewEnergy for having obtained a contract to supply electricty to Bell Atlantic in New Jersey.

12. Budike's November 24 letter was written on A-Valey stationary and identified Budike as the president of A-Valey.

13. In his November 24 letter, Budike proposed a plan for A-Valey and NewEnergy to introduce energy saving projects at certain facilities in New Jersey owned or operated by Bell Atlantic.

14. Specifically, Budike proposed that NewEnergy combine its experience with A-Valey's purported skills to develop particular energy saving opportunities under the then-current "Investment Grade Audit program" and "PSE&G's Standard Offer III demand side management program."

15. The terms "Investment Grade Audit program" and "PSE&G's Standard Offer III demand side management program" refer to procedures established for implementing energy savings strategies according to the published rules for the Pennsylvania Jersey Maryland Interconnection.  At all times relevant to this action, these procedures have been well known to energy industry professionals.

16. With the intent to obtain new business for A-Valey and its affiliate, Powerweb, Budike further proposed that NewEnergy use A-Valey as "the primary energy services subcontractor in all mechanical and lighting projects for Bell Atlantic within the Standard Offer III PSE&G territory" and that NewEnergy "develop and present the projects to Bell Atlantic, manage the program and the Standard Offer III process."

17. Budike represented in his November 24 letter that A-Valey was qualified and uniquely positioned to implement energy saving projects for Bell Atlantic. Specifically, Budike claimed that:

(a) A-Valey served as the "Master Contractor for mechanical services" at many of Bell Atlantic's facilities where NewEnergy was providing electricity;

(b) A-Valey was familiar with Bell Atlantic's facilities in New Jersey where NewEnergy was providing electricity;

(c) A-Valey was "ideally placed to estimate projects" and to implement projects at "minimum costs";

(d) A-Valey had the independent capability to implement energy savings projects for Bell Atlantic.

18. Budike's representations were false and misleading because A-Valey was not familiar with Bell Atlantic's facilities; A-Valey was not ideally placed to estimate energy savings and generation projects or to implement projects at minimum costs; and A-Valey did not have an independent capability to implement energy savings projects for Bell Atlantic.

19. In reliance upon Budike's representations about A-Valey's purported relationship with Bell Atlantic, A-Valey's purported familiarity with Bell Atlantic's New Jersey facilities, A-

Valey's purported ideal placement to estimate projects at minimum costs, and A-Valey's purported independent capability to implement energy savings programs for Bell Atlantic, NewEnergy negotiated with Budike for an agreement to provide electricity load curtailment services -- and particularly "active load management" services -- to Bell Atlantic in New Jersey.

### The Bell Atlantic Marketing Agreement

20. In reliance upon A-Valey's misrepresentations about its qualifications and abilities, and in particular its false statements about its knowledge of Bell Atlantic facilities in New Jersey, NewEnergy entered into a written agreement with A-Valey's affiliate, Powerweb. The agreement, which was dated January 7, 2000, was entitled "Exclusive Agreement for Bell Atlantic" (the "Bell Atlantic Marketing Agreement"). A copy of the Bell Atlantic Marketing Agreement is attached Exhibit "A".

21. Pursuant to the Bell Atlantic Marketing Agreement, during a one-year period ending January 6, 2001, NewEnergy and Powerweb would jointly market to Bell Atlantic a technology product developed by Powerweb. Powerweb called the product Omni-Link.

22. Powerweb described Omni-Link as an Internet-based information product that enabled large electricity consumers that also maintain standby electricity generators to decrease electricity costs and to create revenues through the sale of excess electricity capacity.

23. According to Powerweb, it developed Omni-Link for use by telecommunications companies receiving electricity through the Pennsylvania Jersey Maryland Interconnection ("PJM"), and which sought to conduct "active load management" ("ALM") on the PJM.

24. Specifically, the Bell Atlantic Marketing Agreement stated:

> [Omni-Link] is specifically designed for capacity sales under the
> Active Load Management Program ("ALM") of the Pennsylvania

>   Jersey Maryland Interconnection ("PJM"), and to enable a customer to execute energy saving programs.

25.     ALM is a procedure by which an electricity user that also maintains backup generators turns on the generators during high demand events and sells the electricity created by the generators to other electricity consumers. ALM is conducted pursuant to rules established by the PJM. Accordingly, the term ALM is unique to the PJM. The rules for ALM are available to the public on the PJM website (www.pjm.com).

26.     The Bell Atlantic Marketing Agreement described the scope of the parties' agreement as follows:

>   The parties hereby enter into this exclusive agreement to develop projects for Bell Atlantic [and all correct, future, direct or indirect subdivisions and affiliates] by utilizing the Omni-Link technology to exploit opportunities and create revenues through the sale of electrical capacity and other energy savings programs by the operation of the Bell Atlantic standby generators. Generators will be dispatched within the terms of the Operating Agreement of the PJM as regulations permit to improve reliability and collect the optimum revenues for Bell Atlantic.

