**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 02-CV-2733 (HB) |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| POWERWEB TECHNOLOGIES, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES**
**AND COUNTERCLAIMS TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Powerweb, Inc., t/a Powerweb Technologies, incorrectly identified in this action as Powerweb Technologies, Inc. ("Powerweb"), A-Valey Engineers, Inc. ("A-Valey") and Lothar E.S. Budike, Jr. ("Mr. Budike") (collectively, the "Answering Parties") hereby respond to the Second Amended Complaint filed by Constellation NewEnergy, Inc., f/k/a AES NewEnergy, Inc. ("NewEnergy") as follows:

**JURISDICTION**

1.    Admitted.

**THE PARTIES**

2-7.    The Answering Parties are without knowledge or information sufficient to form a belief as to the truth of the factual averments of these paragraphs. The other averments are conclusions of law, to which no response is required.

8.    It is admitted that Powerweb is a New Jersey corporation engaged, among other things, in the design, development, installation and operation of Internet-based

714797.4 4/7/03

information services and control systems. However, the other averments of this paragraph are denied.

9.      It is admitted that A-Valey is a Pennsylvania corporation engaged, among other things, in mechanical and environmental contracting. However, the other averments of this paragraph are denied.

10.      It is admitted that Mr. Budike is Powerweb's President and Chief Executive Officer. However, the other averments of this paragraph are denied.

## RELEVANT FACTS

11.      It is admitted that A-Valey sent such a letter to NewEnergy (the "A-Valey Letter"). However, the Answering Parties are without knowledge or information sufficient to form a belief as to the truth of the other averments of this paragraph.

12.      It is admitted that the A-Valey Letter was written on A-Valey stationary. However, the other averments of this paragraph are denied.

13-14. It is admitted that the A-Valey Letter made such a proposal. However, the other averments of this paragraph are denied.

15.      Admitted.

16.      It is admitted that the A-Valey Letter made such a proposal. However, the other averments of this paragraph are denied.

17.      It is admitted that the facts in subparagraphs (a) through (d) are correct and were stated in the A-Valey Letter. However, the other averments of this paragraph are denied.

18-19. Denied.

20.    It is admitted that NewEnergy and Powerweb entered into an Exclusive Agreement for Bell Atlantic dated January 7, 2000 ("Joint Venture Agreement"). However, the other averments of this paragraph are denied.

21.    It is denied that NewEnergy has accurately stated the terms of the Joint Venture Agreement in this paragraph.

22-23.  The averments of these paragraphs are denied as oversimplified and incomplete characterizations of Powerweb's descriptions of Omni-Link.

24.    It is denied that NewEnergy has accurately quoted the Joint Venture Agreement.

25.    The first sentence of this paragraph is denied. The remaining sentences of this paragraph are admitted.

26.    It is denied that NewEnergy has accurately quoted the Joint Venture Agreement.

27-29.  It is denied that NewEnergy has accurately stated the terms of the Joint Venture Agreement in these paragraphs.

30.    Admitted.

31-37.  Denied.

38.    It is admitted only that on or about March 1, 2002, more than 2 years after the parties entered into the joint-venture, NewEnergy made a written demand for the return of the $100,000 that Powerweb had spent on designing and engineering the Bell Atlantic project.

39.     It is admitted only that Powerweb has rightfully refused to return to NewEnergy the costs associated with the detailed project implementation plan for the Bell Atlantic project. The remaining averments in this paragraph are conclusions of law, to which no response is required.

40.     Denied.

### COUNT I - BREACH OF CONTRACT
**(Against Powerweb)**

41.     The answers to paragraphs 1 through 40 above are incorporated herein by reference.

42.     Admitted.

43-45. Denied.

WHEREFORE, Powerweb respectfully requests that judgment be entered in its favor and against NewEnergy, with costs of suit and such other relief as this Court deems proper.

### COUNT II - BREACH OF DUTIES OF GOOD FAITH AND FAIR DEALING
**(Against Powerweb)**

46.     The answers to paragraphs 1 through 45 above are incorporated herein by reference.

47.     Admitted.

48.     The averments in this paragraph are conclusions of law, to which no response is required.

49.     Denied.

50.     The averments in this paragraph are conclusions of law, to which no response is required.

51.     Denied.

WHEREFORE, Powerweb respectfully requests that judgment be entered in its favor and against NewEnergy, with costs of suit and such other relief as this Court deems proper.

## COUNT III - FRAUDULENT MISREPRESENTATION
### (Against All Answering Parties)

52.     The answers to paragraphs 1 through 51 above are incorporated herein by reference.

53.     It is admitted that some such representations were made. However, it is denied that any of them were untrue, and all such representations were merged into and superceded by the various written agreements entered into between Powerweb and NewEnergy.

54-57. Denied.

WHEREFORE, the Answering Parties respectfully requests that judgment be entered in their favor and against NewEnergy, with costs of suit and such other relief as this Court deems proper.

## COUNT IV - ACCOUNTING
### (Against Powerweb)

58.     The answers to paragraphs 1 through 57 above are incorporated herein by reference.

59-60. Denied

61.    It is admitted only that Powerweb has rightfully refused to return to NewEnergy the costs associated with the detailed project implementation plan for the Bell Atlantic project.

