## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | **NO. 02-CV-2733 (HB)** |
| POWERWEB TECHNOLOGIES, INC., *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## REPLY MEMORANDUM OF COUNTERCLAIM DEFENDANT RETX, INC. IN FURTHER SUPPORT OF ITS MOTION TO DISMISS

RETX, Inc. (RETX) hereby submits this Reply Memorandum in further support of its Motion to Dismiss the Counterclaims Asserted by Counterclaimant Powerweb Technologies, Inc. ("Powerweb").

## I.    INTRODUCTION

Powerweb's misstatements and over-characterizations do not negate the inevitable conclusion that Powerweb's counterclaims against RETX should be dismissed for lack of personal jurisdiction. Pennsylvania's Long-Arm Statue does not authorize the exercise of jurisdiction over RETX because none of Powerweb's allegations against RETX fall under the enumerated provisions of the statute. Likewise, RETX has insufficient contacts with Pennsylvania for the exercise of general personal jurisdiction. To determine otherwise would violate the due process clause of the United States Constitution. For the reasons set forth in RETX's Memorandum of Law in support of its Motion to Dismiss, as well as the reasons set forth below, Powerweb's counterclaims against RETX should be dismissed.

## II.    RELEVANT FACTS

### A.    Powerweb's Disclosures to Scarpelli Were Not Confidential.

Despite Powerweb's unsupported allegations of theft and misappropriation, it fails to delineate what trade secret and confidential information Peter Scarpelli purportedly acquired from Powerweb and disclosed to RETX, let alone what information RETX purportedly misappropriated and used in the creation of its Load Management Dispatcher ("LMD") software. This is a fatal flaw in Powerweb's arguments, inasmuch as the balance of equities, in determining whether personal jurisdiction can be had over RETX, should consider the lack of merit of Powerweb's claims.

RETX submits that the reason Powerweb has not disclosed the purported confidential information that was allegedly misappropriated is because no such confidential information or trade secrets were ever disclosed to Scarpelli. As evidenced by Scarpelli's Affidavit, attached hereto as Exhibit "A," and the exhibit annexed thereto, Scarpelli did not receive any Powerweb confidential information or trade secrets. Rather, Scarpelli received a cover letter from Lothar Budike vaguely describing the Omni-Link System, with a marketing brochure attached. See Affidavit of Peter C. Scarpelli ("Scarpelli Aff.") at ¶ 2. Neither the cover letter nor the brochure remotely indicated that the information was confidential or proprietary. Indeed, this is the same information that is available on Powerweb's website.

Moreover, Scarpelli was never asked to, nor did he enter into, any confidentiality agreement with Powerweb, nor did Powerweb mention any existing confidentiality agreement with New Energy to which Scarpelli was purportedly bound. Scarpelli Aff. at ¶ 5. One must ask that if the information was of such a confidential or proprietary nature, then why wouldn't Powerweb require

702039_1

Scarpelli to enter into a confidentiality agreement prior to disclosure? RETX submits that it was because the information was not confidential.[1]

Powerweb's baseless conjecture and inflammatory allegations are merely made to obfuscate the real issue here, that being that there is no basis to maintain personal jurisdiction over RETX.

**B.    RETX Has _De Minimus_ Contacts With Pennsylvania.**

In its Amended Memorandum of Law in support of its Motion to Dismiss, RETX sets forth all of its contacts with Pennsylvania over the last five years. For brevity, RETX will not restate the contacts, but notes that they were extremely minor and that only one such contact resulted in a small business deal. Notwithstanding, out of obvious desperation, Powerweb attempts to "expand" RETX's contacts through misstatements, over-characterizations, and exaggerations.

1.    RETX's Contract with Allegheny Power is only with Allegheny Power.

In February, 2002, RETX entered into a contract with Allegheny Power ("AP"), whereby RETX licensed its Notification Manager software to AP.[2] To date, RETX has only been paid $20,000.00.[3] For purposes of personal jurisdiction, the number of customers that AP services, or AP's size, is highly irrelevant. RETX's minimal contract is with AP, not its customer base. Moreover, it is beyond comprehension that Powerweb could suffer damages as a result of RETX's contract with AP, inasmuch as RETX's licensing of Notification Manager to AP has absolutely nothing to do with Powerweb's claims in this litigation.

---

[1]  RETX further notes that Scarpelli never shared the information with anyone at RETX, nor did he rely upon the information during his employment with RETX or otherwise. Scarpelli Aff. at ¶¶ 3-4.

[2]  Notification Manager is an electronic mail software program that enables AP to send electronic communications to multiple recipients simultaneously. Notification Manager dos not allow the sender or recipient to monitor energy usage for curtailment events related to load response. In fact, RETX's customers can use the system for any type of mass communications, not necessarily related to energy. See Affidavit of Ronald J. Josephson ("Josephson Aff.") at ¶ 2, attached hereto as Exhibit "B."

[3]  The maximum value of the contract is $30,000.00.

702039_1

2.    Metering Agreement for Services in New England.

Powerweb next argues that RETX's entry into a metering agreement with Powerweb supports personal jurisdiction over RETX within Pennsylvania. Said metering agreement, however, is not probative on this issue. First, Powerweb never performed any services for RETX under the metering agreement or otherwise. Josephson Aff. at ¶ 3. Second, the metering agreement contemplated that Powerweb would install meters for RETX throughout New England, not Pennsylvania. Id.

Powerweb's reliance upon RETX and Powerweb's discussion of a "possible" business combination is likewise not determinative here. Indeed, RETX did not initiate said discussions, and the discussions never even extended to a negotiation stage. Josephson Aff. at ¶ 4.

3.    Contacts with the PJM extend far beyond Pennsylvania.

Powerweb argues that RETX's involvement with PJM warrants the exercise of personal jurisdiction. To support its contentions, Powerweb grossly misrepresents PJM's scope, service area, and purpose. PJM is one of several Independent System Operators ("ISO") throughout the United States and Canada.[4] Josephson Aff. at ¶ 5. Inasmuch as RETX is a part of the energy demand response community, RETX participates in the working groups for all of the ISOs.[5] Id.

