THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONSTELLATION NEWENERGY, INC., : | |
| : | |
| Plaintiff, : | |
| : | CIVIL ACTION FILE |
| v. : | |
| : | NO. 02-CV-2733 (HB) |
| POWERWEB TECHNOLOGIES, INC., *et al.*, : | |
| : | |
| Defendants : | |

## ORDER

AND NOW, this _____ day of _____, 2003, upon consideration of the Motion to Strike of Counterclaimant Powerweb Technologies, Inc., and the Response of Counterclaim Defendant RETX, Inc. thereto, it is hereby **ORDERED** that the Motion to Strike is **DENIED**.

BY THE COURT:

_____
The Honorable Harvey Bartle, III
United States District Judge

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONSTELLATION NEWENERGY, INC., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> POWERWEB TECHNOLOGIES, INC., *et al.*, : <br> : <br> Defendants : | CIVIL ACTION FILE <br><br> NO. 02-CV-2733 (HB) |

### RESPONSE OF COUNTERCLAIM DEFENDANT RETX, INC. TO MOTION TO STRIKE OF COUNTERCLAIMANT POWERWEB TECHNOLOGIES, INC.

Counterclaim Defendant RETX, Inc. ("RETX"), by its undersigned counsel, hereby submits this Response to the Motion to Strike of Counterclaimant Powerweb Technologies, Inc. ("Powerweb"), in which Powerweb moved to strike the affidavit of Peter C. Scarpelli and Section II.A. of the Reply Memorandum filed by RETX in support of its Motion to Dismiss. Contrary to Powerweb's suggestion, RETX is not improperly arguing the merits of Powerweb's claims and did not instruct Mr. Scarpelli not to answer deposition questions concerning matters addressed in his affidavit.

This Response is supported by the accompanying Memorandum of Law.

Respectfully submitted,

_/s/ signature_
Lee A. Rosengard
Eric M. Hurwitz
STRADLEY, RONON, STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103
(215) 564-8000

Attorneys for Counterclaim Defendant
RETX, Inc.

Tacita A. Mikel Scott
Georgia Bar No. 632283
*(Admitted Pro Hac Vice)*
Emory L. Palmer
Georgia Bar No. 560120
*(Admitted Pro Hac Vice)*
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: (404) 233-7000

Co-Attorneys for Counterclaim Defendant,
RETX, Inc.

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONSTELLATION NEWENERGY, INC., : | |
| : | |
| Plaintiff, : | |
| : | CIVIL ACTION FILE |
| v. : | |
| : | NO. 02-CV-2733 (HB) |
| POWERWEB TECHNOLOGIES, INC., *et al.*, : | |
| : | |
| Defendants : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**RESPONSE OF COUNTERCLAIM DEFENDANT RETX, INC.**
**TO MOTION TO STRIKE OF**
**<u>COUNTERCLAIMANT POWERWEB TECHNOLOGIES, INC.</u>**

I.   **<u>INTRODUCTION</u>**

The Court should deny Powerweb's Motion to Strike the affidavit of Peter Scarpelli ("Mr. Scarpelli") and Section II.A of RETX's Reply Memorandum. In its Motion, Powerweb argues that (i) RETX is improperly arguing the merits of Powerweb's claims and (ii) Powerweb cannot adequately respond to RETX's arguments (and the supporting affidavit of Mr. Scarpelli) because counsel for RETX instructed Mr. Scarpelli not to answer deposition questions concerning matters addressed in his affidavit. Neither assertion is true. First, the facts presented in the Scarpelli affidavit go to the jurisdictional issues presently before the Court. That those same facts may also go to the merits of the dispute is beside the point. Second, counsel for RETX did not instruct Mr. Scarpelli not to answer questions concerning the facts properly at issue here, including questions concerning the Confidentiality Agreement as alleged by Powerweb.

