IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,   :
                Plaintiff,   :
                      :
          v.   :        No. 02-CV-2733 (HB)
                      :
POWERWEB TECHNOLOGIES, INC., *et al*.,   :
             Defendants.   :

## SECOND AMENDED COUNTERCLAIMS

Powerweb Technologies, Inc. ("Powerweb") asserts the following amended counterclaims against Constellation New Energy, Inc. ("NewEnergy"):

## Introduction

86.     NewEnergy procured confidential and proprietary information from Powerweb under a strict confidentiality agreement on numerous occasions from 1999 to 2001 and then breached the agreement by using the information to develop competing products and services of its own and by disclosing it to others who also became competitors of Powerweb.

87.     As a result of NewEnergy's misconduct, Powerweb has suffered and will continue to suffer damages totaling more than $90 million.

## Powerweb and the Omni-Link System

88.     Powerweb is a privately held corporation based in Media, Pennsylvania. Powerweb is in the business of, among other things, providing energy services to utility companies and independent energy providers who, in turn, sell the services to large commercial energy consumers. Powerweb has been engaged in the design, development, installation and operation of information services and control systems for the management of energy consumption for the past thirteen years.

89.    In or about 1996, the electricity markets in various regions across the United States began to be deregulated, opening the door to competition and the development of new ideas and programs to help consumers conserve and manage their consumption of energy in order to save money on energy expenditures.

90.    Because electricity cannot be stored, all power that is generated must be consumed instantaneously. Moreover, when the ambient temperature rises, electricity becomes more difficult to transport over the grid. These factors, among others, make balancing the supply and demand of energy a constant challenge, and make electricity prices extremely volatile. During high demand periods, the wholesale price of electricity can fluctuate by as much as 1,000%.

91.    Having provided its services to large commercial energy consumers for many years, Powerweb was aware that many of its customers have energy resources of their own, such as stand-by electrical generators installed for emergency use. Powerweb designed a system that enables customers to profit from those resources by selling capacity in deregulated energy markets and by using the resources during high-demand periods in order to sell back pre-purchased blocks of energy when prices are high. The system allows consumers and energy suppliers to share the profits from such sales of capacity and energy, creating a true win-win opportunity.

92.    Powerweb's system (the "Omni-Link System") includes (1) patented monitoring and control technology, (2) patented Omni-Link™ internet-service software, and (3) contracting documents, to monitor the price of electricity in the forward energy market, to turn on stand-by generators, and to accomplish the sale transactions in the energy market. The system also allows utilities and energy service providers to hedge their portfolios of capacity and energy.

93.    With the Omni-Link System in place, Powerweb was well-positioned to revolutionize the energy industry because the Omni-Link System offered utility companies, energy service providers, and consumers a unique approach to achieve hundreds of millions of dollars in potential savings that would otherwise be unrealized. The Omni-Link System was the only one of its kind, and Powerweb took every precaution to protect its proprietary interests in it.

94.    Powerweb first launched the Omni-Link System with a pharmaceutical company in Pennsylvania. As a result, the company saved hundreds of thousands of dollars in the first year alone. Since then, Powerweb has licensed the system to more than a thousand other customers.

95.    Among other things, the Omni-Link System provides Powerweb's customers with central control of distributed generation energy resources, load management, real-time energy information and analysis, and integration with commercial building management systems. Powerweb works with utilities, energy marketers, and independent system operators nationwide to use the Omni-Link System to monitor, manage and conserve energy consumption.

### Powerweb Markets Omni-Link to Bell Atlantic

96.    On or about March 12, 1999, Powerweb's President and Chief Executive Officer, Lothar E.S. Budike, Jr., approached the Bell Atlantic Corporation ("Bell Atlantic" n/k/a Verizon) to offer the use of the Omni-Link System at Bell Atlantic's New Jersey facilities. Powerweb estimated that Bell Atlantic could save as much as 15% on its energy expenditures in the first year alone.

