## SECOND AMENDED COUNTERCLAIMS

Powerweb Technologies, Inc. ("Powerweb") asserts the following Counterclaimsamended counterclaims against Constellation New Energy, Inc. ("NewEnergy and additional parties AES CILCO and RETX, Inc."):

### The New Parties

86.    AES CILCO ("CILCO") is a corporation organized and existing under the laws of the state of Illinois with its principal place of business located at 300 Liberty Street, Peoria, Illinois, 61602. CILCO is a gas and electric utility serving customers in Central Illinois. At all times relevant hereto, CILCO was part of the AES Corporation, a global power company with plants and offices throughout North America and in over 20 countries worldwide. On or about January 31, 2003, CILCO and its parent company, Cilcorp, were sold to Ameren Corporation.

87.    RETX, Inc. ("RETX") is a corporation organized and existing under the laws of the state of Delaware and headquartered at 5883 Glenridge Drive, Plaza 400, Suite 180, Atlanta, Georgia 30328. RETX is a privately held corporation founded in 1998 working with electric and gas distribution utilities, load serving entities, ISOs and retail service providers that have or plan to deregulate their energy services. RETX does business throughout North America, including Pennsylvania.

### Jurisdiction over CILCO and RETX

88.    This Court has personal jurisdiction over CILCO and RETX pursuant to the Pennsylvania long-arm statute, 42 Pa. C.S.A. § 5322, and the due process clause of the Fourteenth Amendment.

~~89.    This Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332, because this is an action between citizens of different states, and the amount in controversy exceeds $75,000.~~

## Introduction

~~90.    From 1999 to the present, NewEnergy systematically and improperly procured certain confidential and proprietary information about Powerweb and its business in order to form a business to compete with technology that Powerweb pioneered. Powerweb's technology revolutionized the energy industry and has provided energy suppliers the ability to sell consumers new energy products and energy management services that generate additional revenues in the hundreds of millions of dollars. NewEnergy fraudulently stole Powerweb's confidential and proprietary information and has tortiously interfered with Powerweb's existing and prospective contractual relations with utilities and energy service providers.~~

~~91.    In February 2000, CILCO, then a sister-company of NewEnergy and with the help of NewEnergy, improperly procured confidential information regarding Powerweb's "Energy Technology." Thereafter, CILCO unlawfully shared Powerweb's confidential information with RETX through Peter Scarpelli ("Scarpelli"). At the time, Scarpelli was a CILCO Vice President. Thereafter, Scarpelli became Vice President of Strategy and Business Development for RETX. Scarpelli still holds this position. Together, based on Powerweb's stolen confidential and proprietary information, CILCO and RETX conspired to create a product that unfairly competes with Powerweb's technology, thereby tortiously interfering with Powerweb's existing and prospective contractual relations.~~

86.     NewEnergy procured confidential and proprietary information from Powerweb under a strict confidentiality agreement on numerous occasions from 1999 to 2001 and then breached the agreement by using the information to develop competing products and services of its own and by disclosing it to others who also became competitors of Powerweb.

87.     As a result of NewEnergy's misconduct, Powerweb has suffered and will continue to suffer damages totaling more than $90 million.

**Powerweb and the Omni-Link System**

88.     ~~92.~~ Powerweb is a privately held corporation based in Media, Pennsylvania. Powerweb is in the business of, among other things, providing energy ~~trading~~ services to utility companies and independent energy ~~service~~ providers who, in turn, ~~provide these~~sell the services to large commercial energy consumers. Powerweb has been engaged in the design, development, installation and operation of information services and control systems for the management of energy consumption for the past thirteen years.

89.     ~~93.~~ In or about 1996, the ~~energy industry was~~electricity markets in various regions across the United States began to be deregulated, opening the door to competition and the development of new ideas and programs to help consumers conserve and manage ~~the~~their consumption of energy in order to save money on energy expenditures.

94.     ~~Powerweb immediately saw an opportunity, one that no one else had identified to that date, to utilize untapped electrical resources (through on site~~

~~generation or load reduction) to provide significant savings to large commercial energy consumers.~~

90. ~~95.~~ Because electricity cannot be stored, all power that is generated must be consumed instantaneously ~~in order to balance and deliver electricity on the grid. Due to the characteristics of electricity~~. Moreover, when the ambient temperature rises, electricity becomes more difficult to transport over the grid. ~~The constant challenge to balance the grid and meet instantaneous~~ These factors, among others, make balancing the supply and demand ~~requirements has made~~ of energy a constant challenge, and make electricity ~~the most~~ prices extremely volatile ~~commodity~~. During high demand periods, the wholesale price ~~for each unit~~ of electricity can fluctuate by as much as 1,000%.

91. ~~96.~~ Having provided its services to large commercial energy consumers for many years, Powerweb was aware that many of its customers ~~had their own~~ have energy resources of their own, such as stand-by electrical ~~generation capabilities that were designed to be used during times of~~ generators installed for emergency ~~use~~. Powerweb ~~set out to design a system that would deploy these resources, as well as others,~~ designed a system that enables customers to profit from those resources by selling capacity in deregulated energy markets and by using the resources during high-demand periods ~~and~~ in order to sell back pre-purchased blocks of energy ~~and capacity on the energy market through the utility companies or energy service providers~~ when prices ~~for energy~~ are high. The ~~net result is that the~~ system allows consumers and energy suppliers to share the ~~resale of this energy and~~ profits from such sales of capacity and energy, creating a true win-win opportunity.

92. ~~97.~~ Powerweb ~~developed a three module~~'s system (the "Omni-Link System") ~~that uses~~includes (1) patented monitoring and control technology, (2) patented Omni-Link™ internet-service software, and (3) ~~sophisticated~~ contracting documents, to monitor the price of electricity in the forward energy market, ~~instruct the~~to turn on stand-by generators ~~to turn on~~, and to accomplish the ~~buy back and resale transaction of the electricity blocks~~sale transactions in the energy market ~~("energy trading services"). These energy trading services~~. The system also ~~offered~~allows utilities and energy service providers ~~the opportunity to capitalize on reserve capacity sales~~.

~~98.    Powerweb developed and patented the software internet platform to computerize these energy trading services for large commercial companies and named the software Omni-Link™. By combining the software, its patented monitoring and control technology, and the contracting documents, Powerweb launched the Omni-Link System with a pharmaceutical company in Pennsylvania.~~

~~99.    The Omni-Link System provides Powerweb's customers with central control of distributed generation energy resources, load management, real-time energy information and analysis, and integration with commercial building management systems. Powerweb works with utilities, energy marketers, and independent system operators nationwide to use the Omni-Link System to monitor, manage and conserve energy consumption~~to hedge their portfolios of capacity and energy.

