## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 02-CV-2733 (HB) |
| | : | |
| v. | : | |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| | : | |
| Defendant. | : | |

_____

### ORDER

AND NOW, upon consideration of Plaintiff's Motion for Summary Judgment pursuant to

Federal Rule of Civil Procedure 56, it is hereby ORDERED and DECREED that Plaintiff's

Motion is GRANTED.  Summary Judgment is entered in favor of Plaintiff and against the

Defendant in the amount of $100,000.00 plus pre-judgment interest since January 8, 2001 on

Count I of Plaintiff's Second Amended Complaint.  Further, Summary Judgment is entered in

favor of Plaintiff and against Defendant on Counts I through X of Defendant's Amended

Counterclaims.

**BY THE COURT:**

_____

The Honorable Harvey Bartle, III,  J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

CONSTELLATION NEWENERGY, INC., :
                             :
          Plaintiff,         :     Civil Action No. 02-CV-2733 (HB)
                             :
     v.                    :
                             :
POWERWEB TECHNOLOGIES, INC.,  :
                             :
          Defendant.     :

---

**PLAINTIFF CONSTELLATION NEWENERGY, INC.'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Constellation NewEnergy, Inc., respectfully moves for Summary Judgment

pursuant to Federal Rule of Civil Procedure 56 for the reasons set forth in the accompanying

Memorandum of Law, which is incorporated herein by reference.

For WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP

           s/DL422

David E. Landau, I.D. #43341
Matthew A. White, I.D. #55812
Zachary C. Glaser, I.D. #85979
Jennifer C. O'Neill, I.D. #89755

1650 Arch Street, 22nd floor
Philadelphia, Pennsylvania 19103-2097
(215) 977-2000

*Attorneys for Plaintiff,
Constellation NewEnergy, Inc.*

Dated: June 1, 2004

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 02-CV-2733 (HB) |
| | : | |
| v. | : | |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF CONSTELLATION NEWENERGY, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.    PRELIMINARY STATEMENT**

In 1999, Powerweb Technologies ("Powerweb") approached NewEnergy Ventures

("NewEnergy"),[1] with a product that Bell Atlantic (now, Verizon) purportedly wanted to buy.

At the time, NewEnergy had recently started performing energy audits and selling energy to Bell

Atlantic (in the New York region) and was looking at expanding its relationship in the New

Jersey region.  On January 7, 2000, following a brief due diligence, NewEnergy entered into a

narrow contract pursuant to which Powerweb would supply the necessary hardware and software

to facilitate Bell Atlantic's participation in certain energy savings programs being offered by

local energy providers.  Under the terms of the agreement, NewEnergy forwarded $100,000.00

for project development costs, the expenditure of which was subject to NewEnergy's sole

approval.  The undisputed facts show that NewEnergy authorized only the expenditure of $5,000.

Shortly after the agreement was signed, Bell Atlantic decided it did not want to attempt to use

Powerweb's products, primarily because of regulatory concerns.

---

[1]    Between August 12, 1999 and November, 15, 1999, NewEnergy Ventures was reorganized and purchased by AES Corporation, becoming AES NewEnergy, Inc.  NewEnergy East, LLC was a subsidiary of NewEnergy Ventures that merged into AES NewEnergy, Inc. on December 31, 2000.

This dispute arose when NewEnergy sought to recover the balance of the $100,000, for which no expenditure was ever approved. Only after NewEnergy brought suit, almost two years after the Bell Atlantic project fell through, did Powerweb decide to make a legal claim that NewEnergy inappropriately used Powerweb's technology. Powerweb is claiming damages in excess of $100 million. NewEnergy moves for summary judgment because the contracts it signed preclude Powerweb's bloated tort claims and because these contracts have not been breached. NewEnergy also moves for the return of its $100,000 -- money Powerweb still holds and refuses to return.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Background

During the 1990s, the electricity industry in the United States experienced a number of significant regulatory changes. Electric deregulation -- first in the wholesale markets and later in the retail markets -- opened new opportunities for electric providers, controls companies and retail consumers to profit directly from controlled energy usage. Anderson Dep. 17:6-18:2 (App. 1); Bakey Dep. 50:8-18 (App. 2). For example, electricity consumers were able to re-sell pre-purchased energy that would not be needed, either due to a reduction of their demand (i.e., turning power off) or to an increase of supply (turning generators on). Powerweb Dep. 227:21-230:7 (App. 3).

NewEnergy is a non-regulated energy supplier (i.e., it's not a utility), operating in several energy markets where deregulation got its start, including New York, the Mid-Atlantic (New Jersey, Pennsylvania, Delaware, and Maryland), California and others. McGeown Decl. ¶ 5 (App. 4). In addition to supplying electricity to customers with retail choice, NewEnergy sought out and invested in additional services to lower their customers' energy costs and compete for customers who had traditionally purchased energy from regulated utilities. *Id.* at ¶ 6. For

example, in the Spring of 1999, NewEnergy was developing an internet-based energy product to permits its customers to use the internet to monitor and reduce energy consumption. Singer Dep. 31:2-32:22 (App. 5). This product was called WebJoules. *Id.*

NewEnergy also consulted with a company called Energy Tracking, Inc. ("ETI"). ETI had developed a system of meters with the ability to transmit energy information to a website on the internet where the information could be viewed and manipulated. Mistry Decl. ¶¶ 4, 5 (App. 6); PW Ex. 174 (App. 7). NewEnergy hired ETI to install this system for one of its customers in New York City during Spring and Summer of 1999. Mistry Decl. ¶ 7 (App. 6); PW Ex.173 (App. 8). This system was operational in April, 1999, before Powerweb had any discussions with NewEnergy. Mistry Decl. ¶ 5 (App. 6). Against this backdrop, Powerweb entered the picture with a proposition concerning Bell Atlantic, a telecommunications provider that owned a lot of small back-up generators. Budike Ex. 6 (App. 9).

