IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,    :
                Plaintiff,    :
                        :
          v.            :         No. 02-CV-2733 (HB)
                        :
POWERWEB TECHNOLOGIES, INC.,    :
              Defendant.    :

**O R D E R**

AND NOW, this        day of               , 2004, it is hereby ORDERED

that the motion of plaintiff for summary judgment (Doc. #82) is DENIED in its entirety because of

the existence of genuine issues of material fact.

BY THE COURT:

_____
                                        J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,  :
               Plaintiff,  :
                                  :
               v.  :          No. 02-CV-2733 (HB)
                                  :
POWERWEB TECHNOLOGIES, INC.,  :
               Defendant.  :

**MEMORANDUM OF LAW BY POWERWEB, INC.
IN OPPOSITION TO MOTION BY CONSTELLATION
<u>NEWENERGY, INC. FOR SUMMARY JUDGMENT</u>**

Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.

Date:   June 15, 2004

# TABLE OF CONTENTS

I.   INTRODUCTION ...............................................................................................................1

II.  STATEMENT OF DISPUTED FACTS...........................................................................2
     A.   Background...............................................................................................................2
     B.   Powerweb' Limited Disclosures Regarding the Omni-Link System ........................4
     C.   The Confidentiality Agreement ...............................................................................4
          1.   The Energy Technology Information ...............................................................5
               a.   Hardware ...............................................................................................5
               b.   Software .................................................................................................6
               c.   Energy Programs ...................................................................................7
     D.   Due Diligence and the Letters of Intent ..................................................................7
     E.   The Bell Atlantic Agreement....................................................................................9
     F.   The Bell Atlantic Proposal .......................................................................................9
     G.   The $100,000 Payment ...........................................................................................10
     H.   RETX and CILCO ...................................................................................................10
     I.   Verizon ....................................................................................................................11
     J.   BG&E ......................................................................................................................11

III. ARGUMENT.....................................................................................................................13
     A.   Standard of Review .................................................................................................13
     B.   The Tort Claims.......................................................................................................13
          1.   The Gist of the Action and Economic Loss Doctrines...................................14
               a.   Misappropriation of Trade Secrets ......................................................14
               b.   Fraudulent Misrepresentations .............................................................15
               c.   Unfair Competition ..............................................................................17
               d.   Tortious Interference ............................................................................18
          2.   Fiduciary Duty...............................................................................................18
     C.   Breach of Contract...................................................................................................19
          1.   The Confidentiality Agreement ......................................................................20
               a.   Disclosure of Confidential Information ...............................................20
               b.   Use of Confidential Information ..........................................................22
          2.   The Letter of Intent .......................................................................................23
          3.   The Bell Atlantic Agreement .........................................................................24
     D.   Tortious Interference with the BG&E Contract ......................................................24
     E.   The $100,000 Payment ...........................................................................................25

IV.  CONCLUSION..................................................................................................................26

## I.    INTRODUCTION

Powerweb, Inc. ("Powerweb")[1] submits this memorandum in opposition to the motion for summary judgment filed in this action by Constellation NewEnergy, Inc. ("NewEnergy").

In 1996, the electricity markets in various regions across the United States began to be deregulated, opening the door to competition and new methods for reducing energy costs. Because electricity cannot be stored, all generated power must be consumed instantaneously. That makes balancing supply and demand a constant challenge and causes electricity prices to be extremely volatile. During high demand periods, the wholesale price of electricity can increase by as much as 1,000%. Powerweb designed a system that enables large commercial customers to profit from that fluctuation by cutting back their consumption or using their own emergency generators when prices are at their highest ("Omni-Link system"). (A1 at 1, ¶3.)[2]

NewEnergy agreed to enter into a series of joint ventures with Powerweb to license the Omni-Link system, first to Bell Atlantic Corporation ("Bell Atlantic"),[3] and then to other customers. (A4; A5; A6.) Accordingly, Powerweb disclosed the details of its system to NewEnergy under a written agreement ("Confidentiality Agreement") that prohibited NewEnergy from unilaterally using or disclosing any of the information that Powerweb provided. (A3.) NewEnergy then abandoned Powerweb, used the information to develop competing products and services of its own, and carelessly disclosed important aspects of the information to others who then used it to also become competitors of Powerweb.

---

[1]    Powerweb was incorrectly named in this action as "Powerweb Technologies, Inc."

[2]    All citations to supporting materials are to Powerweb's appendix, in the form of A[tab] at [page].

[3]    Bell Atlantic is now known as Verizon. However, for convenience and clarity, it will be referred to in this memorandum as Bell Atlantic even after it changed its name to Verizon.

NewEnergy commenced this action to seek a return of $100,000 that it paid for the initial Bell Atlantic project. Powerweb answered the complaint, explaining why NewEnergy is not entitled to any repayment. In addition, Powerweb filed counterclaims against NewEnergy for lost profits over the ten-year period covered by the Confidentiality Agreement. NewEnergy then retaliated by inducing Baltimore Gas & Electric Company ("BG&E") to terminate a three-year contract with Powerweb. Recovery for that interference also has been sought by amending the counterclaims.

The damages caused by NewEnergy's wrongful conduct total more than $100 million. (A7; A8.) Thus, although NewEnergy is the nominal plaintiff, this case is primarily about Powerweb's counterclaims. NewEnergy disputes many of the facts upon which the counterclaims are based. As a result, summary judgment may not be granted to either party on those claims.

## II.    STATEMENT OF DISPUTED FACTS

In Section II of its memorandum, NewEnergy's presents its own slanted version of events and wholly ignores all evidence to the contrary, in order to characterize the facts as "undisputed." But as illustrated in the matching sections below,[4] there are genuine disputes about facts material to each of Powerweb's claims.

### A.    Background.

Prior to deregulation, utilities[5] controlled the supply of electricity in their own well-defined territories. To manage the supply, some asked large consumers to "curtail" their

---

[4]    Although the way in which NewEnergy organized its brief is not ideal, Powerweb's memorandum will follow the same order, with matching sections, to better enable the Court to compare the parties' opposing assertions.

