IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| Defendant. | : | |

**REPLY MEMORANDUM BY POWERWEB, INC.**
**IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Powerweb[1] submits this reply memorandum to address contentions made in opposition to its motion for a summary judgment against NewEnergy.

### A.   The Breach of the Contract Claim

NewEnergy incorrectly asserts that Powerweb "does not challenge its non-performance" and "proffers no evidence that it used any part of the $100,000 for 'planning and implementation.'"[2] On the contrary, Powerweb incurred expenses for initial planning that greatly exceeded $100,000.[3] It simply has not sought summary judgment for that reason because it turns on disputed facts, unlike the grounds that Powerweb *did* assert.

#### 1.   There Can Be No Liability for Nonperformance.

As NewEnergy has acknowledged, only non-performance of an "immediate" duty constitutes a breach.[4] The claim alleged here by NewEnergy relates only to *future* duties that

---

[1]   For brevity and convenience, all defined terms in the initial Memorandum of Law by Powerweb, Inc. in Support of Motion for Summary Judgment ("Initial Memo") are used with their same meanings here.

[2]   See Plaintiff Constellation NewEnergy, Inc.'s Response to Powerweb's Motion for Summary Judgment ("NE Memo"), at 3.

[3]   See Initial Memo, Ex. I (work totaling $360,000).

[4]   See NE Memo, at 3 (citing Barnes v. McKellar, 644 A.2d 770, 775 (Pa. Super. 1994)).

never became current duties because Bell Atlantic decided not to proceed with the proposed project.

> The only purported performance breaches alleged here were as follows:
>
> Upon information and belief, Powerweb did not complete a detailed project implementation plan, schedule and cost analysis for the integration of Omni-Link into Bell Atlantic's energy program. Also, Powerweb did not design an Omni-Link System for Bell Atlantic or provide post-installation software and hardware maintenance for the Omni-Link System.[5]

It would be impossible to complete a detailed project implementation plan, schedule, cost analysis and design before some agreement was reached on what the project would entail (i.e, number of buildings, locations, etc.). That never occurred. Nor could any post-installation maintenance be performed before anything was installed. NewEnergy has not disputed any of those facts. Thus, the duties at issue were clearly future obligations. That is why the Contract said that they were to be included in the *subsequent agreements* with Bell Atlantic.[6] Because Bell Atlantic decided not to proceed and never signed any such agreements, the time for completing those tasks never arrived.[7]

Moreover, NewEnergy does not contend that it was harmed in any way by nonperformance of the specified duties. It is undisputed that Bell Atlantic decided not to proceed due to environmental permitting issues,[8] not because Powerweb failed to fulfill any of the alleged obligations. If Powerweb had done everything the breach of performance claim

---

[5] Second Amended Complaint at 8, ¶35.

[6] See Initial Memo at 9-10.

[7] The work Powerweb did before Bell Atlantic decided not to proceed was a series of engineering surveys (subcontracted to A-Valey Engineers) to determine the suitability of various facilities for inclusion in the project. See Initial Memo, Ex. I. That information was necessary to the future preparation of a system design and implementation plan. See Budike, Jr. Dep. at 402:19-405:24, attached hereto as Exhibit A.

[8] See NE Memo, at 2.

describes, NewEnergy would still be in exactly the same position. There can be no cause of action for breach of contract without "resultant damages." Corestates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999). Here, no damages were even alleged to have been caused by the asserted breach. All NewEnergy seeks is the return of a nonrefundable payment.[9] NewEnergy does not contend that the purported failure to perform caused it to lose any profits or suffer any other kind of harm. Nor could it, because Bell Atlantic's decision not to proceed was not based on any inaction by Powerweb.

Accordingly, Powerweb is entitled to judgment as a matter of law on NewEnergy's claim for nonperformance.

