IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| Defendant. | : | |

## **O R D E R**

AND NOW, this          day of                    , 2004, it is hereby ORDERED that the Motion in Limine by Powerweb, Inc. to Preclude Testimony by Raymond F. Dovell, C.P.A. is GRANTED. Mr. Dovell will not be permitted to testify at the trial of this action, because his proffered testimony does not meet the requirements of Rule 702 of the Federal Rules of Evidence.

BY THE COURT:

_____
                                                                                                J.

813356.3 7/15/04

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| Defendant. | : | |

**MOTION IN LIMINE BY POWERWEB, INC.
TO PRECLUDE TESTIMONY BY RAYMOND F. DOVELL, C.P.A.**

Powerweb, Inc.[1] hereby moves the Court for an Order precluding plaintiff, Constellation NewEnergy, Inc., from offering testimony by Raymond F. Dovell, C.P.A. at trial, for the reasons set forth in the accompanying memorandum of law.

                                                                                                                              kc571

                                                    Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.

Date: July 15, 2004

---

[1] Powerweb was incorrectly named in this action as "Powerweb Technologies, Inc."

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION IN LIMINE BY POWERWEB, INC. TO
<u>PRECLUDE TESTIMONY BY RAYMOND F. DOVELL, C.P.A.</u>**

Powerweb, Inc. ("Powerweb")[1] submits this memorandum in support of its motion to preclude Constellation NewEnergy, Inc. ("NewEnergy") from offering testimony by Raymond F. Dovell, C.P.A. as an expert witness on damages.

The Federal Rules of Evidence permit expert testimony to assist the jury in understanding the evidence or determining a fact in issue. The testimony NewEnergy seeks to elicit from Raymond Dovell, C.P.A. is not directed at those goals. The sole purpose of Mr. Dovell's testimony to opine that the report of one of Powerweb's experts, Mr. Constantinos Gus Pappas, C.P.A. does not meet the standards for expert testimony. Mr. Dovell's opinions do not pertain to actual issues in the case, are not based upon sufficient facts or data, and will only serve to confuse rather than assist the jury. As such, Mr. Dovell's proffered opinions are not proper expert testimony and should be excluded.

**I.    BACKGROUND**

In 1996, the electricity markets in various regions across the United States began to be deregulated, opening the door to competition and new methods for reducing energy costs. Because electricity cannot be stored, all generated power must be consumed instantaneously.

---

[1]    Powerweb was incorrectly named in this action as "Powerweb Technologies, Inc."

That makes balancing supply and demand a constant challenge and causes electricity prices to be extremely volatile. During high demand periods, the wholesale price of electricity can increase by as much as 1,000%. Powerweb designed a system that enables large commercial customers to profit from that fluctuation by cutting back their consumption or using their own emergency generators when prices are at their highest ("Omni-Link system").

NewEnergy agreed to enter into a series of joint ventures with Powerweb to license the Omni-Link system, first to Bell Atlantic Corporation ("Bell Atlantic"),[2] and then to other customers. Accordingly, Powerweb disclosed the details of its system to NewEnergy under a written agreement ("Confidentiality Agreement") that prohibited NewEnergy from unilaterally using or disclosing the information that Powerweb provided. NewEnergy then abandoned Powerweb, used the information to develop competing products and services of its own, and carelessly disclosed important aspects of the information to others who then used it to also become competitors of Powerweb.

NewEnergy commenced this action to seek a return of $100,000 that it paid for the initial Bell Atlantic project. Powerweb answered the complaint, explaining why NewEnergy is not entitled to any repayment. In addition, Powerweb filed its counterclaims against NewEnergy for lost profits over the ten-year period covered by the Confidentiality Agreement. NewEnergy then retaliated by inducing Baltimore Gas & Electric Company ("BG&E") to terminate a three-year contract with Powerweb. Recovery for that interference also has been sought by amending the counterclaims.

---

[2] Bell Atlantic is now known as Verizon. However, for convenience and clarity, it will be referred to in this memorandum as Bell Atlantic even after it changed its name to Verizon.

