```
 1          IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2              CASE NO. 02-CV-2733 (HB)
 3
 4  _____
    CONSTELLATION NEWENERGY, INC.,
 5
                 Plaintiffs,           (Videotaped)
 6                                     Oral Deposition of:
         vs.
 7                                     DAVID McGEOWN
    POWERWEB TECHNOLOGIES, INC.,
 8  et al.,
 9              Defendants.                 ORIGINAL
    _____
10
11
                       * * * *
12           Thursday, February 26, 2004
                       * * * *
13
14
15       Transcript in the above matter taken at the
16  offices of Wolf Block, 101 Eisenhower Parkway,
17  Roseland, New Jersey, commencing at 10:17 a.m.,
18  before Seva Flicstein, Certified Shorthand
19  Reporter, Registered Merit Reporter, Certified
20  Realtime Reporter, a Notary Public of the State of
21  New Jersey.
22
          CERTIFIED SHORTHAND REPORTING SERVICES
23                  Arranged Through
          MASTROIANNI & FORMAROLI, INC.
24              709 White Horse Pike
            Audubon, New Jersey  08106
25               (856) 546-1100
```

Page 18

1  Q. Did it become something else after
2  that?
3  A. I was employed at that point -- I
4  became an employee of AES. And within AES we
5  didn't differentiate between NewEnergy, at that
6  time, and anybody globally in AES in terms of your
7  participation by employment with AES NewEnergy. I
8  can't remember the exact date in which that would
9  have changed over to AES Intricity, which is
10 probably where you're headed.
11  Q. Let me make sure I understand what
12 you just said.
13    When you first started, it was
14 NewEnergy Ventures. Then a couple days later it
15 became AES NewEnergy. And at that point did you
16 shift over to working for AES? Is that what you
17 are saying?
18  A. The employment with NewEnergy was
19 continuous. AES acquired all of NewEnergy
20 Ventures. And as such, at that point, I became an
21 AES employee.
22    And I am sure your research has come
23 up with already that that then becomes very
24 difficult to identify exactly which part of AES you
25 were contributing to. But my paycheck was coming

Page 19

1  from NewEnergy from then for -- it's got to be
2  nearly two years ago when my employment with AES
3  ended.
4     And I can't tell you at any point
5  whether or not that switched over from one payroll
6  to another. Never looked at it. It just shows up
7  in a bank account.
8   Q. Would you explain what you mean by
9  the way people at AES worked for all different
10 entities?
11    MR. WHITE: Objection.
12  Q. (BY MR. GARCIA:) I am not sure I am
13 exactly restating what you said, but you said
14 something that -- you said, "And I am sure your
15 research has come up with already that that then
16 becomes very difficult to identify exactly which
17 part of AES you were contributing to."
18    What did you mean by that?
19  A. AES as a global corporation had many
20 different legal entities, subsidiaries. We were
21 expected to help contribute anybody that asked us
22 questions. So one then moved to a mental mind-set
23 of you worked for AES, period.
24    My focus was NewEnergy, and I'm
25 pretty sure my paycheck came from NewEnergy.

Page 20

1     Did that answer your question?
2   Q. Yes, thank you.
3     So during the time that you were
4  getting a paycheck from NewEnergy and it was owned
5  by AES, you were helping out a number of different
6  entities that belonged to AES?
7     MR. WHITE: Objection; compound,
8  lacks foundation.
9     You may answer.
10  A. AES has an advice process, and I was
11 occasionally asked -- all people in AES were asked
12 to give advice on various parts of how AES
13 operated. That was the limit of it.
14    Our primary focus was our day-to-day
15 job at NewEnergy. That was the context of being an
16 AES person.
17  Q. At some point you mentioned a company
18 called Intricity. When was that company formed?
19  A. Don't know the exact date, but I
20 believe it may have been January 2000. I can't be
21 exact on that.
22  Q. Did anything change with respect to
23 your employment at that point?
24  A. No. Functions, things that we were
25 doing on a day-to-day basis changed focus. But I