(emphasis added).

27.     Pursuant to the Bell Atlantic Marketing Agreement, Powerweb was required to: (1) create a detailed project implementation plan, schedule and cost analysis for the integration of Omni-Link into Bell Atlantic's energy program; (2) design an Omni-Link system for Bell Atlantic; and (3) provide post-installation software and hardware maintenance for the Omni-Link system.

28.     Pursuant to the Bell Atlantic Marketing Agreement, NewEnergy was required to, among other things, advance $100,000 to the joint marketing effort, according to the following terms:

>   [NewEnergy] agrees to fund project development costs of up to One Hundred Thousand Dollars ($100,000.00) for Powerweb to

>create a detailed project implementation plan, schedule and investment analysis of the Omni-Link application for Bell Atlantic. [NewEnergy] will deposit the funds with Powerweb within ten (10) business days after the execution of this agreement. Allocation and use of the funds will be subject to the sole approval of [NewEnergy] in advance. If Bell Atlantic does not proceed with the project unused funds will be allocated to joint development of other opportunities. . . .

29.    The Bell Atlantic Marketing Agreement expressly provided that NewEnergy would be repaid the full $100,000 that it had advanced to the joint marketing effort:

>These development funds will be repaid from the first project payments made by Bell Atlantic to either [Powerweb] or [NewEnergy]. The specific form of repayment will be determined and agreed upon with both parties before the final contract negotiations with Bell Atlantic.

30.    In accordance with the Bell Atlantic Marketing Agreement, NewEnergy deposited $100,000 with Powerweb.

31.    In or about May, 2000, Bell Atlantic decided against using Omni-Link and informed NewEnergy and Powerweb not to proceed with the proposed project to integrate Omni-Link into Bell Atlantic's existing energy program.

32.    Upon information and belief, Bell Atlantic's decision not to use Omni-Link was based in part upon Bell Atlantic's conclusion that environmental regulations would have limited Bell Atlantic's use of its standby electricity generators, thereby limiting the potential benefit from ALM.

33.    Following Bell Atlantic's decision not to integrate Omni-Link into its existing energy program, NewEnergy reasonably considered the development of other opportunities with Powerweb. NewEnergy was not successful identifying any opportunities that it believed would be profitable and worth pursuing.

34. NewEnergy complied with all of its obligations under the Bell Atlantic Marketing Agreement.

35. Powerweb did not comply with its obligations under the Bell Atlantic Marketing Agreement. Upon information and belief, Powerweb did not complete a detailed project implementation plan, schedule and cost analysis for the integration of Omni-Link into Bell Atlantic's energy program. Also, Powerweb did not design an Omni-Link system for Bell Atlantic or provide post-installation software and hardware maintenance for the Omni-Link system.

36. Powerweb provided no benefit whatsoever to NewEnergy with respect to the Bell Atlantic Marketing Agreement.

37. NewEnergy did not approve Powerweb's expenditure of any portion of NewEnergy's $100,000.

38. After the Bell Atlantic Marketing Agreement expired, NewEnergy requested that Powerweb return the $100,000 that NewEnergy had advanced to the joint marketing effort and that it had deposited with Powerweb.

39. In breach of the Bell Atlantic Marketing Agreement, Powerweb has refused to return to NewEnergy the $100,000, or any portion thereof.

40. During the course of the one-year Bell Atlantic Marketing Agreement and continuing after the Bell Atlantic Marketing Agreement had expired, for its own gain and without NewEnergy's approval, Powerweb published false or misleading information to the energy market and to officials of the United States Department of Energy. The false or misleading information concerned Powerweb's commercial relationships with NewEnergy and NewEnergy's parent company, The AES Corporation.

## COUNT I – BREACH OF CONTRACT
### (against Powerweb)

41.     NewEnergy repeats and incorporates herein by reference paragraph 1 through 40.

42.     The Bell Atlantic Marketing Agreement was a valid and enforceable contract.

43.     NewEnergy complied with all of its obligations under the Bell Atlantic Marketing Agreement.

44.     Powerweb did not comply with all of its obligations under the Bell Atlantic Marketing Agreement.

45.     Powerweb breached the Bell Atlantic Marketing Agreement by failing to fulfill its contractual obligations and by refusing to return to NewEnergy the $100,000 NewEnergy had advanced to the joint marketing effort and had deposited with Powerweb.

WHEREFORE, NewEnergy demands judgment in its favor and against Powerweb in the amount of $100,000, together with prejudgment interest, post judgment interest, costs, and such other relief as the Court deems just and fair.