62-63. Denied.

WHEREFORE, Powerweb respectfully requests that judgment be entered in its favor and against NewEnergy, with costs of suit and such other relief as this Court deems proper.

## COUNT V - UNJUST ENRICHMENT
### (Against Powerweb)

64.    The answers to paragraphs 1 through 63 above are incorporated herein by reference.

65-71. Denied.

WHEREFORE, Powerweb respectfully requests that this Court enter judgment in its favor and against NewEnergy, and award Powerweb costs of suit and such other relief as this Court deems proper.

## FIRST AFFIRMATIVE DEFENSE

72.    The Second Amended Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

73.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, because NewEnergy has failed to perform its obligations under the Joint-Venture Agreement.

### THIRD AFFIRMATIVE DEFENSE

74.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by NewEnergy's breach of its duty of good faith and fair dealing.

### FOURTH AFFIRMATIVE DEFENSE

75.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by NewEnergy's breach of its fiduciary duty to Powerweb.

### FIFTH AFFIRMATIVE DEFENSE

76.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by NewEnergy's fraud.

### SIXTH AFFIRMATIVE DEFENSE

77.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by NewEnergy's breach of the Confidentiality Agreement described in Powerweb's Counterclaim below.

### SEVENTH AFFIRMATIVE DEFENSE

78.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by the equitable doctrine of recoupment and/or set-off.

### EIGHTH AFFIRMATIVE DEFENSE

79.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by estoppel and/or waiver.

### NINTH AFFIRMATIVE DEFENSE

80.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by the equitable doctrine of unclean hands.

## TENTH AFFIRMATIVE DEFENSE

81.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by the equitable doctrine of laches.

## ELEVENTH AFFIRMATIVE DEFENSE

82.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, because it would be inequitable to award the requested relief to NewEnergy.

## TWELFTH AFFIRMATIVE DEFENSE

83.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by the parol evidence rule.

## THIRTEENTH AFFIRMATIVE DEFENSE

84.    The claims asserted in the Second Amended Complaint are barred, in whole or in part, by the statute of frauds.

## FOURTEENTH AFFIRMATIVE DEFENSE

85.    The claims asserted in the Second Amended Complaint may be barred, in whole or in part, by the applicable statute of limitations.

## COUNTERCLAIMS

Powerweb asserts the following Counterclaims against NewEnergy and additional parties AES CILCO and RETX, Inc.:

### The New Parties

86.    AES CILCO ("CILCO") is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 300 Liberty Street, Peoria, Illinois, 61602.  CILCO is a gas and electric utility serving customers in Central

Illinois.  At all times relevant hereto, CILCO was part of the AES Corporation, a global power company with plants and offices throughout North America and in over 20 countries worldwide.  On or about January 31, 2003, CILCO and its parent company, Cilcorp, were sold to Ameren Corporation.

87.    RETX, Inc. ("RETX") is a corporation organized and existing under the laws of the state of Delaware and headquartered at 5883 Glenridge Drive, Plaza 400, Suite 180, Atlanta, Georgia 30328.  RETX is a privately-held corporation founded in 1998 working with electric and gas distribution utilities, load serving entities, ISOs and retail service providers that have or plan to deregulate their energy services.  RETX does business throughout North America, including Pennsylvania.

## Jurisdiction over CILCO and RETX

88.    This Court has personal jurisdiction over CILCO and RETX pursuant to the Pennsylvania long-arm statute, 42 Pa. C.S.A. § 5322, and the due process clause of the Fourteenth Amendment.

89.    This Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332, because this is an action between citizens of different states, and the amount in controversy exceeds $75,000.

## Introduction

90.    From 1999 to the present, NewEnergy systematically and improperly procured certain confidential and proprietary information about Powerweb and its business in order to form a business to compete with technology that Powerweb pioneered. Powerweb's technology revolutionized the energy industry and has provided energy suppliers the ability to

sell consumers new energy products and energy management services that generate additional revenues in the hundreds of millions of dollars. NewEnergy fraudulently stole Powerweb's confidential and proprietary information and has tortiously interfered with Powerweb's existing and prospective contractual relations with utilities and energy service providers.

91.    In February 2000, CILCO, then a sister-company of NewEnergy and with the help of NewEnergy, improperly procured confidential information regarding Powerweb's "Energy Technology." Thereafter, CILCO unlawfully shared Powerweb's confidential information with RETX through Peter Scarpelli ("Scarpelli"). At the time, Scarpelli was a CILCO Vice President. Thereafter, Scarpelli became Vice President of Strategy and Business Development for RETX. Scarpelli still holds this position. Together, based on Powerweb's stolen confidential and proprietary information, CILCO and RETX conspired to create a product that unfairly competes with Powerweb's technology, thereby tortiously interfering with Powerweb's existing and prospective contractual relations.

### Powerweb and the Omni-Link System

92.    Powerweb is a privately held corporation based in Media, Pennsylvania. Powerweb is in the business of providing energy trading services to utility companies and energy service providers who, in turn, provide these services to large commercial energy consumers. Powerweb has been engaged in the design, development, installation and operation of information services and control systems for the management of energy consumption for the past thirteen years.