Despite the meaning of the PJM acronym, the members of the PJM Demand Response Working Group extend beyond Pennsylvania, New Jersey and Maryland. Josephson Aff. at ¶ 6. Indeed the PJM working group includes member utilities from many other states throughout the mid-Atlantic region, including Illinois, Delaware, Indiana, Michigan, Ohio, West Virginia, Virginia, and the District of Columbia. Id. Thus, RETX's involvement in PJM is hardly indicative of a desire to market

---

[4] Other ISOs include (i) California ISO; (ii) Electric Reliability Council of Texas; (iii) New England ISO; (iv) New York ISO; (v) Midwest ISO; (vi) Independent Market Operator; and (vii) Alberta Power Pool. The purpose of an ISO is to (i) ensure sufficient power flow throughout its region; (ii) ensure that buyers and sellers of energy can execute transactions; and (iii) promulgate the rules and regulations that govern the region. Josephson Aff. at ¶¶ 5-6.

702039_1

or target Pennsylvania utilities. To the contrary, a significant majority of the participants in the PJM reside in states outside of Pennsylvania. Merely because the PJM itself is located in Pennsylvania is likewise not determinative. PJM meetings take place throughout the mid-Atlantic region, and not just within Pennsylvania. Josephson Aff. at ¶ 7.

Although the February, 2003 PJM Demand Response Working Group Conference, to which Powerweb refers in its Opposition Memorandum, was held in Pennsylvania, a significant majority of the participating PJM member companies were not even from Pennsylvania. See Affidavit of Ross D. Malme ("Malme Aff.") at ¶ 2, attached hereto as Exhibit "C." Still further, the "marketing booth" to which Powerweb refers was nothing more than a table whereupon RETX displayed its products for no more than an hour during an all-day conference. Malme Aff. at ¶ 3. Contrary to Powerweb's misrepresentations, RETX did not actively distribute its materials at the PJM conference. Id.

4.    RETX's "Advertising" Does Not Target Pennsylvania Companies.

Notwithstanding Powerweb's contentions, RETX does not actively advertise or promote its products and services in Pennsylvania. As stated in Section B(3) above, RETX did not maintain a "marketing booth" at the PJM Conference, but rather displayed materials on a table for no more than 60 minutes.

Moreover, RETX's involvement with, and attendance at, the Peak Load Management Alliance ("PLMA") meetings does not create a basis for personal jurisdiction. To the contrary, the PLMA meetings do not focus on or target Pennsylvania members. Malme Aff. at ¶ 6. Rather, it is a trade organization, which consists of approximately thirty companies that meet throughout the United

---

[5] A working group is not necessarily "a part" of the ISO, but rather, is more of a membership-type organization.

702039_1

States.[6]  Malme Aff. at ¶ 4.  Indeed, RETX is unaware of any Pennsylvania companies that are actually members of the PLMA.  Malme Aff. at ¶ 7.  Even if they were, participation in a trade organization does not justify the exercise of personal jurisdiction here.

As further evidence of Powerweb's exaggerations, Powerweb contends that RETX specifically m aintains a  Pennsylvania contact list for mass e-mailing.  This is not true.  Rather, for purposes of discovery in this litigation, RETX extracted responsive information from its database, and created the document that is attached as Exhibit "F" to Powerweb's Memorandum.  Josephson Aff., at ¶ 8.

5.    September 2000 Press Release.

Powerweb's reliance upon the September 2000 press release is unavailing.    In September 2000, RETX issued a press release that intimated that it does business within Pennsylvania.  At such time, RETX had not done any business in Pennsylvania.  Josephson Aff. at ¶ 9.  Rather, the states listed on the press release, including Pennsylvania, were those states that had recently deregulated its power.  Id.  It was RETX's initial marketing strategy to market its Customer Choice Manager ("CCM") package to companies within recently deregulated states.[7]  Id.  Subsequent to the issuance of the press release, RETX's marketing strategy changed, and it decided not to market within Pennsylvania.  Josephson Aff. at ¶ 10.  RETX did not recall the content of the September 2000 press release, and therefore, did not remove the press release from its website after its marketing strategy changed.  Josephson Aff. at ¶ 11.  After the September 2000 press release was brought to the attention of Ross Malme during his deposition, RETX promptly removed the press release from its website inasmuch as it misrepresented RETX's business focus.  Josephson Aff. at ¶ 12.

---

[6] The purpose of PLMA is to promote the demand response industry, and to provide an information clearinghouse for its members.  Malme Aff.at ¶ 5.

[7] The CCM package was designed to facilitate the switching of retail customers to different power providers.  Josephson Aff. at ¶ 9.

702039_1

Irrespective of the content of the September 2000 press release, the fact remains that RETX had minimal contacts with Pennsylvania, did not target Pennsylvania companies, and has not done any notable business within Pennsylvania.

## III.    ARGUMENT AND CITATION OF AUTHORITY

Powerweb has the burden of showing that jurisdiction over RETX is proper.  Provident National Bank v. California Federal Savings and Loan Association, 819 F.2d 434, 437 (3d Cir. 1987). To meet this burden, Powerweb must establish either specific jurisdiction or general jurisdiction.  Id. Powerweb may not rely upon conclusory averments, but must come forward with competent evidence that establishes the court's jurisdiction.    Patterson by Patterson v. FBI, 893 F.2d 595, 604 (3d Cir. 1990).  Powerweb has not, and cannot, satisfy its burden.