## II. **ARGUMENT**

Whether the Confidentiality Agreement alleged by Powerweb exists and (if it does) related matters such as the identity and residency of the parties to that agreement, where that agreement was made, and what law governs it, are matters properly at issue on RETX's Motion to Dismiss for lack of personal jurisdiction. Tellingly, Powerweb does not list any such facts among RETX's alleged contacts with Pennsylvania. The absence of such an agreement, or its lack of relation to Pennsylvania, is evidence of RETX's lack of contact with Pennsylvania. Thus, RETX appropriately has offered the affidavit testimony of Mr. Scarpelli that he was never asked to, nor did he, enter into a confidentiality agreement with Powerweb, and that he did not receive confidential information pursuant to such an agreement.

Powerweb argues that RETX is inappropriately arguing the merits of Poweweb's claims and that Powerweb cannot respond to those issues because counsel for RETX "aggressively thwart[ed] discovery that conceivably may have touched upon the merits of Powerweb's claims" by instructing Mr. Scarpelli not to answer "a foundation question regarding whether he knew about the existence of a confidentiality agreement between AES NewEnergy and Powerweb." See Powerweb's July 23, 2003 Memorandum of Law at, pp. 1-2. That simply is not so. To the contrary, the facts established by Mr. Scarpelli's affidavit and the portion of RETX's argument based on those (and other) facts are properly before the Court on the present Motion to Dismiss. Further, counsel for RETX objected only to overbroad merits discovery and did <u>not</u> object when counsel for Powerweb and Defendant CILCO questioned Mr. Scarpelli at length about the relationship (including any confidentiality agreements) between Powerweb or Mr. Budike, on the one hand, and CILCO, RETX or Mr. Scarpelli, on the other hand. Counsel

2

for Powerweb and CILCO also questioned Mr. Scarpelli about the information he received for Powerweb, also without objection from counsel for RETX.

Contrary to Powerweb's claim, counsel for RETX did not instruct Mr. Scarpelli not to answer "a foundation question regarding whether he knew about the existence of a confidentiality agreement between AES NewEnergy and Powerweb." See Powerweb's July 23, 2003 Memorandum of Law, at p. 2. The question to which counsel for RETX objected was a vague and overbroad question going to the merits: "Q. Did Mr. Budike mention to you that he had some sort of arrangement with AES NewEnergy?" See Deposition of Peter Scarpelli ("Scarpelli Dep."), at 28:20-21, relevant excerpts of which are attached hereto as Exhibit "A." Given that Powerweb has described its "arrangement" with NewEnergy as "several agreements regarding the development of a joint venture, including a broad confidentiality agreement," see Powerweb's July 7, 2003 Memorandum of Law, at p. 3, the question cannot be fairly construed as a mere "foundation question" limited to "the existence of a confidentiality agreement."

Further, counsel for Powerweb and CILCO each questioned Mr. Scarpelli extensively about various contracts and/or confidentiality agreements, drawing no objection from RETX's counsel:

> MS. GOODCHILD [counsel for Powerweb]: Are there any other agreements entered into between Powerweb and RETX?
>
> MR. SCARPELLI: Confidentiality agreement, I believe.
>
> MS. GOODCHILD: Why would they—do you know why RETX and Powerweb entered into a confidentiality agreement?
>
> MR. SCARPELLI: We enter into confidentiality agreements as a matter of course with everyone we meet with. Not anyone, but anyone we have substantive discussions.
>
> MS. GOODCHILD: What do you mean, "substantive discussions?"
>
> MR. SCARPELLI: Anytime we are going to talk about our products or our services.

3

(Whereupon the court reporter marked Exhibit No. 13 for identification.)

MS. GOODCHILD: Mr. Scarpelli, I have handed you what has been marked as Powerweb 13, which is CDRETX1427 through 1429. Can you take a minute and look at that?

MR. SCARPELLI: Okay.

MS. GOODCHILD: Do you recognize it as the confidentiality agreement between RETX and Powerweb?

MR. SCARPELLI: I recognize that is what it says.

MS. GOODCHILD: Do you have any reason to believe that there is a different confidentiality agreement?

MR. SCARPELLI: No.

\* \* \*

MS. BAIO [counsel for CILCO]: Did you, while you were employed with CILCO, enter into any contractual relationship with Mr. Budike or with Powerweb?

MR. SCARPELLI: I don't believe so.