97.    Bell Atlantic was very interested in the Omni-Link System and suggested that Powerweb coordinate with Bell Atlantic's energy supplier, NewEnergy.

**Powerweb Offers NewEnergy a Joint Venture Opportunity
to Market the Omni-Link System to Bell Atlantic and Other Customers**

98.     On or about July 15, 1999, Mr. Budike wrote to NewEnergy introducing Powerweb and the Omni-Link System and describing Powerweb's relationship with Bell Atlantic.

99.     From August through October 1999, Powerweb met with NewEnergy numerous times at its offices in New York City. At the meetings, the parties discussed generally how the Omni-Link System could be utilized to maximize savings to Bell Atlantic and other customers. As a first step, Powerweb and NewEnergy discussed the possibility of entering into a joint venture to implement the Omni-Link System at certain of Bell Atlantic's facilities.

**The Confidentiality Agreement**

100.     NewEnergy insisted on receiving all of the technical information on the Omni-Link System before it would consider whether or not to proceed with the Bell Atlantic project.

101.     NewEnergy made numerous representations to Powerweb in order to induce Powerweb to provide NewEnergy with its proprietary information regarding the Omni-Link System. For example, NewEnergy stated that it had every intention of proceeding with a joint venture to market the Omni-Link System to Bell Atlantic and to other customers in the future. NewEnergy also assured Powerweb that it would not attempt to compete with Powerweb or the Omni-Link System.

102.     In order to protect its proprietary interest in the Omni-Link System, in its energy trading and conservation products and services, and in its prospective business relationships with Bell Atlantic and other customers, Powerweb asked NewEnergy to enter into a written confidentiality agreement.

103.    On or about October 11, 1999, David I. McGeown, Director of Energy Services for AES Corporation and NewEnergy, signed a confidentiality agreement with Powerweb ("Confidentiality Agreement") on behalf of NewEnergy and all of its affiliates, a true and correct copy of which is attached hereto as Exhibit A.

104.    The Confidentiality Agreement provides:

WHEREAS, Powerweb Technologies is the legal owner of a number of energy sensing and energy reduction inventions comprised of gas sensing technologies, electronic metering devices, electricity control devices, and electricity consumption devices; and

WHEREAS, Powerweb Technologies is also the legal owner of a patented integrated translation software system (Omni-Link®) which is utilized for energy information transfer, energy procurement, and facility based monitoring. Omni-Link® is comprised of digital sensors, networking communication protocol, computer server configurations, and a graphical machine-man interface; and

WHEREAS, Powerweb is also the developer of custom "stand-by generation" capacity credit programs which utilize the above mentioned technologies to sell back capacity on the open market as well as leverage energy procurement in deregulated electricity territories; and

WHEREAS, all of these above mentioned technologies, inventions, and energy resale strategies are collectively known as "Energy Technology."

105.    The Confidentiality Agreement prohibits NewEnergy and its affiliates from disclosing any "'Energy Technology' information" to any third-party and also prohibits NewEnergy from using any of the Energy Technology information for any purpose whatsoever without the prior written approval of Powerweb. Thus, the Confidentiality Agreement specifically prohibits NewEnergy and its affiliates from using the information it received in its confidential relationship with Powerweb to offer products or services that compete with Powerweb and the Omni-Link System. The term of the Confidentiality Agreement is ten years.

106.    With the Confidentiality Agreement in place, Powerweb disclosed protected Energy Technology information to NewEnergy in order to proceed with the development of the proposed Bell Atlantic project. For example, Powerweb provided NewEnergy's technical analyst, Kirk Hampton, with documents that described every aspect of the Omni-Link System, including infrastructure diagrams, patent applications, internet architecture diagrams, information regarding the metering technology, internet protocol information and other confidential information. At the time of each submission, Powerweb emphasized the importance of the confidential relationship and reminded NewEnergy of its obligations under the Confidentiality Agreement.