93. ~~100.~~ With the Omni-Link System in place, Powerweb was well-positioned to revolutionize the energy industry because the Omni-Link System offered utility companies, energy service providers, and consumers a unique approach to achieve hundreds of millions of dollars in potential savings that would otherwise be unrealized.

The Omni-Link System was the only one of its kind, and Powerweb took every precaution to protect its proprietary interests in it.

94. Powerweb first launched the Omni-Link System with a pharmaceutical company in Pennsylvania. As a result, the company saved hundreds of thousands of dollars in the first year alone. Since then, Powerweb has licensed the system to more than a thousand other customers.

95. Among other things, the Omni-Link System provides Powerweb's customers with central control of distributed generation energy resources, load management, real-time energy information and analysis, and integration with commercial building management systems. Powerweb works with utilities, energy marketers, and independent system operators nationwide to use the Omni-Link System to monitor, manage and conserve energy consumption.

### Powerweb Markets Omni-Link to Bell Atlantic

96. ~~101.~~ On or about March 12, 1999, Powerweb's President and Chief Executive Officer, ~~Mr~~Lothar E.S. Budike, Jr., approached the Bell Atlantic Corporation ("Bell Atlantic" n/k/a Verizon) to offer the ~~energy trading services~~use of the Omni-Link System at Bell Atlantic's New Jersey facilities. Powerweb estimated that Bell Atlantic could save as much as 15% on its energy expenditures in the first year alone.

97. ~~102.~~ Bell Atlantic was very interested in the Omni-Link System and suggested that Powerweb coordinate with Bell Atlantic's energy supplier, NewEnergy~~, in order to explore implementation of the Omni-Link System. Bell Atlantic's Real Estate Manager, Jim Goodman, told Powerweb to contact David McGeown at NewEnergy to coordinate the effort~~.

### Powerweb Offers NewEnergy a Joint- Venture Opportunity
### to Market the Omni-Link System to Bell Atlantic and Other Customers

98. ~~103.~~ On or about July 15, 1999, ~~Powerweb~~Mr. Budike wrote to ~~David McGeown at~~ NewEnergy introducing Powerweb and the Omni-Link System and describing Powerweb's relationship with Bell Atlantic.

**99.** ~~104.~~ From August through October 1999, Powerweb met with NewEnergy ~~a total of 12~~numerous times at its offices in New York City. At the meetings, the parties discussed generally how the Omni-Link System could be utilized to maximize savings to Bell Atlantic~~.~~ and other customers. As a first step, Powerweb and NewEnergy discussed the possibility of entering into a joint- venture to ~~market~~implement the Omni-Link System ~~to~~at certain of Bell Atlantic's facilities.

### The Confidentiality Agreement

100. ~~105.~~ NewEnergy insisted on receiving all of the technical information on the Omni-Link System before it would consider whether or not to proceed with the Bell Atlantic project.

~~106. In order to protect its proprietary interest in the Omni-Link System, in its energy trading and conservation products and services, and in its prospective business relationship with Bell Atlantic and other prospective customers, Powerweb asked NewEnergy to enter into a broad confidentiality agreement.~~

101. ~~107.~~ NewEnergy made ~~certain~~numerous representations to Powerweb in order to induce Powerweb to provide NewEnergy with its proprietary information regarding the Omni-Link System. For example, NewEnergy stated that it had every intention of proceeding with a joint- venture to market the Omni-Link System to

Bell Atlantic and to other customers in the future. NewEnergy also assured Powerweb that it would not attempt to compete with Powerweb or the Omni-Link System.

102.    In order to protect its proprietary interest in the Omni-Link System, in its energy trading and conservation products and services, and in its prospective business relationships with Bell Atlantic and other customers, Powerweb asked NewEnergy to enter into a written confidentiality agreement.

103.    ~~108.~~ On or about October 11, 1999, David I. McGeown, Director of Energy Services for AES Corporation and NewEnergy, signed a ~~Confidentiality Agreement~~ confidentiality agreement with Powerweb ("Confidentiality Agreement") on behalf of NewEnergy and all of its ~~subsidiaries, joint ventures,~~ affiliates ~~and sub-contractors. A,~~ a true and correct copy of ~~the Confidentiality Agreement~~ which is attached hereto as Exhibit A.

104.    ~~109.~~ The Confidentiality Agreement provides:

> WHEREAS, Powerweb Technologies is the legal owner of a number of energy sensing and energy reduction inventions comprised of gas sensing technologies, electronic metering devices, electricity control devices, and electricity consumption devices; and
>
> WHEREAS, Powerweb Technologies is also the legal owner of a patented integrated translation software system (Omni-Link®) which is utilized for energy information transfer, energy procurement, and facility based monitoring. Omni-Link® is comprised of digital sensors, networking communication protocol, computer server configurations, and a graphical machine-man interface; and
>
> WHEREAS, Powerweb is also the developer of custom "stand-by generation" capacity credit programs which utilize the above mentioned technologies to sell back capacity on the open market as well as leverage energy procurement in deregulated electricity territories; and

WHEREAS, all of these above mentioned technologies, inventions, and energy resale strategies are collectively known as "Energy Technology."

105. ~~110.~~ The Confidentiality Agreement prohibits NewEnergy and its affiliates from disclosing any "<u>'</u>Energy Technology<u>"'</u> information<u>"</u> to any third-party and also prohibits NewEnergy from using any of the "Energy Technology" information for any purpose whatsoever without the prior written approval of Powerweb. Thus, the Confidentiality Agreement specifically prohibits NewEnergy and its affiliates from using the information it received in its confidential relationship with Powerweb to ~~start a rival business to~~<u>offer products or services that</u> compete with Powerweb and the Omni-Link System. The term of the Confidentiality Agreement is ten years.

106. ~~111.~~ With the Confidentiality Agreement in place, Powerweb ~~proceeded to disclose the technical details of the Omni-Link System~~<u>disclosed protected Energy Technology information</u> to NewEnergy in order to proceed with the development of the proposed Bell Atlantic project. <u>For example,</u> Powerweb provided NewEnergy's technical analyst, ~~Mr.~~ Kirk Hampton, with ~~a series of~~ documents that described every aspect of the Omni-Link System~~. This included~~<u>, including</u> infrastructure diagrams, patent applications, internet architecture diagrams, ~~proprietary~~ information ~~on~~<u>regarding</u> the metering technology, internet protocol information and other confidential information. At the time of each submission, Powerweb emphasized the importance of the confidential relationship and reminded NewEnergy of its obligations under the Confidentiality Agreement.