### B.    Powerweb Markets its Omni-Link System

In March, 1999, Powerweb wrote to Jim Goodman at Bell Atlantic, generally describing Powerweb's Omni-Link Efficiency System and mentioning energy savings strategies which Powerweb had developed for Bell Atlantic. Budike Ex. 2 (App. 10). Several months later, Powerweb sent a second letter to Goodman, describing a program offered by the local energy grid, the Pennsylvania, New Jersey, Maryland Interconnection ("PJM"), that paid customers for their promise to turn on back-up generators during periods of high demand. Budike Ex. 4 (App. 11). In July, 1999, Powerweb wrote to David McGeown, director of energy services for NewEnergy East, describing Powerweb's effort to market its product to Bell Atlantic and enclosing marketing materials regarding Omni-Link. (App. 9); *see also* McGeown Decl. ¶¶ 7, 8 (App. 4). Powerweb provided these marketing brochures, descriptions and demonstration CD's

to Bell Atlantic and to NewEnergy without requiring either company to sign a non-disclosure agreement.  Powerweb Dep. 30:16-18 (App. 3); Budike Ex. 8 (App. 12).

### C.    The Non-Disclosure Agreement

On October 11, 1999, Powerweb and NewEnergy East executed a Non-Disclosure Confidentiality Agreement (the "Non-Disclosure Agreement"), by which NewEnergy East would be permitted to view Powerweb's "Energy Technology" information, "for the sole purpose of deciding whether to pre-purchase products and services to sell and distribute these Energy Technology to Bell Atlantic" pursuant to an exclusive agreement.  *Id.*  NewEnergy's confidentiality obligations did not apply to any information already in the public domain or which become public.  *Id.*

### 1.    The "Energy Technology" Information

The "Energy Technology" protected by the Non-Disclosure Agreement is defined as consisting of specifically enumerated "technologies, inventions and energy resale strategies" which are broken into three categories.  *Id.*  The categories are defined as follows:

### a.    Hardware

According to the Non-Disclosure Agreement, Powerweb was "the legal owner of a number of energy sensing and energy reduction inventions comprised of gas sensing technologies, electronic metering devices, electricity control devices, and electricity consumption devices."  *Id.*  It is undisputed, however, that Powerweb's hardware consisted of off-the shelf components and certain items which Powerweb's president and chief owner, Lou Budike, Jr., claims to have patented or to which Mr. Budike claims to have acquired patent rights.  Powerweb Dep. 400:6-11, 401:7-13 (App. 3).  This description is consistent with the testimony of Kirk Hampton, a NewEnergy employee who reviewed descriptions of Powerweb's hardware as part of NewEnergy's due diligence effort.  Hampton Dep. 88:24-89:6; 110:6-14; 111:1-3 (App. 13);

PW Ex. 124 (App. 14). There is no evidence that Powerweb ever showed any actual hardware to NewEnergy and certainly no evidence that Powerweb physically delivered any such hardware to NewEnergy.[2]

### b.    Software

Powerweb also claimed to be "the legal owner of a patented integration translation software system (Omni-Link®) which is utilized for energy information transfer, energy procurement, and facility based monitoring. *Id.* (Omni-Link®) is comprised of digital sensors, networking communications protocol, computer server configurations, and a graphical machine-man interface." *Id.*

According to Powerweb's software patent, the Omni-Link system was designed to integrate and translate software from building automation systems ("BAS"), extract energy information from the BAS and remotely control generators. PW Ex. 125 (App. 15). Neither Powerweb's patents nor the description of the software in the Non-Disclosure Agreement mentions the ability to permit a customer to remotely monitor or control any energy consuming devices via the internet, or perform functions necessary to permit customers to participate in ISO-sponsored curtailment programs. *Id.*; (App. 12). Moreover, Mr. Budike did not attach any significance to any software – it was just code that anybody could do.[3] At the time the NDA was signed, Omni-Link's only function was permitting the user to view information from a BAS system from a remote location. McGeown Decl. ¶ 10 (App. 4). Indeed, Powerweb had not yet

---

[2]    "When it came to the kind of control they were talking about, the concepts had been around a long time, but I never saw a live demo. I never saw a piece of equipment actually functioning." Hampton Dep. 53:16-19 (App. 13).

[3]    Powerweb Dep. 223:13-15 ("We did not provide them code because code is kind of useless."); 670:15-17 (App. 3).

written curtailment software.[4]  Though Powerweb claims to have written and sold curtailment software eventually, there is no evidence that any NewEnergy employee ever viewed Powerweb's curtailment software.

### c.    "ALM" on "the PJM"

Powerweb's final claim is that it was the "developer of custom 'stand by generator' capacity credit programs which utilize the above mentioned technologies to sell back capacity on the open market as well as leverage energy procurement in deregulated energy territories." (App. 12).  According to Mr. Budike, this paragraph described Powerweb's two programs (reserve capacity sales and leveraged energy procurement) and "the corresponding contract . . . that enables that transaction to take place."  Powerweb Dep. 230:1-18 (App. 3).

Powerweb produced no evidence that its programs were confidential or proprietary to Powerweb.  Other than Powerweb's self-serving view that this program was secret, the overwhelming evidence is that these programs are business principles that have been around for years.  Langbein Dep. 83:13-18 (App. 18); Anderson Dep. 20:21-21:12 (App. 1).

Despite Powerweb's allegations, no such contract was produced in discovery or was recalled by any NewEnergy employee.  *E.g.*, McGeown Decl. ¶ 12 (App. 4).  Andrew Bakey, the Powerweb employee who allegedly conceived of the ideas contained in the contract, recalls only one sample contract for both energy and capacity.  Bakey Dep. 126:19-127:21 (App. 2). According to Mr. Bakey, the sample contract was drafted by another one of his employers, EPEX, based on an idea he developed while working for Conectiv.  Moreover, he shared this

---

[4]        At his deposition, Joseph Bonner, who was responsible for rewriting Powerweb's website sometime in the fall of 1999, could not remember when after the completion of Powerweb's new website he commenced work on internet-based curtailment software.  Bonner Dep. 22:18-23:9, 31:20-32:2 (App. 16); Anderson Dep. 95:12-96:2 (App. 1).  The definition of Powerweb's "Energy Technology" in Mr. Bonner's employment agreement dated March 10, 2000, suggests that work on curtailment software commenced at approximately this time.  Bonner Ex. 1 (App. 17).

idea with John Reynolds of the PJM in connection with his representation of Conectiv at an ALM working group. *Id.* at 41:13-42:19, 61:19-62:5 (App. 2). This was not Powerweb's information.