[5]    The term utilities is used generically in this memorandum to refer to all entities supplying electricity to retail customers in a regulated market, regardless of corporate form.

usage during times when the demand for energy was high. In return for such curtailment, the customer received a lower electricity bill, but the utility benefited far more than the customer. Similarly, in some regions, there were programs that permitted utilities to purchase capacity from each other, and perhaps from some customers with their own generators. These capacity programs, however, were only open to utilities. (A1 at 1, ¶3; A2 at 1, ¶4.)

Deregulation created open markets in large regions and allowed non-regulated entities such as NewEnergy to sell electricity to retail customers. Powerweb identified an opportunity in deregulated markets to translate energy management strategies available to utilities, i.e. curtailment and capacity programs, to non-regulated suppliers and end-use customers. (A1 at 1, ¶3.) Powerweb brought together remote metering technology, software and business strategies in a novel way that permitted a retail customer to generate revenue by curtailing and selling its energy and capacity into the deregulated market. (A1 at 1, ¶3.)

In addition to selling electricity as a commodity, NewEnergy offered some demand-side energy-efficiency programs, such as lighting retrofits. (A14 at 158-59.) However, before it was introduced to Powerweb, NewEnergy did not offer, and was unaware of, the ability of a customer to sell retail energy and capacity into the deregulated market. (A4.) Similarly, NewEnergy's software, called Webjoules, offered nothing more than the display of day-old energy usage in one-hour intervals. (A1 at 5, ¶19.) The version of Webjoules that NewEnergy sold to a customer in 1999 did not include a curtailment module or other advanced features offered by Powerweb's Omni-Link system. (A1 at 5, ¶19.) To say that the two systems did the same thing would be akin to equating a bicycle with the space shuttle because both are modes of transportation.

- 3 -

**B.    Powerweb' Limited Disclosures Regarding the Omni-Link System**

Powerweb had a long-standing business relationship with Bell Atlantic prior to approaching the company regarding the Omni-Link system. (A1 at 1, ¶2; A13 at 8-9.) In early 1999, Powerweb mentioned the system in a casual conversation with Jim Goodman, Bell Atlantic's Manager of Team Energy. (A11 at 19; A24; A13 at 7.) In that initial conversation, Powerweb received assurances of confidentiality from Mr. Goodman. (A11 at 30.) Powerweb followed up the conversation with a March 1999 letter. (A24.) Mr. Goodman asked for permission to share the information with his boss, and Powerweb agreed on condition that the information would remain confidential and not be disclosed further. (A11 at 31-32; A13 at 14-15.)

Similarly, when Powerweb was introduced to NewEnergy, Powerweb sought assurances of confidentiality and initially disclosed only the broad overview and limited detail necessary for NewEnergy to determine whether it was interested in learning more. (A1 at 3, ¶9.) Before disclosing more sensitive or technical information, Powerweb insisted upon having a written confidentiality agreement in place. (A1 at 3, ¶10.)

**C.    The Confidentiality Agreement**

Following extensive discussions regarding the need for and importance of protecting Powerweb's confidential information, the parties entered into the Confidentiality Agreement  on October 11, 1999. (A3.) The Confidentiality Agreement was the first in a series of agreements regarding contemplated joint ventures between NewEnergy and Powerweb. (A3; A4; A5; A6.) It prohibited NewEnergy from disclosing or using any of the described "Energy Technology Information" without Powerweb's consent for a period of ten years. (A3.) It provided that the duty of non-disclosure did not apply to any information that was already in the

public domain or common knowledge, but included no such exemption for NewEnergy's own *use* of Energy Technology Information. (A3.)

### 1.    The Energy Technology Information

As use in the Confidentiality Agreement, "Energy Technology" generally describes the Omni-Link system and its core elements: (a) hardware, (b) software, and (c) the underlying contract mechanisms and business strategies. The descriptions of those elements were general categories into which the information shared by Powerweb fell, not detailed lists of what was protected. (A1 at 3-4, ¶12.) The term Energy Technology Information encompassed the individual components, the system as a whole and the manner in which the pieces fit together. (A3 at 1; A1 at 3-4, ¶12.)

### a.    Hardware

The particular hardware components were not all unique or proprietary to Powerweb, but the manner in which they were combined and used was protected Energy Technology Information. (A1 at 4, ¶13.) Powerweb shared the specifications for and technical descriptions of the hardware with NewEnergy. (A1 at 6, ¶22-23; A25; A26; A28; A29; A32.) Moreover, NewEnergy was told and shown how to arrange all of the hardware in order to build that portion of the system. (A1 at 4, ¶13; A1 at 6, ¶22-23.) Indeed, David McGeown, NewEnergy's Director of Energy Services (A19 at 22), viewed a working installation at a Bell Atlantic facility. (A1 at 6, ¶22.) Mr. Budike gave Mr. McGeown a tour of the installation, answered all of his questions, and provided him with in-depth explanations of the function of each piece of equipment. (A1 at 6, ¶22.) The tour effectively taught Mr. McGeown how to assemble the various pieces of equipment and construct the "hardware" portion of the Omni-Link system. (A1 at 6, ¶22-23.)

b.    **Software**

Powerweb's Internet-based software pulled various energy related functions together into a single integrated application, some elements of which were patented and the others of which were trade secrets. (A1 at 4, ¶14.) Prior to development of the Omni-Link software, other programs performed some of the same functions, such as customer billing. However, no other program had integrated the available functions into a single application and some of the functions were unique to Omni-Link. (A1 at 2, ¶7.) When the Confidentiality Agreement was signed, all of Omni-Link's features (engines) *were* working, including the curtailment module.[6] (A1 at 6-7, ¶19-21.) Powerweb demonstrated the fully functioning Omni-Link software to several NewEnergy employees on multiple occasions. (A1 at 5-6, ¶19-21.) Powerweb showed NewEnergy the curtailment module by replaying recordings of actual curtailment events and transactions by other Omni-Link customers. (A1 at 6, ¶24.) NewEnergy also was given passwords so it could access the Omni-Link software at will and thoroughly test its functionality. (A1 at 6, ¶21; A11 at 261-62.) James Curnyn, NewEnergy's Business Development Manager (A12 at 20), admitted using a password and logging on to the Omni-Link system. (A12 at 211.) Powerweb attached great importance to its software and took great pains not to let anyone see it without having a confidentiality agreement in place. (A11 at 48-49; A1 at 2-3, ¶8.) Powerweb password-protected all access to its software to prevent it from being reverse-engineered. (A1 at 2-3, ¶8.) Once someone sees all the functionality and how the various modules work together, a competent programmer could create a similar product without needing to use the same source code. (A1 at 2-3, ¶8.)