### 2. The $100,000 Was Not Refundable.

The Contract allowed any unspent portion of the $100,000 to be applied to other projects. However, it did not provide for a refund if there were no other projects. Indeed, Powerweb explicitly refused to include such a refund provision because it wanted NewEnergy to pursue other customers for the Omni-Link system.[10] By choosing not to do so, NewEnergy forfeited any credit that it would otherwise have been entitled to receive. That arrangement was much the same as when a retailer offers a store credit for returns, but not a cash refund. NewEnergy simply allowed its store credit to go unused.

NewEnergy asks this Court to add a cash refund requirement to the Contract despite its intentional omission by the parties. That simply cannot be done. See Vaccarello v. Vaccarello, 757 A.2d 909, 914 (Pa. 2000) (finding error with interpretation of agreement that ignored plain language and added a provision that was not included or intended).

---

[9]   See Section A.2 below.
[10]  See Initial Memo at 7-8 n.15.

Accordingly, Powerweb is entitled to judgment as a matter of law on NewEnergy's claim for a refund.[11]

### B. The Unjust Enrichment Claim

NewEnergy admits that there was a valid written contract governing its $100,000 payment to Powerweb.[12] A claim of unjust enrichment cannot be used to change the terms of a written contract and will not stand where the basis for the claim is within the scope of the agreement between the parties. See Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999-1000 (3d Cir. 1987) (affirming summary judgment where unjust enrichment allegations related to services within the scope of a contract). The parties here *agreed* not to require a cash refund.[13] NewEnergy understandably regrets the bargain that it made, but it is bound by it nonetheless. See Hershey Foods, 828 F.2d at 1000 (whether a bad bargain was made is not an issue that can preclude summary judgment).[14]

### C. The Claim for an Equitable Accounting

NewEnergy's response proves Powerweb's point that no accounting is warranted. Among other things, it attached testimony explaining what was done and why, the amount invoiced to Powerweb and the amount Powerweb still owes to A-Valey Engineers, as well as

---

[11] What work was done, what expense was incurred and whether it was authorized, are all in dispute, but none of that is material to the issue at hand. Based on the facts as to which there is no genuine dispute, Powerweb is entitled to judgment as a matter of law.

[12] See NE Memo at 2.

[13] See Section A.2 above.

[14] Once again, NewEnergy asserts disputed facts that are not material to this issue. Powerweb *did* incur expenses well beyond the $100,000, but it has not sought summary judgment on that basis. The fact that the President of A-Valey Engineers has not hounded his son for payments that Powerweb cannot yet afford does not belie the debt and is also beside the point. NewEnergy also misconstrues Powerweb's statement that "it is NewEnergy who elected to discontinue the venture." See NE Memo at 8 (citing Powerweb's Initial Memo at 13). That referred to NewEnergy's decision not to continue working with Powerweb on *other* projects, not the Bell Atlantic project. That was what caused the forfeiture of NewEnergy's entitlement to a credit for any unused funds.

invoices detailing the work performed.[15] In addition to some of those same items, Powerweb's motion also attached a transmittal form detailing what was delivered to Bell Atlantic, a letter describing the work performed, and a summary of the various invoices totaling $360,000.[16] It is difficult to imagine what more an accounting could provide.

Moreover, as a matter of law, an accounting is not required. NewEnergy seeks an *equitable* accounting.[17] In arguing its case, NewEnergy contends that an equitable accounting is available "when discovery is needed and is material to relief, *or* where plaintiff does not have an adequate legal remedy."[18] However, an equitable accounting is available *only* where "the plaintiff does not have an adequate legal remedy." See Meier v. Maleski, 648 A.2d 595, 606 n.21 (Pa. Commw. 1994). As demonstrated by its count for breach of contract, NewEnergy would have an available legal remedy if there were any merit to its claim.[19] See Berger & Montague, P.C. v. Scott & Scott L.L.C., 153 F. Supp.2d 750, 754 (E.D. Pa. 2001) (noting that an equitable accounting is not appropriate where there are adequate remedies at law for breach of contract and conversion claims). Thus, NewEnergy has no right to an equitable accounting.

## CONCLUSION

While there are many factual issues in this case, those that are not in dispute prevent any recovery by NewEnergy as a matter of law. Accordingly, summary judgment should be granted in favor of Powerweb on all of NewEnergy's remaining claims.