## II.   ARGUMENT

### A.   Legal Standards for the Admission of Expert Testimony.

The trial court has a duty to ensure that all expert testimony is relevant and reliable. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993). In order for a court to permit expert testimony, it must meet the minimum standards of Federal Rule of Evidence 702. Kent v. Howell Elec. Motors, et al., No. Civ. A. 96-7221, 1999 WL 517106, at *2 (E.D. Pa. July 20, 1999). Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, if expert testimony will assist the trier of fact, its admissibility turns on (1) whether the expert is qualified by knowledge, skill, experience, training or education; (2) whether the expert's testimony is based on sufficient facts or data; (3) whether the expert's testimony is the product of reliable principles and methods; and (4) whether the expert has reliably applied the principles and methods to the facts. See Daubert, 509 U.S. at 593; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994), cert. denied sub nom. Gen. Elec. Co. v. Ingram, 513 U.S. 1190 (1995). The party offering the expert has the burden of proving admissibility under Rule 702 by a preponderance of proof. Total Containment, Inc. v. Dayco Prods., Inc., No. Civ. A. 1997-CV-6013, 2001 WL 1167506, at *3 (E.D. Pa. Sept. 6, 2001). The decision to admit expert testimony is in the discretion of the trial court. Id.

Rule 702 requires that expert testimony have the requisite "fit" or relevance to assist the trier of fact. See In re Paoli R.R., 35 F.3d at 743. In the context of expert testimony,

relevance is less expansive than it is generally under the Federal Rules of Civil Procedure. See Kent, 1999 WL 517106, at *4. In order to meet the fit requirement, the testimony must "connect the witness's conclusions, based on a reliable methodology, to an issue presented in the case." Kent, 1999 WL 517106, at *4. "[E]xpert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." Daubert, 509 U.S. at 591 (citing United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)).

Expert opinions must "assist the trier of fact to understand the evidence." Fed. R. Evid. 702; see also Bracy v. Waste Mgmt. of Pa., Inc., No. Civ. A. 99-1189, 2001 WL 880313 at *2 (E.D. Pa. Apr. 17, 2001). Opinions addressing matters equally within the competence of the jury to understand are inadmissible. See McGowan v. Cooper Indus., Inc., 863 F.2d 1266 (6th Cir. 1988) (excluding expert testimony because it was not helpful to the jury); see also In re Diet Drugs, No. MDL 1203, 2001 WL 454586 at *7 (E.D. Pa. Feb. 1, 2001) (citation omitted) ("[T]estimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the jury."). The expert's opinion must be drawn from the facts of the case, not from the expert's own speculation. See Kent, 1999 WL 517106, at *4.

Rule 702 also requires that an expert's opinion be based upon a methodology or technique that is reliable. Fed. R. Evid. 702. This requirement is satisfied when the proposed testimony is based upon "good grounds," meaning that the expert's opinion is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003) (citing Daubert, 509 U.S. at 590).

In determining whether an expert's testimony is reliable, the court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts

known to the expert and the methodology used." Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (internal quotations omitted), cert denied, 532 U.S. 921 (2001). "A court may conclude that there is simply too great a gap between the data and the opinion proffered." Id. (internal quotations omitted). Moreover, expert testimony that is based on assumptions unsupported by the record is properly excluded. See Evans v. Mathis Funeral Home Inc., 996 F.2d 266, 268 (11th Cir. 1993); Shaw v. Strackhouse, 920 F.2d 1135, 1149 (3d Cir. 1990); Rayburn v. Bell Helicopter Textron, Inc., No. Civ. A. 94-CV-1818, 2000 WL 782081 at *2 (E.D. Pa. Apr. 14, 2000).

  **B.** **Mr. Dovell's Testimony Is Not Relevant and Does Not Assist the Trier of Fact.**

Mr. Dovell was not retained to provide an opinion as to Powerweb's lost profits or any factual issue in the case. On the contrary, his only function was to comment on the adequacy of Mr. Pappas's reports.[3] Mr. Dovell offers the following five opinions with respect to Mr. Pappas' opinions:

- Pappas failed to comply with professional standards of the AICPA (American Institute of Certified Public Accountants).
- The wording of Pappas's opinion is misleading because it implies he performed analyses and tests to confirm the reasonableness of his assumptions.
- Pappas's report represents little more than a mathematical calculation by Powerweb that is not based in financial reality.
- Pappas's calculations do not require expert opinion.
- Due to his non-compliance with professional standards, Pappas has no basis to offer an opinion on lost profits.[4]

All of those opinions address whether Mr. Pappas is qualified to offer his opinions on Powerweb's lost profits. That is a determination to be made by the Court, not the jury.

---

[3] All citations to supporting materials are to Powerweb's appendix, in the form of A[tab] at [page]. See Deposition of Raymond Dovell (A1) at 27:3-23.

[4] See Mr. Dovell's supplemental report (A2), and his initial report (A3) at 12-13.

813356.3 7/15/04  - 5 -

Accordingly, the opinions proffered by Mr. Dovell do not meet the standards of Rule 702 and must be excluded.