Page 21

1  don't think with regard to employment.
2   Q. Did you receive a paycheck from
3  Intricity, then, instead of NewEnergy? Or was it
4  still NewEnergy?
5   A. I honestly don't know the answer to
6  that.
7   Q. And the paychecks you got from
8  NewEnergy were from what? NewEnergy Ventures and
9  then AES NewEnergy, or what?
10  A. It may be embarrassing. The money
11 showed up in the bank account. I never looked.
12  Q. Well, to try to simplify this, I am
13 going to ask you some questions about your
14 employment at NewEnergy. And by that I mean to
15 include whichever of the entities it was at the
16 time during the time period you described. Okay?
17  A. Yeah.
18  Q. When you first started working at
19 NewEnergy, who did you report to?
20  A. Day one, I believe NewEnergy Ventures
21 was Steve Levine.
22  Q. And what were your responsibilities
23 at that point?
24  A. I had the responsibility for helping
25 put together and run the energy services portfolio

Page 22

1  for the East Coast of NewEnergy Ventures.
2      Q.  What was the energy services
3  portfolio?
4      A.  We didn't have one at that time, but
5  it subsequently became products and services that
6  augmented the sale of electricity; such as reducing
7  energy consumption, lending money -- arranging for
8  loans for energy efficiency projects, anything that
9  could reduce a client's energy operating costs.
10     Q.  What was Steve Levine's position at
11 that point?
12     A.  I believe he was the regional vice
13 president.
14     Q.  And what was your position at that
15 point?
16     A.  I believe it was director of energy
17 services. We didn't put titles on business cards.
18     Q.  Did you have any employees working
19 for you at that time?
20     A.  No.
21     Q.  Subsequently did you end up reporting
22 to someone different?
23     A.  Yes.
24     Q.  Who was the next person?
25     A.  The next one I can clearly remember

Page 23

1  is Brian Hayduk.
2      Q.  Do you remember approximately when it
3  was that that shifted from Steve Levine to Brian
4  Hayduk?
5      A.  No.
6      Q.  Were there any others after Brian
7  Hayduk?
8      A.  Rob Morgan.
9      Q.  Rob Morgan?
10     A.  Yeah.
11     Q.  Do you remember when that was?
12     A.  Not exactly, but that was probably
13 the fall of '99.
14     Q.  And was he also involved with the
15 East Coast?
16     A.  He was an AES guy. So he was
17 involved with national issues.
18     Q.  At that point did you become involved
19 with national issues as well?
20     A.  Yes.
21     Q.  Did you have a different title
22 then?
23     A.  No. We never focused on titles. We
24 just changed roles and responsibilities.
25     Q.  You say the fall of 1999. Can you be

Page 24

1  any more specific than that?
2      A.  Several months after AES acquired
3  NewEnergy Ventures. I'm guessing it was about
4  three to four months.
5      Q.  At that point did you have any
6  employees reporting to you?
7      A.  No.
8      Q.  When you left NewEnergy, what did you
9  do?
10     A.  We tried to keep Energy Tracking
11 alive for about seven months. At that point I was
12 technically still on the AES payroll as part of our
13 severance. And then I became an independent
14 consultant.
15     Q.  Is Energy Tracking a company that
16 Keith Mistry had owned in the past?
17     A.  No.
18     Q.  What is Energy Tracking?
19     A.  It's a Delaware Corp. that was
20 formed.
21     Q.  Was there a different company called
22 Energy Tracking before that?
23     A.  Yes.
24     Q.  Was that company acquired by
25 NewEnergy or AES?