## COUNT II– BREACH OF DUTIES OF GOOD FAITH AND FAIR DEALING
### (against Powerweb)

46.     NewEnergy repeats and incorporates herein by reference paragraph 1 through 45.

47.     The Bell Atlantic Marketing Agreement was a valid and enforceable contract.

48.     The Bell Atlantic Marketing Agreement contained implied duties of good faith and fair dealing.

49.     NewEnergy complied with all of its obligations under the Bell Atlantic Marketing Agreement.

50. Powerweb owed a duty to NewEnergy to perform its obligations under the Bell Atlantic Marketing Agreement and to conduct itself in accordance with the implied duties of good faith and fair dealing.

51. Powerweb breached its duties of good faith and fair dealing to NewEnergy by, among other things, misleading NewEnergy as to its knowledge and capability to perform under the contract, using the Bell Atlantic Marketing Agreement to obtain $100,000 from NewEnergy, refusing to return that money to NewEnergy, and improperly, falsely and misleadingly using NewEnergy and its parent company's corporate identities and reputations for its own commercial gain.

WHEREFORE, NewEnergy demands judgment in its favor and against Powerweb in the amount of $100,000, together with prejudgment interest, post judgment interest, costs, and such other relief as the Court deems just and fair.

### COUNT III -- FRAUDULENT MISREPRESENTATION
### (against all defendants)

52. NewEnergy repeats and incorporates herein by reference paragraph 1 through 51.

53. Defendants, namely Powerweb, Budike and A-Valey, made numerous representations to NewEnergy concerning their abilities, skills and knowledge with respect to Bell Atlantic, and specifically their knowledge and access to information about Bell Atlantic's New Jersey facilities and energy program.

54. Defendants made these representations knowing they were false and misleading and with the intent to induce NewEnergy to enter into agreements with Powerweb and to provide Powerweb with development funds and investment funds.

55. Defendants' representations were material to NewEnergy's decision to enter into the Agreement and to provide Powerweb with development funds.

56. NewEnergy justifiably relied upon defendants' misrepresentations to its detriment.

57. NewEnergy has suffered damages as a direct result of defendants' fraudulent misrepresentations.

WHEREFORE, NewEnergy demands judgment in its favor and against Powerweb, A-Valey and Budike, in the amount of $100,000, together with punitive damages, prejudgment interest, post judgment interest, costs, and such other relief as the Court deems just and fair.

### COUNT IV -- ACCOUNTING
### (against Powerweb)

58. NewEnergy repeats and incorporates herein by reference paragraph 1 through 57.

59. Powerweb accepted $100,000 from NewEnergy on the condition that it did not use any of the money without NewEnergy's advance approval.

60. NewEnergy did not approve Powerweb's use of any of the $100,000.

61. Powerweb has not returned the $100,000 to NewEnergy.

62. The $100,000 rightfully belongs to NewEnergy.

63. Equity demands that Powerweb account for its use of the $100,000, or any portion thereof.

WHEREFORE, NewEnergy demands that Powerweb provide a complete accounting of its use of all or any portion of NewEnergy's $100,000.

### COUNT V – UNJUST ENRICHMENT
### (against Powerweb)

64. NewEnergy repeats and incorporates herein by reference paragraph 1 through 63.

65. NewEnergy provided $100,000 to Powerweb for the limited purpose of advancing the parties' joint effort to market Omni-Link to Bell Atlantic.

66. NewEnergy and Powerweb agreed in writing that NewEnergy's $100,000 would be repaid to NewEnergy.

67. NewEnergy did not authorize Powerweb to spend any portion of the $100,000.

68. Powerweb remains in possession of NewEnergy's $100,000, or it has improperly and without any legal right spent the money for solely its own benefit.

69. The $100,000 rightfully belongs to NewEnergy.

70. Powerweb has improperly and unjustly enriched itself by retaining and refusing to return NewEnergy's $100,000 and has deprived NewEnergy of its $100,000.

71. It would be unjust, inequitable and unconscionable if Powerweb were permitted to retain and be enriched by NewEnergy's $100,000.

WHEREFORE, NewEnergy demands an order requiring Powerweb to disgorge its ill-gotten $100,000, together with prejudgment interest, post judgment interest, costs, and such other amounts as the Court deems just and fair.

_____
Matthew A. White
Joel M. Sweet

Attorneys for Plaintiff, Constellation NewEnergy, Inc.

OF COUNSEL:

WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
22nd Floor, 1650 Arch Street
Philadelphia, Pennsylvania  19102-2097
(215) 977-2000

Dated:  _____, 2002

**CERTIFICATE OF SERVICE**

  I, Joel M. Sweet, hereby certify that on November 15, 2002, I caused a true and correct copy of plaintiff's Second Amended Complaint to be served by first class mail upon the following:

    Rudolph Garcia, Esquire
    SAUL EWING LLP
    Centre Square West
    1500 Market Street, 38th Floor
    Philadelphia, PA  19102-2186
    (Counsel for Powerweb Technologies, Inc.)


                _____
                Joel M. Sweet

DSB:877270.2/AES003-158567