93.    In or about 1996, the energy industry was deregulated, opening the door to competition and the development of new ideas and programs to help consumers conserve and manage the consumption of energy in order to save money on energy expenditures.

94.    Powerweb immediately saw an opportunity, one that no one else had identified to that date, to utilize untapped electrical resources (through on-site generation or load reduction) to provide significant savings to large commercial energy consumers.

95.    Because electricity cannot be stored, all power that is generated must be consumed instantaneously in order to balance and deliver electricity on the grid. Due to the characteristics of electricity, when the temperature rises, electricity becomes difficult to transport over the grid. The constant challenge to balance the grid and meet instantaneous supply and demand requirements has made electricity the most volatile commodity. During high demand periods, the price for each unit can fluctuate as much as 1,000%.

96.    Having provided its services to large commercial energy consumers for many years, Powerweb was aware that many of its customers had their own energy resources such as stand-by electrical generation capabilities that were designed to be used during times of emergency. Powerweb set out to design a system that would deploy these resources, as well as others, during high-demand periods and sell back pre-purchased blocks of energy and capacity on the energy market through the utility companies or energy service providers when prices for energy are high. The net result is that the consumers and energy suppliers share the resale of this energy and capacity creating a true win-win opportunity.

97.    Powerweb developed a three-module system (the "Omni-Link System") that uses (1) patented monitoring and control technology, (2) patented internet-service

software, and (3) sophisticated contracting documents, to monitor the price of electricity in the forward energy market, instruct the stand-by generators to turn on, and to accomplish the buy-back and resale transaction of the electricity blocks in the energy market ("energy trading services"). These energy trading services also offered utilities and energy service providers the opportunity to capitalize on reserve capacity sales.

98.     Powerweb developed and patented the software internet platform to computerize these energy trading services for large commercial companies and named the software Omni-Link™. By combining the software, its patented monitoring and control technology, and the contracting documents, Powerweb launched the Omni-Link System with a pharmaceutical company in Pennsylvania.

99.     The Omni-Link System provides Powerweb's customers with central control of distributed generation energy resources, load management, real-time energy information and analysis, and integration with commercial building management systems. Powerweb works with utilities, energy marketers, and independent system operators nationwide to use the Omni-Link System to monitor, manage and conserve energy consumption.

100.     With the Omni-Link System in place, Powerweb was well-positioned to revolutionize the energy industry because the Omni-Link System offered utility companies, energy service providers, and consumers a unique approach to achieve hundreds of millions of dollars in potential savings that would otherwise be unrealized. The Omni-Link System was the only one of its kind, and Powerweb took every precaution to protect its proprietary interests in it.

## Powerweb Markets Omni-Link to Bell Atlantic

101.    On or about March 12, 1999, Powerweb's President and Chief Executive Officer, Mr. Budike, approached the Bell Atlantic Corporation ("Bell Atlantic" n/k/a Verizon) to offer the energy trading services of the Omni-Link System at Bell Atlantic's New Jersey facilities. Powerweb estimated that Bell Atlantic could save as much as 15% on its energy expenditures in the first year.

102.    Bell Atlantic was very interested in the Omni-Link System and suggested that Powerweb coordinate with Bell Atlantic's energy supplier, NewEnergy, in order to explore implementation of the Omni-Link System. Bell Atlantic's Real Estate Manager, Jim Goodman, told Powerweb to contact David McGeown at NewEnergy to coordinate the effort.

## Powerweb Offers NewEnergy a Joint-Venture Opportunity
## to Market the Omni-Link System to Bell Atlantic and Other Customers

103.    On or about July 15, 1999, Powerweb wrote to David McGeown at NewEnergy introducing Powerweb and the Omni-Link System and describing Powerweb's relationship with Bell Atlantic.

104.    From August through October 1999, Powerweb met with NewEnergy a total of 12 times at its offices in New York City. At the meetings, the parties discussed how the Omni-Link System could be utilized to maximize savings to Bell Atlantic. Powerweb and NewEnergy discussed the possibility of entering into a joint-venture to market the Omni-Link System to Bell Atlantic.

### The Confidentiality Agreement

105.    NewEnergy insisted on receiving all of the technical information on the Omni-Link System before it would consider whether or not to proceed with the Bell Atlantic project.

106.    In order to protect its proprietary interest in the Omni-Link System, in its energy trading and conservation products and services, and in its prospective business relationship with Bell Atlantic and other prospective customers, Powerweb asked NewEnergy to enter into a broad confidentiality agreement.

107.    NewEnergy made certain representations to Powerweb in order to induce Powerweb to provide NewEnergy with its proprietary information regarding the Omni-Link System. NewEnergy stated that it had every intention of proceeding with a joint-venture to market the Omni-Link System to Bell Atlantic and to other customers in the future. NewEnergy also assured Powerweb that it would not attempt to compete with Powerweb or the Omni-Link System.