### A.    Specific Jurisdiction Does Not Attach.

Powerweb argues that RETX has caused harm or tortious injury in Pennsylvania by an act or omission outside Pennsylvania.   To support its contention, Powerweb alleges that RETX misappropriated its confidential information to develop LMD, and that RETX markets LMD within Pennsylvania, thereby causing Powerweb to suffer damages.  Powerweb relies on the "effects test," as set out in Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482 (1984).[8]

Powerweb cannot even satisfy the first prong of the "effects test."  Other than making inflammatory allegations, Powerweb has proffered no evidence that it even disclosed any confidential or trade secret information to Scarpelli, let alone that Scarpelli disclosed same to RETX, and RETX misappropriated same for its LMD software.  Likewise, Powerweb proffers no evidence that RETX tortiously interfered with its customers or engaged in unfair competition.  Powerweb's Complaint is not verified, nor has it attached an affidavit to its Memorandum to support its contentions.  Indeed, in the

---

[8]  The "effects test" requires Powerweb to show that: (i) RETX committed an intentional tort; (ii) Powerweb felt the brunt of the harm in Pennsylvania; and (iii) RETX expressly aimed its tortious conduct at Pennsylvania.  Remick v. Manfredy, 238 F.3d 248, 258 (3rd Cir. 2001).

702039_1

Complaint, Powerweb casts its allegations against RETX "upon information and belief." As discussed above, to establish jurisdiction, even when using the "effects test," Powerweb may not rely upon conclusive averments, but must come forward with competent evidence. Paterson, 893 F.2d at 604. Thus, Powerweb's conclusory allegations are insufficient.

Even if Powerweb could satisfy the first prong of the "effects test," it cannot overcome the hurdle created by the second element. Powerweb fails to allege that RETX has ever sold LMD anywhere, let alone Pennsylvania. Thus, one must wonder what harm could Powerweb possibly be feeling the "brunt" of? All Powerweb has contended is that RETX purportedly "marketed" LMD to a few companies located in Pennsylvania. It does not even identify the companies to which it is referring.

Furthermore, merely because Powerweb has its principle place of business in Pennsylvania and purportedly does much of its business in Pennsylvania is insufficient to satisfy the "effects test." As the court pointed out in Remick v. Manfredy, "simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient ... ." Id. at 238 F.3d 248, 258 (3d Cir. 2001).

In addition, RETX's alleged activities cannot satisfy the third element of the "effects test" because Pennsylvania was not the "focal point of the tortious activity." Powerweb's allegations that RETX marketed LMD in Pennsylvania fail to meet this requirement. In fact, it cannot possibly do so since there is no allegation that RETX sold LMD (and thus caused Powerweb any damages) in Pennsylvania or otherwise. As pointed out above, Powerweb's reliance upon its purported principle place of business is insufficient to establish an intentional target of Pennsylvania. See Remick v. Manfredy, supra.

Powerweb's remaining arguments are equally unavailing. The mere fact that RETX has a business relationship with AP, relative to the sale of its Notification Manager software, does not

702039_1

establish that RETX targeted Pennsylvania for its purported tortious conduct.  Indeed, Notification Manager has absolutely nothing to do with Powerweb's allegations against RETX.

And, contrary to Powerweb's misleading contentions, Pennsylvania was not one of two states where RETX first successfully marketed LMD.  The September 2000 press release related to RETX's CCM package, which was never even marketed in Pennsylvania.

In a nutshell, RETX's minimal contacts in Pennsylvania do not support the exercise of specific jurisdiction because said contacts do not form a basis for Powerweb's cause of action in this case.  See Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147, 151 (3d Cir. 1996) (specific jurisdiction is present only if the plaintiff's cause of action arises out of the defendant's forum-related activities).

**B.    The Exercise of Jurisdiction Over RETX Violates Due Process.**

Even if Pennsylvania's long arm statute conferred jurisdiction over RETX, Powerweb's counterclaims should still be dismissed inasmuch as the exercise of jurisdiction over RETX would violate due process.  See Dollar Savings Bank v. First Security Bank of Utah, 746 F.2d 208, 211 (3rd Cir. 1984).  Due process can only be met if RETX has "certain minimum contacts with Pennsylvania such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct 154 (1945).

1.    RETX Does Not Have the Requisite "Minimum Contacts" with Pennsylvania.

The current test for minimum contacts involves analyzing RETX's purposeful direction of activity to receive the benefits and protections of Pennsylvania.  Asahi Metal Co. v. Superior Court of California, 480 U.S. 102, 107 S.Ct. 1026 (1987).  Said contacts must be "continuous and systematic." Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 416 (1984).  "Contacts with the forum state that are 'random, fortuitous, or attenuated' are not sufficient for the assertion of personal jurisdiction." Lehigh Coal & Navigation Co. v. Geko-Mayo, 56 F. Supp. 559, 566 (E.D. Pa. 1999) (citing Burger King v. Rudzewicz, 471 U.S. 462, 475 (1985)).

702039_1

RETX's contacts with Pennsylvania are random and attenuated, and not the type that are essential to establish the requisite minimum contacts. In addition, RETX's contacts within Pennsylvania have absolutely nothing to do with the allegations contained in Powerweb's counterclaims. Thus, it cannot be legitimately contended that RETX engaged in purposeful activity to receive the benefits and protections of Pennsylvania, or that it otherwise was reasonable for RETX to expect to be sued by Powerweb in Pennsylvania.

Yet, Powerweb contends that two brief discussions that RETX had with an existing client and an attendee at an Atlantic City trade show, concerning LMD, are sufficient to support minimum contacts. Powerweb has not, does not, and cannot allege that RETX ever sold LMD to either of those entities, or to anyone else for that matter.

Pennsylvania courts have declined to find jurisdiction where, as here, the defendant did not sell the allegedly misappropriated product in the forum. See Visual Security Concepts, Inc. v. KTV, Inc., 102 F. Supp. 2d 601 (E.D. Pa. 2000). In Visual Security, the court held that a manufacturer of televisions, which had allegedly been manufactured in violation of the plaintiff's patent, was not subject to jurisdiction in Pennsylvania because the manufacturer had not sold any of the televisions in the forum state, despite having marketed the televisions within Pennsylvania. Id. at 102 F. Supp. 2d at 604.[9]

> 2.  Jurisdiction over RETX Offends the Traditional Notions of Fair Play and Substantial Justice.