\* \* \*

MS. BAIO: You talked earlier about the confidentiality agreement that exists between RETX and Powerweb now. Was there any confidentiality agreement that you are aware of during your tenure at CILCO between CILCO and Powerweb?

MR. SCARPELLI: First of all, I'm not sure if you said "now" with the confidentiality agreement. I'm not sure if it is still in force. I don't know what the time period is.

MS. BAIO: Okay, that's fine.

\* \* \*

MS. GOODCHILD: When you were at CILCO, was there a similar policy about entering into confidentiality agreements with anyone you had discussions with?

MR. SCARPELLI: I don't know what the corporate policy was. I don't recall what the corporate policy was.

MS. GOODCHILD: How about in practice?

4

> MR. SCARPELLI: In practice we would do confidentiality agreements, yes.
>
> MS. GOODCHILD: Do you recall having any discussions—strike that. IN the two conversations you had with—strike that. Did you ever make plans to meet with Mr. Budike while you were at CILCO?
>
> MR. SCARPELLI: I don't think so.
>
> MS. GOODCHILD: All right. That is it.

Scarpelli Dep., Ex. A at 78:16-79:17; 89:10-13; 91:11-20; 92:6-21. These excerpts show that Powerweb had ample and repeated opportunities to ask Mr. Scarpelli about any confidentiality agreements – completely uninterrupted by RETX's counsel.

Further, that counsel for Powerweb pursued these lines of questioning in a deposition limited to jurisdictional issues is a tacit admission that these matters are properly at issue on the present motion to dismiss. Indeed, in its papers, Powerweb includes factual allegations and argument concerning these same matters. For example, Powerweb argues that RETX's "specific activities within Pennsylvania show that RETX aimed its tortious conduct with respect to the *theft of Powerweb's confidential technology; subsequent unfair competition; and interference with Powerweb's prospective business in Pennsylvania...*" See Powerweb's July 7, 2003 Memorandum of Law, at p. 10 (emphasis added). Powerweb now hypocritically complains that RETX unfairly argued about the merits of Powerweb's claims because RETX has pointed out in its Reply that Powerweb's case is based on unsubstantiated allegations. RETX's inclusion of references to Mr. Scarpelli's affidavit in its Reply Memorandum are provided to rebut the specific allegations of Powerweb in its Response to the Motion to Dismiss that RETX was subject to personal jurisdiction because it had intentionally aimed its conduct at the Commonwealth of Pennsylvania through Mr. Scarpelli's alleged misappropriation of Powerweb's confidential information. It would be manifestly unfair to say that RETX could not

respond to these allegations because Powerweb now construes the Reply as arguments about the "merits" of the case.

## III. CONCLUSION

For all the foregoing reasons, RETX respectfully requests that this Court deny Powerweb's Motion to Strike the affidavit of Peter A. Scarpelli and Section II.A. of the Reply Memorandum filed by RETX in support of its Motion to Dismiss.

Respectfully submitted,

_____
Lee A. Rosengard
Eric M. Hurwitz
STRADLEY, RONON, STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103
(215) 564-8000

Attorneys for Counterclaim Defendant RETX, Inc.

Tacita A. Mikel Scott
Georgia Bar No. 632283
Emory L. Palmer
Georgia Bar No. 560120
*(Admitted Pro Hac Vice)*
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: (404) 233-7000

Co-Attorneys for Counterclaim Defendant
RETX, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2003, I caused a copy of the foregoing Response of Counterclaim Defendant RETX, Inc. to Motion to Strike of Counterclaimant Powerweb Technologies, Inc. to be served by U.S. mail, first class, postage prepaid, to the following:

>Joel M. Sweet, Esq.
>Wolf, Block, Schoor & Solis-Cohen, L.L.P.
>1650 Arch Street, 22nd Floor
>Philadelphia, Pennsylvania 19102
>
>*Attorneys for Plaintiff Constellation NewEnergy, Inc.*
>
>Eric A. Weiss, Esq.
>Marshall, Dennehey, Warner, Coleman & Goggin
>1845 Walnut Street
>Philadelphia, PA 19103-4979
>
>*Attorneys for Counterclaim Defendant AES CILCO*
>
>Kara H. Goodchild, Esq.
>Saul Ewing, L.L.P.
>Centre Square West
>1500 Market Street
>38th Floor
>Philadelphia, Pennsylvania 19102
>
>*Attorneys for Defendants A-Valey Engineers, Inc. and Lothar Budike, and Defendant/Counterclaimant Powerweb Technologies, Inc.*