## The Contracting Documents

107.    One of the most significant cost-savings programs Powerweb offered to Bell Atlantic involved the sale of electricity capacity from Bell Atlantic to the energy grid ("reserve capacity sales"). Bell Atlantic was able to realize significant cost-savings through that program by committing to use its own electrical generation resources during certain limited high-demand time periods.

108.    Another of Powerweb's significant cost-savings programs permitted Bell Atlantic to sell pre-purchased electricity back to the energy market at a substantial profit when energy prices are high.

109.    After extensive research and development, Powerweb had acquired and then further developed the contracts necessary to achieve the sales of capacity and electricity in the energy market in full compliance with all applicable government and market rules and regulations. This contracting information was extremely confidential and proprietary.

110.    NewEnergy insisted on receiving the contracting and regulatory information from Powerweb in order to satisfy itself of the viability of this unique concept and facilitate the development of the Bell Atlantic project. NewEnergy stated that it required the information to revise its current agreements with end-use customers to allow for the resale of the electricity and to ensure that the project met all of the regulatory guidelines.

111.    Again, NewEnergy stated that it had no intention of competing with Powerweb or the Omni-Link System.

**The Letter Agreement**

112.    On or about October 26, 1999, NewEnergy signed a written Letter of Intent purporting to memorialize NewEnergy's intent to proceed with Powerweb in the proposed Bell Atlantic project ("Letter Agreement"), a true and correct copy of which is attached hereto as Exhibit B.

113.    The Letter Agreement provides, in part:

> [NewEnergy] acknowledges that [Powerweb] brought the concept of reserve capacity sales to the PJM to [NewEnergy] and agrees not to independently pursue this opportunity in the telecommunications industry (specifically Bell Atlantic). In addition, [NewEnergy] agrees to maintain all confidentiality obligations detailed in the executed non-disclosure agreement.

114.    After the Letter Agreement was signed, Powerweb provided NewEnergy with the proprietary contracting and regulatory information it had requested.

**The Joint Venture Agreement**

115.    After some negotiation, Powerweb and NewEnergy executed an Exclusive Agreement for Bell Atlantic on January 7, 2000 and an Exclusive Bell Atlantic Agreement Addendum: Profit Distribution Agreement on January 8, 2000 (collectively, "Joint Venture Agreement"), true and correct copies of which are attached hereto as Exhibit C.

116.    The Confidentiality Agreement was expressly included as part of the Joint Venture Agreement, thereby reaffirming its importance and prohibiting NewEnergy from independently pursuing any similar business opportunities with Bell Atlantic until the Confidentiality Agreement expires on October 11, 2009.

### The Joint Marketing Agreement

117.    On or about February 8, 2000, Powerweb and NewEnergy entered into an Exclusive PWT Customer Marketing Agreement whereby the parties agreed to jointly market the Energy Technology information to other customers located in the PJM and the New York ISO territories ("Joint Marketing Agreement"), a true and correct copy of which is attached hereto as Exhibit D.

118.    The Confidentiality Agreement was expressly included as part of the Joint Marketing Agreement, thereby reaffirming its importance and prohibiting NewEnergy from independently pursuing any similar business opportunities until the Confidentiality Agreement expires on October 11, 2009.

### NewEnergy Authorized Powerweb to Spend the $100,000 Pursuant to the Joint Venture Agreement

119.    On February 3, 2000, NewEnergy asked Powerweb to begin development of a detailed implementation plan for the Bell Atlantic project.

120.    On or about February 7, 2000, Powerweb outlined the specific tasks that would be undertaken to develop the Bell Atlantic project implementation plan. Powerweb notified NewEnergy that the necessary tasks would cost more than the $100,000 allocated for the development of the plan. In response, Mr. McGeown instructed Mr. Budike to "get it done."