**The Contracting Documents**

107.    ~~112.~~ One of the most significant cost-savings programs Powerweb offered to Bell Atlantic involved the ~~resale~~sale of electricity capacity from Bell Atlantic ~~back~~ to the energy grid ~~through the internet~~ ("reserve capacity sales"). Bell Atlantic was able to realize significant cost-savings through that program by ~~utilizing~~committing to use its own electrical generation resources during certain limited high-demand time periods.

~~113.    In order to implement the cost-savings program at Bell Atlantic, NewEnergy needed to be able to resell unused blocks of energy and capacity from Bell Atlantic to its other energy consumers.~~

108.    Another of Powerweb's significant cost-savings programs permitted Bell Atlantic to sell pre-purchased electricity back to the energy market at a substantial profit when energy prices are high.

109.    ~~114. Powerweb, having pioneered the idea of reserved capacity sales programs, had already spent an enormous amount of time and money developing a program to implement a buy-back and resale of electricity and capacity in the energy market.~~ After extensive research and development, Powerweb had acquired and then further developed the contracts necessary to achieve ~~a resale~~the sales of capacity and electricity in the energy market ~~while ensuring that the concept satisfied all of the~~in full compliance with all applicable government and market rules and regulations. This contracting information was extremely confidential and proprietary.

110.    ~~115.~~ NewEnergy insisted on receiving the contracting and regulatory information from Powerweb in order to satisfy itself of the viability of this unique concept and facilitate the development of the Bell Atlantic project. NewEnergy

stated that it required the information to revise its current agreements with end-use customers to allow for the resale of the electricity and to ensure that the project met all of the regulatory guidelines.

111. ~~116.~~ Again, NewEnergy stated that it had no intention of competing with Powerweb or the Omni-Link System.

### The Letter Agreement

112. ~~117. Powerweb requested that NewEnergy sign a written letter agreement.~~ On or about October ~~25,~~26, 1999, NewEnergy signed a written ~~letter agreement memorializing the parties'~~Letter of Intent purporting to memorialize NewEnergy's intent to proceed with ~~a joint venture to market the project to~~Powerweb in the proposed Bell Atlantic _project ("Letter Agreement"), a true and correct copy of which is attached hereto as Exhibit B.

113. ~~118.~~ The Letter Agreement provides, in part:

> [NewEnergy] acknowledges that [Powerweb] brought the concept of reserve capacity sales to the PJM to [NewEnergy] and agrees not to independently pursue this opportunity in the telecommunications industry (specifically Bell Atlantic). In addition, [NewEnergy] agrees to maintain all confidentiality obligations detailed in the executed non-disclosure agreement.

114. ~~119.~~ After the Letter Agreement was signed, Powerweb provided NewEnergy with the proprietary contracting and regulatory information it had requested.

### The Joint- Venture Agreement

115. ~~120.~~ After some negotiation, ~~on January 7, 2000,~~ Powerweb and NewEnergy executed an ~~exclusive agreement to market the Bell Atlantic project ("Joint~~ Exclusive Agreement for Bell Atlantic on January 7, 2000 and an Exclusive Bell Atlantic Agreement Addendum: Profit Distribution Agreement on January 8, 2000 (collectively,

"Joint Venture Agreement"), a true and correct ~~copy~~copies of which ~~is~~are attached hereto as Exhibit C.

116. ~~121. The Joint~~The Confidentiality Agreement was expressly included as part of the Joint Venture Agreement ~~reemphasized the~~, thereby reaffirming its importance ~~of the Confidentiality Agreement and specifically prohibited~~and prohibiting NewEnergy from independently pursuing any similar business opportunities ~~for the reserve capacity sale of electricity.~~with Bell Atlantic until the Confidentiality Agreement expires on October 11, 2009.

**The Joint- Marketing Agreement**

117. ~~122. O~~On or about ~~January~~February 8, 2000, Powerweb and NewEnergy entered into ~~a joint marketing agreement~~an Exclusive PWT Customer Marketing Agreement whereby the parties agreed to jointly market the ~~Omni Link System to NewEnergy's customers throughout Pennsylvania, New Jersey, and Maryland ("Joint~~ Energy Technology information to other customers located in the PJM and the New York ISO territories ("Joint Marketing Agreement"), a true and correct copy of which is attached hereto as Exhibit D.

118. The Confidentiality Agreement was expressly included as part of the Joint Marketing Agreement, thereby reaffirming its importance and prohibiting NewEnergy from independently pursuing any similar business opportunities until the Confidentiality Agreement expires on October 11, 2009.

**NewEnergy ~~Authorizes~~Authorized Powerweb to Spend the
$100,000 Pursuant to the Joint- Venture Agreement**

119.    ~~123.~~On February 3, 2000, NewEnergy ~~instructed~~asked Powerweb to begin development of ~~the~~a detailed ~~project~~ implementation plan for the Bell Atlantic project ~~immediately~~.

120.    ~~124.~~On or about February 7, 2000, Powerweb outlined the specific tasks that would be undertaken to develop the Bell Atlantic project implementation plan. Powerweb notified NewEnergy that the necessary tasks ~~could easily~~would cost more than the ~~initial~~ $100,000 allocated for the development of the plan. In response, Mr. McGeown instructed Mr. Budike to "get it done."

**NewEnergy ~~Instructs~~Instructed Powerweb to Send
Confidential Information ~~on The Omni-Link System to CILCO~~to Peter Scarpelli
and Andrew Singer**

121.    ~~125.~~In early February 2000, ~~NewEnergy requested that Powerweb contact~~Mr. McGowan asked Mr. Budike to contact Peter Scarpelli, who was then employed by NewEnergy's sister company, CILCO, in Chicago, Illinois, and Andrew Singer, an executive at NewEnergy's office in Los Angeles, California, regarding the creation of ~~a~~additional marketing ~~plan~~plans similar to the Joint- Venture Agreement ~~between Powerweb and NewEnergy. Specifically, NewEnergy directed Powerweb to contact Scarpelli then Vice President of CILCO,~~ but covering other regions of the country.

122.    ~~126.~~As a result, ~~Scarpelli requested Powerweb to send CILCO Powerweb's~~on February 7, 2000, Mr. Budike sent confidential and proprietary Energy Technology information to Messrs. Scarpelli and Singer regarding the ~~"Omni-Link System Energy Technology."~~Omni-Link System and the Joint Venture Agreement. With

-13-

respect to Mr. Scarpelli, Mr. Budike reasonably relied on the protections Mr. McGowan purported to provide in the Confidentiality Agreement on behalf of all affiliates of NewEnergy.