### D.    Due Diligence and The Letters of Intent

Letters of intent were signed on October 25 and 26, 1999, outlining the scope due diligence and restating the intent of the parties. PW Ex. 77 (App. 19); PW Ex. 78 (App. 20). The later version corrected certain errors, such as NewEnergy's address, and limited the scope of the parties' agreement to offering Omni-Link to Bell Atlantic. (App. 20).[5]

The later version also included an integration clause, limiting the agreement between the parties to it and the Non-Disclosure Agreement, without any reference to the October 25, 1999 version. *Id.*

During a brief due diligence period, Powerweb provided materials David McGeown, Kirk Hampton and Steve Levine. Budike Ex. 19 (App. 21). Despite repeated requests by NewEnergy during discovery, Powerweb produced no evidence that anything produced in due diligence was confidential or proprietary information -- that is, not publicly available or already known to NewEnergy. Further, Powerweb has not proferred any expert to opine that any of the information it purportedly showed to NewEnergy was, in fact, a trade secret.[6]

### E.    The Exclusive Agreement for Bell Atlantic

On January 7, 2000, NewEnergy East and Powerweb executed the Exclusive Agreement for Bell Atlantic ("Bell Atlantic Agreement"). PW Ex. 5 (App. 23). The scope of the technology at issue and the proposed transaction were limited. "This system is specifically

---

[5]    This statement of intent replaced a broader statement in the former letter of intent by which the parties agreed to partner to develop projects to Bell Atlantic, and later, other telecommunications companies. (App. 19)

[6]    By contrast, NewEnergy's expert has offered numerous examples of how the information Powerweb claims as its own is information already in the public domain. *See* Summit Blue Rep. at 11-13 (App. 22).

designed for capacity sales under the Active Load Management Program ("ALM") of the

Pennsylvania Jersey Maryland Interconnect ("PJM"), and to enable a customer to execute energy

savings programs." *Id.* The transaction was clearly delineated to apply to Bell Atlantic <u>only</u>:

> The Parties hereby enter into to [sic.] this exclusive agreement to
> develop projects for Bell Atlantic [and all current, future, direct or
> indirect subsidiaries and affiliates] by utilizing the Omni-Link
> technology to exploit opportunities and create revenues through the
> sale of electrical capacity and other energy savings programs by
> the operation of the Bell Atlantic standby generators.

*Id.* The only commercial limitation placed on NewEnergy was its promise not to pursue a

certain program (Active Load Management), within a certain geographic region (the PJM), for a

specific industry ("agrees not to independently pursue this opportunity in the

telecommunications industry, specifically, Bell Atlantic."). *Id.*

NewEnergy agreed to fund $100,000 of the project development costs and retained the

<u>sole</u> approval for expenditure of such funds.[7] *Id.* The term of the agreement was one year. *Id.*

This exclusive agreement contains a prohibition on oral modifications as well as an integration

clause which states that it and the Non-Disclosure Agreement represent the entire agreement

between the parties. *Id.* Powerweb and NewEnergy executed two additional agreements within

a month of signing the Bell Atlantic, neither of which are alleged to have been breached.[8]

**F.    The Bell Atlantic Proposal**

The effort to market Powerweb's products and services to Bell Atlantic was unsuccessful,

and no agreement with Bell Atlantic was ever signed. Jim Goodman, Powerweb's principal

---

[7]    NewEnergy only ever approved the expenditure of $5,000. *See* PW Ex. 48 (App. 44).

[8]    On January 8, 2000, the parties executed a profit sharing addendum to the Bell Atlantic Agreement. PW Ex. 9 (App. 24). This addendum was not appended to the Amended Counterclaims and is not mentioned as the basis for any of the claims before this Court. On February 8, 2000, the parties executed an Exclusive PWT Customer Marketing Agreement. PW Ex. 16 (App. 25). A portion of this agreement was appended to Powerweb's Amended Counterclaims, however Powerweb has not asserted a cause of action for breach of this agreement, either.

contact at Bell Atlantic in New Jersey, and a member of Bell Atlantic's Team Energy, testified

that Bell Atlantic declined to go forward because their back-up generators were only permitted to

run in emergencies and not for curtailment.  Goodman Dep. 86:21-87:9 (App. 26).  Jeremy Metz,

who was designated by Verizon[9] to testify on its behalf, concurred.  Verizon Dep. 87:10-25

(App. 27).  No witness or document contradicted this testimony.

### G.    Powerweb's Efforts to Avoid Repaying $100,000

Following Bell Atlantic's decision not to proceed with the ALM program for the summer

of 2000, Mr. Budike wrote to Brian Hayduk on August 16, 2000, requesting permission to issue

a press release about the companies' future plan to work together.  NE Ex. 75 (App. 28).

Mr. Budike expressed his belief that Powerweb was entitled to more than what NewEnergy had

agreed to in the contracts.  *Id.*

Mr. Hayduk wrote to Powerweb, restating the status of the parties' relationship: "The

agreement with Powerweb is to jointly develop a curtailment project with Verizon

Communications (previously known as Bell Atlantic)."  NE Ex. 44 (App. 29).  Mr. Hayduk went

on to state that, although Verizon had not approved the project, NewEnergy would be willing to

consider extending the Bell Atlantic agreement beyond its one year term if Powerweb agreed.

*Id.*  Absent an agreement to extend the Bell Atlantic agreement, "NewEnergy would anticipate a

full refund of money provided for development costs."  *Id.*

George Drosdowich, a NewEnergy attorney, ultimately sent a letter to Powerweb on

March 1, 2002, demanding that Powerweb refund the $100,000.  NE000016 (App. 30).  Finally,

with no response forthcoming, on May 7, 2002, NewEnergy filed this suit against Powerweb for

breach of contract.

---

[9]      Verizon is the successor to Bell Atlantic.

### H.    RETX and CILCO

Powerweb alleges that it "sent confidential information concerning the 'Omni-Link System Energy Technology' to [Peter] Scarpelli at CILCO" at the direction of NewEnergy. Am. CC ¶ 127. Powerweb claims that Mr. Scarpelli stole the energy technology and developed a competing product with a company called RETX. Am. CC ¶¶ 148-156.

The undisputed facts are otherwise. According to Mr. McGeown, after their initial conversations about the Bell Atlantic deal, Mr. Budike requested assistance in obtaining additional contracts from AES (then NewEnergy's parent company) which would support Powerweb's goal of soliciting venture capital funding. In response to his requests, Mr. McGeown posted an e-mail through the AES intranet to business development leaders throughout the company, making them aware of Powerweb. Scarpelli Ex. 1 (App. 31). As a result of this e-mail, Mr. McGeown facilitated a sales discussion between Powerweb and Mr. Scarpelli, then of AES CILCO in Chicago.