---

[6]    NewEnergy contends that portions of the software were written later, based on the date of Mr. Bonner's employment agreement. See Constellation NewEnergy, Inc.'s Mem. of Law in Support of Its Motion for Summary Judgment ("NewEnergy's Brief") at 6 n.4. However, Mr. Bonner was a consultant to Powerweb long before that employment agreement was signed. (A11 at 269-70.)

### c.    Energy Programs

Prior to Powerweb's concept, no entity other than a utility had sold a retail customer's capacity or energy into the market in the PJM. (A2 at 1, ¶2.; A9 at 44.) Powerweb's adaptation of strategies previously used by traditional utilities into a comprehensive software package to benefit energy consumers in deregulated markets was novel in 1999. (A1 at 3; A10 at 157-58, 161-62.) Even, NewEnergy acknowledged that it was unfamiliar with the concept and learned of it from Powerweb. (A4 at 1.)

NewEnergy contends that the business concept, or contracting piece, may not belong to Powerweb.[7] However, Mr. Bakey admits that although he initially conceived of the business concept on his own, he later transferred all of his rights to the concept and contract mechanisms to Powerweb. (A2 at 2, 12.) He also confirms that it never belonged to either of his former employers.[8] (A2 at 2, ¶9, 11.) NewEnergy does not proffer any contrary testimony. Thus, there is at least a factual issue and at most an uncontested issue of fact in favor of Powerweb's ownership.

### D.    Due Diligence and the Letters of Intent

In furtherance of their intended joint ventures, NewEnergy and Powerweb signed a letter of intent for the Bell Atlantic project on October 25, 1999. (A4.) The following day, Mr. McGeown told Mr. Budike that NewEnergy needed to make some minor corrections, but nothing substantive. (A1 at 4, ¶15.) Thus, the parties signed a revised letter of intent ("Letter of Intent") on October 26, 1999. (A4.) In that letter, NewEnergy expressly acknowledged that Powerweb "brought the concept of reserve capacity sales to the PJM to NEE [NewEnergy]," agreed not to

---

[7]    See NewEnergy's Brief at 6-7.

[8]    Mr. Bakey testified that he sought the assistance of someone at Epex to put his ideas on paper, but that Epex acknowledged it was his intellectual property. (A9 at 86-87.)

independently pursue that business in the telecommunications industry, and reaffirmed all of its previous obligations under the Confidentiality Agreement. (A4 at 1.)

There is overwhelming evidence that Powerweb shared confidential information with NewEnergy during the due diligence period and thereafter, not the least of which is NewEnergy's own admissions. In his memo dated November 27, 1999, Mr. McGeown stated that, after the preliminary due diligence, his team was satisfied that Powerweb's representations regarding the hardware and the contracting mechanisms were true. (A31) In an email, Mr. McGeown cautioned the members of his due diligence team that Powerweb "is concerned about the confidentiality of this information" and reminded them that NewEnergy was bound by the Confidentiality Agreement with Powerweb. (A26) Kirk Hampton's preliminary due diligence report also acknowledges that the information is confidential and is subject to the Confidentiality Agreement. (A31) Mr. Bakey taught NewEnergy the contracting mechanisms necessary for an unregulated entity to sell a retail customer's capacity on the PJM. (A2 at 3, ¶13.) Mr. Budike had many meetings with Mr. McGeown and others in which he explained in detail both the Omni-Link system and the business strategies that comprise the Energy Technology Information protected by the Confidentiality Agreement. (A1 at 5, ¶18.)

Joseph Bonner, Powerweb's programmer, was unable to find anything akin to the Omni-Link system after searching the Internet and speaking with various experts. (A10 at 157-158, 160-162.) The Omni-Link system and Powerweb's Energy Technology Information was not common knowledge in October 1999. (A1 at 2, ¶7.) Even NewEnergy's own expert agrees that trading capacity and energy on an open exchange, as was described by Powerweb, was novel in 1999. (A23 at 206; A44 at 13.) Moreover, even if some portions of the Energy Technology

Information were known in 1999, NewEnergy was still bound not to *use* that information without Powerweb's consent. (A3 at 1.)

       **E.**     **The Bell Atlantic Agreement**

       Powerweb and NewEnergy entered into the Bell Atlantic Agreement to jointly develop a business proposal for Bell Atlantic's facilities in New Jersey including revenue streams for both energy and capacity. (A12 at 133; A5 at 1.) The Bell Atlantic Agreement incorporated the Confidentiality Agreement and thus included all of the duties previously established, including the promise not to use or disclose Energy Technology Information for ten years.[9] (A5 at 2.)

       **F.**     **The Bell Atlantic Proposal**

       Powerweb and NewEnergy moved forward in devising a program for Bell Atlantic. Powerweb focused on gathering the technical information necessary to determine appropriate sites, while NewEnergy took over the coordination with Bell Atlantic. (A1 at 4, 16.) NewEnergy had several meetings and telephone conversations with Jeremy Metz, the head of purchasing for Bell Atlantic, during which Energy Technology Information was disclosed. (A34; A35; A36.) In April 2000, NewEnergy gave a detailed presentation setting forth how NewEnergy would facilitate energy and capacity sales for Bell Atlantic. (A37.) After receiving all the information, Bell Atlantic determined that it could not go forward because of an issue with the permits for its generators in New Jersey. (A13, at 55.)