---

[15] See NE Memo, Ex. D, F, G.

[16] See Initial Memo, Ex. B, C, I.

[17] See NE Memo at 8.

[18] See NE Memo at 8 (emphasis added).

[19] Indeed, NewEnergy implicitly acknowledges this fact by citing the standard for the entitlement to the legal accounting, a remedy not sought by NewEnergy.

                        Respectfully submitted,

                                RG574

                        Rudolph Garcia, Esquire
                        Kara H. Goodchild, Esquire
                        Kristin L. Calabrese, Esquire
                        SAUL EWING LLP
                        1500 Market Street, 38th Floor
                        Philadelphia, PA 19102
                        (215) 972-1961; -7187; -7533
                        Attorneys for Powerweb, Inc.

Date:    June 23, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing reply memorandum was served today upon counsel for Constellation NewEnergy, Inc. by notice of electronic filing, addressed to:

> David E. Landau, Esquire
> Wolf, Block, Schorr and Solis-Cohen, LLP
> 1650 Arch St., 22nd Floor
> Philadelphia, PA 19102

        RG574
Rudolph Garcia, Esquire

Date:   June 23, 2004

809811.4 6/23/04

## TESTIMONY OF LOTHAR E.S. BUDIKE, JR. ON JANUARY 13, 2004

Page 402
19    Q. Okay. Tell me, what is --
20 what am I looking at here?
21    A. You're looking at a
22 spreadsheet, a -- a downloaded
23 spreadsheet of all of the generators in
24 every one of the Bell Atlantic

Page 403
1 territories, a one page of that, the
2 first column being a code to the
3 building. The second column being the
4 location of that Bell Atlantic generator,
5 the location of the building. The third
6 column being where the generator is
7 located. The fourth column being who is
8 the manufacturer of the generator. The
9 fifth column being what's the fuel that
10 operates the generator. The fifth column
11 being the gear ratio and whether these
12 things could turn on automatically. And
13 the state is the last column.
14    Q. And you said "downloaded,"
15 where was it downloaded from?
16    A. I have no idea. It was
17 faxed to me by Dave McGeown. So Dave
18 McGeown was interacting with Jim Hopkins
19 and the people at Bell, and our job was
20 to find the generators throughout the
21 state that would meet the requirements to
22 operate.
23    So we had to take a list of
24 hundreds, maybe even thousands of

Page 404
1 generators, do it state by state and then
2 zero down on the generator, analyze the
3 generator. And then after that was done,
4 Deidra had to get us the account codes
5 for each of these generators so we could
6 put together a presentation to Bell in
7 order to facilitate this deal.
8    Q. How did you go about
9 determining that?
10    A. Determining -- we had -- we
11 had to go out to site visits on every one
12 of the ones that met our criteria,
13 meaning which ones had approval to
14 operate within the EPA standard 250/500
15 hour guidelines.
16    Then we had to see, was
17 there auto switch transfers with ground
18 fault detection. What that is is, at the
19 bottom of the buildings, if you were to
20 lose power, if this building loses power
21 right now, if there's no ground fault
22 detection system, it won't automatically
23 blink and turn back on through a
24 generator.

Page 405
1    So if we kill the power to
2 the generator and turn it on in order to
3 dispatch the energy and capacity, the
4 relay could read that as a power failure
5 and go -- switch the whole building on to
6 batteries, which we did not need that to
7 happen.
8    So each building had to get
9 a ground fault detection system analyzed
10 to see if this building was actually a
11 good candidate.
12    And, thirdly, was the
13 generator big enough and new enough to
14 operate. If we were going to run these
15 old generators and they needed to be
16 repaired with repair people every two
17 weeks because they were old diesels, they
18 couldn't stand up to running them in
19 order to produce the money, then it
20 wasn't worth doing that type of deal.
21    Q. Did you do that kind of
22 research?
23    A. Absolutely. That was the
24 research that was done by A-Valey.

## Exhibit A