Mr. Pappas issued a report calculating a portion of Powerweb's damages stemming from NewEnergy's breach of contract and additional tortious activity. The relevant issues are whether Powerweb sustained those damages and whether the estimation of the damages is appropriate, not whether Mr. Dovell believes that Mr. Pappas' report complies with AICPA standards. Not even Mr. Dovell's opinion that the wording of Mr. Pappas's report is misleading will assist the jury to understand or evaluate Powerweb's losses. Even presuming the opinion to be valid, any wordsmithing issue in the report would be mooted by Mr. Pappas' live testimony at trial. The jury does not need Mr. Dovell opining on Mr. Pappas' written report to evaluate the veracity of Powerweb's damages or Mr. Pappas' damage calculations. Accordingly, Mr. Dovell's testimony should be excluded because it does not relate to any issue in this case.

### C. Mr. Dovell's Opinions and Statements in Support Thereof Are Not Based upon Sufficient Facts or Data and Do Not Satisfy the "Fit" Requirement.

There is a significant gap between the facts of the case and Mr. Dovell's assumptions and conclusions. In support of his opinions, Mr. Dovell purports to identify errors and deficiencies in Mr. Pappas' report. Even if Mr. Dovell's testimony with respect to any of the alleged errors and deficiencies could be found to assist the trier of fact, they would still be inadmissible, because they are not supported by sufficient facts.

Mr. Dovell posits that "[d]ocumentary evidence is a critical element of all litigation services, including those involving lost profits."[5] His own "analysis," however, does not employ the relevant documentary evidence he believes to be necessary and render an opinion

---

[5] See A3 at 5.

on lost profits. Indeed, he specifically requested certain documents, some of which were provided only after his report was completed and some of which were never provided.[6] Mr. Dovell requested documentation regarding Powerweb's relationship with BG&E and received a limited compilation of documents selected by NewEnergy's counsel constituting "summary-level" documentation of the relationship.[7] Although many of those documents were deposition exhibits, Mr. Dovell failed to review any of the testimony relating to the exhibits, or any testimony at all. Mr. Dovell recognized the inadequacy of the data regarding Powerweb's relationship with BG&E and Powerweb's actual costs under the pilot study or subsequent contract with BG&E, but made statements and opinions nonetheless.[8]

Mr. Dovell makes numerous statements that he acknowledges are not based on sufficient data. For example, he opines that a gross margin of over 87% is overly optimistic and impossible to achieve. However, at his deposition, he conceded that he was without a sufficient basis for that conclusion:

> Q. Is it possible to have a gross profit margin of 87 percent?
>
> A. Well, it's possible to have anything. I don't know if it's possible in this situation, because <u>I would need to know more facts and circumstances with respect to the way this business is structured</u> at the time that they entered into the contracts that they entered into and what additional costs that they needed to incur in order to service all of these -- this projected revenue that he talks about in his report.[9]

Without any knowledge of, or effort to discover, Powerweb's cost structure or the capacity of its existing infrastructure, Mr. Dovell asserts that Mr. Pappas did not properly account for his

---

[6]   See A1 at 71:19-25, 72:2-17. Moreover, despite receiving the requested financial statements from NewEnergy, Mr. Dovell has not taken Powerweb's financial data into account.

[7]   See A1 at 29:20-34:21.

[8]   See A1 at 69:5-70:18.

[9]   A1 at 57:15-58:2 (emphasis added).

projected growth in revenue.[10] Similarly, Mr. Dovell purports to offer a comparison of costs between Powerweb and one of its competitors to highlight Mr. Pappas' alleged failure to make such a comparison. However, Mr. Dovell fails to determine if the costs he is comparing are similar.[11] Indeed, each time he was questioned regarding the factual basis or the data supporting his criticisms, he responded with a litany of "I don't knows."[12]

Mr. Dovell's purported justification for his "I don't knows" was the fact that he was only asked to analyze the report and in large measure his statements and opinions are limited to what was explicitly set forth in Mr. Pappas' report.[13] "My opinions are based upon what [Mr. Pappas] has in his report and what he referenced as what he used in his report as a basis and as data for his lost profits calculation."[14] Thus, Mr. Dovell concedes that he approached this assignment with blinders on. A glaring example is his criticism of Mr. Pappas for failing to take into account the time value of money. Mr. Pappas' states in his report that his calculations are not discounted to present value. That is because the discounting was done by Powerweb's other

---

[10]  See A1 at 63:2-21.