Page 25

1      A.  It was acquired by AES.
2      Q.  And then is that roughly when
3  Intricity was formed?
4      A.  Yes. I'm sure it's exactly when
5  Intricity was formed.
6      Q.  And the person involved in Energy
7  Tracking before it was acquired was Keith Mistry?
8      A.  That's correct.
9      Q.  And at the time it was acquired,
10 Intricity was formed, did Mr. Mistry come to work
11 for Intricity?
12     A.  Yes.
13     Q.  And when you left, that was when the
14 new Energy Tracking company was formed?
15     A.  No. The new Energy Tracking company
16 had been formed probably a couple of months prior
17 to that, in a transition.
18     Q.  And then when you said tried to keep
19 it alive for about seven months, what did you
20 mean?
21     A.  Our focus was trying to secure
22 venture capital.
23     Q.  And did you succeed in doing that?
24     A.  No.
25     Q.  Do you still have a position with

mfreporting@verizon.net                Mastroianni & Formaroli, Inc.                856-546-1100
                              Professionals Serving Professionals

Page 70

1   After execution of this letter of
2 intent, did Powerweb provide the information set
3 forth in that list?
4     A.  I don't know.
5         MR. WHITE: Objection.
6     Q.  If you look at item number 4 in the
7 list, it says, "Describe and provide detailed
8 documentation on how a capacity side virtual sale
9 is transacted and demonstrate an actual sale with
10 all contractual support documentation."
11       Why is it that you wanted Powerweb to
12 do that?
13    A.  My recollection is that as we shared
14 the business development efforts to pull this deal
15 together, Mr. Budike represented that he had staff
16 in Powerweb that were technically competent with
17 the PJM ALM program, and could provide us with the
18 documentation from PJM that showed how that PJM
19 program worked, and how we would transact a sale.
20 And I believe we asked him to demonstrate an actual
21 sale to PJM, and show us the actual documents that
22 PJM will require.
23    Q.  And is it true that NewEnergy had not
24 done that on its own prior to this time?
25        MR. WHITE: Objection.

Page 71

1     A.  I don't know.
2     Q.  You are not aware of it having done
3 that?
4     A.  No.
5         MR. WHITE: Objection. "That" is
6 vague.
7     Q.  (BY MR. GARCIA:) "That" refers to
8 what we just discussed in the paragraph. If there
9 is any doubt about it, how a capacity side virtual
10 sale is transacted.
11        MR. WHITE: That general.
12    Q.  With that clarification, did you want
13 to change your answer in any way?
14    A.  I'm sorry. You both lost me. Would
15 you ask again?
16    Q.  Had NewEnergy at that point actually
17 made any capacity side virtual sales?
18    A.  I believe that they had.
19    Q.  Are you referring to California?
20    A.  Yes.
21    Q.  Was there a program in California
22 involving that type of thing?
23    A.  Yes.
24    Q.  When was that program?
25    A.  I believe it was a year prior to

Page 72

1 this.
2     Q.  Do you know what actually occurred in
3 that program?
4     A.  No.
5     Q.  Do you know whether anyone actually
6 sold capacity in that program?
7         MR. WHITE: Objection; vague.
8     A.  No, I don't know.
9     Q.  Aside from that, are you aware of any
10 NewEnergy company having done this before?
11        MR. WHITE: Objection.
12    A.  I'm trying to figure out what you
13 mean by that. But I believe the root of what you
14 are digging for is I believe Chicago's office was
15 also involved in similar transactions.
16    Q.  In what year?
17    A.  At about this time.
18    Q.  What do you mean by a similar
19 transaction?
20    A.  I believe that the NewEnergy office
21 in Chicago was participating in Commonwealth
22 Edison's load management program. And I believe
23 that included capacity sales. But I do not know.
24 I'm speculating again.
25    Q.  Okay.