108.    On or about October 11, 1999, David I. McGeown, Director of Energy Services for AES Corporation and NewEnergy, signed a Confidentiality Agreement with Powerweb ("Confidentiality Agreement") on behalf of NewEnergy and all of its subsidiaries, joint ventures, affiliates and sub-contractors.  A true and correct copy of the Confidentiality Agreement is attached hereto as Exhibit A.

109.    The Confidentiality Agreement provides:

> WHEREAS, Powerweb Technologies is the legal owner of a number of energy sensing and energy reduction inventions comprised of gas sensing technologies, electronic metering devices, electricity control devices, and electricity consumption devices; and

WHEREAS, Powerweb Technologies is also the legal owner of a patented integrated translation software system (Omni-Link®) which is utilized for energy information transfer, energy procurement, and facility based monitoring. Omni-Link® is comprised of digital sensors, networking communication protocol, computer server configurations, and a graphical machine-man interface; and

WHEREAS, Powerweb is also the developer of custom "stand-by generation" capacity credit programs which utilize the above mentioned technologies to sell back capacity on the open market as well as leverage energy procurement in deregulated electricity territories; and

WHEREAS, all of these above mentioned technologies, inventions, and energy resale strategies are collectively known as "Energy Technology."

110.    The Confidentiality Agreement prohibits NewEnergy and its affiliates from disclosing any "Energy Technology" information to any third-party and also prohibits NewEnergy from using any of the "Energy Technology" information for any purpose whatsoever without the prior written approval of Powerweb. Thus, the Confidentiality Agreement specifically prohibits NewEnergy and its affiliates from using the information it received in its confidential relationship with Powerweb to start a rival business to compete with Powerweb and the Omni-Link System. The term of the Confidentiality Agreement is ten years.

111.    With the Confidentiality Agreement in place, Powerweb proceeded to disclose the technical details of the Omni-Link System to NewEnergy in order to proceed with the development of the proposed Bell Atlantic project. Powerweb provided NewEnergy's technical analyst, Mr. Kirk Hampton, with a series of documents that described every aspect of the Omni-Link System. This included infrastructure diagrams, patent applications, internet architecture diagrams, proprietary information on the metering technology, internet protocol information and other confidential information. At the time of each submission, Powerweb

emphasized the importance of the confidential relationship and reminded NewEnergy of its obligations under the Confidentiality Agreement.

### The Contracting Documents

112.    One of the most significant cost-savings programs Powerweb offered to Bell Atlantic involved the resale of electricity from Bell Atlantic back to the energy grid through the internet ("reserve capacity sales"). Bell Atlantic was able to realize significant cost-savings through that program by utilizing its own electrical generation resources during high-demand time periods.

113.    In order to implement the cost savings program at Bell Atlantic, NewEnergy needed to be able to resell unused blocks of energy and capacity from Bell Atlantic to its other energy consumers.

114.    Powerweb, having pioneered the idea of reserved capacity sales programs, had already spent an enormous amount of time and money developing a program to implement a buy-back and resale of electricity and capacity in the energy market. After extensive research and development, Powerweb acquired the contracts necessary to achieve a resale of electricity in the energy market while ensuring that the concept satisfied all of the applicable government regulations. This contracting information was extremely confidential and proprietary.

115.    NewEnergy insisted on receiving the contracting and regulatory information from Powerweb in order to satisfy itself of the viability of this unique concept and facilitate the development of the Bell Atlantic project. NewEnergy stated that it required the

information to revise its current agreements with end-use customers to allow for the resale of the electricity and to ensure that the project met all of the regulatory guidelines.

116.    Again, NewEnergy stated that it had no intention of competing with Powerweb or the Omni-Link System.

## The Letter Agreement

117.    Powerweb requested that NewEnergy sign a written letter agreement. On or about October 25, 1999, NewEnergy signed a written letter agreement memorializing the parties' intent to proceed with a joint-venture to market the project to Bell Atlantic ("Letter Agreement"), a true and correct copy of which is attached hereto as Exhibit B.

118.    The Letter Agreement provides, in part:

> [NewEnergy] acknowledges that [Powerweb] brought the concept of reserve capacity sales to the PJM to [NewEnergy] and agrees not to independently pursue this opportunity in the telecommunications industry (specifically Bell Atlantic). In addition, [NewEnergy] agrees to maintain all confidentiality obligations detailed in the executed non-disclosure agreement.

119.    After the Letter Agreement was signed, Powerweb provided NewEnergy with the proprietary contracting and regulatory information it had requested.

## The Joint-Venture Agreement

120.    After some negotiation, on January 7, 2000, Powerweb and NewEnergy executed an exclusive agreement to market the Bell Atlantic project ("Joint-Venture Agreement"), a true and correct copy of which is attached hereto as Exhibit C.

121.    The Joint-Venture Agreement reemphasized the importance of the Confidentiality Agreement and specifically prohibited NewEnergy from independently pursuing business opportunities for the reserve capacity sale of electricity.

**The Joint-Marketing Agreement**

122.    On or about January 8, 2000, Powerweb and NewEnergy entered into a joint-marketing agreement whereby the parties agreed to jointly market the Omni-Link System to NewEnergy's customers throughout Pennsylvania, New Jersey, and Maryland ("Joint-Marketing Agreement"), a true and correct copy of which is attached hereto as Exhibit D.