Notwithstanding Powerweb's arguments, the fact remains that the traditional notions of fair play and substantial justice will be offended if RETX is required to defend this lawsuit in

---

[9] Cases where sufficient contacts have been found to exercise specific jurisdiction are clearly distinguishable from the case at bar. In Hershey Pasta Group v. Vitelli-Elvea Co., Inc., 921 F. Supp. 1344 (M.D. Pa. 1996), the non-resident company defendant, unlike RETX, had significant sales in Pennsylvania and its products had been registered with the Pennsylvania Department of Agriculture. In Allen Organ Co. v. Kawai Musical Instruments, 593 F. Supp. 107 (E.D. Pa. 1984), the court found jurisdiction was proper where the non-resident company, also unlike RETX, had actually sold more than $2 million

*(Footnote Continued on Next Page)*

702039_1

Pennsylvania. RETX has been belatedly added as a party to a lawsuit that has been ensuing for almost a year. There has been a significant amount of discovery conducted, and the matter involves a number of parties. Moreover, there are numerous allegations between the Plaintiff and Defendant Powerweb, and Defendant Powerweb and CILCO. Indeed, of the 10 counts in Powerweb's counterclaims, only 3 of them are made against RETX.

Despite this, Powerweb disingenuously argues that it will be required to expend "additional financial resources and would risk the same issues being decided in two jurisdictions." This is not true. Powerweb would not be required to expend any additional litigation resources in suing RETX than it would if RETX was litigating within Pennsylvania. The allegations against RETX would not change, nor would the scope of discovery, motion practice, and trial preparation. In addition, there is no risk that similar issues will be decided inconsistently in two jurisdictions because the issues would not be the same in the Pennsylvania lawsuit and a separate lawsuit against RETX. Indeed, the claims against RETX are not contingent upon Plaintiff's claims against Powerweb, or Powerweb's counterclaims against Plaintiff or CILCO. Rather, the claims against RETX stand alone. Either RETX engaged in the behavior alleged, or it did not. The litigation in Pennsylvania would have no bearing on this issue.

Conversely, the overwhelming burden and expense lies against RETX inasmuch as it would be required to participate in a lawsuit with copious other parties and allegations, thereby requiring it to engage in expensive and expansive written discovery, document reviews, depositions, motion practice, and ultimately a trial on numerous claims -- the majority of which have absolutely nothing to do with RETX. The detriment to RETX clearly outweighs any benefit to Powerweb for

---

worth of goods in Pennsylvania. Unlike these cases, RETX has never sold a single product in Pennsylvania that is alleged to have been developed with information misappropriated from Powerweb.

702039_1

hailing RETX to adjudicate Powerweb's claims in Pennsylvania.[10]  Forcing RETX to litigate this matter in a foreign jurisdiction at this juncture of the case would clearly offend the traditional notions of fair play and justice.

**C.    RETX's Contacts With Pennsylvania Are Far From Continuous and Systematic.**

General jurisdiction under Section 5301(b) requires extensive and pervasive contacts far beyond those that are present here.  See Reliance Steel Products Co. v. Watson, Ess, Marshal, & Enggas, 675 F.2d 587, 589 (3rd Cir. 1982) (the facts required to meet general jurisdiction must be extensive and persuasive).  Thus, to support jurisdiction under § 5301(b), Powerweb must show "more contacts with [Pennsylvania] than the mere minimum contacts required for specific jurisdiction." Lehigh Coal & Navigation Co., 56 F. Supp. at 570.

RETX's contacts with Pennsylvania are sporadic and tenuous at best.  Over the span of five years, RETX has only had one business relationship valued at $20,000.  In addition, there have only been a smattering of visits and telephone calls, none of which have resulted in business opportunities for RETX, and remotely relate to Powerweb's allegations against RETX.  Powerweb's reliance on Elbeco, Inc. v. Estrella Deplato Corp., 989 F. Supp. 669 (E.D. Pa. 1997) does not change the foregoing facts, or the fact that general jurisdiction does not lie against RETX.[11]

RETX's contacts are incapable of satisfying the Elbeco requirements.  First, RETX has not made "a substantial number of direct sales to the forum."  To the contrary, over its five-year existence, RETX's only sale in Pennsylvania is valued at $20,000.  Despite Powerweb's attempts to "expand" the sale, and make it larger than life, the fact remains that it was a single $20,000 transaction

---

[10]  The remaining analysis under the fair play and substantial justice paradigm was briefed extensively in Section B(2) of RETX's Memorandum in Support of Motion to Dismiss, and therefore, the arguments will not be recanted here.

[11]  Elbeco provides that in determining the contacts necessary for general jurisdiction, courts examine whether the non-resident defendant (i) makes a substantial number of direct sales in the forum; (ii) solicits business regularly; and (iii) advertises in a way specifically targeted at the forum market. Elbeco, 989 F. Supp. 673.

for a product that is completely unrelated to Powerweb's allegations in this lawsuit.[12]  Clearly, this one $20,000 sale does not rise to the level of "a substantial number of direct sales to the forum" as required under Elbeco.

Similarly, RETX does not "solicit business regularly" in Pennsylvania.  Other than in connection with the AP deal, RETX has only traveled to Pennsylvania to explore business opportunities on seven occasions, over a span of five years, and has only attended one trade conference in Pennsylvania.  This is insufficient to rise to the level of soliciting business regularly.  See Strick Corp., 532 F. Supp. 951 (general jurisdiction did not exist despite telephone solicitations and visits with the Pennsylvania plaintiff).

In recognition of the problems that it faces in establishing the second element of the Elbeco test, Powerweb mischaracterizes RETX's relationship with the PJM.  It is irrelevant that the PJM manages the power grid in Pennsylvania.  RETX is merely involved with PJM's Demand Response Working group.  This group does not manage the power grid for Pennsylvania.  Moreover, as stated supra on page 4, the members of the PJM Demand Response Working group extend far beyond Pennsylvania, New Jersey and Maryland.