_____
Eric M. Hurwitz

# EXHIBIT A

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CONSTELLATION NEWENERGY, INC.,)
                              )
          Plaintiff,          )    CIVIL ACTION FILE
                              )
     vs.                      )    NO. 02-CV-2733 (HB)
                              )
POWERWEB TECHNOLOGIES, INC.,  )
et al.,                       )
                              )
          Defendants.         )

                         - - -

     Deposition of PETER CHRISTIAN SCARPELLI,
taken on behalf of Powerweb Technologies, Inc.,
pursuant to agreement of counsel, in accordance
with the Federal Rules of Civil Procedure, before
Kathleen J. Sherwood, Certified Court Reporter,
at Morris, Manning & Martin, LLP, 1600 Atlanta
Financial Center, 3343 Peachtree Road, N.E.,
Atlanta, Georgia, on the 19th day of June, 2003,
commencing at the hour of 10:43 a.m.

                         - - -




              REGENCY-BRENTANO, INC.
                    Suite 140
                13 Corporate Square
              Atlanta, Georgia 30329
                  (404) 321-3333
```

Page 26

1  MS. SCOTT: You are going to have to start
2  being a little more specific, because otherwise I think
3  we are going to waste the entire day objecting and
4  going back and forth as to whether merit discovery is
5  being taken.
6  Q. (By Ms. Goodchild) Did there come a time
7  where you learned that Powerweb was located in
8  Pennsylvania?
9  A. Sure.
10 Q. And do you recall when that was?
11 A. No.
12 Q. Did you request Powerweb send you materials?
13 A. No.
14 Q. Did Powerweb send you materials?
15 A. Yes.
16 Q. Were you expecting those materials?
17 A. Yes.
18 Q. And why were you expecting those materials?
19    MS. SCOTT: I am going to object. You are
20 going into merit discovery.
21    MS. GOODCHILD: Are you directing him not to
22 answer?
23    MS. SCOTT: I'm going to direct him not to
24 answer anything that deals with merit discovery, yes.
25 The judge's order was very clear. And we may even want

Page 27

1  to mark that and put that in, too, as an exhibit as to
2  what can be discussed and what we are dealing with
3  here. We are only dealing with jurisdiction.
4     Actually, it's probably not necessary to
5  mark. Everybody has seen the judge's order.
6     MS. GOODCHILD: I don't think we need to
7  mark it. I think this is just a point where there is
8  overlap. I see it differently than you see it, and
9  that's fine.
10    Can we mark this as 2.
11    (Whereupon, the court reporter
12    marked Exhibit No. 2 for
13    identification.)
14 Q. (By Ms. Goodchild) Mr. Scarpelli, you have
15 in front of you what has been marked as Powerweb 2, a
16 document numbered RET0398 to 399. Can you take a
17 minute and just look that over. Do you recall
18 receiving this letter?
19 A. Yes.
20 Q. Were there things attached to this letter?

Page 28

1  A. Yes.
2  Q. And when did you talk to Mr. Bedike?
3  A. I don't know. Sometime after the letter. I
4  don't recall. Probably within ten days.
5  Q. Is there a reason that you say "probably
6  within ten days"?
7  A. No.
8  Q. And how many times did you talk to
9  Mr. Bedike?
10 A. When?
11 Q. In early 2000, while you were employed by
12 CILCO.
13 A. I believe twice.
14 Q. What was the topic of those conversations?
15 A. He was trying to sell a system.
16 Q. Tell me what you mean by that.
17 A. It was a function of his sales process. He
18 was trying to explain to me what they were doing and
19 thought that it might be interesting for us.
20 Q. Did Mr. Bedike mention to you that he had
21 some sort of arrangements with AES NewEnergy?
22    MS. SCOTT: Objection.
23    MS. BAIO: Objection.
24    MS. SCOTT: Merit. Goes to merits. Has
25 nothing to do with jurisdiction.

Page 29

1  Q. (By Ms. Goodchild) Unless she directs you