**NewEnergy Instructed Powerweb to Send**
**Confidential Information to Peter Scarpelli and Andrew Singer**

121.    In early February 2000, Mr. McGowan asked Mr. Budike to contact Peter Scarpelli, who was then employed by NewEnergy's sister company, CILCO, in Chicago, Illinois, and Andrew Singer, an executive at NewEnergy's office in Los Angeles, California, regarding the creation of additional marketing plans similar to the Joint Venture Agreement, but covering other regions of the country.

122.    As a result, on February 7, 2000, Mr. Budike sent confidential and proprietary Energy Technology information to Messrs. Scarpelli and Singer regarding the Omni-Link System and the Joint Venture Agreement. With respect to Mr. Scarpelli, Mr. Budike reasonably relied on the protections Mr. McGowan purported to provide in the Confidentiality Agreement on behalf of all affiliates of NewEnergy.

123.    In addition, Mr. McGeown directly disclosed aspects of Powerweb's confidential and proprietary Energy Technology information to Messrs. Scarpelli and Singer.

**NewEnergy Made Its Presentation to**
**Bell Atlantic Without Notifying Powerweb**

124.    On or about November 4, 1999, Powerweb asked NewEnergy to enter into a confidentiality agreement with Bell Atlantic prohibiting any unauthorized disclosure or use of Powerweb's Energy Technology information by Bell Atlantic. NewEnergy falsely represented to Powerweb that such an agreement was already in place between NewEnergy and Bell Atlantic.

125.    Powerweb relied on NewEnergy's misrepresentation regarding a confidentiality agreement with Bell Atlantic in permitting NewEnergy to share Energy Technology information with Bell Atlantic.

126.    On or about February 25, 2000, NewEnergy provided Bell Atlantic with an initial proposal for the project without first contacting or consulting Powerweb.

127.    Upon information and belief, NewEnergy provided Bell Atlantic with the official final proposal sometime in April 2000. Again, Powerweb was not notified, consulted or even given a copy of the proposal to review and approve.

128.    Powerweb provided NewEnergy with the necessary engineering documentation in order to prepare the final proposal to Bell Atlantic. At this time, Powerweb's development costs associated with Omni-Link and the Bell Atlantic project had already exceeded $100,000.

129.    On or about May 15, 2000, Powerweb learned that Bell Atlantic had decided not to implement the project in 2000, but would be implementing it in the summer of 2001. NewEnergy reassured Powerweb that it had every intention of pursuing the Bell Atlantic project as a joint venture with Powerweb.

### NewEnergy Stole the Energy Technology
### Information and Is Using It to Compete with Powerweb

130.    In or around, October 2000, Powerweb discovered that NewEnergy was using Powerweb's Energy Technology information by marketing important aspects of it to customers throughout New Jersey, New York and Pennsylvania. Powerweb has since learned that NewEnergy also is using Powerweb's Energy Technology information with customers in New England, Illinois and California. All of those uses are in direct violation of the Confidentiality Agreement, the Letter Agreement, the Joint Venture Agreement and the Joint Marketing Agreement.

131.    NewEnergy purchased one company and invested in another to develop software and metering technology similar to the Omni-Link System.

132.     NewEnergy also developed its own programs to sell customers' energy and capacity in competition with Powerweb.

133.     In direct breach of the Confidentiality Agreement, the Letter Agreement, the Joint Venture Agreement and the Joint Marketing Agreement, NewEnergy used its confidential relationship with Powerweb to gather as much Energy Technology information as it could in order to secretly develop competing products and services of its own.

134.     NewEnergy never intended to honor its obligations under the Confidentiality Agreement, the Letter Agreement, the Joint Venture Agreement or the Joint Marketing Agreement. Instead, NewEnergy intentionally and successfully concealed its abuse of its position of trust with Powerweb to develop competing products and services using the Energy Technology information.

135.     NewEnergy fraudulently misrepresented its intentions to proceed in a joint venture with Powerweb. At all times material hereto, NewEnergy intended to breach the Confidentiality Agreement in order to compete with Powerweb and the Omni-Link system. NewEnergy intentionally concealed its misconduct from Powerweb.