127.   ~~Pursuant to NewEnergy's and CILCO's requests and under the protections of the Confidentiality Agreement, Powerweb sent confidential information concerning the "Omni-Link System Energy Technology" to Scarpelli at CILCO.~~

128.   ~~Again pursuant to NewEnergy and CILCO's requests and under the protections of the Confidentiality Agreement, Powerweb also sent confidential information concerning the Joint Venture Agreement directly to Scarpelli at CILCO.~~

123.   In addition, Mr. McGeown directly disclosed aspects of Powerweb's confidential and proprietary Energy Technology information to Messrs. Scarpelli and Singer.

**NewEnergy ~~Makes~~Made Its Presentation to
Bell Atlantic Without Notifying Powerweb**

124.   ~~129.~~ On or about November 4, 1999, Powerweb asked NewEnergy to enter into a confidentiality agreement with Bell Atlantic prohibiting any unauthorized disclosure or use of Powerweb's Energy Technology information by Bell Atlantic. NewEnergy falsely represented to Powerweb that such an agreement was already in place between NewEnergy and Bell Atlantic.

125.   Powerweb relied on NewEnergy's misrepresentation regarding a confidentiality agreement with Bell Atlantic in permitting NewEnergy to share Energy Technology information with Bell Atlantic.

126. <u>On or about</u> February 25, 2000, NewEnergy~~, without contacting or consulting Powerweb,~~ provided Bell Atlantic with an initial proposal for the project <u>without first contacting or consulting Powerweb</u>.

127. ~~130.~~ Upon information and belief, NewEnergy provided Bell Atlantic with the official final proposal sometime in April 2000. Again, Powerweb was not notified, consulted or even given a copy of the proposal to review <u>and approve</u>.

128. ~~131.~~ Powerweb provided NewEnergy with the necessary engineering documentation in order to prepare the final proposal to Bell Atlantic. At this time, Powerweb's development costs associated with Omni-Link and the Bell Atlantic project had already exceeded $100,000.

129. ~~132.~~ On or about May 15, 2000, Powerweb learned that Bell Atlantic had decided not to implement the project in 2000, but would be implementing it in the summer of 2001. NewEnergy reassured Powerweb that it had every intention of pursuing the Bell Atlantic project as a joint- venture <u>with Powerweb</u>.

**~~Powerweb Discovers That~~ NewEnergy Stole the ~~Omni-Link System~~<u>Energy Technology</u>**

**<u>Information and Is Using It to Compete with</u> ~~the Omni-Link System in the Energy Industry~~<u>Powerweb</u>**

130. ~~133.~~ In or around, October 2000, Powerweb discovered that NewEnergy was using ~~the "~~<u>Powerweb's</u> Energy Technology~~"~~ <u>information</u> by marketing ~~Powerweb's energy trading concepts~~<u>important aspects of it</u> to customers throughout New Jersey, New York and Pennsylvania. <u>Powerweb has since learned that NewEnergy also is using Powerweb's Energy Technology information with customers in New England, Illinois and California. All of those uses are</u> in direct violation of the Confidentiality

Agreement, the Letter Agreement, the Joint- Venture Agreement and the Joint-Marketing Agreement.

~~134.    NewEnergy made an investment in a technology company to develop software similar to the Omni-Link software.~~

131.    ~~135.~~ NewEnergy purchased ~~its own metering company to provide services~~ one company and invested in another to develop software and metering technology similar to ~~those provided by~~ the Omni-Link System.

132.    ~~136. Upon information and belief,~~ NewEnergy also developed its own programs to sell customers' energy and capacity ~~resale product to compete with the Omni-Link System~~ in competition with Powerweb.

133.    ~~137.~~ In direct breach of the Confidentiality Agreement, the Letter Agreement, the Joint- Venture Agreement and the Joint- Marketing Agreement, NewEnergy used its confidential relationship with Powerweb to gather as much ~~information as possible about the~~ "Energy Technology,~~" Powerweb's business, and the Omni-Link System~~ information as it could in order to secretly ~~commence a rival business to compete with Powerweb~~ develop competing products and services of its own.

134.    ~~138. Upon information and belief,~~ NewEnergy never intended to honor its obligations under the Confidentiality Agreement, the Letter Agreement, the Joint- Venture Agreement or the Joint- Marketing Agreement. Instead, NewEnergy intentionally and successfully concealed its abuse of its position of trust with Powerweb to ~~start a~~ develop competing ~~business~~ products and services using the "Energy Technology~~"~~ information.

135. ~~139. Upon information and belief,~~ NewEnergy fraudulently misrepresented its intentions to proceed in ~~this business with Powerweb in~~ a joint-venture with Powerweb. At all times material hereto, NewEnergy intended to breach the Confidentiality Agreement in order to compete with Powerweb and the Omni-Link system. NewEnergy intentionally concealed its misconduct from Powerweb.

136. ~~140. Upon information and belief~~As described more fully below, NewEnergy has~~also~~ improperly ~~shared some or all of the~~ "disclosed Energy Technology" information ~~with numerous third-parties that~~to others who have used the information to compete with Powerweb ~~and the Omni-Link System~~.

~~141. Upon information and belief, Powerweb has lost profits in an amount exceeding $100,000,000 as a direct result of NewEnergy's misconduct described above.~~

**NewEnergy ~~Steals the~~used Energy Technology Information to Pursue Bell Atlantic Project**

137. ~~142.~~ In or around ~~the Summer of~~March 2001, NewEnergy submitted a proposal to Bell Atlantic ~~notified Powerweb that it had entered into a contract with NewEnergy in which NewEnergy was~~ to provide services almost identical to those offered by Powerweb and the Omni-Link System. ~~NewEnergy had stolen Powerweb's proprietary information and usurped its prospective business relationship with Bell Atlantic.~~

138. Having been educated on Energy Technology Information by NewEnergy without any restrictions placed upon it use, beginning in 2001, Bell Atlantic implemented its own program to sell energy and capacity, eliminating its need for the Omni-Link System.

139. NewEnergy has facilitated and continues to facilitate Bell Atlantic's program.

140. Thus, NewEnergy has stolen Powerweb's proprietary information and usurped its prospective business relationship with Bell Atlantic.

**NewEnergy Also Failed to Protect Powerweb's Energy
Technology Information from Disclosure to RETX and Silicon Energy**

141. Mr. Scarpelli left CILCO to become Vice President of Strategy and Business Development for RETX shortly after he received Powerweb's confidential and proprietary Energy Technology information.

142. Mr. Scarpelli improperly shared Powerweb's Energy Technology information with RETX.

143. Sometime after the Spring of 2000, RETX introduced a new product called Load Management Dispatcher, which was intended to and does compete directly with Powerweb's Omni-Link System.

144. Prior to obtaining Powerweb's confidential and proprietary information from Mr. Scarpelli, RETX did not have the capability to produce a product that competes with the Omni-Link System.