By the time Mr. Budike first contacted Mr. Scarpelli in February 2000, RETX's Load Management Dispatcher software had already begun beta testing and was well on its way to market. Scarpelli Dep. 85:3-11, 123:2-9 (App. 32). The software features were basically the same since June 1999. *Id.* at 88:5-15 (App. 32). The standard Powerweb marketing materials which Mr. Budike sent to Mr. Scarpelli (cover letter, brochure, and automated CD tour of Omni-Link) do not contain any technical information from which Powerweb's technology could be stolen or reverse engineered -- much less in a matter of weeks. *Id.* at 53:17- 22, 62:17-65:6 (App. 32); Scarpelli Exs. 3, 4 (App. 33). Mr. Scarpelli testified that he never evaluated Powerweb's software and any evaluation of the technology by RETX personnel was the result of merger talks between RETX and Powerweb, which happened long after the launch of RETX's software and were wholly unrelated to Mr. Scarpelli's employment with CILCO. Scarpelli Dep.

90:18-91:2 (App. 32). Powerweb produced no witness or document to cast doubt on Mr. Scarpelli's testimony other than Mr. Budike's speculation.

### I.    Verizon

Powerweb also alleges that NewEnergy stole "Powerweb's proprietary information and usurped its prospective business relationship with Bell Atlantic. Am. CC ¶ 142. This allegation is based on NewEnergy's participation in a 2002 transaction between Verizon and one of Powerweb's competitors, Electrotek. Metz Ex. 6 (App. 34). Jeremy Metz, Verizon's 30(b)(6) deponent, testified that Verizon agreed to use technology provided by Electrotek to participate in a New York-region curtailment program. Verizon Dep. 11:12-12:3 (App. 27). Verizon participated directly in Long Island Power Authority and New York Power Authority curtailment programs, and there is no evidence that NewEnergy is responsible for Verizon's participation in these programs. *Id.*

### J.    BG&E

On March 31, 2002, Powerweb and Baltimore Gas & Electric ("BG&E") signed an Omni-Link License Agreement. PW Ex. 167 (App. 35).[10] This agreement was terminable at will upon 30 days notice and payment of a $20,000 termination fee. *Id.*

BG&E was dissatisfied with Powerweb's ability to deliver its product as promised.[11] Problems with Powerweb's curtailment engine continued throughout 2002. *E.g.*, Bonner Exs.7, 8 (App. 38). In December 2002, the BG&E Special Projects team submitted a report to senior

---

[10]    The BG&E contract followed an extensive pilot program pursuant to an Omni-Link License Agreement with BG&E signed on November 4, 2000. PW Ex. 161 (App. 36). Belying its assertion of some larger joint-venture relationship, Powerweb never consulted with NewEnergy about this curtailment opportunity, which involves capacity sales on the PJM.

[11]    "Here we are at contract signing plus 68 days [that is, in June, 2002] and we have neither a working Internet engine to deliver to our customers nor the stable hardware configuration we agreed to in the Powerweb contract. I believe it is time we began the process of documenting our experience with PWT." Kiselewich Ex. 3 (App. 37).

BG&E personnel about the persistent problems with Powerweb and the lackluster performance of Powerweb's program. Kiselewich Ex. 6 (App. 39). A presentation was then prepared by Ruth Kiselewich, Director of Special Projects and Supplier Services, detailing the program's performance and the alternatives to Powerweb being considered by BG&E. Kiselewich Exs.7, 8 (App. 40). BG&E exercised its 30-day termination clause and the contract was terminated effective March 31, 2003. BG&E Dep. 111:18-19 (App. 41).

Powerweb has alleged that its termination was caused by pressure from NewEnergy. Am. CC ¶ 215. This claim is supported only by Mr. Budike's speculation. Although there is evidence that Ms. Kiselewich was contacted in the Fall of 2002 by an attorney from Constellation Energy Group ("CEG"), the parent company of BG&E and NewEnergy,[12] that call concerned only a request for Ms. Kiselewich's assistance in settling this lawsuit. BG&E Dep. 189:15-19 (App. 41). Ms. Kiselewich's uncontroverted testimony is that BG&E's decision to exercise the termination clause was strictly the result of Powerweb's poor performance and cost considerations, and had nothing to do with the calls from CEG regarding this litigation. *Id.* at 192:19-193:8 (App. 41). Powerweb did not depose anyone else from BG&E or the CEG attorney nor did it produce any documents to place this explanation in dispute.

III.   **ARGUMENT.**

A.   **Standard of Review**

The standard for granting summary judgment is well-known. We pause only to note that a party cannot defeat summary judgment simply by denying facts or by making conclusory statements. *Parry v. Jackson Nat'l Life Ins. Co.*, 54 F. Supp. 2d 473, 477 (E.D. Pa. 1999) (granting summary judgment for defendant) (quoting *Harley v. McCoach*, 928 F. Supp. 533, 535

---

[12]   AES sold its NewEnergy division to Constellation Energy Group on September 9, 2002.

(E.D. Pa. 1996)).  Almost all of Powerweb's counterclaims are supported only by the

unsupported assertions and suspicions of its principal, Lou Budike, Jr.  Accordingly, summary

judgment is appropriate as a matter of law and of undisputed fact.

**B.**  **Powerweb Cannot Maintain Simultaneous Contract and Tort Claims Arising from the Same Transactions.**

**1.**  **The "Gist of the Action" and "Economic Loss" Doctrines Preclude Powerweb's Tort and Fraud-Based Claims.**

Pennsylvania courts recognize the "gist of the action" doctrine, which bars a party from

asserting a tort grounded in breach of contract.  *See Bohler-Uddeholm America, Inc. v. Ellwood*

*Group, Inc.*, 247 F.3d 79, 106 (3d Cir. 2001); *see also Etoll, Inc. v. Elias/Savion Advertising,*

*Inc.*, 811 A.2d 10, 14, 2002 Pa. Super. 347 (2002) (affirming summary judgment on company's

fraud claims because alleged acts of fraud inextricably intertwined with contract claims).  The

purpose of the doctrine is to "maintain the conceptual distinction between breach of contract

claims and tort claims."  *Etoll*, 811 A.2d at 14.

Likewise, the economic loss doctrine bars a party from asserting tort claims when

contract remedies are available.  *See Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir.