---

[9]     NewEnergy contends that two other agreements were signed later and are not alleged to have been breached. <u>See</u> NewEnergy's Brief at 8. One of those was an addendum to and is therefore part of the same Bell Atlantic Agreement. (A5.) The other was a joint venture agreement for other customers ("Joint Marketing Agreement") (A6), which Powerweb *did* allege was also breached. <u>See</u> Defendants' Amended Answer, Affirmative Defenses and Counterclaims to Plaintiff;s Second Amended Complaint, ¶¶ 122, 133, 137, 138 (Doc.#39).

### G.    The $100,000 Payment

Powerweb wanted to reaffirm the relationship with NewEnergy and requested Mr. Hayduk's permission to issue a press release. In his letter to Mr. Hayduk (A39), Mr. Budike expressed his belief that Powerweb was entitled to what NewEnergy had agreed. The letter set forth Powerweb's understanding of the scope of all of the various agreements between Powerweb and NewEnergy.

Powerweb never agreed to refund any of the money NewEnergy paid pursuant to the Bell Atlantic Agreement under any circumstances and the contract did not call for any money to be refunded.[10]

### H.    RETX and CILCO

Mr. McGeown wanted to work with Powerweb to bring the novel concept of the Omni-Link system to the various divisions of AES, the parent company of NewEnergy. In furtherance of that effort, Mr. McGeown asked Mr. Budike to disclose information to Peter Scarpelli at AES CILCO. (A1 at 7 ¶25.) At the time, Mr. Scarpelli was working on load management programs for CILCO, a utility, in a regulated market. CILCO was not engaged in those programs in the Summer of 1999, when Powerweb first approached NewEnergy. (A21 at 28.) Unbeknownst to Powerweb, Mr. Scarpelli was consulting with RETX on the design of an energy management and curtailment software program when he received Powerweb's Energy Technology Information, in conjunction with his work for CILCO. Prior to 2000, RETX was not in the business of curtailment. (A18 at 16-18, 22.) Indeed, Load Management Dispatcher, RETX's version of Omni-Link, was not operational until June 2000. (A18 at 36; A21 at 77.)

---

[10]     See Motion by Powerweb, Inc. for Summary Judgment (Doc. #85).

### I.    Verizon

Even after the Confidentiality Agreement with NewEnergy was in place, Powerweb took further steps to protect its information by asking NewEnergy to obtain a written confidentiality agreement from Bell Atlantic. (A1 at 4, ¶16.) Mr. Budike prepared an agreement that mirrored his own Confidentiality Agreement with NewEnergy and gave it to Mr. McGeown for execution by Bell Atlantic. (A1 at 4, ¶16.; A30.) Mr. McGeown told Mr. Budike that the agreement was not necessary, because confidentiality agreements were already in place for the commodity sales that would protect anything of Powerweb's that was disclosed to Bell Atlantic. (A1 at 5, ¶17.) Powerweb relied on Mr. McGeown's representation in permitting its confidential information to be disclosed to Bell Atlantic without an additional confidentiality agreement. (A1 at 5, ¶17.) However, no confidentiality agreement was in place between NewEnergy and Bell Atlantic and NewEnergy never asked Bell Atlantic to execute one. (A20 at 61-62.)

### J.    BG&E

BG&E did not terminate its 2002 license agreement for Omni-Link because of any dissatisfaction with Powerweb. That agreement related to the commercial roll-out of the Omni-Link system to a segment of BG&E's customers and was a follow up to a more extensive pilot program (the "Roll Out"). (A1 at 7, ¶27.) In conjunction with the Roll-Out, BG&E substantially changed its specifications for the Omni-Link System, deleting or altering many engines that were a part of the pilot program. (A1 at 7, ¶28.) As a result of BG&E's many changes, Powerweb had to redesign portions of the Omni-Link software to meet BG&E's revised specifications. (A1 at 7, ¶28; A10 at 238-40.) BG&E's changes, and thus the number of redesigns, were numerous and caused some delay in getting certain portions of the system online. (A1 at 7, ¶28.) However, by November 2002, BG&E agreed that all work was satisfactory and

that all of the software engines were substantially in compliance with BG&E's specifications. (A1 at 8, ¶29; A41; A15 at 234.)

Thereafter, a lawyer for NewEnergy named Jordan Karp asked BG&E's Ruth Kiselewich to pressure Mr. Budike to drop Powerweb's claims against NewEnergy. (A15 at 124.) NewEnergy's Brief misdescribes Mr. Karp as an employee of NewEnergy's parent company and ignores Ms. Kiselewich's testimony that he was acting on behalf of NewEnergy. (A15 at 124.) Moreover, Mr. Karp is NewEnergy's corporate secretary.[11] (A43.) Following Mr. Karp's instructions, Ms. Kiselewich told Mr. Budike that it would be in Powerweb's interest to drop its claims in this case. (A15 at 127.) Mr. Budike declined to do that, given the enormous losses that Powerweb has suffered as a result of NewEnergy's wrongdoing. (A15 at 122-23, 127; A41; A1 at 8, ¶30.) Only then did BG&E begin to hint that Powerweb's relationship with BG&E might be in trouble. (A1 at 8, ¶31.)