[11]  See A1 at 69:5-70:18

[12]  See, e.g., A1 at 35:23-36:16 (admitting that he does not know if BG&E pilot program, which Mr. Dovell relied upon was comparable to the actual BG&E contract), 37:13-16 (admitting that he did not know if the revenues used to criticize Mr. Pappas were the only source of revenues); 57:11-58:2 (admitting that he did not know Powerweb had gross profit margin of 87% after critiquing Mr. Pappas for utilizing a 87% profit margin); 80:18-81:8 ("I can't look at the contracts and project the revenue over that three year term, because I an not familiar with the number of customers . . . and . . . the invoicing"); 87:21-88:8 (acknowledging that he does not know if the penetration rate used by Mr. Pappas is accurate), 89:1-90:14 (acknowledging that he does not know if maintenance costs were accurately reflected in Mr. Pappas' report), 93:7-93:14 ("I don't know the monthly revenue that Powerweb billed to BG&E under its contract, nor do I know the monthly revenue that Powerweb billed to the other three . . . .")

[13]  See, e.g., A1 at 61:19-62:3 ("I can only go by Mr. Pappas' report that he issued in this case . . . ."); 87:21-88:8 ("I don't know if it is or it isn't. What I know is that when looking at Mr. Pappas' report . . ."); 89:23 -90:14 ("I can't determine whether or not it's true . . . by looking at his report . . . [i]t's just a statement. It's a statement that's not supported by any facts that are in the report . . . .") (emphasis added).

[14]  A1 at 97:2-5.

expert, Peter Fox-Penner, Ph.D. Mr. Dovell did not ask for Dr. Fox-Penner's report, was not provided with Dr. Fox-Penner's report and did not even bother to ask if Dr. Fox-Penner had performed the discounting of Mr. Pappas' calculations.[15]

Mr. Dovell also ignores evidence and assumptions used to support one opinion when it contradicts another opinion.[16] Mr. Dovell assumes that Mr. Pappas holds a management position with Powerweb and is overseeing the daily accounting and monthly reporting functions of the company for purposes of raising a conflict of interest, yet he assumes that Mr. Pappas does not have sufficient financial information to render a reliable lost profits report.[17] Not surprisingly when tested, Mr. Dovell reversed his position and admitted that he does not know the scope of Mr. Pappas' responsibilities with respect to Powerweb, but concedes that Mr. Pappas knew the contents of the financial documents he prepared.[18] Mr. Dovell's blatant disregard of available information or lack of effort to obtain sufficient data to support his opinions renders both his opinions and supporting statements unreliable and inadmissible.

### D.    Mr. Dovell's Opinions Are Not Based on any Methodology.

Mr. Dovell's conclusions do not flow from *any* methodology. He does not present any standards or calculations that are normally followed in determining lost profits or adherence to the AICPA standards. Indeed, Mr. Dovell does not perform his own calculations or analysis of Powerweb's damages. Instead, he simply offers his own opinions, apparently not based on professional experience, as to whether Mr. Pappas' report complies with AICPA standards and whether Mr. Pappas' lost profits calculations are reasonable. Without an articulated

---

[15]    See A1 at 49:10-18.

[16]    See A3 at 3.

[17]    See A3 at 3, 5.

[18]    See A1 at 59:21-60:3, 60:10-19.

methodology, Mr. Dovell's conclusions are nothing more than expressions of personal opinion and are not within the proper realm of expert testimony.

Mr. Dovell similarly advances no contrary methodology to disprove Mr. Pappas' calculations. Mr. Dovell assumes that Mr. Pappas performed no analysis of the actual costs incurred by Powerweb under its contracts, yet Mr. Dovell did not review Powerweb's financial statements to test this hypothesis. Mr. Dovell also concludes that Mr. Pappas' lost profit numbers are too high in part because he assumes that Powerweb's costs should compare with those of Silicon Energy.[19] However, in making this comparison, Mr. Dovell did not seek to discover whether the companies and products he was comparing were truly capable of comparison.[20] Mr. Dovell's assumption that there is a comparison here to be made is, like his other conclusions, without any basis in the record.

### III. CONCLUSION

For the foregoing reasons, the Court should exclude the purported expert testimony of Mr. Dovell, or in the alternative, hold a <u>Daubert</u> hearing to determine whether any limited aspects of it might be admissible.

---

[19]    <u>See</u> A3 at 7.

[20]    <u>See</u> A1 at 69:5-15.

        Respectfully submitted,

          kc571

Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.

Date:   July 15, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing proposed Order, motion and memorandum were filed electronically today and are available for viewing and downloading from the ECF system. They were served upon counsel for Constellation NewEnergy, Inc. by notice of electronic filing, addressed to:

> David E. Landau, Esquire
> Wolf, Block, Schorr and Solis-Cohen, LLP
> 1650 Arch St., 22nd Floor
> Philadelphia, PA 19102

   kc571   
Kristin L. Calabrese, Esquire

Date:  July 15, 2004

813356.3 7/15/04