Page 73

1     A.  I do know they were engaged in the
2 program.
3     Q.  Whatever program they had in Chicago
4 at that time?
5     A.  Correct.
6     Q.  If any.
7         Aside from those possibilities, are
8 you aware of anything like this that NewEnergy had
9 done before?
10        MR. WHITE: Objection; vague.
11    A.  I am not aware of anything else.
12    Q.  Once again, this says at the very
13 end, this letter agreement in addition to the
14 nondisclosure agreement represents the whole
15 agreement.
16       You understood, did you not, at this
17 time that the nondisclosure agreement remained in
18 force?
19        MR. WHITE: Objection; document
20 speaks for itself, calls for legal conclusion.
21       You may answer.
22    A.  At about this time I understood we
23 had a nondisclosure agreement. I don't recall this
24 document. I don't recall signing it. I
25 acknowledge my signature is on the back. So it's

Page 214

1  constraints on the grid.
2      Q.  So those enhancements were finished
3  by September of 2001?
4      A.  In answer, they were never actually
5  finished, because the product definition never
6  stayed in place long enough and the goalposts were
7  always, always moving.
8          But approximately with regard to the
9  goal of that curtailment team, the coalition
10 breaking up, and the New York office being the only
11 one left doing anything reasonable in regard to
12 anything close to those goals, then there was a
13 functioning product by that September.
14     Q.  And by that September, you mean
15 September 2001?
16     A.  Yes.
17         (Discussion off the record.)
18     Q.  (BY MR. GARCIA:) Do you remember
19 anything else about any meetings or discussions
20 with anyone at Powerweb that you haven't already
21 told me about today?
22         MR. WHITE: Objection; overly broad.
23     A.  No.
24     Q.  Do you remember anything else about
25 any meetings with anyone at Bell Atlantic regarding

Page 215

1  the project with Powerweb that you haven't already
2  told me today?
3      A.  No.
4      Q.  Do you have any files, documents,
5  data on computers relating to any of the subjects
6  we've discussed today?
7      A.  Only insofar as there was some copies
8  of the e-mail traffic that -- or these documents
9  that had floated around last week from counsel.
10     Q.  In other words, they provided
11 documents to you?
12     A.  That's correct.
13     Q.  Other than things they've given you,
14 did you have anything of your own?
15     A.  No.
16     Q.  Were all of the things they gave you
17 marked with Bates numbers on the bottom?
18         Do you know what that is?
19     A.  To be honest with you, I got a very
20 large box of stuff, I looked at it, I haven't
21 looked at it since. I don't know.
22     Q.  Do you recall seeing any documents
23 there other than ones we've looked at today?
24     A.  No.
25     Q.  What did you do, if anything, to

Page 216

1  prepare for the deposition today?
2      A.  We met Monday to give me a briefing
3  on what a deposition is and what is appropriate
4  conduct.
5      Q.  This is a meeting with Mr. White?
6      A.  That's correct.
7      Q.  Had you had any other meetings or
8  discussions with any other lawyer representing
9  NewEnergy?
10     A.  There was a brief meeting several
11 months ago when the potential for this to get ugly
12 first occurred. And it was Joel Sweet and one
13 other attorney met me to understand what I knew,
14 what I could recollect of what had happened in that
15 period. And they asked me a bunch of general
16 questions.
17     Q.  Was the other attorney Zach Glaser?
18     A.  No.
19     Q.  Was it Jennifer O'Neill?
20     A.  No.
21     Q.  Was it a male or female?
22     A.  Male. David.
23     Q.  David Landau?
24     A.  Could be.
25     Q.  What do you recall about that

Page 217

1  discussion?
2      A.  They simply asked me what my
3  recollection was of various pieces of things that
4  happened during the process of trying to do the
5  Powerweb deal.
6      Q.  Do you remember telling them anything
7  that you haven't already said today at this
8  deposition?
9      A.  No. I was probably a little bit more
10 visceral on Mr. Budike's ethics, but that was
11 probably about it.
12     Q.  A little more emotion?
13     A.  Yes.
14     Q.  Did you give them any documents at
15 that time?
16     A.  No.
17         MR. WHITE: I'm sorry. Give them
18 any?
19         MR. GARCIA: Documents at that time.
20     A.  Gave them the bill. That counts as a
21 document.
22     Q.  Did you get paid for that meeting?
23     A.  No. We had a meal. We met in a
24 restaurant. That was it. They picked up the tab.
25     Q.  Have you had any discussions about