**NewEnergy Authorizes Powerweb to Spend the
$100,000 Pursuant to the Joint-Venture Agreement**

123.    On February 3, 2000, NewEnergy instructed Powerweb to begin development of the detailed project implementation plan for the Bell Atlantic project immediately.

124.    On or about February 7, 2000, Powerweb outlined the specific tasks that would be undertaken to develop the Bell Atlantic project implementation plan. Powerweb notified NewEnergy that the necessary tasks could easily cost more than the initial $100,000 allocated for the development of the plan.

**NewEnergy Instructs Powerweb to Send
Information on The Omni-Link System to CILCO**

125.    In early February 2000, NewEnergy requested that Powerweb contact NewEnergy's sister company, CILCO, regarding the creation of a marketing plan similar to the Joint-Venture Agreement between Powerweb and NewEnergy.  Specifically, NewEnergy directed Powerweb to contact Scarpelli then Vice President of CILCO.

126.    As a result, Scarpelli requested Powerweb to send CILCO Powerweb's confidential and proprietary information regarding the "Omni-Link System Energy Technology."

127.    Pursuant to NewEnergy's and CILCO's requests and under the protections of the Confidentiality Agreement, Powerweb sent confidential information concerning the "Omni-Link System Energy Technology" to Scarpelli at CILCO.

128.    Again pursuant to NewEnergy and CILCO's requests and under the protections of the Confidentiality Agreement, Powerweb also sent confidential information concerning the Joint-Venture Agreement directly to Scarpelli at CILCO.

### NewEnergy Makes Its Presentation to Bell Atlantic Without Notifying Powerweb

129.    On or about February 25, 2000, NewEnergy, without contacting or consulting Powerweb, provided Bell Atlantic with an initial proposal for the project.

130.    Upon information and belief, NewEnergy provided Bell Atlantic with the official final proposal sometime in April 2000. Again, Powerweb was not notified, consulted or even given a copy of the proposal to review.

131.    Powerweb provided NewEnergy with the necessary engineering documentation in order to prepare the final proposal to Bell Atlantic. At this time, Powerweb's development costs associated with Omni-Link and the Bell Atlantic project had already exceeded $100,000.

132.    On or about May 15, 2000, Powerweb learned that Bell Atlantic had decided not to implement the project in 2000, but would be implementing it in the summer of 2001. NewEnergy reassured Powerweb that it had every intention of pursuing the Bell Atlantic project as a joint-venture.

**Powerweb Discovers That NewEnergy Stole the Omni-Link System Technology
and Is Using It to Compete with the Omni-Link System in the Energy Industry**

133.    In or around, October 2000, Powerweb discovered that NewEnergy was using the "Energy Technology" by marketing Powerweb's energy trading concepts to customers throughout New Jersey, New York and Pennsylvania in direct violation of the Confidentiality Agreement, the Letter Agreement, the Joint-Venture Agreement and the Joint-Marketing Agreement.

134.    NewEnergy made an investment in a technology company to develop software similar to the Omni-Link software.

135.    NewEnergy purchased its own metering company to provide services similar to those provided by the Omni-Link System.

136.    Upon information and belief, NewEnergy developed its own capacity resale product to compete with the Omni-Link System.

137.    In direct breach of the Confidentiality Agreement, the Letter Agreement, the Joint-Venture Agreement and the Joint-Marketing Agreement, NewEnergy used its confidential relationship with Powerweb to gather as much information as possible about the "Energy Technology," Powerweb's business, and the Omni-Link System in order to secretly commence a rival business to compete with Powerweb.

138.    Upon information and belief, NewEnergy never intended to honor its obligations under the Confidentiality Agreement, the Letter Agreement, the Joint-Venture Agreement or the Joint-Marketing Agreement. Instead, NewEnergy intentionally and successfully concealed its abuse of its position of trust with Powerweb to start a competing business using the "Energy Technology" information.

139.    Upon information and belief, NewEnergy fraudulently misrepresented its intentions to proceed in this business with Powerweb in a joint-venture. At all times material hereto, NewEnergy intended to breach the Confidentiality Agreement in order to compete with Powerweb and the Omni-Link system. NewEnergy intentionally concealed its misconduct from Powerweb.

140.    Upon information and belief, NewEnergy has improperly shared some or all of the "Energy Technology" information with numerous third-parties that have used the information to compete with Powerweb and the Omni-Link System.

141.    Upon information and belief, Powerweb has lost profits in an amount exceeding $100,000,000 as a direct result of NewEnergy's misconduct described above.

## NewEnergy Steals the Bell Atlantic Project

142.    In or around the Summer of 2001, Bell Atlantic notified Powerweb that it had entered into a contract with NewEnergy in which NewEnergy was to provide services almost identical to those offered by Powerweb and the Omni-Link System. NewEnergy had stolen Powerweb's proprietary information and usurped its prospective business relationship with Bell Atlantic.