Still further, RETX's metering agreement with Powerweb had absolutely nothing to do with meter installations in Pennsylvania, and dealt only with the provision of metering services in New England.[13]

In addition, Powerweb grossly misrepresents the facts when it contends that RETX "considered purchasing the assets of Powerweb."  First of all, RETX did not initiate discussions about a business combination with Powerweb.  Second, the few conversations that RETX and Powerweb had

---

[12]  Additionally, contrary to Powerweb's mischaracterizations, Notification Manager is not an interactive product but, rather, is a simple e-mail notification program that enables AP to send electronic communications to multiple recipients simultaneously.

[13]  Notwithstanding the metering agreement, Powerweb performed no services for RETX under the agreement or otherwise.

702039_1

to "explore" a business combination did not even rise to the level of negotiations, let alone asset purchase considerations.

As for the third element of the Elbeco test, RETX has not advertised "in a way specifically targeted" to Pennsylvania. The press releases and newsletters upon which Powerweb relies is not advertising "targeted" to Pennsylvania. To the contrary, press releases are distributed nationwide, and, although they may circulate within Pennsylvania, they are not specifically directed to the state. This type of "advertising" is insufficient to support the exercise of general jurisdiction. See Derman v. Wilair Services, Inc., 404 Pa. Super. 136, 590 A.2d 317 (1991).

Moreover, it is absurd to argue that RETX "specifically targets Pennsylvania" merely because it takes along brochures to trade group meetings. It is not as though the PJM Demand Response Working group and the PLMA exist for the benefit of marketing or targeting Pennsylvania companies. To the contrary, the purpose of the trade organizations have absolutely nothing to do with marketing. And, if Pennsylvania companies participate in said organizations, their participation is overwhelmed by the participation of utilities from other states exclusive of Pennsylvania. Under Powerweb's analysis, any time corporate brochures are carried into a state, jurisdiction attaches. This result would not comport with the due process requirements of the Constitution.

It is not disputed that RETX occasionally mailed information to entities that happened to be located in Pennsylvania. This does not mean that they are being "targeted." Rather, RETX mails its newsletters to a multitude of persons and companies worldwide with which it has had contact, irrespective of locale, and irrespective of whether said company could ever become a customer of RETX. Indeed, Powerweb is listed on RETX's mailing list. Surely, Powerweb does not contend that RETX was soliciting its business.

The totality of RETX's contacts with Pennsylvania amount to no more than a handful. As Scarpelli explained in his deposition, RETX does not actively market in Pennsylvania. Scarpelli

14

Depo. at P. 44, attached as Exhibit "D." In sum, RETX's contacts with Pennsylvania do not rise to the broad and systematic level necessary to exercise general jurisdiction under 5301(b) or otherwise.

IV.    **CONCLUSION**

For the reasons set forth above, and in RETX's Memorandum in Support of its Motion to Dismiss, the exercise of personal jurisdiction over RETX is not proper. RETX's Motion to Dismiss should be granted and Powerweb's counterclaims against RETX should be dismissed

Respectfully submitted,

Lee A. Rosengard
Eric M. Hurwitz
STRADLEY, RONON, STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103
(215) 564-8000

Attorneys for Counterclaim Defendant
RETX, Inc.

Tacita A. Mikel Scott
Georgia Bar No. 632283
Emory L. Palmer
Georgia Bar No. 560120
*(Admitted Pro Hac Vice)*
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: (404) 233-7000

Co-Attorneys for Counterclaim Defendant
RETX, Inc.

702039_1

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| POWERWEB TECHNOLOGIES, INC., *et al.*, | : | NO. 02-CV-2733 (HB) |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

### AFFIDAVIT OF PETER C. SCARPELLI

Personally appeared before the undersigned attesting officer, duly authorized to administer oaths, PETER C. SCARPELLI , the subscriber, who, being duly sworn on oath, says that he is over the age of eighteen (18) years, has personal knowledge of the facts set forth in this Affidavit, and makes this Affidavit for use as evidence for any and all reasons in the above-entitled action for all purposes authorized by law.

1.

I am currently the Vice President of Sales and Marketing of RETX, Inc. ("RETX").

2.

Attached hereto at Exhibit "1" is the information that I received from Powerweb in February, 2000. I do not have, and do not recall receiving, any other information.

3.

I did not show anyone at RETX the information attached at Exhibit "1," except when RETX was responding to a subpoena that was served by Powerweb in the Northern District of Georgia in December 2002.

Scarpelli Aff.doc

4.

I did not use any of the information attached as Exhibit "1," during my employment with RETX, or otherwise.

5.

I was never asked, nor did I enter into, a confidentiality agreement with Powerweb prior to receiving the information attached as Exhibit "1."

6.

The facts stated in this Affidavit are true.

FURTHER AFFIANT SAYETH NOT.

Sworn to and subscribed before me this 16TH
day of July, 2003.

_____
Notary Public

_____
PETER C. SCARPELLI

OFFICIAL SEAL
PORTIA L. FIELDS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 12-19-06

-2-

Scarpelli Aff.doc

# EXHIBIT 1



February 7, 2000

*Lothar E. S. Budike Jr.*
President

POWERWEB TECHNOLOGIES
655 Niblick Lane, Suite 100
Wallingford, PA 19086
888-2POWERWEB
FAX 610-874-7212
www.2powerweb.com
lbudike@2powerweb.com

Mr. Peter Scarpelli
AES CILCO
575 W. Madison #3410
Chicago, IL 60661

Dear Mr. Scarpelli:

In response to a telephone conversation with Dave McGeown, I am forwarding to you information regarding Omni-Link®, an interactive power dispatch system designed for the energy supply industry. Powerweb Technologies believes that our interactive product line in conjunction with AES CILCO's new interruptible supply product will yield tremendous monetary savings and enhanced power reliability to both the supplier and customer.