2  not to answer, you can answer.
3     MS. SCOTT: Don't answer.
4     MS. GOODCHILD: Let's go off the record for
5  a minute.
6     (Whereupon, a discussion was held off the
7     record.)
8  Q. (By Ms. Goodchild) Mr. Scarpelli, did you
9  ever send anything to Mr. Bedike?
10 A. I don't remember. Assuming, of course, you
11 are talking about that time frame.
12 Q. Yeah. Let me just back up. For right now,
13 this is the time you were employed by CILCO.
14    Did you have any discussions with Mr. Bedike
15 about entering into any agreement?
16 A. With whom? Him?
17 Q. With Powerweb.
18 A. Sure.
19 Q. And when did you have those discussions?
20 A. Probably during one of those two -- probably

Page 74

1    Q. And when did you first contact them?
2    A. I never first contacted them.
3    Q. When did you have a first contact with them?
4    A. About 14 months ago.
5    Q. How many contacts have you had with them?
6    A. I don't recall.
7    Q. They have been by telephone?
8    A. Yes.
9    Q. Have you ever met them?
10   A. Personally? I don't think so.
11   Q. And what is the purpose of your contact?
12   A. They were trying to do business in New
13 England.
14   Q. Let's go back for a minute to early 2000
15 when you -- let me back up. Let's go back to when you
16 first met or talked to Mr. Budike.
17   A. Okay.
18   Q. Was that early 2000?
19   A. According to the letter, it was sometime in
20 February.
21   Q. Okay. You testified you had two phone
22 conversations with him around that time, is that
23 correct?
24   A. While employed by CILCO?
25   Q. Mm-hmm.

Page 75

1    A. Approximately, to the best of my
2 recollection, there were two.
3    Q. How many times did you speak to Mr. Budike
4 after you left CILCO?
5    A. I haven't the foggiest idea.
6    Q. Was it more than once?
7    A. Absolutely.
8    Q. More than twice?
9    A. Absolutely.
10   Q. Can you give me an estimate?
11   A. Less than 50.
12   Q. Were these phone conversations?
13   A. Some.
14   Q. How else did you communicate with
15 Mr. Budike?
16   A. As you indicated, we had a meeting in
17 Pennsylvania with them and -- with Lou and PJM
18 Technologies.
19        I think he and I also met at a restaurant
20 outside of D.C. I think it was outside the BWI Airport
21 as a matter of fact. I think I was staying at a
22 Marriott. He drove down to meet me there.
23        He has also met with us in our office here
24 in Atlanta on, I believe, two occasions.
25   Q. Have you e-mailed back and forth with

Page 76

1 Mr. Budike?
2    A. Certainly.
3    Q. When you visit Pennsylvania, do you call
4 Mr. Budike?
5    A. I have only been there twice, and it was
6 with him. We saw him both times, I believe.
7    Q. And why have you maintained contact with
8 Mr. Budike?
9    A. He is fun to talk to.
10   Q. He is just a good guy?
11   A. If that is a character statement, I'm not
12 sure I -- I don't know.
13   Q. Any other reason?
14   A. We had business discussions.
15   Q. And what were those business discussions?
16   A. I believe that there were two types, two
17 categories.
18   Q. And what were they?
19   A. We entertained discussions on possible
20 mergers and as a first step towards going toward that
21 merger process. I think we entertained a discussion of
22 meter-installation services. I also believe actually
23 that he attempted to sell his software system to us at
24 RETX.
25   Q. Has RETX entered into any agreements with

Page 77

1 Powerweb?
2    A. I was informed yesterday that we did.
3    Q. Who told you that?
4    A. Rick Tabin.
5    Q. I'm sorry?
6    A. Rick Tabin.
7    Q. And who is Mr. Tabin?
8    A. Vice president of operations at RETX.
9    Q. And why did Mr. Tabin tell you that?
10   A. Because I asked him.
11   Q. And why did you ask him?
12   A. Because -- I didn't know.