136.     As described more fully below, NewEnergy also improperly disclosed Energy Technology information to others who have used the information to compete with Powerweb.

**NewEnergy used Energy Technology Information to Pursue Bell Atlantic**

137.     In or around March 2001, NewEnergy submitted a proposal to Bell Atlantic to provide services almost identical to those offered by Powerweb and the Omni-Link System.

138.    Having been educated on Energy Technology Information by NewEnergy without any restrictions placed upon it use, beginning in 2001, Bell Atlantic implemented its own program to sell energy and capacity, eliminating its need for the Omni-Link System.

139.    NewEnergy has facilitated and continues to facilitate Bell Atlantic's program.

140.    Thus, NewEnergy has stolen Powerweb's proprietary information and usurped its prospective business relationship with Bell Atlantic.

### NewEnergy Also Failed to Protect Powerweb's Energy Technology Information from Disclosure to RETX and Silicon Energy

141.    Mr. Scarpelli left CILCO to become Vice President of Strategy and Business Development for RETX shortly after he received Powerweb's confidential and proprietary Energy Technology information.

142.    Mr. Scarpelli improperly shared Powerweb's Energy Technology information with RETX.

143.    Sometime after the Spring of 2000, RETX introduced a new product called Load Management Dispatcher, which was intended to and does compete directly with Powerweb's Omni-Link System.

144.    Prior to obtaining Powerweb's confidential and proprietary information from Mr. Scarpelli, RETX did not have the capability to produce a product that competes with the Omni-Link System.

145.    On January 3, 2001, CILCO announced that it had chosen RETX to perform services similar to Powerweb's Omni-Link System.

146. Upon information and belief, Mr. Scarpelli, RETX and CILCO conspired with NewEnergy to steal Powerweb's confidential and proprietary information in order to develop a product that directly competes with the Omni-Link System.

147. After obtaining Powerweb's confidential and proprietary information, RETX was able to compete with and defeat Powerweb for various contracts, including a large contract with the New England ISO.

148. Moreover, RETX engaged Silicon Energy to assist in the development of the Load Management Dispatcher product. In addition, NewEnergy had several business dealings with Silicon Energy. Powerweb believes, and therefore avers, that through their business dealings, RETX and NewEnergy also disclosed Powerweb's confidential and proprietary information to Silicon Energy.

149. As a result of those disclosures, Silicon Energy developed a product that competes directly with Powerweb's Omni-Link System. Consequently, Powerweb also has lost prospective contracts for the Omni-Link System to Silicon Energy.

150. The Confidentiality Agreement required NewEnergy to "use all reasonable efforts to preserve the Confidentiality of the 'Energy Technology' information." NewEnergy failed to fulfill that obligation, as a result of which Powerweb has lost substantial business to RETX and Silicon Energy.

### NewEnergy Interferes With Powerweb's
### Baltimore Gas & Electric Company Contract

151. Prior to and during this action, Powerweb had a contractual relationship with Baltimore Gas & Electric Company ("BG&E").

152. At all relevant times, BG&E was owned by Constellation Energy Group.

153.    In or about September 2002, Constellation Energy Group acquired NewEnergy, as a result of which, NewEnergy and BG&E became sister companies.

154.    Shortly thereafter, NewEnergy contacted BG&E to discuss Powerweb on at least two occasions that have been disclosed in this litigation. Powerweb believes that there were other occasions as well that have not yet been disclosed.

155.    The representative of NewEnergy known to have contacted BG&E was Jordan Karp. Mr. Karp was NewEnergy's Vice President and Secretary.

156.    Ruth C. Kiselewich was the representative of BG&E whom Mr. Karp is known to have contacted. Ms. Kiselewich was BG&E's Contracts Administrator and was responsible for administration of Powerweb's contract with BG&E.

157.    In their discussions, Mr. Karp pressured Ms. Kiselewich to end BG&E's contractual relationship with Powerweb unless Powerweb agreed to dismiss its counterclaims in this action.