145. On January 3, 2001, CILCO announced that it had chosen RETX to perform services similar to Powerweb's Omni-Link System.

146. Upon information and belief, Mr. Scarpelli, RETX and CILCO conspired with NewEnergy to steal Powerweb's confidential and proprietary information in order to develop a product that directly competes with the Omni-Link System.

147.    After obtaining Powerweb's confidential and proprietary information, RETX was able to compete with and defeat Powerweb for various contracts, including a large contract with the New England ISO.

148.    Moreover, RETX engaged Silicon Energy to assist in the development of the Load Management Dispatcher product. In addition, NewEnergy had several business dealings with Silicon Energy. Powerweb believes, and therefore avers, that through their business dealings, RETX and NewEnergy also disclosed Powerweb's confidential and proprietary information to Silicon Energy.

149.    As a result of those disclosures, Silicon Energy developed a product that competes directly with Powerweb's Omni-Link System. Consequently, Powerweb also has lost prospective contracts for the Omni-Link System to Silicon Energy.

150.    The Confidentiality Agreement required NewEnergy to "use all reasonable efforts to preserve the Confidentiality of the 'Energy Technology' information." NewEnergy failed to fulfill that obligation, as a result of which Powerweb has lost substantial business to RETX and Silicon Energy.

### NewEnergy Interferes With Powerweb's Baltimore Gas & Electric Company Contract

151.    Prior to and during this action, Powerweb had a contractual relationship with Baltimore Gas & Electric Company ("BG&E").

152.    At all relevant times, BG&E was owned by Constellation Energy Group.

153.    In or about September 2002, Constellation Energy Group acquired NewEnergy, as a result of which, NewEnergy and BG&E became sister companies.

154.     Shortly thereafter, NewEnergy contacted BG&E to discuss Powerweb on at least two occasions that have been disclosed in this litigation. Powerweb believes that there were other occasions as well that have not yet been disclosed.

155.     The representative of NewEnergy known to have contacted BG&E was Jordan Karp. Mr. Karp was NewEnergy's Vice President and Secretary.

156.     Ruth C. Kiselewich was the representative of BG&E whom Mr. Karp is known to have contacted. Ms. Kiselewich was BG&E's Contracts Administrator and was responsible for administration of Powerweb's contract with BG&E.

157.     In their discussions, Mr. Karp pressured Ms. Kiselewich to end BG&E's contractual relationship with Powerweb unless Powerweb agreed to dismiss its counterclaims in this action.

158.     Ms. Kiselewich then contacted Powerweb and "suggested" that Powerweb drop its counterclaims against NewEnergy for the good of Powerweb's relationship with BG&E.

159.     Powerweb declined to follow BG&E's "suggestion."

160.     As a result, in February 2003, BG&E issued a notice of termination of its contract with Powerweb.

161.     BG&E terminated the contract as a direct result of the improper actions of NewEnergy.

**NewEnergy's Wrongful Conduct Is Causing Continuing Harm to Powerweb**

162.     Powerweb has lost and continues to lose substantial profits as a direct result of NewEnergy's misconduct.

163. 143. Powerweb has a clear right to permanently enjoin NewEnergy from using or disclosing the "Energy Technology" information and/or other confidential and proprietary information about Powerweb's ~~reserve capacity sales~~ business and the Omni-Link System to third-parties.

164. 144. Powerweb will suffer irreparable harm if NewEnergy is not permanently enjoined from disclosing or using ~~such~~that information ~~described above~~.

165. 145. Upon information and belief, NewEnergy is holding property (the profits it has improperly received using the "Energy Technology" information it procured from Powerweb) subject to an equitable duty to convey such property to Powerweb.

166. 146. NewEnergy will be unjustly enriched if permitted to retain ~~said~~that property.

167. 147. NewEnergy's conduct was deliberate, malicious, wanton and outrageous. Thus, ~~and~~ Powerweb is ~~therefore~~ entitled to an award of punitive damages.

**~~CILCO Through Scarpelli Steals Powerweb's Energy Technology and Markets This Technology to RETX~~**

~~148. After improperly obtaining Powerweb's confidential proprietary information on behalf of CILCO, Scarpelli became Vice President of RETX.~~

~~149. Sometime after the Spring of 2000, RETX introduced its new product, Load Management Dispatcher. This product was intended to compete and does compete directly with Powerweb's Omni-Link System.~~

~~150. On January 3, 2001, CILCO announced that it had chosen RETX as its load management dispatcher.~~

151. ~~Upon information and belief, CILCO, through Scarpelli, stole Powerweb's confidential and proprietary "Energy Technology."~~

152. ~~Upon information and belief, Scarpelli improperly shared most if not all of the "Energy Technology" information with RETX.~~

153. ~~Upon information and belief, prior to wrongfully obtaining Powerweb's confidential and proprietary information from CILCO through Scarpelli, RETX did not have the capability to produce a product that competes with the Omni-Link System.~~

154. ~~Upon information and belief, CILCO and RETX conspired to use Powerweb's stolen confidential and proprietary information to develop a product that directly competes with the Omni-Link System.~~

155. ~~Upon information and belief, Powerweb has lost and continues to lose profits as a direct result of the misconduct of CILCO and RETX.~~

156. ~~Upon information and belief, Powerweb suffers and will continue to suffer irreparable harm if RETX is not enjoined from marketing its Load Management Dispatcher, the product based upon and created from technology stolen from Powerweb.~~

157. ~~The conduct of CILCO and RETX was deliberate, malicious, wanton and outrageous, and Powerweb is therefore entitled to an award of punitive damages.~~

**COUNT I**
**(Breach of Contract ~~Against New~~Energy ~~and CILCO~~)**

158. ~~Powerweb incorporates here by reference the allegations of paragraphs 1 through 157.~~

-22-

168.    Paragraphs 1 through 167 above are incorporated herein by reference.

169.    ~~159.~~ The Confidentiality Agreement is a valid enforceable contract.

~~160.    McGeown signed the Confidentiality Agreement in his capacity as Director of Energy Services of AES Corporation and NewEnergy.~~

~~161.    The Confidentiality Agreement is binding upon NewEnergy all of its affiliates including CILCO.~~

~~162.    CILCO has breach its obligations under the Confidentiality Agreement by improperly disclosing the "Energy Technology" information and other confidential and proprietary information about Powerweb's reserve capacity sales business and the Omni Link System technology to third parties and by using the "Energy Technology" information and confidential and proprietary information for its own use without Powerweb's prior written approval.~~

~~163.    McGeown had actual and apparent authority to bind AES and all of its affiliates, including but not limited to CILCO and NewEnergy.~~

170.    ~~164.~~ Powerweb has complied with all of its obligations under the Confidentiality Agreement.