2002).  The doctrines of gist of the action and economic loss share a common purpose -- to

maintain a separation between tort law and contract law.  Pennsylvania courts have demonstrated

"a willingness . . . to restrict tort claims that overlap with contract claims."  *Id.* at 680 (affirming

the district court's analogy between the gist of the action doctrine and the economic loss doctrine

and agreeing that the Supreme Court of Pennsylvania would apply economic loss doctrine

similarly).

**a.**    **Powerweb's misappropriation of trade secrets claim is grounded in breach of contract regarding the Non-Disclosure Agreement.**

Powerweb's misappropriation of trade secrets claim is grounded in breach of contract and should be dismissed. *See Med. Broadcasting Co. v. Flaiz, et al.*, No. 02-8554 (May 29, 2003) (Bartle, J.) (App. 42). The "Energy Technology" at issue in this tort claim and NewEnergy's duties with respect to the "Energy Technology" are defined by a contract, the Non-Disclosure Agreement. Further, the alleged harm at issue is factually indistinguishable from the harm alleged in Powerweb's breach of contract claim. *Werwinski*, 286 F.3d at 678.

In *Bohler-Uddeholm*, the Third Circuit examined a jury verdict and determined that if the jury based its verdict upon the defendant's use and misuse of information covered by the agreement, then the gist of the action doctrine applied. 247 F.3d at 107. Although the court remanded the action, its reasoning supports application of the gist of the action doctrine to bar Powerweb's misappropriation claim, because the information NewEnergy is accused of misappropriating was covered by the agreement. *Id.* The exchange of information in this case was governed by a contract. Accordingly, Powerweb's trade secret claim should be dismissed.

**b.**    **Powerweb's fraudulent misrepresentation claim is grounded in its contract claims.**

Powerweb's fraudulent misrepresentation claim is also grounded in its contract claims and should be dismissed. *See Williams v. Hilton Group, PLC*, No. 99-2024, 2003 U.S. Dist. LEXIS 7580, at *15 (W.D. Pa. March 13, 2003) (stating that alleging misconduct or an ulterior motive in inducing an agreement does not convert a contract claim into a fraud claim). For example, the fraudulent misrepresentation claim alleges that "NewEnergy and McGeown made numerous representations to Powerweb concerning their intention to proceed with a joint venture . . . ." Am. CC ¶ 191. Powerweb acknowledges in paragraph 193 that "[t]hese representations

were material to each of the transactions." *Id.* at ¶ 193. Also, some of the purported

representations were made prior to entering into the agreement. *Id.* at ¶ 191; *see Owen J.*

*Roberts School Dist. v. HTE*, No. Civ. A. 02-7830, 2003 WL 735098, at *3 (E.D. Pa. Feb. 28,

2003) (stating that doctrine precludes fraud claim if fraudulent statement became the basis for

contractual duty). Regardless of when the alleged misrepresentations took place, the essence of

Powerweb's fraud claim is still grounded in its breach of the Non-Disclosure Agreement claim.

Am. CC ¶¶ 197, 198. Pennsylvania case law and Powerweb's admission that the representations

were material to the transaction support application of the gist of the action doctrine. *Werwinski*,

286 F.3d at 677.[13]

### c.    Powerweb's unfair competition claim is intertwined with the breach of contract claims.

Count X, Powerweb's unfair competition claim, is based upon the allegation that

"NewEnergy and CILCO diverted business from Powerweb by means of their fraudulent

misrepresentations and through the wrongful use of the "Energy Technology" and other

confidential information."[14] Am. CC ¶ 222. This claim is also intertwined with the breach of

contract claims and should be dismissed accordingly.

---

[13]    Moreover, Powerweb cannot recover on a fraudulent inducement claim where the contract is fully integrated. *See Goldstein v. Murland, Murland & Nathan, P.C.*, No. 02-247, 2002 U.S. Dist. LEXIS 11331, at *7 (E.D. Pa. June 24, 2002) (dismissing amended counterclaims). Accordingly, the claim must fail as a matter of law.

[14]    Under Pennsylvania common law, an unfair competition claim has the same requirements as a Lanham Act claim, excepting the interstate commerce prong. *See Louis Vuitton Malletier and Oakley, Inc., v. Veit*, 211 F. Supp. 2d 567 (E.D. Pa. 2002). Under the Lanham Act, a plaintiff is required to prove by a preponderance of the evidence that: (1) the defendant made false or misleading statements as to its product, or those of the plaintiff; (2) there was actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales or a loss of good will. *See* Lanham Trade-Mark Act, § 43(a)(1)(B), 15 U.S.C.A. § 1125(a)(1)(B). Powerweb has introduced no evidence to support any component of this claim.

### d.    Powerweb's claim for tortious interference with prospective contractual relations is precluded by gist of the action.

Powerweb's claim for tortious interference with prospective contractual relations merely restates its unfair competition claim. Paragraph 208 states that "NewEnergy, CILCO and RETX purposefully and improperly obtained certain confidential proprietary information about the reserve capacity sales business and the Omni-Link System from Powerweb with the intention of interfering with Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers. Their sole purpose . . . was to interfere with Powerweb's prospective contractual relations." Am. CC ¶ 208. Again, the confidential information to which Powerweb refers is a subject of the Non-Disclosure Agreement. Put another way, the "wrong" alleged here flows directly from the purported breach of the Non-Disclosure Agreement. This claim is grounded in breach of contract and cannot be recast as a tortious interference claim. *See Werwinski*, 286 F.3d at 675.

### 2.    NewEnergy Did Not Owe a Fiduciary Duty to Powerweb.

Powerweb's Count V is a breach of fiduciary duty claim against NewEnergy. Powerweb asserts that "[p]ursuant to the Joint-Venture Agreement, NewEnergy owed a fiduciary duty to Powerweb to protect Powerweb's confidential proprietary interest in the Omni-Link System, Powerweb's unique position in the reserve capacity sales market, and Powerweb's prospective contractual relations with Bell Atlantic and other commercial energy consumers." Am. CC ¶ 185. The Exclusive Agreement for Bell Atlantic did not create a fiduciary relationship between the parties.