Prior to entering into the license agreement, BG&E had analyzed the cost of the program and determined that it would not be profitable for several years. (A15 at 157.) BG&E did not expect to recoup the license fees paid to Powerweb from fees paid by customers; rather the major source of revenue was projected to be the indirect revenue from curtailments by customers using the Omni-Link System. (A15 at 155.) At the time of termination, there were fifteen BG&E customers on-line with the Omni-Link System and another five customers with signed contracts in various stages of set-up. (A1 at 8, ¶32.) This was in line with the goal of twenty customers that BG&E had set for 2002. (A40.) Powerweb was understandably surprised when in January 2003—after Powerweb refused to drop its claims against NewEnergy—BG&E

---

[11]   NewEnergy did not amend its initial disclosures following the addition of the claim for tortuous interference with the BG&E contract. Mr. Karp's identity was only revealed at Ms. Kiselewich's deposition, which occurred approximately one week prior to the discovery deadline. At that point the parties were already fully scheduled until the end of the discovery period.

began to contend that the license agreement was too costly. (A1 at 8, ¶31.) BG&E suggested a way to save the relationship that no rational business could accept—BG&E insisted that Powerweb offer its services for free. (A1 at 8, ¶31.)

Despite personally wanting to continue the relationship with Powerweb, Ms. Kiselewich bowed to the pressure and recommended terminating the license agreement. (A15 at 161.) She did not make the *decision* to terminate Powerweb. (A15 at 167.) Moreover, Ms. Kiselewich did not recommend termination until after Mr. Budike had refused to drop this lawsuit. (A15 at 165.)

## III.    ARGUMENT

### A.    Standard of Review

Summary judgment may be granted only where there is no genuine issue of material of fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A genuine issue of fact exists where there is evidence on which a reasonable jury could find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to the non-moving party. See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Moreover, the court cannot consider the credibility or weight of the evidence, even if the quantity of the moving party's evidence far outweighs that of the non-moving party. See id.

### B.    The Tort Claims

Powerweb's tort claims are not barred by the gist of the action doctrine or the economic loss rule.

### 1. The Gist of the Action and Economic Loss Doctrines

The "gist of the action" doctrine applies only where a contractual duty is the basis for the alleged tort, as opposed to an independent duty imposed as a matter of social policy. Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3d Cir. 2001). As explained below, Powerweb's tort claims are not barred by this doctrine because the claims are based on breaches of independent duties. The "economic loss doctrine" also does not apply, because Powerweb is not asserting product liability claims. Id. at 104 n.11.

### a. Misappropriation of Trade Secrets

The scope of the parties' Confidentiality Agreement is one of the most hotly contested issues in this case. Powerweb reads it broadly, but NewEnergy reads it narrowly. Which interpretation is correct cannot be determined at this stage. If any of the alleged tort duties are found to be outside the scope of the contract, claims for their breach could not be barred by the gist of the action doctrine.[12] For example, if the jury concludes that a particular trade secret was not covered by the Confidentiality Agreement, a claim for misappropriation of that secret could not be barred as based on a contractual duty. Indeed, the third circuit made that very point in Bohler-Uddeholm. Id. at 107 (remanding for a determination of which trade secrets were within and which were outside of the contract). Thus, it would be premature to evaluate the gist of the action doctrine's applicability to the trade secret claims until the scope of the Confidentiality Agreement is adjudicated.

Moreover, Powerweb's misappropriation claims are not limited to the "Energy Technology" that was protected by the Confidentiality Agreement. For example, Powerweb also

---

[12] A plaintiff is entitled to assert alternative causes of action. Fed. R. Civ. P. 8(e)(2). Thus, to the extent that any asserted tort claim may overlap with a breach of contract claim, neither may be dismissed at this stage.

disclosed customer lists and pricing information to NewEnergy. (A1 at5, ¶18.) Those clearly

qualify as trade secrets notwithstanding their lack of inclusion in the contract. Bohler-Uddeholm

at 107.

Powerweb objects to NewEnergy's citation of Medical Broadcasting Co. v. Flaiz,

No. 02-8554 (May 29, 2003) (Bartle, J.), as an improper *ex parte* argument. All that was

included for that case in NewEnergy's appendix is an Order containing a one sentence ruling on

a misappropriation claim. NewEnergy's counsel and the Court were both involved in the case,

but Powerweb's counsel was not. The briefs, which might shed some light on the facts and the

basis for the ruling, were *filed under seal*. Thus, NewEnergy is making a secret argument that

only the Court is in a position to understand, thereby depriving Powerweb of any opportunity to

respond. That is patently unfair and should not be countenanced. Accordingly, the citation should

be disregarded.

### b.    Fraudulent Misrepresentations

NewEnergy induced Powerweb to enter into the contracts by representing that it

intended to sell the Omni-Link system to its numerous customers in various regions. Without

that misrepresentation, Powerweb would have selected a different joint venture partner. (A33.)

However, the contracts merely gave NewEnergy the option to pursue the business with

Powerweb or not pursue it at all. (A5; A6.) Thus, the misrepresentation did not become a part of

the contract. Such claims for fraud in the inducement are not barred by the gist of the action

doctrine, because they do not concern the performance of contractual duties. Flynn v. Health

Advocate, Inc., No. 03-3764, 2004 U.S. Dist. LEXIS 293, *30-31 (3d Cir. 2004) ("the distinction

between fraud in the inducement and fraud in the performance claims with regard to the gist of

the action doctrine is crucial"); Etoll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa.

- 15 -

Super. 2002); accord, Foster v. Northwestern Mutual Life, No. Civ. A. 02-2211, 2002 U.S. Dist. Lexis 15078, *7-8 (E.D. Pa. July 25, 2002) (Van Antwerpen, J.). The cases cited by NewEnergy are inapposite. See Werwinski v. Ford Motor Co., 286 F.3d 661 (3d Cir. 2002) (fraudulent concealment, not inducement); Williams v. Hilton Group, PLC, 261 F. Supp.2d 324, 330 (W.D. Pa. 2003), aff'd, No. 03-2590, 2004 U.S. App. LEXIS 4980 (3d Cir. Mar. 17, 2004) (not precedential) (fraud in performance, not inducement); Owen J. Roberts Sch. Dist. v. HTE, No. Civ. A. 02-7830, 2003 WL 735098, at *3 (E.D. Pa. Feb. 28, 2003) (Dalzell, J.) (failure to perform incorrectly styled as fraud in inducement).