Page 222

1  three-minute break, and let me just reorganize that
2  pile of documents so I can pull out the documents
3  that I want to show you in a quick way. I think it
4  will take about five to ten minutes of questions.
5           THE VIDEOGRAPHER: Off record,
6  4:41 p.m.
7           (Break taken.)
8           THE VIDEOGRAPHER: On record,
9  4:50 p.m.
10          THE WITNESS: I want to go back to
11 your last question.
12          As we were sitting here I was
13 thinking back any possible other sources, and you
14 mentioned computer archives. And I said a
15 definitive no.
16          I do have a couple of old computers
17 at home that may have some of this old First Class
18 e-mail on it. I have no idea what the content is.
19 But it is possible that there are archived files
20 there.
21          I just wanted to make sure in true
22 candor that I answered as best I could.
23     Q.   (BY MR. GARCIA:) Would you be able
24 to search for those? In other words, are those
25 computers still functioning?

Page 223

1      A.  I believe that they are. They should
2  function. I think they are swamped with kids games
3  right now.
4           But it occurred to me that there may
5  be data, and I couldn't unequivocally say I don't
6  have any of those e-mail track records.
7      Q.  Would you be willing to search and
8  produce them if they are?
9      A.  I would be happy to.
10          (Information requested)
11          MR. WHITE: Just get in touch with me
12 if you find something, and we will look it over and
13 see if we should produce it. And I will let
14 counsel know whether you found anything, yes or no.
15          MR. GARCIA: Thank you for bringing
16 that up.
17          THE WITNESS: Want to get it all out.
18          -----
19          EXAMINATION
20          -----
21 BY MR. WHITE:
22     Q.   Mr. McGeown, I want to ask you a few
23 questions on some of the documents that Mr. Garcia
24 showed you.
25          I want to start with the document

Page 224

1  Exhibit Powerweb-130. And since I am going a
2  little out of order, we will give Mr. Garcia a
3  chance to find where we are.
4           Powerweb-130 was one of the documents
5  that talked -- it was the October 26, 1999 e-mail
6  from yourself to several people that
7  includes -- enclosed a document called Reserve
8  Capacity Update. And there is a line item on here
9  that talked about -- it says, "Kirk has okayed
10 first sniff on technology."
11          I just want to ask you a question
12 about that.
13          Do you remember your testimony on
14 that earlier today?
15     A.   Yeah. Yeah.
16     Q.   What was your understanding of the
17 level of detail in which Mr. Hampton reviewed the
18 technology?
19     A.   Is it appropriate to expand on what
20 "sniff test" means?
21     Q.   Sure.
22     A.   Does it smell like bullshit?
23     Q.   Okay.
24     A.   That's what the "sniff" refers to.
25          So it is -- it reasonably appears to

Page 225

1  be capable of doing what it claims to, but we
2  haven't done any detailed testing or analysis or
3  whatever.
4      Q.  What type of information would you
5  have expected Mr. Hampton to review to perform the
6  sniff test, as you use the phrase?
7      A.  Sales literature and product cut
8  sheets, technical specification sheets. High level
9  function of what the thing is supposed to do.
10     Q.   When you say "cut sheet," what does
11 that phrase mean to you?
12     A.   A cut sheet is an industry standard
13 term.
14          The first document you might have
15 would be a customer sales piece that describes the
16 benefits of the product.
17          And the next piece would be a cut
18 sheet that would have some kind of technical
19 specification that somebody with engineering
20 training would look at that cut sheet and from that
21 be able to determine if, at first sniff, the thing
22 appears to be capable of doing the job that you
23 want it to do. Size, voltage, bits, bytes.
24          Like you go get your computer, a
25 beautiful pink computer, how many megawatts, what