143.    Powerweb has a clear right to permanently enjoin NewEnergy from using or disclosing the "Energy Technology" information and/or other confidential and proprietary information about Powerweb's reserve capacity sales business and the Omni-Link System to third-parties.

144.    Powerweb will suffer irreparable harm if NewEnergy is not permanently enjoined from disclosing or using such information described above.

145.   Upon information and belief, NewEnergy is holding property (the profits it has improperly received using the "Energy Technology" information it procured from Powerweb) subject to an equitable duty to convey such property to Powerweb.

146.   NewEnergy will be unjustly enriched if permitted to retain said property.

147.   NewEnergy's conduct was deliberate, malicious, wanton and outrageous, and Powerweb is therefore entitled to an award of punitive damages.

### CILCO Through Scarpelli Steals Powerweb's Energy Technology and Markets This Technology to RETX

148.   After improperly obtaining Powerweb's confidential proprietary information on behalf of CILCO, Scarpelli became Vice President of RETX.

149.   Sometime after the Spring of 2000, RETX introduced its new product, Load Management Dispatcher.   This product was intended to compete and does compete directly with Powerweb's Omni-Link System.

150.   On January 3, 2001, CILCO announced that it had chosen RETX as its load management dispatcher.

151.   Upon information and belief, CILCO, through Scarpelli, stole Powerweb's confidential and proprietary "Energy Technology."

152.   Upon information and belief, Scarpelli improperly shared most if not all of the "Energy Technology" information with RETX.

153.   Upon information and belief, prior to wrongfully obtaining Powerweb's confidential and proprietary information from CILCO through Scarpelli, RETX did not have the capability to produce a product that competes with the Omni-Link System.

154.    Upon information and belief, CILCO and RETX conspired to use Powerweb's stolen confidential and proprietary information to develop a product that directly competes with the Omni-Link System.

155.    Upon information and belief, Powerweb has lost and continues to lose profits as a direct result of the misconduct of CILCO and RETX.

156.    Powerweb suffers and will continue to suffer irreparable harm if RETX is not enjoined from marketing its Load Management Dispatcher, the product based upon and created from technology stolen from Powerweb.

157.    The conduct of CILCO and RETX was deliberate, malicious, wanton and outrageous, and Powerweb is therefore entitled to an award of punitive damages.

## COUNT I
### (Breach of Contract Against NewEnergy and CILCO)

158.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 157.

159.    The Confidentiality Agreement is a valid enforceable contract.

160.    McGeown signed the Confidentiality Agreement in his capacity as Director of Energy Services of AES Corporation and NewEnergy.

161.    The Confidentiality Agreement is binding upon NewEnergy all of its affiliates including CILCO.

162.    CILCO has breach its obligations under the Confidentiality Agreement by improperly disclosing the "Energy Technology" information and other confidential and proprietary information about Powerweb's reserve capacity sales business and the Omni-Link System technology to third-parties and by using the "Energy Technology" information and confidential and proprietary information for its own use without Powerweb's prior written approval.

163.    McGeown had actual and apparent authority to bind AES and all of its affiliates, including but not limited to CILCO and NewEnergy.

164.    Powerweb has complied with all of its obligations under the Confidentiality Agreement.

165.    NewEnergy has breached its obligations under the Confidentiality Agreement by improperly disclosing the "Energy Technology" information and other confidential and proprietary information about Powerweb's reserve capacity sales business and the Omni-Link System technology to third-parties and by using the "Energy Technology" information and confidential and proprietary information for its own use without Powerweb's prior written approval.

166.    Powerweb has suffered damages as a result of NewEnergy's breach of the Confidentiality Agreement.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with interest, costs, and such other and further relief as this Court deems appropriate, and that the

Court permanently enjoin NewEnergy from using the "Energy Technology" information or disclosing it to third-parties.

## COUNT II
### (Breach of Contract Against NewEnergy)

167.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 166.

168.    The Letter Agreement is a valid enforceable contract.

169.    Powerweb has complied with all of its obligations under the Letter Agreement.

170.    NewEnergy has breached its obligations under the Letter Agreement by improperly competing with Powerweb and the Omni-Link System in direct violation of the contract.

171.    Powerweb has suffered damages as a result of NewEnergy's breach of the Letter Agreement.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with interest, costs, and such other and further relief as this Court deems appropriate, and that the Court permanently enjoin NewEnergy from using the "Energy Technology" information or disclosing it to third-parties.

## COUNT III
## (Breach of Contract Against NewEnergy)

172.     Powerweb incorporates here by reference the allegations of paragraphs 1 through 171.

173.     The Joint-Venture Agreement is a valid enforceable contract.

174.     Powerweb has complied with all of its obligations under the Joint-Venture Agreement.

175.     NewEnergy has breached its obligations under the Joint-Venture Agreement by improperly competing with Powerweb and the Omni-Link System in direct violation of the contract.

176.     Powerweb has suffered damages as a result of NewEnergy's breach of the Joint-Venture Agreement.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with interest, costs, and such other and further relief as this Court deems appropriate, and that the Court permanently enjoin NewEnergy from using the "Energy Technology" information or disclosing it to third-parties.