During this competitive age of deregulation, energy suppliers are striving to offer customers new types of value added services that differentiate their own line of energy products from their competitors. Although suppliers often attempt to offer their clients supply-side products (billing information systems, etc.) and demand-side opportunities (ESCO retrofit projects), no supplier has been able to escape the fact that the margins in a bundled "supply-only" contract are very small and constantly diminishing.

Powerweb Technologies believes that the key to success in the energy supply business is having the ability to harness a customer's on-site resources and transact these resources through an information system to the open energy market. This will enable a supplier to offer any customer interruptible power supply rates as well as the ability to re-sell the customer's energy and capacity to the open market and 3rd party suppliers. In addition, the supplier can now sell an integrated solution for the client.

Omni-Link® is the first interactive power monitoring and dispatch system that enables customers to monitor generation reliability, deploy on-site generation and control facility resources based on real-time price signals in order to transact energy into the deregulated energy market.

In addition, Omni-Link® is the first interactive power dispatch system that enables suppliers to offer customers integrated energy-based value added services. Each system is custom tailored for a specific industry. Omni-Link® is a enterprise level software system that utilizes digital TCP/IP addressed sensors, micro-controllers and a computer server to monitor, analyze, and control the daily operation of a buildings resources. These resources can range from on-site generation to building loads such as chillers and lighting.

Powerweb Technologies has developed the specific protocols and executed contract mechanisms that enable the transaction of capacity and energy on the open energy market. "Real-Time" price signals are processed from the energy market and transmitted to the local commodity supplier. These signals are then integrated into the systems

POWERWEB TECHNOLOGIES
655 Niblick Lane, Suite 100
Wallingford, PA 19086
888-2POWERWEB
FAX 610-874-7212
www.2powerweb.com

RETX0000398



database enabling the supplier to optimize the value of this capacity and energy in the open market. To date, transactions can be cleared through the PJM, New York Power Pool, and California's Power Exchange. .

In addition to resource transactions for reduced supply costs, Omni-Link® can be utilized to offer clients a multitude of value added services. For example, in the telecommunication industry, Omni-Link® will enable a supplier to offer integrated network side and demand side solutions as well. Examples of these services are;

1. *Generator Operational Status* – Omni-Link® will enable Bell Atlantic to monitor the "Run" status of each generator. .

2. *Generator Battery Charge* - Omni-Link® will enable Bell Atlantic to monitor the charge of the battery for each generator in order to enhance generator reliability.

3. *Generator Fuel Status* - Omni-Link® will enable Bell Atlantic to monitor the fuel status of the generators, schedule fuel deliveries, and maintain fuel database.

4. *Transfer Switch Position*- Omni-Link® will enable Bell Atlantic to monitor the current position of the transfer switch, and maintenance testing of the switches.

5. *Air Quality Efficiency Control* – Omni-Link® will enable a telecommunication customer to remotely monitor carbon dioxide, VOC and other indoor pollutants to digitally regulate the outside air intake, year around.  This air regulation will achieve energy savings as well as network reliability.

6. *Network Failure* – Due to the extreme importance of the computer switch, Omni-Link® is designed to identify and monitor the conditions of switch failure.  These services will reduce the risk of switch failure and increase the network reliability.

I have taken the liberty of forwarding an automated tour of how the Omni-Link® System would operate for the Bell Atlantic Corporation. I look forward to meeting you again for an actual demonstration of our product line.

If you have any questions concerning our material, please feel free to contact me directly at 610 874-8070. Thank you for your interest in our company.

Best regards,

Lothar E.S. Budike Jr. / President

RETX0000399



RETX0000412



## RESPOND WITH THE APPROPRIATE CORRECTIVE ACTION



Kwh Load Profile



Demand Load Profile

Power Factor Profile

Pertinent energy data for each facility can be processed, stored, diagnosed and then retrieved instantly as an energy saving response.

*Omni-Link's* new Adaptive Load Control Diagnosis (ALCD) technology can reduce on-demand charges without the shutdown of vital equipment. *Omni-Link's* microprocessor anticipates each peak load and automatically initiates a protocol response. Demand Spikes and Sags are continually anticipated and eliminated for your facility.

*Omni-Link™* will compute and store energy data for each facility. When a discrepancy does arise, the existing energy management system is instantaneously accessed so the problem is quickly diagnosed and resolved.

*Omni-Link™* can maximize power efficiency based on its integrated real time data. *Omni-Link™* has the capability of integrating all pre-existing building systems into a single interface for pre-programmed or real time control.

**ANALYSIS** → **RESPONSE**



Demand Reduction Sequence



"Back-Up" Generator Sequence



HVAC Set Back Sequence



RETX0000413



# REAL TIME ENERGY ACCESS

**ACCESS ALTERNATIVE ENERGY SOURCES ON-LINE**

*Omni-Link*™ enables a facility manager or purchasing agent the flexibity of various options for accessing alternative energy sources whether it be through standard communication protocol, intranet or internet highways.

*Omni-Link*™ can coordinate energy information for a commercial or industrial energy user who has more than one location. All the energy information from these facilities can be gathered, stored and accessed at one central location. This would give your organization the ability to consolidate all of its energy needs and bid power requirements to multiple suppliers through the systems network.



RETX0000414

## ADDITIONAL Omni-Link™ FEATURES

The *Omni-Link* system is continuously being Expandable to varies or industry. The system's open protocol allows multiple sensors, relator or digital inputs as well as communication protocol to create customized systems.

## MULTISITE CONSOLIDATION OF...



*Omni-Link* can coordinate the vital cost information of multiple locations in real time.

- BILLING
- RATES
- TARIFFS
- POWER INFORMATION

## INTERNET CONTROL OF HVAC EQUIPMENT

*Omni-Link*™ can integrate a user friendly interface to access and control multiple energy management systems systems such as Johnson Controls, Honeywell®, and Andover Controls can be integrated and linked through one common protocol. Control of these systems can be accessed via the internet or lan based networks.