13   Q. Why were you interested?
14   A. We were preparing for the deposition, or I
15 was preparing for the deposition, with my attorney.
16   Q. What else did Mr. Tabin tell you?
17   A. He told me that we -- well, presuming you
18 are talking about in the context of this conversation I
19 had with them on the telephone yesterday afternoon.
20   Q. If that is when you had the conversation in
21 which he told you.
22   A. Because I talked to Rick on numerous times
23 throughout the last several years. But during that
24 discussion there were essentially two salient issues.
25 One was that the contract had been executed, and the

Page 86

1   MS. SCOTT: Just send a reminder letter, and
2   we take a look at it and decide.
3   Q. (By Ms. Goodchild) Was anyone else at that
4   meeting with Ms. Baio and Ms. Scott?
5   A. Yes.
6   Q. Who else was there?
7   A. Mr. Broderick.
8   Q. Did you look at documents during that
9   meeting?
10  A. I think so.
11  Q. Did you look at documents that we looked at
12  today?
13  A. Yes.
14  Q. Do you know whether the documents you looked
15  at have been produced?
16  A. I don't know if I can answer that question.
17  MS. SCOTT: Are you asking me?
18  THE WITNESS: I am asking you.
19  MS. SCOTT: Are you asking me have the
20  documents that he looked at been produced?
21  MS. GOODCHILD: No. I am asking him whether
22  he knows whether or not they have been produced.
23  THE WITNESS: That is a legal thing. I'm
24  not sure what the definition of "produced" means.
25  Could you restate the question?

Page 87

1   Q. (By Ms. Goodchild) Do you know whether the
2   documents that you reviewed have been produced?
3   MS. BAIO: I believe the question has been
4   asked and answered, and he said he didn't know what
5   "produced" meant.
6   THE WITNESS: That's true.
7   Q. (By Ms. Goodchild) Did they have numbers on
8   the bottom of them?
9   A. Probably.
10  Q. When you were at CILCO, did you have any
11  other contact with Pennsylvania other than the couple
12  of conversations with Mr. Budike?
13  A. I don't believe so.
14  Q. Did you ever visit Pennsylvania when you
15  worked at CILCO?
16  A. I don't believe so.
17  MS. GOODCHILD: I think I am done. Give me
18  one minute.
19  MS. SCOTT: Okay.
20  (Whereupon, a recess was taken from 1:29 to
21  1:33 p.m.)
22  MS. GOODCHILD: I think we are done.
23  THE WITNESS: Thank you.
24  DIRECT EXAMINATION
25  BY MS. BAIO:

Page 88

1   Q. I have a couple of follow-up questions, and I
2   will try not to keep you, Mr. Scarpelli. Going back to
3   the period of time that you were employed at CILCO,
4   were you ever a vice president?
5   A. No.
6   Q. Did you ever have an e-mail address at
7   NewEnergy?
8   A. Not to my knowledge.
9   Q. Were you ever employed by NewEnergy?
10  A. No.
11  Q. Regarding your conversation or conversations
12  with Mr. Budike in or about February of 2000, you
13  testified that you received one or two calls from him
14  in that time period.
15  A. What was the time period?
16  Q. I am sorry. In or about February of 2000.
17  A. Yes.
18  Q. Could you tell us how long in duration those
19  calls were?
20  A. Oh, gosh. I don't know. Probably less than
21  30 minutes.
22  Q. Would you characterize – you spoke earlier
23  about conversations you had with Powerweb since your
24  employ with RETX, and we talked about the difference
25  between discussions and negotiations. How would you

Page 89

1   characterize your discussions with Mr. Budike while you
2   were employed about CILCO?
3   A. Sales pitch.
4   Q. It was a sales pitch you were receiving from
5   Mr. Budike?
6   A. Yes.
7   Q. Did you give any serious consideration to
8   that sales pitch?
9   A. No.
10  Q. Did you, while you were employed with CILCO,
11  enter into any contractual relationship with Mr. Budike