158.    Ms. Kiselewich then contacted Powerweb and "suggested" that Powerweb drop its counterclaims against NewEnergy for the good of Powerweb's relationship with BG&E.

159.    Powerweb declined to follow BG&E's "suggestion."

160.    As a result, in February 2003, BG&E issued a notice of termination of its contract with Powerweb.

161.    BG&E terminated the contract as a direct result of the improper actions of NewEnergy.

**NewEnergy's Wrongful Conduct Is Causing Continuing Harm to Powerweb**

162.    Powerweb has lost and continues to lose substantial profits as a direct result of NewEnergy's misconduct.

163.    Powerweb has a clear right to permanently enjoin NewEnergy from using or disclosing the Energy Technology information and/or other confidential and proprietary information about Powerweb's business and the Omni-Link System to third-parties.

164.    Powerweb will suffer irreparable harm if NewEnergy is not permanently enjoined from disclosing or using that information.

165.    NewEnergy is holding property (the profits it has improperly received using the Energy Technology information it procured from Powerweb) subject to an equitable duty to convey such property to Powerweb.

166.    NewEnergy will be unjustly enriched if permitted to retain that property.

167.    NewEnergy's conduct was deliberate, malicious, wanton and outrageous. Thus, Powerweb is entitled to an award of punitive damages.

## COUNT I
## (Breach of Contract)

168.    Paragraphs 1 through 167 above are incorporated herein by reference.

169.    The Confidentiality Agreement is a valid enforceable contract.

170.    Powerweb has complied with all of its obligations under the Confidentiality Agreement.

171.    NewEnergy has breached its obligations under the Confidentiality Agreement by improperly disclosing Powerweb's Energy Technology information to third-parties and by using Powerweb's Energy Technology information for NewEnergy's own financial gain without Powerweb's prior written approval.

172.    Powerweb has suffered damages as a result of the above.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90

million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT II
### (Breach of Contract)

173.    Paragraphs 1 through 172 above are incorporated herein by reference.

174.    The Letter Agreement was a valid enforceable contract.

175.    Powerweb has complied with all of its obligations under the Letter Agreement.

176.    NewEnergy has breached its obligations under the Letter Agreement by improperly disclosing Powerweb's Energy Technology information to third-parties and by using Powerweb's Energy Technology information for NewEnergy's own financial gain without Powerweb's prior written approval.

177.    NewEnergy also has breached its obligations under the Letter Agreement by independently pursuing similar opportunities in the telecommunications industry, including opportunities with Bell Atlantic.

178.    Powerweb has suffered damages as a result of NewEnergy's breaches of the Letter Agreement.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT III
## (Breach of Contract)

179.    Paragraphs 1 through 178 above are incorporated herein by reference.

180.    The Joint Venture Agreement was a valid enforceable contract.

181.    Powerweb has complied with all of its obligations under the Joint Venture Agreement.

182.    NewEnergy has breached its obligations under the Joint Venture Agreement by improperly disclosing Powerweb's Energy Technology information to third-parties and by using Powerweb's Energy Technology information for NewEnergy's own financial gain without Powerweb's prior written approval.

183.    NewEnergy also has breached its obligations under the Joint Venture Agreement by independently pursuing similar opportunities in the telecommunications industry, including opportunities with Bell Atlantic.

184.    Powerweb has suffered damages as a result of NewEnergy's breaches of the Joint Venture Agreement.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT IV
## (Breach of Contract)

185.    Paragraphs 1 through 184 above are incorporated herein by reference.

186.    The Joint Marketing Agreement was a valid enforceable contract.

187.    Powerweb has complied with all of its obligations under the Joint Marketing Agreement.

188.    NewEnergy has breached its obligations under the Joint Marketing Agreement by improperly disclosing Powerweb's Energy Technology information to third-parties and by using Powerweb's Energy Technology information for NewEnergy's own financial gain without Powerweb's prior written approval.