171.    ~~165.~~ NewEnergy has breached its obligations under the Confidentiality Agreement by improperly disclosing ~~the~~ "Powerweb's Energy Technology~~"~~ ~~information and other confidential and proprietary information about Powerweb's reserve capacity sales business and the Omni Link System technology~~ information to third-parties and by using ~~the~~ "Powerweb's Energy Technology~~"~~

information and confidential and proprietary information for ~~its~~NewEnergy's own ~~use~~financial gain without Powerweb's prior written approval.

172.    ~~166.~~Powerweb has suffered damages as a result of ~~NewEnergy's breach of the Confidentiality Agreement~~the above.

WHEREFORE, Powerweb ~~demands~~requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with interest, costs, and such other and further relief as this Court deems appropriate~~in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from ~~using~~any further use or disclosure of the "Energy Technology" information ~~or disclosing it to third parties~~and grant such other relief as may be appropriate and just.

### COUNT II
### (Breach of Contract ~~Against NewEnergy~~)

~~167.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 166.~~

173.    Paragraphs 1 through 172 above are incorporated herein by reference.

174.    ~~168.~~The Letter Agreement ~~is~~was a valid enforceable contract.

175.    ~~169.~~Powerweb has complied with all of its obligations under the Letter Agreement.

176.    ~~170.~~NewEnergy has breached its obligations under the Letter Agreement by improperly ~~competing with Powerweb and the Omni-Link System in direct violation of the contract~~disclosing Powerweb's Energy Technology information to

third-parties and by using Powerweb's Energy Technology information for NewEnergy's own financial gain without Powerweb's prior written approval.

177.    NewEnergy also has breached its obligations under the Letter Agreement by independently pursuing similar opportunities in the telecommunications industry, including opportunities with Bell Atlantic.

178.    ~~171.~~ Powerweb has suffered damages as a result of NewEnergy's ~~breach~~breaches of the Letter Agreement.

WHEREFORE, Powerweb ~~demands~~requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with interest, costs, and such other and further relief as this Court deems appropriate~~in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from ~~using~~any further use or disclosure of the "Energy Technology" information ~~or disclosing it to third-parties~~and grant such other relief as may be appropriate and just.

## COUNT III
**(Breach of Contract ~~Against NewEnergy~~)**

~~172.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 171.~~

179.    Paragraphs 1 through 178 above are incorporated herein by reference.

180.    ~~173.~~ The Joint- Venture Agreement ~~is~~was a valid enforceable contract.

181.    ~~174.~~ Powerweb has complied with all of its obligations under the Joint- Venture Agreement.

182. ~~175.~~ NewEnergy has breached its obligations under the Joint-Venture Agreement by improperly ~~competing with Powerweb and the Omni-Link System in direct violation of the contract~~ disclosing Powerweb's Energy Technology information to third-parties and by using Powerweb's Energy Technology information for NewEnergy's own financial gain without Powerweb's prior written approval.

183. NewEnergy also has breached its obligations under the Joint Venture Agreement by independently pursuing similar opportunities in the telecommunications industry, including opportunities with Bell Atlantic.

184. ~~176.~~ Powerweb has suffered damages as a result of NewEnergy's ~~breach~~ breaches of the Joint- Venture Agreement.

WHEREFORE, Powerweb ~~demands~~ requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with interest, costs, and such other and further relief as this Court deems appropriate~~ in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from ~~using~~ any further use or disclosure of the "Energy Technology" information ~~or disclosing it to third-parties~~ and grant such other relief as may be appropriate and just.

### COUNT IV
### (Breach of Contract)

185. Paragraphs 1 through 184 above are incorporated herein by reference.

186. The Joint Marketing Agreement was a valid enforceable contract.

187. Powerweb has complied with all of its obligations under the Joint Marketing Agreement.

188.    NewEnergy has breached its obligations under the Joint Marketing Agreement by improperly disclosing Powerweb's Energy Technology information to third-parties and by using Powerweb's Energy Technology information for NewEnergy's own financial gain without Powerweb's prior written approval.

189.    NewEnergy also has breached its obligations under the Joint Marketing Agreement by independently pursuing similar opportunities with other customers in the PJM and New York ISO territories.

190.    Powerweb has suffered damages as a result of NewEnergy's breaches of the Joint Marketing Agreement.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT V
### (Breach of Duty of Good Faith and Fair Dealing ~~Against NewEnergy and CILCO~~)

~~177.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 176.~~

191.    Paragraphs 1 through 190 above are incorporated herein by reference.

192. ~~178.~~ NewEnergy owed a duty to Powerweb to perform its obligations under the Confidentiality Agreement, the Letter Agreement, ~~and~~ the Joint-Venture Agreement and ~~to conduct itself in accordance with the implied duty of good~~

~~faith and fair dealing.~~the Joint Marketing Agreement and to conduct itself in accordance with the implied duty of good faith and fair dealing.

~~179.    CILCO owed a duty to Powerweb to perform its obligations under the Confidentiality Agreement and to conduct itself in accordance with the implied duty of good faith and fair dealing.~~

193.    ~~180.~~NewEnergy breached its duty of good faith and fair dealing ~~to Powerweb~~ by, among other things, using the Confidentiality Agreement to procure ~~certain~~ confidential~~,~~ and proprietary information ~~from Powerweb in order to design its own software system to compete with the Omni-Link System in the reserve capacity sales market~~in order to develop its own competing products and services and thereby deprive Powerweb of the intended benefits of its bargain.

~~181.    CILCO breached its duty of good faith and fair dealing to Powerweb by, among other things, using the Confidentiality Agreement to procure certain confidential, proprietary information from Powerweb in order to design its own software system to compete with the Omni-Link System in the reserve capacity sales market.~~

194.    ~~182.~~As a direct result of NewEnergy's breach of the covenant of good faith and fair dealing, Powerweb has suffered damages.

~~183.    As a direct result of CILCO's breach of the covenant of good faith and fair dealing, Powerweb has suffered damages.~~

WHEREFORE, Powerweb ~~demands~~requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with interest, costs, and such other and further relief as~~

this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, in an amount equal to the amount by which NewEnergy has been unjustly enriched by its misconduct in excess of $90 million, including lost profits, attorney's fees, interest and costs, and that the Court permanently enjoin NewEnergy from using any further use or disclosure of the "Energy Technology" information or disclosing it to third parties information and grant such other relief as may be appropriate and just.