Under Pennsylvania law, a fiduciary duty arises from a special relationship of trust in which there is, "confidence reposed by one side, [and] domination and influence exercised by the other." *Ellis v. Steck Mfg. Co., Inc.*, Civ. No 00-3761, 2001 U.S. Dist. LEXIS 21053, at *22

(E.D. Pa. Dec. 19, 2001) (quoting *Polymer Dynamics, Inc. v. Bayer Corp.*, Civ. No. 99-4040, 2000 U.S. Dist. LEXIS 11493, at *22 (E.D. Pa. Aug. 14, 2000)). "A business relationship may only serve as the basis for a fiduciary relationship 'if one party surrenders substantial control over some portion of his affairs to the other." *Ellis*, 2001 U.S. Dist. LEXIS 21053, at *23 (citation omitted); *see also Kligman v. Advanced Polymer Sys., Inc.*, Civ. No. 00-580, 2001 U.S. Dist. LEXIS 15854, at *24 (E.D. Pa. Oct. 2. 2001) (granting summary judgment in a matter in which a licensor claimed that a confidential relationship arose when technology was shared pursuant to a confidentiality agreement and a licensing agreement.); *In re Estate of Scott*, 455 Pa. 429, 316 A.2d 883, 886 (1974).

Powerweb has failed to allege (much less prove) either its weakness, dependence or trust in NewEnergy, or NewEnergy's "overmastering influence" over Powerweb. *See Kligman*, 2001 U.S. Dist. LEXIS 15854, at * 23 (citing *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412, 417 (1981)). On the contrary, Powerweb brought the Bell Atlantic deal to NewEnergy and drafted the agreements. Powerweb Dep. 297:22 - 298:7 (App. 3). Even if Powerweb could prove the existence of a fiduciary duty, the record does not provide a reasonable inference that such a duty was breached.

### C.    NewEnergy is Entitled to Summary Judgment on Counts I, II and III -- Powerweb's Breach of Contract Claims.

Powerweb has not introduced any evidence that NewEnergy has breached the Non-Disclosure Agreement, the Letter Agreement ("Letter of Intent"), and the Exclusive Agreement with Bell Atlantic ("Bell Atlantic Agreement").[15]

---

[15]    Pennsylvania law does not recognize an independent cause of action for breach of the duty of good faith and fair dealing claim under these circumstances. *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91-2 (3d Cir. 2000) (granting summary judgment on stand-alone claim for breach of the duty of good faith and fair dealing). Accordingly, the claim for breach of the duty of good faith and fair dealing (Count IV) should be dismissed. *See King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001)

1.     **Count I -- There Was No Breach of the Non-Disclosure Agreement.**

After reviewing almost 100,000 pages of documents in discovery and taking almost

twenty depositions, Powerweb was unable to adduce any evidence (save for Mr. Budike's claim

that it must be so) that NewEnergy used or revealed to others any information covered by the

Non-Disclosure Agreement.  As a threshold matter, Powerweb has not proffered an industry

expert to opine that its purported technology was confidential or used by NewEnergy.  On that

basis alone, summary judgment should be granted in favor of NewEnergy.

a.     **NewEnergy did not disclose confidential information.**

Courts examine a breach of a Non-Disclosure Agreement in the context of traditional

breach of contract.  *See generally In re Spree.com Corp.*, No. 00-34433DWS, 2001 WL 1518242

(Bankr. E.D. Pa. Nov. 2, 2001).  To sustain a claim for breach of contract under Pennsylvania

law, the plaintiff must show the following: "1) the existence of a contract to which the plaintiff

and defendants are parties; 2) the essential terms of that contract; 3) a breach of duty imposed by

the contract; and 4) damages to plaintiff as a result of the breach."  *Telamerica Media Inc. v.*

*AMN Television*, No. 99-2572, 2002 U.S. Dist. LEXIS 18360, at *36 (E.D. Pa. Sept. 26, 2002)

(citations omitted).  The burden of proving all four elements rests on Powerweb.  *Id.* (citing

*Bohler-Uddeholm*, 247 F.3d at 102).

Powerweb alleges that it "sent confidential information concerning the 'Omni-Link

System Energy Technology' to [Peter] Scarpelli at CILCO" at the direction of NewEnergy.  Am.

CC ¶ 127.[16]  Powerweb claims that Mr. Scarpelli stole the energy technology and developed a

---

("Because the actions forming the basis of KPEC's breach of contract claim and its good faith and fair dealing claim
are essentially the same, KPEC cannot pursue both causes of action.").

[16]     Mr. Budike voluntarily sent his marketing materials to CILCO, which was not a NewEnergy company.
Mr. McGeown was simply giving Mr. Budike sales leads to assist him.   This favor has turned into the cornerstone
of Powerweb's fanciful claim:  Mr. McGeown and NewEnergy orchestrated the wholesale dissemination of

competing product with a company called RETX.  Am. CC ¶¶ 148-156.

On the contrary, by the time Mr. Budike first contacted Mr. Scarpelli in February 2000, the system which would ultimately become RETX's Load Management Dispatcher software was already designed, a pilot program had been completed, and the product was well on its way to market.  Scarpelli Dep. 85:3-11, 88:5-15, 123:2-9 (App. 32).  According to Mr. Scarpelli's undisputed testimony, he received marketing materials from Budike and phone calls which he described as a "sales pitch," neither of which he was interested in.  Scarpelli Dep. 122:13-123:9 (App. 32).  He stored the materials in a file at his home office, and never shared them with RETX.  Scarpelli Dep. 53:17-22, 62:17-65:6, 90:18-91:2 (App. 32, 33).[17]

Similarly, there is no evidence that NewEnergy gave Powerweb's "Energy Technology" to Verizon or its predecessor, Bell Atlantic.  This allegation is based on NewEnergy's participation in a transaction between Verizon and one of Powerweb's competitors, Electrotek, in 2002, long after the Bell Atlantic deal had expired.  (App. 34).  Jeremy Metz, Verizon's 30(b)(6) deponent, testified that Verizon used a system designed by Electrotek to participate in a New York-region curtailment program. Verizon Dep. 11:12-12:3 (App. 27).  If anything, it was Powerweb, not NewEnergy, who provided Verizon with its energy technology information -- beginning in March 1999 with a letter to Jim Goodman and periodically until 2000.  *Id.* at 72:8-74:17 (App. 27); (App. 10).

### b.    NewEnergy did not use confidential information.

---

Powerweb's trade secrets by duping Mr. Budike into making sales pitches.  Were it not for the fact that NewEnergy has had to spend real money to defend these baseless claims, this would almost be comical.