The controlling facts here are strikingly similar to those in Polymer Dynamics, Inc. v. Bayer Corp., No. Civ. A. 99-4040, 2000 WL 1146622 (E.D. Pa. Aug. 14, 2000) (Waldman, J.). There, the plaintiff also alleged that the defendant misappropriated confidential information disclosed in reliance on promises of a future business relationship. Id. at *2-3. The court held that those allegations stated a cause of action that was not barred by the gist of the action doctrine. The third circuit also held the gist of the action doctrine inapplicable on similar facts in Flynn. There, the fraud alleged was misrepresentations made to induce the plaintiffs to agree to non-disclosure agreements in order to steal the plaintiff's trade secrets. Id. at *32.

After the Confidentiality Agreement was signed, NewEnergy also misrepresented that a similar agreement was in place with Bell Atlantic that would protect Powerweb's information. (A1 at 5, ¶17.) Powerweb relied on that false representation in allowing the disclosures that ultimately enabled Bell Atlantic to implement its own program without Powerweb or NewEnergy. That misrepresentation also was not a contractual promise. Such misrepresentations, made after a contract is signed, cannot be subject to the gist of the action doctrine. See Owen J. Roberts School Dist. at *15 (citing Pennsylvania cases).

- 16 -

NewEnergy also represented that because Mr. Scarpelli worked for an affiliate, any disclosures to him were covered by the Confidentiality Agreement. (A3; A1 at 7, ¶25.) Powerweb relied on NewEnergy's representation in allowing the disclosures that ultimately enabled Mr. Scarpelli to help RETX and Silicon Energy compete with Powerweb. (A1 at 7, ¶25.) NewEnergy now denies that the Confidentiality Agreement applied to its affiliates. Misrepresentations about the scope of a contract are separate from the contractual promises and are not barred by the gist of the action doctrine. See Asbury Auto. Group LLC v. Chrysler Ins. Co., No. 01-3319, 2002 WL 15925, *3 (E.D. Pa. Jan. 7, 2002) (Reed, S.J.).

As explained in Section III.B.1 above, the "gist of the action" doctrine applies only where a contractual duty is the basis for the alleged tort. Bohler-Uddeholm at 103. That is not the case for Powerweb's fraudulent misrepresentation claims.[13]

### c.    Unfair Competition

Unfair competition is a common law tort based upon § 1 of the Restatement (Third) of Unfair Competition. Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co., 953 F. Supp. 617, 668 (E.D. Pa. 1997). Many different circumstances may give rise to liability for unfair competition. In general, any act or practice is unfair if it "substantially interferes with the ability of others to compete on the merits of their products or otherwise conflicts with accepted principles of public policy recognized by statute or common law." Restatement (Third) of Unfair Competition, § 1 cmt. g (1995). If the acts alleged are otherwise tortious, "they will also ordinarily constitute an unfair method of competition." Id. For example, if a competitor interferes with the commercial relations of another, makes fraudulent misrepresentations, wrongfully uses

---

[13]    NewEnergy's contention that a fraudulent inducement claim is unavailable because the contract was fully integrated incorrectly assumes that the misrepresentations here were coterminous with the Confidentiality Agreement. As explained above, they were not.

confidential information or misappropriates trade secrets, it thereby also engages in unfair competition. Id. Thus, a Lanham-Act-like claim is only one species of unfair competition, not the *only* kind, as NewEnergy seems to contend. See Pennsylvania State Univ. v. University Orthopedics, 706 A.2d 863, 867 (Pa. Super 1998) ("A [common law] claim of unfair competition encompasses trademark infringement, but also includes a broader range of unfair practices . . . ."). Indeed, all of the other tort claims asserted here also constitute unfair competition. Restatement (Third) of Unfair Competition, § 1 cmt. g (1995).

NewEnergy has not cited a single case applying the gist of the action doctrine to unfair competition, nor has Powerweb's counsel found any such case. That is not surprising, because the basis for an unfair competition claim is social policy, not contractual obligations. See Bohler-Uddeholm.

### d.    Tortious Interference

The "gist" of the tortious interference claim is that NewEnergy interfered with Powerweb's prospective sales to independent customers. That does not coincide with a contractual undertaking. Once again, NewEnergy has not cited a single case that even considered applying the gist of the action doctrine to such a claim.[14] The only case Powerweb's counsel has found declined to apply the doctrine. See Mill Run Assocs. v. Locke Prop. Co., 282 F. Supp. 2d 278 (E.D. Pa. 2003) (Scuderi, M.J.).

### 2.    Fiduciary Duty

NewEnergy cited Bohler-Uddeholm for other purposes, but has neglected to mention that it is controlling precedent adverse to NewEnergy's position regarding Powerweb's fiduciary duty claim. As the third circuit recognized there, a joint venture agreement *does* give

---

[14]    NewEnergy did cite Werwinski, but that case says nothing at all about tortious interference claims.

rise to a fiduciary duty. Id. at 105; see also Snellbaker v. Herrmann, 462 A.2d 713, 718 (Pa. Super. 1983) ("a joint venturer owes a fiduciary duty of the utmost good faith and must act toward his associate with scrupulous honesty.").[15] The Bell Atlantic Agreement and the subsequent Joint Marketing Agreement were both joint venture agreements. See Snellbaker at 716. Moreover, both of them included all terms previously agreed to in the Confidentiality Agreement. (A5; A6.) Thus, a summary judgment cannot be granted on Powerweb's claims for breach of fiduciary duties.

### C. Breach of Contract

Powerweb has amassed evidence and admissions from NewEnergy regarding NewEnergy's breaches of its duties under each of the agreements with Powerweb. Consequently, there are disputed material facts which preclude summary judgment on Counts I, II, and III of Powerweb's amended counterclaims.[16]

---

[15]     Because such a duty goes "well beyond the particular obligations contained in the Agreement itself" and is imposed as a matter of social policy, a fiduciary duty claim is not barred by the gist of the action doctrine. Bohler-Uddeholm at 105.