## COUNT IV
## (Breach of Duty of Good Faith and Fair Dealing Against NewEnergy and CILCO)

177.     Powerweb incorporates here by reference the allegations of paragraphs 1 through 176.

178.    NewEnergy owed a duty to Powerweb to perform its obligations under the Confidentiality Agreement, the Letter Agreement, and the Joint-Venture Agreement and to conduct itself in accordance with the implied duty of good faith and fair dealing.

179.    CILCO owed a duty to Powerweb to perform its obligations under the Confidentiality Agreement and to conduct itself in accordance with the implied duty of good faith and fair dealing.

180.    NewEnergy breached its duty of good faith and fair dealing to Powerweb by, among other things, using the Confidentiality Agreement to procure certain confidential, proprietary information from Powerweb in order to design its own software system to compete with the Omni-Link System in the reserve capacity sales market.

181.    CILCO breached its duty of good faith and fair dealing to Powerweb by, among other things, using the Confidentiality Agreement to procure certain confidential, proprietary information from Powerweb in order to design its own software system to compete with the Omni-Link System in the reserve capacity sales market.

182.    As a direct result of NewEnergy's breach of the covenant of good faith and fair dealing, Powerweb has suffered damages.

183.    As a direct result of CILCO's breach of the covenant of good faith and fair dealing, Powerweb has suffered damages.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against

NewEnergy, in an amount equal to the amount by which NewEnergy has been unjustly enriched by its misconduct, and that the Court permanently enjoin NewEnergy from using the "Energy Technology" information or disclosing it to third-parties.

## COUNT V
### (Breach of Fiduciary Duty Against NewEnergy)

184.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 183.

185.    Pursuant to the Joint-Venture Agreement, NewEnergy owed a fiduciary duty to Powerweb to protect Powerweb's confidential proprietary interest in the Omni-Link System, Powerweb's unique position in the reserve capacity sales market, and Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers.

186.    NewEnergy breached its fiduciary duty to Powerweb by improperly utilizing its position of trust with Powerweb to procure certain confidential proprietary information about the reserve capacity sale of electricity and the Omni-Link System.

187.    NewEnergy used the confidential proprietary information to develop a software system to compete with Omni-Link and to interfere with Powerweb's existing and prospective economic relationships with commercial energy consumers.

188.    NewEnergy also used the confidential proprietary information to develop a project with Bell Atlantic for the reserve capacity sale of electricity. NewEnergy did so with the specific intent of excluding Powerweb from the project in order to realize more profit for itself.

189.    Powerweb has suffered damages as a direct result of NewEnergy's breach of fiduciary duty.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, in an amount equal to the amount by which NewEnergy has been unjustly enriched by its misconduct, and that the Court permanently enjoin NewEnergy from using the "Energy Technology" information or disclosing it to third-parties.

### COUNT VI
### (Fraudulent Misrepresentation Against NewEnergy and CILCO)

190.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 189.

191.    Prior to entering into the Confidentiality Agreement, the Letter Agreement, and the Joint-Venture Agreement, NewEnergy and McGeown made numerous representations to Powerweb concerning their intention to proceed with a joint-venture with Powerweb, its acknowledgment that Powerweb had pioneered the reserve capacity sales idea, and that NewEnergy or its affiliates did not intend to compete with Powerweb or the Omni-Link System.

192.    Once Powerweb entered into these agreements, NewEnergy and CILCO made numerous representations to Powerweb concerning CILCO's intention to proceed in a similar joint-venture with Powerweb.

193.    These representations were material to each of the transactions.

194.    NewEnergy and CILCO made these representations knowing that the representations were false and with the specific intent to induce Powerweb to provide

NewEnergy and CILCO with the details of the proposed Bell Atlantic project, the reserve capacity sales market, the "Energy Technology," and the patented Omni-Link System.

195.    Powerweb believes and therefore avers that these representations were false when made to Powerweb and that NewEnergy and CILCO were aware of their falsity.

196.    Justifiably relying on these representations, Powerweb entered into the Confidentiality Agreement, the Letter Agreement, and the Joint-Venture Agreement with NewEnergy and provided NewEnergy with the "Energy Technology" information and certain other confidential proprietary information about the reserve capacity sales market, the Omni-Link System, and the Bell Atlantic project.

197.    Justifiably relying on the representations of NewEnergy and CILCO concerning CILCO's interest in a joint-venture and with the understanding that the information would be protected under the Confidentiality Agreement, Powerweb provided CILCO with confidential and proprietary information.

198.    NewEnergy and CILCO used the "Energy Technology" information and the confidential proprietary information to compete with Powerweb and the Omni-Link System in the reserve capacity sales market and to otherwise tortiously interfere with Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers.

199.    Powerweb has suffered damages as a direct result of the fraudulent conduct of both NewEnergy and CILCO.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems

appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy and CILCO, in an amount equal to the amount by which these parties have been unjustly enriched by their misconduct, and that the Court permanently enjoin NewEnergy and CILCO from using the "Energy Technology" information or disclosing it to third-parties.

## COUNT VII
### (Misappropriation of Trade Secrets Against NewEnergy, CILCO and RETX)

200.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 199.