## POWER QUALITY



*Omni-Link*™ can integrate a user friendly interface to access power quality information such as harmonic distortion and power factor. This power quality information can be integrated to monitor individual critical loads of the facility and respond with sequence alarms as well as preventive maintenance schedules. In addition custom capacitors can be added to correct power quality problems.

## BACK UP GENERATION FOR LOAD SHEDDING

*Omni-Link*™ can integrate a user friendly interface to control back up emergency generator operation. The interface will automatically turn the generator on or off depending on the electrical demand level within the facility. The system can also automate a start sequence for preventive maintenance routines.



RETX0000415

# Omni-Link™ makes deregulation savings as simple as...

**Om·ni-link** (om-NI-LINGK) *noun*  1.The interactive energy information system that prepares end users for deregulation. 2.The energy control/response system that enables facilities to operate more efficiently. 3.The internet communication system that will easily facilitate on-line energy procurement.

## REAL TIME ACCESS TO INFORMATION

### INSTANT ENERGY INFORMATION

*Omni-Link™* will provide your facility with a "virtual dashboard" that acts as an interactive control center which can procure energy and manage daily operations more efficiently.

"Instant Access of Facility Consumption Data at Your Fingertips!"

RETX0000416



**POWERWEB**

ERWEB TECHNOLOGIES
NIBLICK LANE, SUITE 100
ALLINGFORD, PA 19086

EL:888-2POWERWEB
FAX: 610-874-7212

RETX0000417

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| POWERWEB TECHNOLOGIES, INC., *et al.*, | : | **NO. 02-CV-2733 (HB)** |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## AFFIDAVIT OF RONALD J. JOSEPHSON

Personally appeared before the undersigned attesting officer, duly authorized to administer oaths, RONALD J. JOSEPHSON, the subscriber, who, being duly sworn on oath, says that he is over the age of eighteen (18) years, has personal knowledge of the facts set forth in this Affidavit, and makes this Affidavit for use as evidence for any and all reasons in the above-entitled action for all purposes authorized by law.

1.

I am the Vice-President, Chief Operating Officer, and Chief Financial Officer of RETX, Inc. ("RETX").

2.

RETX's Notification Manager is an electronic mail software program that enables the end-user to send electronic communications to multiple recipients simultaneously. Notification Manager does not allow the sender or recipient to monitor energy usage for curtailment events related to load response. In fact, RETX's customers can use the system for any type of mass communications, not necessarily related to energy.

3.

In July, 2001, RETX and Powerweb entered into the metering agreement. The agreement contemplated that Powerweb would install meters for RETX throughout New England. The metering agreement was not for, and did not contemplate, meter installations in Pennsylvania. Powerweb performed no services for RETX under the metering agreement, or otherwise.

4.

RETX and Powerweb engaged in minimal discussions about a possible business combination. These discussions did not even reach a negotiation stage.

5.

PJM is one of several Independent System Operators ("ISO") throughout the United States and Canada. Other ISOs include (i) California ISO; (ii) ERCOT (Electric Reliability Council of Texas); (iii) New England ISO; (iv) New York ISO; (v) Mid-West ISO; (vi) Independent Market Operator; and (vii) Alberta Power Pool. Inasmuch as RETX is a part of the energy demand response community, RETX participates in the working groups for all of the ISOs throughout the United States and Canada.

6.

The purpose of an ISO is to (i) ensure sufficient power flow throughout its region; (ii) ensure that buyers and sellers of energy can execute transactions; and (iii) promulgate the rules and regulations that govern the region. Despite PJM's acronym, the members of the PJM demand response working group extend beyond Pennsylvania, New Jersey and Maryland. Indeed, the PJM working group includes member utilities from many other states throughout the mid-Atlantic region, including Illinois, Delaware, Indiana, Michigan, Ohio, West Virginia, Virginia, and the District of Columbia.

7.

PJM meetings take place throughout the Mid-Atlantic region.

8.

RETX does not maintain a separate Pennsylvania contact list for mass e-mailing or other communications.

9.

In September 2000, RETX issued a press release that intimated that it does business within Pennsylvania. At such time, RETX had not done any business in Pennsylvania. Rather, the states listed on the press release, including Pennsylvania, were those states that had recently deregulated its power. It was RETX's initial marketing strategy to market its Customer Choice Manager ("CCM") package to companies within recently deregulated states. The CCM package was designed to facilitate retail customer switching to different power providers.

10.

Subsequent to the issuance of the press release, RETX's marketing strategy changed, and it decided not to actively market within Pennsylvania.

11.

RETX did not recall the content of the September, 2000 press release, and therefore, did not remove the press release from its website after its marketing strategy changed.

12.

After the September, 2000 press release was brought to the attention of Ross Malme during his deposition, RETX promptly removed the press release from its website inasmuch as it misrepresented RETX's business focus.

Josephson Aff1.doc

13.

The facts stated in this Affidavit are true.

FURTHER AFFIANT SAYETH NOT.

Sworn to and subscribed before me this 16
day of July, 2003.

_Patricia Duncan_
Notary Public
exp 8-11-05

_____
RONALD J. JOSEPHSON

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,        :
                                      :
                Plaintiff,            :
                                      :
        v.                            :        CIVIL ACTION
                                      :
POWERWEB TECHNOLOGIES, INC., *et al.*, :        NO. 02-CV-2733 (HB)
                                      :
                Defendants.           :
                                      :
_____:

## AFFIDAVIT OF ROSS D. MALME

Personally appeared before the undersigned attesting officer, duly authorized to administer oaths, ROSS D. MALME, the subscriber, who, being duly sworn on oath, says that he is over the age of eighteen (18) years, has personal knowledge of the facts set forth in this Affidavit, and makes this Affidavit for use as evidence for any and all reasons in the above-entitled action for all purposes authorized by law.

1.

I am the Chief Executive Officer of RETX, Inc. ("RETX").

2.