12  or with Powerweb?
13  A. I don't believe so.
14  MS. GOODCHILD: "You" being Mr. Scarpelli
15  individually?
16  MS. BAIO: Well, on his own behalf or as an
17  employee of CILCO.
18  THE WITNESS: I still don't believe so.
19  Q. (By Ms. Baio) We also identified as
20  Powerweb Exhibit Number 2 a February 7, 2000, letter
21  which you received from Mr. Budike. Do you recall that
22  letter?
23  A. I do.
24  Q. Okay. Did you ask Mr. Budike or Powerweb to
25  send that letter to you?

23 (Pages 86 to 89)

Page 90

1  A. No.
2  Q. Okay. Did he send you anything else?
3  A. Other than the letter itself?
4  Q. Yes.
5  A. I believe there was a brochure attached to
6  the letter or submitted with the letter.
7  Q. Okay. Can we mark this as 14.
8     (Whereupon, the court reporter
9     marked Exhibit No. 14 for
10    identification.)
11 Q. Now, I realize that this is a photocopy, but
12 does this look like the brochure that was included with
13 Mr. Badlike's letter of February 7, 2000?
14 A. Yes.
15 Q. Did you receive anything else from
16 Mr. Badlike at that time?
17 A. Not to my recollection.
18 Q. Did you ask Mr. Badlike or Powerweb to
19 forward anything else to you while you were employed by
20 CILCO?
21 A. I don't think so.
22 Q. Did you ever send anything to Mr. Badlike or
23 Powerweb while you were employed by CILCO?
24 A. I don't recall.
25 Q. Did you ever receive any written proposal

Page 91

1  from Mr. Badlike or from Powerweb while you were
2  employed by CILCO?
3  A. I don't think so.
4  Q. Did you ever send any written proposals to
5  them while you were employed by CILCO?
6  A. I don't think so, I don't recall.
7  Q. Did you ever offer to sell goods or services
8  to Mr. Badlike or to Powerweb while you were employed by
9  CILCO?
10 A. No.
11 Q. You talked earlier about the confidentiality
12 agreement that exists between RSTS and Powerweb now.
13 Was there any confidentiality agreement that you are
14 aware of during your tenure at CILCO between CILCO and
15 Powerweb?
16 A. First of all, I'm not sure if you said "now"
17 with the confidentiality agreement. I'm not sure if it
18 is still in force. I don't know what the time period
19 is.
20 Q. Okay. That's fine.
21 A. But you had asked earlier if I had executed

Page 92

1  A. Well, with people, sure, but not with
2  Powerweb.
3  Q. Not with Powerweb.
4     MS. BAIO: I don't have any other questions.
5           CROSS-EXAMINATION
6  BY MS. GOODCHILD:
7  Q. I just have one followup. If you can just
8  go back to Exhibit 2.
9     MS. SCOTT: Can you let him borrow yours?
10 Can you still ask your question if he has it?
11 MS. GOODCHILD: Yeah.
12 Q. (By Ms. Goodchild) If you look at the
13 second-to-the-last paragraphs there --
14 A. Yes.
15 Q. -- Mr. Badlike says he has taken the liberty
16 of forwarding to you an automated tour of how the
17 Omni-Link system would operate for Bell Atlantic.
18 A. Yes.
19 Q. Does that refresh your recollection as to
20 whether or not you got anything else besides the
21 Exhibit 14?
22 A. It does not.
23 Q. Do you recall getting any automated tour?
24 A. No.
25 Q. Do you recall receiving any CDs?

Page 93

1  A. No.
2  Q. Did you ever send any materials back to
3  Powerweb?
4  A. As I just said to counsel, I don't believe
5  so.
6  Q. When you were at CILCO, was there a similar
7  policy about entering into confidentiality agreements
8  with anyone you had discussions with?
9  A. I don't know what the corporate policy was.
10 Q. How about in practice?
11 A. In practice we would do confidentiality
12 agreements, yes.
13 Q. Do you recall having any discussions --
14 strike that.
15 In the two conversations you had with --
16 strike that.
17 Did you ever make plans to meet with
18 Mr. Badlike while you were at CILCO?
19 A. I don't believe so.
20 MS. GOODCHILD: All right. That is it