189.    NewEnergy also has breached its obligations under the Joint Marketing Agreement by independently pursuing similar opportunities with other customers in the PJM and New York ISO territories.

190.    Powerweb has suffered damages as a result of NewEnergy's breaches of the Joint Marketing Agreement.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT V
### (Breach of Duty of Good Faith and Fair Dealing)

191.    Paragraphs 1 through 190 above are incorporated herein by reference.

192.    NewEnergy owed a duty to Powerweb to perform its obligations under the Confidentiality Agreement, the Letter Agreement, the Joint Venture Agreement and the Joint Marketing Agreement and to conduct itself in accordance with the implied duty of good faith and fair dealing.

193.    NewEnergy breached its duty of good faith and fair dealing by, among other things, using the Confidentiality Agreement to procure confidential and proprietary information in order to develop its own competing products and services and thereby deprive Powerweb of the intended benefits of its bargain.

194.    As a direct result of NewEnergy's breach of the covenant of good faith and fair dealing, Powerweb has suffered damages.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

### COUNT VI
### (Unjust Enrichment)

195.    Paragraphs 1 through 194 above are incorporated herein by reference.

196.    Powerweb shared its confidential and proprietary information with NewEnergy.

197.    Powerweb did so with the expectation that NewEnergy would use such information only if and as authorized by Powerweb, and that Powerweb would be fairly compensated for the value of such information.

198.    NewEnergy has been unjustly enriched by accepting the information and retaining its benefits without fairly compensating Powerweb for its value.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly

enriched, lost profits, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT VII
### (Breach of Fiduciary Duty)

199.    Paragraphs 1 through 198 above are incorporated herein by reference.

200.    Pursuant to the Joint Venture Agreement and the Joint Marketing Agreement, NewEnergy owed a fiduciary duty to Powerweb to protect Powerweb's confidential and proprietary Energy Technology information, Powerweb's unique position in the market, and Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers.

201.    NewEnergy breached its fiduciary duty to Powerweb by improperly utilizing its position of trust with Powerweb to procure, improperly disclose and misappropriate confidential and proprietary Energy Technology information.

202.    NewEnergy used the confidential proprietary information to develop its own competing products and services and to interfere with Powerweb's existing and prospective economic relationships with commercial energy consumers.

203.    NewEnergy also used the confidential proprietary information to develop a project with Bell Atlantic with the specific intent of excluding Powerweb in order to realize more profit for itself.

204.    Powerweb has suffered damages as a direct result of NewEnergy's breaches of fiduciary duties.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90

million, including a constructive trust for all amounts by which NewEnergy has been unjustly

enriched, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin

NewEnergy from any further use or disclosure of the Energy Technology information and grant

such other relief as may be appropriate and just.

**COUNT VIII**
**(Fraudulent Misrepresentation)**

205.    Paragraphs 1 through 204 above are incorporated herein by reference.

206.    Prior to entering into the Confidentiality Agreement, the Letter

Agreement, the Joint Venture Agreement and the Joint Marketing Agreement, NewEnergy and

Mr. McGeown made numerous representations to Powerweb concerning their intention to

proceed with a joint venture with Powerweb and falsely assured Powerweb that neither

NewEnergy nor its affiliates intended to compete with Powerweb or the Omni-Link System.

207.    Once Powerweb entered into the agreements, NewEnergy also made

representations to Powerweb concerning CILCO's intention to proceed in a similar joint venture

with Powerweb.

208.    NewEnergy's representations were material to each of the transactions and

disclosures.

209.    NewEnergy made the representations knowing that they were false and

with the specific intent to induce Powerweb to provide NewEnergy and CILCO with the details

of the proposed Bell Atlantic project, the reserve capacity sales market, the Energy Technology

information and the patented Omni-Link System.

210.    Justifiably relying on the representations, Powerweb entered into the

Confidentiality Agreement, the Letter Agreement, the Joint Venture Agreement and the Joint

Marketing Agreement with NewEnergy and provided NewEnergy with the Energy Technology

-21-

information and certain other confidential and proprietary information about the market, the Omni-Link System, and the Bell Atlantic project.