### COUNT VI
### (Unjust Enrichment)

195.    Paragraphs 1 through 194 above are incorporated herein by reference.

196.    Powerweb shared its confidential and proprietary information with NewEnergy.

197.    Powerweb did so with the expectation that NewEnergy would use such information only if and as authorized by Powerweb, and that Powerweb would be fairly compensated for the value of such information.

198.    NewEnergy has been unjustly enriched by accepting the information and retaining its benefits without fairly compensating Powerweb for its value.

WHEREFORE, Powerweb requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits, interest and costs, and that the Court permanently

enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other relief as may be appropriate and just.

## COUNT ~~V~~VII
### (Breach of Fiduciary Duty ~~Against NewEnergy~~)

~~184.   Powerweb incorporates here by reference the allegations of paragraphs 1 through 183.~~

199.   Paragraphs 1 through 198 above are incorporated herein by reference.

200.   ~~185.~~ Pursuant to the Joint~~-~~ Venture Agreement and the Joint Marketing Agreement, NewEnergy owed a fiduciary duty to Powerweb to protect Powerweb's confidential and proprietary ~~interest in the Omni Link System~~Energy Technology information, Powerweb's unique position in the ~~reserve capacity sales~~ market, and Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers.

201.   ~~186.~~ NewEnergy breached its fiduciary duty to Powerweb by improperly utilizing its position of trust with Powerweb to procure ~~certain~~, improperly disclose and misappropriate confidential and proprietary Energy Technology information ~~about the reserve capacity sale of electricity and the Omni Link System~~.

202.   ~~187.~~ NewEnergy used the confidential proprietary information to develop ~~a software system to compete with Omni Link~~its own competing products and services and to interfere with Powerweb's existing and prospective economic relationships with commercial energy consumers.

203.   ~~188.~~ NewEnergy also used the confidential proprietary information to develop a project with Bell Atlantic ~~for the reserve capacity sale of electricity.~~

NewEnergy did so with the specific intent of excluding Powerweb from the project in order to realize more profit for itself.

204. 189. Powerweb has suffered damages as a direct result of NewEnergy's breachbreaches of fiduciary dutyduties.

WHEREFORE, Powerweb demandsrequests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, in an amount equal to the amountin excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched by its misconduct, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy from using the "any further use or disclosure of the Energy Technology" information or disclosing it to third partiesand grant such other relief as may be appropriate and just.

### COUNT VIVIII
### (Fraudulent Misrepresentation Against NewEnergy and CILCO)

190. Powerweb incorporates here by reference the allegations of paragraphs 1 through 189.

205. Paragraphs 1 through 204 above are incorporated herein by reference.

206. 191. Prior to entering into the Confidentiality Agreement, the Letter Agreement, and the Joint Venture Agreement and the Joint Marketing Agreement, NewEnergy and Mr. McGeown made numerous representations to Powerweb concerning their intention to proceed with a joint venture with Powerweb, its acknowledgment that

and falsely assured Powerweb had pioneered the reserve capacity sales idea, and that neither NewEnergy or~~nor~~ its affiliates ~~did not intend~~intended to compete with Powerweb or the Omni-Link System.

207. ~~192.~~ Once Powerweb entered into ~~these~~the agreements, NewEnergy ~~and CILCO~~also made ~~numerous~~ representations to Powerweb concerning CILCO's intention to proceed in a similar joint- venture with Powerweb.

208. ~~193. These~~NewEnergy's representations were material to each of the transactions and disclosures.

209. ~~194.~~ NewEnergy ~~and CILCO~~ made ~~these~~the representations knowing that ~~the representations~~they were false and with the specific intent to induce Powerweb to provide NewEnergy and CILCO with the details of the proposed Bell Atlantic project, the reserve capacity sales market, the "Energy Technology," information and the patented Omni-Link System.

~~195. Powerweb believes and therefore avers that these representations were false when made to Powerweb and that NewEnergy and CILCO were aware of their falsity.~~

210. ~~196.~~ Justifiably relying on ~~these~~the representations, Powerweb entered into the Confidentiality Agreement, the Letter Agreement, ~~and~~ the Joint- Venture Agreement and the Joint Marketing Agreement with NewEnergy and provided NewEnergy with the "Energy Technology" information and certain other confidential and proprietary information about the ~~reserve capacity sales~~ market, the Omni-Link System, and the Bell Atlantic project.

211. ~~197.~~ Justifiably relying on ~~the~~NewEnergy's representations ~~of NewEnergy and CILCO~~ concerning CILCO's interest in a joint ~~venture and with the understanding that the~~ venture, and reasonably relying on Mr. McGeown's assurances that information disclosed to affiliates of NewEnergy would be protected under the Confidentiality Agreement, Powerweb provided ~~CILCO~~Mr. Scarpelli with confidential and proprietary information.

212. ~~198.~~ NewEnergy and ~~CILCO~~Mr. Scarpelli have both used the "Energy Technology" information and the other confidential and proprietary information to compete with Powerweb and the Omni-Link System ~~in the reserve capacity sales market~~ and to otherwise tortiously interfere with Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers.

~~199.    Powerweb has suffered damages as a direct result of the fraudulent conduct of both NewEnergy and CILCO.~~

WHEREFORE, Powerweb ~~demands~~requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy and CILCO, in an amount equal to the amount by which these parties have~~in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched ~~by their misconduct~~, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy ~~and CILCO from using the "~~from any further

use or disclosure of the ~~Energy Technology"~~ information ~~or disclosing it to third parties~~and grant such other relief as may be appropriate and just.

## COUNT ~~VIII~~IX
### (Misappropriation of Trade Secrets ~~Against NewEnergy, CILCO and RETX~~)

~~200.    Powerweb incorporates here by reference the allegations of paragraphs 1 through 199.~~

213.    Paragraphs 1 through 212 above are incorporated herein by reference.

214.    ~~201.~~ Through ~~their~~its fraudulent and other tortious conduct described above, NewEnergy ~~and CILCO~~ improperly procured trade secrets from Powerweb ~~about~~including the ~~"~~Energy Technology~~," the reserve capacity sale of electricity, and the Omni-Link System~~ information.

215.    ~~202.~~ NewEnergy ~~and CILCO~~ improperly used the confidence reposed in ~~them~~it by Powerweb to obtain the confidential and proprietary information necessary ~~for them~~ to advance a rival business interest and to otherwise interfere with Powerweb's prospective business relationships with Bell Atlantic and other commercial energy consumers.

216.    ~~203. Through conspiracy with CILCO and Scarpelli, RETX~~NewEnergy also improperly ~~procured these same~~caused the disclosure of Powerweb's trade secrets ~~from Powerweb~~to RETX and Silicon Energy, which also used them to advance ~~a~~ rival business ~~interest~~interests and to otherwise interfere with Powerweb's prospective business relationships.