[17]    Even if Powerweb could prove that Mr. Scarpelli took Powerweb's proprietary information from his current employer [CILCO] and gave it to his new employer [RETX], Powerweb cannot prove that stealing information was within the scope of his employment or that NewEnergy could be liable for the actions of an affiliated company's "rogue" employee.

Powerweb has not demonstrated that NewEnergy ever used Powerweb's alleged confidential and proprietary information in violation of the Non-Disclosure Agreement. NewEnergy was already developing its own technology prior to meeting Powerweb, and that fact alone is sufficient to prevail on summary judgment. The product which NewEnergy first marketed to its customers as early as July, 1999 was built by Keith Mistry and already installed for a NewEnergy customer between July and October, 1999. Mistry Decl. ¶¶ 7, 8 (App. 6). During the summer of 2000, when the California ISO published rules for calculating curtailment, Mr. Mistry personally designed NewEnergy's first curtailment software. *Id.* ¶ 13 (App. 6). NewEnergy's internet-based energy information technology and its curtailment software were independently developed. *Id.* ¶ 7, 8, 13 (App. 6).

In Pennsylvania, independent development is inextricably linked with the "use" element of trade secret misappropriation. *See Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 567 (3d Cir. 2003) (affirming decision to require plaintiff to disprove independent development in order to satisfy elements of trade secret misappropriation). In light of the "use" provision of the breach of the Non-Disclosure Agreement, the analysis for breach of contract on this issue is comparable to the analysis for the "use" element of trade secret misappropriation. NewEnergy cannot have breached the Non-Disclosure Agreement by using Powerweb's confidential and proprietary information if NewEnergy independently developed its own product. *Id.* ("if there is proof that the defendant independently developed a technique that resembles the trade secret, then the defendant did not 'use' the trade secret.").

Similarly, Powerweb cannot argue that its capacity sales information was not independently developed by NewEnergy when, by April, 1999, NewEnergy was already pursing this type of transaction. McGeown Decl. ¶ 4, Ex. A (McGeown00001-2) (App. 4).

In response to uncontroverted evidence that Powerweb's allegedly secret information was already in the public domain, Powerweb offered a twisted interpretation of the Non-Disclosure Agreement. Powerweb's view of the "use" provision was never agreed to by the parties. According to Mr. Budike, NewEnergy was not permitted to "use" – anywhere and for any purpose -- the business concepts which Powerweb wanted to offer to Bell Atlantic, regardless of whether these ideas were already in the public domain or known to NewEnergy. Powerweb Dep. 673:13-27, 674:13-23 (App. 3).

Further, Mr. Budike testified that Powerweb's "Energy Technology" goes well beyond the clear and limited scope of the Non-Disclosure Agreement (ALM on the PJM for telecommunications applications) and includes any program (no matter where offered) related to curtailment or the purchase and sale of customers' energy or capacity. *Id.* at 675:15-19 (App. 3). According to Mr. Budike, NewEnergy was restricted from using any of this alleged "Energy Technology" information, regardless of whether the information was confidential, for a period 10 years. *Id.* at 673:13-27, 674:13-23 (App. 3). By Mr. Budike's reasoning, NewEnergy's participation in due diligence in anticipation of a joint-marketing venture to offer one program (ALM), in one region of the country (PJM), to one customer (Bell Atlantic), was a Trojan Horse that unleashed upon NewEnergy the burden of becoming Powerweb's 50/50 business partner for all curtailment programs, anywhere, for a decade – irrespective of the fact that NewEnergy was already participating in such programs.

This strained interpretation violates the well-established principle of contract interpretation that the language of a contract must be read as a whole. *See United States of America v. Boro Developers, Inc.*, No. 96-5498, 1997 U.S. Dist. LEXIS 182523, at *10-11 (E.D. Pa. Nov. 20, 1997). Sections two and six of the NDA state it does not apply to information in the

public domain. Section one on use must be read in light of these provisions. Otherwise, the

NDA is transformed into a 10-year, nationwide, non-compete clause for which <u>no</u> consideration

was received. Accordingly, NewEnergy's Motion for Summary Judgment should be granted.

### 2. Count II -- The Letter of Intent Was Integrated into the Bell Atlantic Agreement and Cannot Serve as the Basis of a Cause of Action.

Powerweb has failed to show that NewEnergy breached the Letter of Intent or that

Powerweb suffered any damages as a result of such a breach. The express, unambiguous term of

the Bell Atlantic Agreement states that the Non-Disclosure Agreement and Bell Atlantic

Agreement represent the entire agreement between the parties. (App. 23). Because of this

integration clause, the Letter of Intent is void and cannot be the basis of a breach of contract

action. *See Auerbach v. Kantor-Curley Pediatric Assocs.*, No. 01-CV-854, 2004 U.S. Dist.

LEXIS 6316, at *18 (E.D. Pa. Mar. 23, 2004) (granting summary judgment based on contract

term requiring that any further modifications and amendments be in writing and signed by both

parties). In *Auerbach*, the court looked to the express, unambiguous terms of the contract itself

to determine the parties' intent. *Id.* The presence of the integration clause in the Bell Atlantic

Agreement is dispositive and summary judgment should be granted on this claim. *Id.*

### 3. Count III -- The Bell Atlantic Agreement Expired After One Year and Verizon Independently Chose Electrotek As Its Vendor.

Powerweb has asserted that NewEnergy breached the Exclusive Agreement for Bell

Atlantic by "improperly competing with Powerweb and the Omni-Link System." Am. CC ¶ 175.

During the term of the agreement, NewEnergy agreed not to "independently pursue" Active Load

Management on the PJM with customers, "in the telecommunications industry, specifically Bell

Atlantic." (App. 23). This obligation, like the agreement itself, expired on January 7, 2001. *Id.*

While NewEnergy did participate in a transaction between Verizon and Electrotek in 2002, this

transaction involved programs offered outside the PJM service region after the Bell Atlantic

Agreement had expired.  (App. 34) (contract dated September 30, 2002).  Verizon did not use or rely on Powerweb's Energy Technology information in contracting with Electrotek.  Verizon Dep. 11:12-12:3 (App. 27).  Mr. Metz's undisputed testimony is dispositive on this point. Accordingly, NewEnergy is entitled to summary judgment.