[16]     NewEnergy also contends in a footnote that Powerweb's Count IV should be dismissed because "Pennsylvania law does not recognize an independent cause of action for breach of the duty of good faith and fair dealing." NewEnergy's Brief at 17 n.15. However, that greatly overstates the point. Although "Pennsylvania courts have recognized a separate duty of good faith performance of contracts only in limited circumstances," one of those circumstances is "where there is some special relationship between the parties, such as a confidential or fiduciary relationship." Commonwealth, Dep't of Transp. v. E-Z Parks, Inc., 620 A.2d 712, 717 (Pa. Commw. 1993). Powerweb has alleged such a "special relationship" here and is therefore entitled to assert the separate claim.

Moreover, the limitations described in the case NewEnergy cited are to no avail:

>      Courts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term. Thus, a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are "identical to" a claim for "relief under an established cause of action."

Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-92 (3d Cir. 2000) (citations omitted). Here, the good faith obligation is not being used "to override an express contract term." Whether the claim for its breach is "identical" to any of Powerweb's other breach of contract

### 1.    The Confidentiality Agreement

The Confidentiality Agreement imposes two separate and distinct obligations upon NewEnergy with respect to the Energy Technology Information: a duty of non-disclosure and a duty of non-use. (A3 at 1, ¶1.) There are disputed issues of fact as to whether any portion of the Omni-Link system was in the public domain. Messrs. Budike, Bakey and Bonner all contend that the concepts of selling retail energy and capacity on the open market and other elements of the Energy Technology Information were not widely disseminated or common knowledge in 1999, when the Confidentiality Agreement was signed. (A1 at 1-2, ¶3-7; A9 at 44; A10 at 157-58, 161-62.) Even NewEnergy's expert agrees that trading of retail capacity on an open exchange, including the concept devised by Powerweb, was novel in 1999. (A23 at 203, agreeing with a published timetable indicating that the concept began to be developed in 1999.) Moreover, the ISO sponsored programs which made the sale of energy and capacity by customers more widespread did not begin to develop until the spring of 2000, six months after the Confidentiality Agreement was signed. (A23 at 43; A9 at 187,88; A12 at 59; A22 at 124.)

### a.    Disclosure of Confidential Information

There are disputed issues of fact regarding NewEnergy's disclosure of information in violation of the Confidentiality Agreement. At the direction of Mr. McGeown, and with his assurance that CILCO, as a sister company of NewEnergy, was covered by the Confidentiality Agreement, Powerweb forwarded written materials and discussed confidential Energy Technology Information with Mr. Scarpelli at CILCO. (A1 at 7, ¶25.) Mr. Scarpelli's characterization of the materials as sales literature does not defeat their confidentiality.

---

claims depends upon whose interpretation of the contractual language ultimately prevails. Accordingly, it would be premature to rule now on the separate viability of Count IV. At most, it might become duplicative if Powerweb's interpretation prevails.

Powerweb's testimony is that even those materials were protected Energy Technology Information and were not released without an assurance of confidentiality. (A11 at 356.) In addition to the documents provided, Powerweb also gave NewEnergy detailed explanations over the telephone and at meetings of the Omni-Link system, its features, how it operated, and how to structure the business transactions with customers. (A1 at 5, ¶18.) Much of that was also disclosed to Mr. Scarpelli. (A1 at 7 ¶26.) Indeed, Mr. Scarpelli admits that he did receive additional information from Mr. Budike. (A21 at 35-36.)

NewEnergy also provided confidential information to Mr. Scarpelli directly, such as how the revenues from the Bell Atlantic deal were to be shared. (A21 at 35-36.) According to Mr. Scarpelli, Mr. McGeown failed to inform him of the Confidentiality Agreement or caution him about the confidentiality of the Powerweb's information. (A21 at 36.)

At the time he received the information, Mr. Scarpelli was consulting with RETX on the development of its program called Load Management Dispatcher. (A21 at 77-78.) Shortly after gaining an understanding of Omni-Link from Powerweb, Mr. Scarpelli left his position as a manager at CILCO to become RETX's Vice-President of Business Development. (A21 at 6,84.) In that position, he was involved with the development and design of RETX's Load Management Dispatcher, which thereafter became a direct competitor of the Omni-Link system. (A21 at 77-78.) While Mr. Scarpelli contends that the desired features of the software had been identified prior to March 2000, he admits that the software itself was not functioning. (A21 at 84-85) Only after he had Powerweb's explanation of how such a system could work was RETX able to develop a functioning product. RETX then launched its competing Load Management Dispatcher in June 2000.

NewEnergy failed to properly protect Powerweb's information either by misrepresenting its authority to bind CILCO to the Confidentiality Agreement or by failing to take adequate steps to guard the information, by alerting Mr. Scarpelli to the Confidentiality Agreement and providing him with a copy. As a result of NewEnergy's action or inaction, Mr. Scarpelli was able to give RETX the help it needed to build its competing product.

NewEnergy similarly failed to protect Powerweb's Energy Technology Information with respect to Bell Atlantic. NewEnergy presented Powerweb's idea to Jeremy Metz at Bell Atlantic. (A36; A37.) NewEnergy educated Bell Atlantic on how to do the energy and capacity sales without a confidentiality agreement in place, notwithstanding Mr. McGeown's representation that Powerweb's information was protected. Not surprisingly, once given the playbook, Bell Atlantic took the information and used it itself rather than forming a partnership with Powerweb and NewEnergy.