201.    Through their fraudulent and other tortious conduct described above, NewEnergy and CILCO improperly procured trade secrets from Powerweb about the "Energy Technology," the reserve capacity sale of electricity, and the Omni-Link System.

202.    NewEnergy and CILCO improperly used the confidence reposed in them by Powerweb to obtain the proprietary information necessary for them to advance a rival business interest and to otherwise interfere with Powerweb's prospective business relationships with Bell Atlantic and other commercial energy consumers.

203.    Through conspiracy with CILCO and Scarpelli, RETX improperly procured these same trade secrets from Powerweb and used them to advance a rival business interest and to otherwise interfere with Powerweb's prospective business relationships.

204.    Powerweb has suffered damages as a direct result of the possession, disclosure and use of the trade secrets by these entities.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with

punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, CILCO and RETX, in an amount equal to the amount by which these entities have been unjustly enriched by their misconduct, and that the Court permanently enjoin NewEnergy, CILCO and RETX from using the "Energy Technology" information or disclosing it to third-parties.

**COUNT VIII**
**(Tortious Interference With Prospective Contractual Relations Against NewEnergy,**
**CILCO and RETX)**

205.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 204.

206.    Because Powerweb had pioneered the reserve capacity sales business and had developed the patented Omni-Link System, Powerweb was in a unique position to provide many large commercial energy consumers with enormous savings on their energy consumption.

207.    Powerweb had several prospective contractual relations with Bell Atlantic and other commercial energy consumers in which Powerweb could provide them with the benefits of the Omni-Link System.

208.    NewEnergy, CILCO and RETX purposefully and improperly obtained certain confidential proprietary information about the reserve capacity sales business and the Omni-Link System from Powerweb with the intention of interfering with Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers.

Their sole purpose in obtaining this information was to interfere with Powerweb's prospective contractual relations.

209.    None of the parties were privileged or justified in their intention to interfere with Powerweb's prospective contractual relations.

210.    Powerweb has suffered actual legal damages as a direct result of each of the party's tortious conduct.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, CILCO and RETX in an amount equal to the amount by which the entities have been unjustly enriched by their misconduct, and that the Court permanently enjoin these parties from using the "Energy Technology" information or disclosing it to third-parties.

## COUNT IX
### (Tortious Interference With Existing Contractual Relations Against NewEnergy)

211.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 210.

212.    Prior to and during this action, Powerweb had a contractual relationship with Baltimore Gas & Electric Company ("BG&E").

213.    At all times relevant hereto, BG&E was owned by Constellation Energy Group.

214.    In or about September 2002, Constellation Energy Group acquired NewEnergy. By virtue of this transaction, NewEnergy and BG&E became sister companies.

215.    Upon information and belief, shortly after becoming affiliated with BG&E, NewEnergy contacted BG&E regarding Powerweb's counterclaims in this action. Further, upon information and belief, NewEnergy directly or indirectly pressured BG&E to end its contractual relationship with Powerweb if Powerweb refused to drop its counterclaims in this action.

216.    Shortly after becoming affiliated with NewEnergy, BG&E, which was previously unaware of the lawsuit between Powerweb and NewEnergy, "suggested" that Powerweb drop its counterclaims against NewEnergy for the good of Powerweb's relationship with BG&E.

217.    Powerweb has refused to follow BG&E's "suggestion."

218.    In February 2003, BG&E issued a notice of termination of the contract with Powerweb. Upon information and belief, BG&E sent the termination notice as a result of the improper actions of NewEnergy.

219.    NewEnergy was neither privileged nor justified in its actions to interfere with Powerweb's contractual relationship with BG&E.

220.    Powerweb has suffered actual legal damages as a direct result of NewEnergy's tortious conduct.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with

punitive damages, interest, costs, and such other and further relief as this Court deems appropriate.

## COUNT X
## (Unfair Competition Against NewEnergy, CILCO and RETX)

221.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 220.

222.    NewEnergy and CILCO diverted business from Powerweb by means of their fraudulent misrepresentations and through the wrongful use of the "Energy Technology" and other confidential information.

223.    RETX diverted business from Powerweb through wrongful possession and use of Powerweb's "Energy Technology."

224.    By way of their misconduct described above, the parties have engaged in unfair competition with Powerweb.

225.    This unfair competition has resulted in actual legal damages to Powerweb.

WHEREFORE, Powerweb demands that judgment be entered in its favor in an amount to be determined at trial, currently believed to be at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, CILCO and RETX, in an amount equal to the amount by which the parties have been unjustly enriched by their misconduct, and that the Court permanently enjoin these entities from using the "Energy Technology" information or disclosing it to third-parties.

*Kara H. Goodchild*

_____

Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Nicholas J. Nastasi, Esquire
Atty. I.D. Nos. 25336, 74948, 82102
Saul Ewing LLP
1500 Market Street, 38th Floor
Philadelphia, PA  19102
(215) 972-1961; -7109; -1983
Attorneys for Powerweb, Inc.,
A-Valey Engineers, Inc. and
Lothar E.S. Budike, Jr.

Dated: April 7, 2003