In early 2003, RETX attended a PJM Demand Response Working Group conference, which was held in Pennsylvania. Quite a number of PJM member companies attended the conference, but many of which were not from Pennsylvania.

3.

Like many other attendees, RETX set up a table at the PJM conference, where it displayed some of its software and product sheets. RETX displayed its products for about an

hour during an all-day conference. RETX did not actively distribute its materials at the PJM Demand Response Working Group conference.

4.

The Peak Load Management Alliance ("PLMA") is a trade organization, which consists of approximately thirty companies that meet throughout the United States.

5.

The purpose of the PLMA is to promote the demand response industry, and provide an information clearinghouse for its members.

6.

The PLMA does not target membership or participation by Pennsylvania companies.

7.

I am unaware of any Pennsylvania companies that are actually members of the PLMA.

8.

The facts stated in this Affidavit are true.

FURTHER AFFIANT SAYETH NOT.

Sworn to and subscribed before me this 16
day of July, 2003.

_____
ROSS D. MALME

_____
Notary Public
exp. 8-11-2005

Malme Aff.doc

# EXHIBIT D

Page 42

1     Q.  Your second visit to Pennsylvania when you
2 met with Mr. Budike?
3     A.  I hate to call it the second visit because
4 I'm not sure which one occurred first, but in relation
5 to the conversation I was talking about when we met
6 with Lou and Powerweb and PJM, the answer would be yes.
7     Would this be a good time to take a restroom
8 break?
9     Q.  Sure.
10     (Whereupon, a recess was taken from 11:44 to
11     11:53 a.m.)
12     (Whereupon, the court reporter
13     marked Exhibit No. 4 for
14     identification.)
15     Q.  Let me hand you what has been marked as
16 Powerweb 4. Do you recognize the top portion as an
17 e-mail that you sent?
18     A.  I don't recall writing this but it appears
19 that I did.
20     Q.  And does this refresh your recollection as
21 when you had the meeting with ComEd and PECO?
22     A.  No. Let me read it. Yes.
23     Q.  That would have been in roughly late January
24 2001?
25     A.  Yes.

Page 43

1     Q.  Has your title changed since you have been
2 employed by RETX?
3     A.  Yes.
4     Q.  Let me back up for a minute. You are
5 currently employed by RETX, is that correct?
6     A.  I hope so.
7     Q.  As far as you know.
8     And what did your title change to from vice
9 president of business development?
10     A.  Vice president, marketing and business
11 development.
12     Q.  What are your responsibilities as vice
13 president of marketing and business development?
14     A.  Similar to what I had said previously, which
15 were strategic partnerships and sales.
16     Q.  And when did that happen?
17     A.  Sometime last year. About 12 months ago.
18 About a year ago.
19     Q.  Okay. 2002?
20     A.  Sometime, yeah.
21     Q.  Did you have any additional duties as a
22 result of becoming vice president, marketing and
23 business development?
24     A.  Over and above previous?
25     Q.  Right.

Page 44

1     A.  Yes.
2     Q.  As related to marketing?
3     A.  Yes.
4     Q.  Can you tell me what those were, generally?
5     A.  I oversee the people that do marketing.
6     Q.  Are you generally responsible for RETX's
7 marketing?
8     A.  Yes.
9     Q.  Does RETX market in Pennsylvania?
10     A.  Under -- the definition -- what do you mean
11 by "marketing"?
12     Q.  Does RETX seek to sell its products and
13 services to entities located in Pennsylvania?
14     A.  On an active basis, I don't believe so.
15     Q.  What do you mean "on an active basis"?
16     A.  I am not familiar with any specific sales
17 efforts in Pennsylvania.
18     Q.  Are you involved in PJM?
19     A.  In what regard?
20     Q.  Do you have any involvement with PJM?
21     MS. SCOTT: Kara, for clarification.
22     THE WITNESS: I'm not sure what that means.
23     MS. SCOTT: Excuse me, clarification. When
24 you are using "PJM," to what are you referring?
25 Because I understand there is PJM Technologies and

Page 45

1 there is PJM -- a whole variety of different things, so
2 just for point of clarification on the record what are
3 you referring to?
4     Q.  (By Ms. Goodchild) Well, let's back up.
5 Are you involved with any PJM entity?
6     A.  Me or the company?
7     Q.  The company or you.
8     A.  I am not.
9     Q.  Is RETX involved with any PJM entity?
10     A.  No.
11     Q.  Did RETX ever participate in a PJM demand?
12     A.  Did we participate in a conference or in a
13 meeting?
14     Q.  In a working group, demand response working
15 group.
16     A.  Yes.
17     Q.  Okay. Back up for a minute. What PJM
18 entity oversaw the demand response working group?
19     A.  I believe it would be PJM Interconnection.
20     Q.  I just wanted to make sure that we are all
21 on the same page.
22     A.  Mm-hmm.
23     Q.  Where is PJM Interconnection located?
24     A.  I don't know.
25     Q.  Have you ever spoken with anyone on the

12 (Pages 42 to 45)

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2003, I caused a copy of the foregoing Reply Memorandum of Counterclaim Defendant RETX, Inc. in Further Support of Its Motion to Dismiss to be served by U.S. mail, first class, postage prepaid, to the following:

Joel M. Sweet, Esq.
Wolf, Block, Schoor & Solis-Cohen, L.L.P.
1650 Arch Street, 22nd Floor
Philadelphia, Pennsylvania  19102

*Attorneys for Plaintiff Constellation NewEnergy, Inc.*

Eric A. Weiss, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut Street
Philadelphia, PA  19103-4979

*Attorneys for Counterclaim Defendant AES CILCO*

Kara H. Goodchild, Esq.
Saul Ewing, L.L.P.
Centre Square West
1500 Market Street
38th Floor
Philadelphia, Pennsylvania  19102

*Attorneys for Defendants A-Valey Engineers, Inc. and Lothar Budike, and Defendant/Counterclaimant Powerweb Technologies, Inc.*

_____
Eric M. Hurwitz

702039_1