211.    Justifiably relying on NewEnergy's representations concerning CILCO's interest in a joint venture, and reasonably relying on Mr. McGeown's assurances that information disclosed to affiliates of NewEnergy would be protected under the Confidentiality Agreement, Powerweb provided Mr. Scarpelli with confidential and proprietary information.

212.    NewEnergy and Mr. Scarpelli have both used the Energy Technology information and the other confidential and proprietary information to compete with Powerweb and the Omni-Link System and to otherwise tortiously interfere with Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT IX
### (Misappropriation of Trade Secrets)

213.    Paragraphs 1 through 212 above are incorporated herein by reference.

214.    Through its fraudulent and other tortious conduct described above, NewEnergy improperly procured trade secrets from Powerweb including the Energy Technology information.

215.    NewEnergy improperly used the confidence reposed in it by Powerweb to obtain the confidential and proprietary information necessary to advance a rival business interest

and to otherwise interfere with Powerweb's prospective business relationships with Bell Atlantic and other commercial energy consumers.

216.    NewEnergy also improperly caused the disclosure of Powerweb's trade secrets to RETX and Silicon Energy, which also used them to advance rival business interests and to otherwise interfere with Powerweb's prospective business relationships.

217.    Powerweb has suffered damages as a direct result of NewEnergy's possession, disclosure and use of the trade secrets.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT X
### (Tortious Interference With Prospective Contractual Relations)

218.    Paragraphs 1 through 217 above are incorporated herein by reference.

219.    Because Powerweb had pioneered the reserve capacity sales business and had developed the patented Omni-Link System, Powerweb was in a unique position to provide many large commercial energy consumers with enormous savings on their energy consumption.

220.    Powerweb had several prospective contractual relations with Bell Atlantic and other commercial energy consumers in which Powerweb could provide them with the benefits of the Omni-Link System.

221.    NewEnergy purposefully and improperly obtained confidential and proprietary information from Powerweb with the intention of interfering with Powerweb's

prospective contractual relations with Bell Atlantic and other commercial energy consumers. The sole purpose in obtaining the information was to interfere with Powerweb's prospective contractual relations.

222.    New Energy was not privileged or justified in its intention to interfere with Powerweb's prospective contractual relations.

223.    Powerweb has suffered actual legal damages as a direct result of New Energy's tortious conduct.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT XI
### (Tortious Interference With Existing Contractual Relations)

224.    Paragraphs 1 through 223 above are incorporated herein by reference.

225.    As described more fully above, NewEnergy caused BG&E to terminate its contract with Powerweb in an effort to force Powerweb to abandon the counterclaims asserted in this lawsuit.

226.    NewEnergy was neither privileged nor justified to interfere with Powerweb's contractual relationship with BG&E.

227.    Powerweb has suffered actual damages as a direct result of NewEnergy's tortious conduct.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT XII
### (Unfair Competition)

228.    Paragraphs 1 through 227 above are incorporated herein by reference.

229.    As described more fully above, NewEnergy has diverted business from Powerweb by means of its fraudulent misrepresentations and wrongful use of confidential information, has misappropriated Powerweb's trade secrets, has tortiously interfered with Powerweb's prospective and existing contractual relationships, and with respect to BG&E, has substantially interfered with the ability of Powerweb to compete on the merits of its products and services.

230.    Accordingly, NewEnergy has engaged in unfair competition.

231.    The unfair competition has resulted in actual damages to Powerweb.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

_____

Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Nicholas J. Nastasi, Esquire
Atty. I.D. Nos. 25336, 74948, 82102
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA  19102
(215) 972-1961; -7187; -1983
Attorneys for Powerweb, Inc.,
 A-Valey Engineers, Inc. and
 Lothar E.S. Budike, Jr.

Dated:  April 28, 2004