217.    ~~204.~~ Powerweb has suffered damages as a direct result of ~~the~~NewEnergy's possession, disclosure and use of the trade secrets ~~by these entities~~.

WHEREFORE, Powerweb ~~demands~~requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, CILCO and RETX, in an amount equal to the amount by which these entities have been unjustly enriched by their misconduct~~in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin NewEnergy~~, CILCO and RETX from using the "~~ from any further use or disclosure of the Energy Technology~~" information ~~or disclosing it to third parties~~and grant such other relief as may be appropriate and just.

## COUNT ~~VIII~~X
**(Tortious Interference With Prospective Contractual Relations ~~Against NewEnergy, CILCO and RETX~~)**

~~205.   Powerweb incorporates here by reference the allegations of paragraphs 1 through 204.~~

218.   Paragraphs 1 through 217 above are incorporated herein by reference.

219.   ~~206.~~ Because Powerweb had pioneered the reserve capacity sales business and had developed the patented Omni-Link System, Powerweb was in a unique position to provide many large commercial energy consumers with enormous savings on their energy consumption.

220. ~~207.~~ Powerweb had several prospective contractual relations with Bell Atlantic and other commercial energy consumers in which Powerweb could provide them with the benefits of the Omni-Link System.

221. ~~208.~~ NewEnergy~~, CILCO and RETX~~ purposefully and improperly obtained ~~certain~~ confidential and proprietary information ~~about the reserve capacity sales business and the Omni-Link System~~ from Powerweb with the intention of interfering with Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers. ~~Their~~The sole purpose in obtaining ~~this~~the information was to interfere with Powerweb's prospective contractual relations.

222. ~~209. None of the parties were~~New Energy was not privileged or justified in ~~their~~its intention to interfere with Powerweb's prospective contractual relations.

223. ~~210.~~ Powerweb has suffered actual legal damages as a direct result of ~~each of the party~~New Energy's tortious conduct.

WHEREFORE, Powerweb ~~demands~~requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, CILCO and RETX in an amount equal to the amount by which the entities have~~in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched ~~by their misconduct~~, lost profits, punitive damages, interest and costs, and that the Court permanently enjoin ~~these parties~~NewEnergy from ~~using~~any further use

or disclosure of the "Energy Technology" information or disclosing it to third parties and grant such other relief as may be appropriate and just.

## COUNT IX XXI
### (Tortious Interference With Existing Contractual Relations Against NewEnergy)

211. Powerweb incorporates here by reference the allegations of paragraphs 1 through 210.

212. Prior to and during this action, Powerweb had a contractual relationship with Baltimore Gas & Electric Company ("BG&E").

213. At all times relevant hereto, BG&E was owned by Constellation Energy Group.

214. In or about September 2002, Constellation Energy Group acquired NewEnergy. By virtue of this transaction, NewEnergy and BG&E became sister companies.

215. Upon information and belief, shortly after becoming affiliated with BG&E, NewEnergy contacted BG&E regarding Powerweb's counterclaims in this action. Further, upon information and belief, NewEnergy directly or indirectly pressured BG&E to end its contractual relationship with Powerweb if Powerweb refused to drop its counterclaims in this action.

216. Shortly after becoming affiliated with NewEnergy, BG&E, which was previously unaware of the lawsuit between Powerweb and NewEnergy, "suggested" that Powerweb drop its counterclaims against NewEnergy for the good of Powerweb's relationship with BG&E.

217. Powerweb has refused to follow BG&E's "suggestion."

~~218.   In February 2003, BG&E issued a notice of termination of the contract with Powerweb. Upon information and belief, BG&E sent the termination notice as a result of the improper actions of NewEnergy.~~

<u>224.   Paragraphs 1 through 223 above are incorporated herein by reference.</u>

<u>225.   As described more fully above, NewEnergy caused BG&E to terminate its contract with Powerweb in an effort to force Powerweb to abandon the counterclaims asserted in this lawsuit.</u>

<u>226.</u>   ~~219.~~ NewEnergy was neither privileged nor justified ~~in its actions~~ to interfere with Powerweb's contractual relationship with BG&E.

<u>227.</u>   ~~220.~~ Powerweb has suffered actual ~~legal~~ damages as a direct result of NewEnergy's tortious conduct.

WHEREFORE, Powerweb ~~demands~~<u>requests</u> that judgment be entered in its favor <u>against NewEnergy</u> in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with~~<u>in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched, lost profits,</u> punitive damages, interest,~~ costs, and such other and further~~ <u>and costs, and that the Court permanently enjoin NewEnergy from any further use or disclosure of the Energy Technology information and grant such other</u> relief as ~~this Court deems~~<u>may be</u> appropriate <u>and just.</u>

### COUNT X~~XII~~<u>XII</u>
### <u>(Unfair Competition ~~Against NewEnergy, CILCO and RETX~~)</u>

~~221.   Powerweb incorporates here by reference the allegations of paragraphs 1 through 220.~~

228. Paragraphs 1 through 227 above are incorporated herein by reference.

229. ~~222.~~ As described more fully above, NewEnergy ~~and CILCO~~ has diverted business from Powerweb by means of ~~their~~ its fraudulent misrepresentations and ~~through the wrongful use of the "Energy Technology" and other confidential information~~ wrongful use of confidential information, has misappropriated Powerweb's trade secrets, has tortiously interfered with Powerweb's prospective and existing contractual relationships, and with respect to BG&E, has substantially interfered with the ability of Powerweb to compete on the merits of its products and services.

~~223. RETX diverted business from Powerweb through wrongful possession and use of Powerweb's "Energy Technology."~~

230. ~~224. By way of their misconduct described above, the parties have~~ Accordingly, NewEnergy has engaged in unfair competition ~~with Powerweb.~~

231. ~~225. This~~ The unfair competition has resulted in actual ~~legal~~ damages to Powerweb.

WHEREFORE, Powerweb ~~demands~~ requests that judgment be entered in its favor against NewEnergy in an amount to be determined at trial, currently believed to be ~~at least $100,000,000, together with punitive damages, interest, costs, and such other and further relief as this Court deems appropriate, that the Court grant the equitable remedy of a constructive trust in favor of Powerweb and against NewEnergy, CILCO and RETX, in an amount equal to the amount by which the parties have~~ in excess of $90 million, including a constructive trust for all amounts by which NewEnergy has been unjustly enriched ~~by their misconduct~~, lost profits, punitive damages, interest and costs,

and that the Court permanently enjoin ~~these entities from using the~~ "~~New~~Energy from any further use or disclosure of the Energy Technology" information ~~or disclosing it to third parties~~and grant such other relief as may be appropriate and just.