**D.    NewEnergy is Entitled to Summary Judgment on Powerweb's Tortious Interference with Existing Contractual Relations Claim.**

It was Powerweb's own failure to meet its contractual obligations with BG&E and not Constellation's contact which caused BG&E to cancel its contract with Powerweb.

Maryland law controls this tortious interference claim.[18]  The contract with which Constellation is accused of interfering was performed in Maryland; BG&E is a Maryland corporation; and the lawyer who supposedly "interfered" with the contract works for CEG, a Maryland corporation and also BG&E's parent company.

The termination provision in section 8.3 of Powerweb's BG&E contract qualifies it as terminable at will.  *See Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 118 (Md. 1994).  Under Maryland law, a claim for tortious interference with a terminable at will contract is subject to a more stringent standard than a claim for interference with an existing contract.  *See id.* at 117 (stating that "a broader right to interfere with economic relations exists where . . . a contract terminable at will is involved.").  Powerweb must prove:  (1) an intentional and willful act; (2) calculated to cause damage to the plaintiff in its lawful business; (3) done with malice, or an unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of

---

[18]    As the forum state in a diversity case in federal court  Pennsylvania's choice of law rule applies.  *See LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1070 (3d Cir. 1996) (applying Delaware law to a Pennsylvania case).  In tort claims, Pennsylvania applies the law of the state that has the greatest interest in and is most intimately concerned with the outcome of the litigation.  *See KNK Med.-Dental Specialties, LTD v. Tamex Corp.*, No. 99-3409, 2000 U.S. Dist. LEXIS 14536, at *8-9 (E.D. Pa. Sept. 28, 2000) (citing *Complaint of Bankers Trust Corp.*, 752 F.2d 874, 882 (3d Cir. 1984)).  Moreover, the contract subject to the purported interference states that any claims related thereto are to be governed by Maryland law.  (App. 35) (Omni-Link License Agreement § 14.6).  Even if Pennsylvania law were to apply, Powerweb cannot satisfy the necessary elements for a tortious interference claim.

the defendant; and (4) actual damage as a result. *Alexander & Alexander, Inc. v. Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994).

BG&E opted to exercise the termination provision due to Powerweb's failure to deliver the products and services for which BG&E bargained for. *See* BG&E Dep. 133:7-136:2, 143:1-145:8, 153:15-154:22, 160:14-161:6, 168:2-9 (App. 41);[19]  Kiselewich Exs. 1-3 (App. 43, 37). There is no evidence that the conversations regarding this lawsuit between Ruth Kiselewich, a BG&E employee, and Jordan Karp, an attorney for CEG, affected BG&E's decision.[20] Powerweb chose not to depose Mr. Karp or other witnesses with personal knowledge of the issue. Powerweb also cannot point to any evidence that CEG or NewEnergy "directly or indirectly pressured BG&E to end its contractual relationship with Powerweb if Powerweb refused to drop its counterclaims." Am. CC ¶ 215.

Accordingly, Constellation is entitled to summary judgment on Count IX.

### E.    Powerweb Owes New Energy $100,000.

NewEnergy's contract claim seeks the return of money which it provided to Powerweb pursuant to the following provision in the Bell Atlantic Agreement:

> NEE agrees to fund project development costs of up to One Hundred Thousand Dollars ($100,000.00) for Powerweb to create a detailed project implementation plan, schedule and investment analysis of an Omni-Link application for Bell Atlantic. . . . Allocation and use of the funds will be subject to the sole approval of NEE in advance.

(App. 23).  This money was paid to Powerweb, and the only approval of funds which

---

[19]     Although Powerweb alleges that *NewEnergy* interfered with its contractual relationship, it was not a NewEnergy employee who contacted Ms. Kiselewich, but a CEG attorney.  BG&E Dep. 128:15-20 (App. 41). There is no precedent for holding a subsidiary liable for the unilateral actions of its parent company.

[20]     Even if CEG had influenced BG&E's decision, this type of "interference" is countenanced under both Maryland and Pennsylvania law.  *See Alexander & Alexander, Inc.*, 650 A.2d at 272; *Windsor Sec., Inc. v. Hartford Ins. Co.*, 986 F.2d 655, 665 (3d Cir. 1993).

NewEnergy made was on March 3, 2000, when Mr. McGeown authorized the spending of $5,000 to deliver opinions regarding regulations governing the operation of on-site generators. (App. 44). Powerweb neither delivered these opinions, nor presented the plan, schedule and analysis for which this money was designated. McGeown Dep. 135:12-136:4 (App. 45). Powerweb's designee confirmed Powerweb still has this money. Powerweb Dep. 562:13-17 (App. 3).[21] Since the Bell Atlantic agreement expired in January, 2001, and these funds were never allocated or spent, summary judgment is appropriate and judgment should be entered for $100,000.00 plus interest. *See McDermott v. Party City Corp.*, 11 F. Supp. 2d. 612, 632 (E.D.Pa. 1998) (citations omitted).

## IV.    CONCLUSION

Powerweb's failure to establish genuine issues of material fact defeats all of its claims. Accordingly, Constellation NewEnergy respectfully requests an order dismissing all of Powerweb's counterclaims. Further, because Powerweb has no defense to the $100,000 that NewEnergy advanced, judgment should be entered in favor of NewEnergy on this claim and against Powerweb.

Wolf, Block, Schorr & Solis-Cohen LLP

By:          s/DL422        
        David E. Landau, I.D. #43341
        Matthew A. White, I.D. #55812
        Zachary C. Glaser, I.D. #85979
        Jennifer C. O'Neill, I.D. #89755
1650 Arch Street,  22nd floor
Philadelphia, PA 19103-2097
(215) 977-2000

Dated:  June 1, 2004

---

[21]      According to Powerweb, the $100,000.00 which was provided for the creation of a project implementation plan, schedule and investment analysis is still being held by Powerweb, but appears in Powerweb's books and records as "an outstanding bill to A-Valey Engineers for engineering services on this project." Powerweb Dep. 565:6-13 (App. 3).

## CERTIFICATE OF SERVICE

I, Jennifer C. O'Neill, certify that on June 1, 2004, I caused a true and correct copy of

Plaintiff Constellation NewEnergy, Inc.'s Motion for Summary Judgment, a supporting

memorandum of law, a proposed order and an appendix to be served via hand delivery upon:

> Rudolph Garcia, Esquire
> SAUL EWING LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA  19102-2186

> _s/JO416_____
> Jennifer C. O'Neill