### b.    Use of Confidential Information

One of the primary purposes of the Confidentiality Agreement was to ensure that NewEnergy would not engage in customer energy or capacity sales without Powerweb once Powerweb explained how that was done. (A1 at 3, ¶11.) Consequently, the Confidentiality Agreement included an agreement that NewEnergy would not *use* any of the Energy Technology Information without Powerweb's consent, including the business concepts of selling a customer's energy or capacity into the deregulated market. (A1 at 3, ¶11; A3.) After the Confidentiality Agreement was signed, several ISOs, including PJM, New York, and New England, developed programs and published rules explaining how to sell retail energy and capacity in their deregulated markets. While the ISO sponsored programs are not as sophisticated and profitable as what could be accomplished with the Omni-Link system, they include certain

of the strategies protected by the Confidentiality Agreement.[17] There is abundant evidence that NewEnergy participated in ISO sponsored programs beginning in 2000 and continues to do so today. (A16 at 135-36, 219-220; A17 at 117, 145-48; A12 at 48-49.)

NewEnergy cannot deny that the ISO sponsored programs in which it participates are covered by the literal definition of Energy Technology Information. Thus, NewEnergy argues that the wrongful "use" claim must be analyzed as if it were a trade secret claim, rather than a breach of contract claim. There is no authority for that argument. The breach of the duty of non-use must be analyzed as any other breach of contract, and "use" must be given its plain meaning.

NewEnregy next attempts to limit the duty of non-use to non-public information, but the Confidentiality Agreement contains no such limitation. The promise not to use the information was an essential element of the agreement. Mr. Budike made it clear from the outset that he did not want NewEnergy to engage in this type of business without Powerweb. Mr. McGeown understood Powerweb's position and alerted others at NewEnergy that "Lou [Budike] does not want us to do this without him." (A27.) There is no factual support for reading in any conditions on the duty of non-use. NewEnergy promised not to do it without Powerweb for ten years. It has broken that promise.

### 2.    The Letter of Intent

Powerweb concedes that the only evidence of breaches during the time the letter of intent was in effect were breached of the Confidentiality Agreement.  Powerweb therefore withdraws its claim for breach with respect to the letter of intent.

---

[17]    NewEnergy's own expert acknowledged that at least some of the ISO sponsored load management programs are in his expert opinion within the definition of stand-by generation capacity credit programs. (A24 at 188:10-14.)

### 3. The Bell Atlantic Agreement

The Bell Atlantic Agreement also incorporates the obligations of the Confidentiality Agreement. During the one-year term of the Bell Atlantic Agreement, NewEnergy both improperly disclosed information and used protected information for it own benefit. NewEnergy gave Bell Atlantic the blueprint for selling energy and capacity on the open market without properly protecting that information. NewEnergy also began to develop its own business strategies for the sale of customers' energy and capacity on the PJM during 2000. (A12 at 47-48.) It succeeded in landing at least one customer for the summer of 2000, Amboy Aggregates, without even advising Powerweb that it had done so. (A38.) These actions breached the Bell Atlantic Agreement during its term.

### D. Tortious Interference with the BG&E Contract

NewEnergy's argument that the BG&E Contract was terminable at will misperceives the nature of Powerweb's claim. This is not a breach of contract claim against BG&E—Powerweb has sued NewEnergy for wrongfully inducing the termination. There are disputed factual issues regarding Powerweb's claim for tortious interference with the BG&E contract, and thus summary judgment must be denied.

Ms. Kiselewich was contacted twice by a lawyer for NewEnergy, a man she had never met, and asked to use her personal relationship to influence Powerweb. The NewEnergy lawyer, Jordan Karp, gave her instructions and points on items she could offer Powerweb in exchange for dropping its claims against NewEnergy. (A15 at 124.) Ms. Kiselewich told Mr. Budike it would be in both their interests if he would walk away from his lawsuit. (A15 at 127.) She then reported Powerweb's refusal to acquiesce back to Mr. Karp. (A15 at 131-32.) Only then did BG&E begin to raise "cost issues" and consider terminating Powerweb.

NewEnergy contends that BG&E terminated Powerweb for performance issues.[18] However, BG&E certified that it was satisfied with Powerweb's performance in November 2002, less than three months later BG&E recommended termination. (A1 at 8, ¶29; A41.) BG&E also purports to have had cost issues, but the costs had not changed since the license agreement was signed. The program was not projected to earn a profit for several years and BG&E had met its goal for the number of customers enrolled in 2002. (A1 at 8, A 40; A15 at 155.) BG&E's attitude toward Powerweb changed only after NewEnergy pressured BG&E to insist that Powerweb abandon its claims.

There is sufficient factual support for Powerweb's claim that NewEnergy improperly interfered with the BG&E contract. Moreover, NewEnergy had no privilege to interfere with a contract of its sister corporation, BG&E.[19]

### E.    The $100,000 Payment

Powerweb disputes NewEnergy's contention that only a $5,000 expenditure was authorized. Mr. Budike testified that he advised NewEnergy of the work that was needed, explained that it could easily cost more than $100,000, and was told by Mr. McGeown to "get it done." (A11 at 555-557.) Thus, there is a genuine factual issue on this point, which precludes a summary judgment for NewEnergy.

Moreover, Powerweb would not have been required to return any of the $100,000 even if none of it had been spent. See Motion by Powerweb, Inc. for Summary Judgment (Doc. #85), which is incorporated herein by reference.

---

[18]    NewEnergy's Brief at 23.

[19]    NewEnergy conveniently glosses over the fact that Powerweb has asserted a claim that NewEnergy, not its parent company, interfered with the BG&E contract.

**IV.    CONCLUSION**

For the foregoing reasons, NewEnergy's summary judgment motion should be denied in its entirety.

Respectfully submitted,

RG574

Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.

Date:    June 15, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,          :
                    Plaintiff,          :
                                        :
            v.                          :          No. 02-CV-2733 (HB)
                                        :
POWERWEB TECHNOLOGIES, INC.,            :
                    Defendant.          :

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing proposed order and memorandum of law were served today upon counsel for Constellation NewEnergy, Inc. by U.S. mail, addressed as follows:

David E. Landau, Esquire
Wolf, Block, Schorr and Solis-Cohen, LLP
1650 Arch St., 22nd Floor
Philadelphia, PA 19102


_____RG574_____
Rudolph Garcia, Esquire

Date:   June 15, 2004