```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                    Civ.No. 02-CV-2733 (HB)
 3       ------------------------------------------
 4  CONSTELLATION NEW ENERGY, INC.,
 5                            Plaintiff,
 6       V.                                    WITNESS:
                                               ANDREW BAKEY
 7
    POWERWEB TECHNOLOGIES, INC.,
 8  A-VALEY ENGINEERS, INC. AND
    LOTHAR E.S. BUDIKE, JR.,
 9
                              Defendants.
10
         ------------------------------------------
11
                            ------
12
                    Philadelphia, Pennsylvania
13                     February 19, 2004
14                          ------
15
               TRANSCRIPT of testimony of as taken by
16
    and before Maureen McCarthy, a  Registered
17
    Professional Reporter and Commissioner in and for the
18
    Commonwealth of Pennsylvania, at the offices
19
    WOLF, BLOCK, SCHORR AND SOLIS-COHEN, 1650 Arch Street,
20
    22nd Floor, on the above date, commencing at 9:30 am.
21
22              ESQUIRE DEPOSITION SERVICES
              1880 John F. Kennedy Boulevard
23                      15th Floor
             Philadelphia, Pennsylvania 19103
24                   (215) 988-9191
```

**Exhibit A**

Page 42

1  A.    One location.
2  Q.    One location. What location?
3  A.    Rhone-Poulenc Rorer.
4  Q.    Do you remember the date that you implemented
5  your capacity energy contract with Rhone-Poulenc
6  Rorer?
7  A.    Would have been prior to my employment with
8  EPEX.
9  Q.    Spring of '99?
10 A.    Yes, February, March.
11 Q.    So could be winter of '99. Okay, February or
12 March, '99 prior to EPEX.
13 A.    That transaction I did was not the concept
14 that I performed while I was at EPEX.
15 Q.    Which was procurement?
16 A.    No. I did an active load management deal with
17 Rhone-Poulenc Rorer while at Conective. The concepts
18 that I came up with, I didn't implement until I became
19 an EPEX consultant.
20 Q.    We're going to break this down. Forgive me.
21 You know way more about this than I do, and I think it
22 might be important so I'm going to ask questions until
23 I understand you'll have to forgive me.
24        What exactly did you implement at

Page 43

1  Rhone-Poulenc Rorer while you were at Conective? You
2  described that you implemented something at Conective.
3  It was not what you did later.
4         What exactly did you do while you were at
5  Conective?
6         MR. NASTASI: Objection.
7  BY MR. GLASER:
8  Q.    You can answer.
9  A.    Conective bought the output capacity from the
10 Rhone-Poulenc Rorer -- excuse me, from Rhone-Poulenc
11 Rorer's generators.
12 Q.    Did you say output capacity?
13 A.    Generator capacity output.
14 Q.    Were you finished with your answer? I'm sorry
15 to interrupt.
16 A.    Yes.
17 Q.    Do you want me to ask a different question?
18        Conective purchased generator capacity from
19 Rhone-Poulenc Rorer?
20 A.    That's correct.
21 Q.    In 1999?
22 A.    That's correct.
23 Q.    What role did you play in that transaction?
24 A.    I educated the customer in how it would work.

Page 44

1  Q.    How did you learn how it would work?
2  A.    For about a year, I sat on the PJM active load
3  management committee.
4  Q.    What year was that?
5  A.    Would have been 1998, '99.
6  Q.    What is the PJM active load management
7  committee?
8         MR. NASTASI: Were you finished with your
9  answer?
10 BY MR. GLASER:
11 Q.    Maybe I'll break it up in smaller questions.
12        What was the PJM load management committee in
13 1998, 1999?
14 A.    It was a committee made up of utility
15 companies, one or two customers, and at that point, a
16 few consultants.
17        I was the only person on the committee who
18 asked the committee if I could buy a customer's
19 capacity as now a third-party supplier -- let me
20 clarify.
21 Q.    Thank you.
22 A.    I can emphatically say I was the first person
23 in the entire United States to come up with the
24 concept of buying capacity from a customer who no

Page 45

1  longer was a regulated customer of a utility company.
2  Q.    You just said a mouthful. I have to break it
3  down, I apologize.
4  A.    That's fine.
5  Q.    First person if the United States to come up
6  with the concept to buy capacity. Just so we all
7  understand, what's capacity?
8         MR. NASTASI: Objection.
9  BY MR. GLASER:
10 Q.    There was more to what you said.
11        MR. NASTASI: And it's important.
12        MR. GLASER: It is important.
13        MR. NASTASI: I'm going to object to you
14 splitting apart at least the way you have right now,
15 splitting apart his statement.
16 BY MR. GLASER:
17 Q.    To the extent that you can understand my
18 question, in the sentence, first person in the United
19 States to come up with the concept to buy capacity
20 from an unregulated utility --
21        MR. NASTASI: That's not what he said.
22 BY MR. GLASER:
23 Q.    Unregulated entity -- consumer? Did you say
24 consumer? I'm sorry. We have real time.

ESQUIRE DEPOSITION SERVICES

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM  * Pg 1/8
06/15/2004 16:29 FAX 609 569 8149         KINKO'S                                                                  ☑001

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONSTELLATION NEWENERGY, INC., : | |
| Plaintiff, : | |
| : | |
| v. : | No. 02-CV-2733 (HB) |
| : | |
| POWERWEB TECHNOLOGIES, INC., : | |
| Defendant. : | |

### DECLARATION OF LOTHAR E.S. BUDIKE, JR.

I, Lothar E.S. Budike, Jr., upon penalty of perjury, do hereby declare:

1. I am the President and Chief Executive Officer of Powerweb Inc. ("Powerweb"), which was incorrectly named in this case as Powerweb Technologies, Inc.

2. Powerweb has been involved in the development of software, building automation systems, HVAC controls, and ESCO services since the company was founded as CAMTEL in 1991. As the provider of these services, Powerweb developed a relationship with Bell Atlantic Corporation ("Bell Atlantic"), which is now known as Verizon.

3. In the wake of deregulation of electricity supply, Powerweb identified an opportunity to provide energy consumers with a one-stop shopping energy package that provides all the information necessary to purchase power intelligently, operate efficiently, respond to price signals to curtail consumption, remotely operate generators, and make energy management strategies available to customers and non-regulated suppliers that were previously available only to utilities. The package brought together remote metering technology, software, and business strategies that permitted the customer to earn revenue by using its own generators or reducing its load during high-price periods in order to profit by "re-selling" the energy that it was entitled to purchase from a supplier, and by selling its capacity, into the deregulated market. The package was named the Omni-Link system.

**Exhibit B**

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM * Pg 2/8
06/15/2004 16:29 FAX 609 589 8149        KINKO'S                                                              ☒002

4.   The portion of the Omni-Link system related to how the utility management strategies could be applied to consumers and non-regulated suppliers was developed initially by Andrew Bakey, a consultant and later an employee of Powerweb. Mr. Bakey transferred his rights in the concept to Powerweb and further developed the concept for Powerweb thereafter.

5.   I developed the concept for Omni-Link in 1998, the pertinent patents were granted in 1998 and programming began around March 1999. Although I designed the software, the programming was done by Joseph Bonner, a consultant to Powerweb at the time.

6.   By June 1999, Mr. Bonner had completed writing the code and Omni-Link was operational. At that time Omni-Link obtained pricing information by screen scraping the data from the PJM website. By the end of the summer of 1999, Omni-Link was scaleable and able to handle up to 50 customer sites.

7.   At the time the Confidentiality Agreement with Constellation NewEnergy, Inc. ("NewEnergy") was signed in October 1999, the Omni-Link software had, among others, the following features: a plant locator (maps to sites); weather display; energy alarms (alerts to customers to curtail); real-time pricing; energy transaction (curtailment calculator); energy dispatch (remote control of generators); energy production; real-time energy usage; energy usage charts; rate analysis; savings strategies; billing questions; e-commerce; and energy news. At that time no other software had all those capabilities and the industry was unfamiliar with the concept of selling retail energy and capacity into a deregulated market.

8.   I am, and always have been, cautious to maintain the confidentiality of Powerweb's products and services, including the Omni-Link system and the Omni-Link software. Powerweb password protects all access to its software to maintain its confidentiality

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM *Pg 3/8
06/15/2004 16:30 FAX 609 569 8149          KINKO'S                                                              ☒003

and prevent it from being reverse-engineered. By simply exploring the software and viewing its functionality and gaining an understanding of how the modules work together, a competent programmer could build a similar product without needing to use use Omni-Link's source code.

9. At the outset, I expressed concerns about confidentiality to David McGeown of NewEnergy. Mr. McGeown stated that he needed some information to determine if a business relationship with Powerweb was worth exploring. We came to an understanding that I would disclose a broad overview of Omni-Link and the business concepts of how a retail asset could be traded into the market and NewEnergy would keep the information confidential and use it only to determine if it was interested in learning more.

10. As NewEnergy asked for more detailed information, I requested a written confidentiality agreement. I did not disclose any technical or highly sensitive information until that agreement ("Confidentiality Agreement") was in place.

11. During the negotiation of the Confidentiality Agreement, I explained to Mr. McGeown that I did not want NewEnergy to be able to engage in any sales of customers' energy or capacity without Powerweb. Mr. McGeown and I discussed that NewEnergy and Powerweb were going to be partners in this business. In order to ensure that NewEnergy would not be able to do this without Powerweb, the Confidentiality Agreement included a duty not to use along with a duty not to disclose.

12. In order to protect each aspect of the Omni-Link system (often referred to as hardware, software and contracting mechanisms or business strategies) as well as the system as a whole, the Confidentiality Agreement refers to "Energy Technology Information," which encompasses the individual components, the system as a whole and how the pieces fit together. The elements of Energy Technology set forth in the Confidentiality Agreement are categories

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM  * Pg 4/8
06/15/2004 16:30 FAX 609 569 8149          KINKO'S                                                     ☒004

and include some examples, but are not an exclusive or exhaustive list of the protected information. The Confidentiality Agreement signed on October 11, 1999 was the first step in the parties' partnership.

13. Some of the hardware elements used in the Omni-Link system are not proprietary to Powerweb. However, the way in which the parts were arranged and used in combination is a concept that belongs to Powerweb. I explained to NewEnergy how the hardware components fit together in order to create that portion of the Omni-Link system.

14. The software portion of the Omni-Link system refers to the Omni-Link software and includes some elements that are protected by patents and others that are trade secrets.

15. Moving forward with the partnership, Powerweb and NewEnergy executed a letter of intent on October 25, 1999. The following day McGeown contacted me and explained that NewEnergy needed to make some minor corrections to the letter, but nothing that would change the substance of our deal. Accordingly, I signed a revised letter of intent on October 26, 1999 ("Letter of Intent").

16. As Powerweb and NewEnergy began to move forward toward a deal with Bell Atlantic, NewEnergy took responsibility for the contact with Bell Atlantic, while Powerweb focused on gathering the technical information. I told Mr. McGeown that it was imperative that he have a confidentiality agreement in place with Bell Atlantic before disclosing any details regarding the Omni-Link system. I emphasized that I did not want to teach Bell Atlantic how to do energy and capacity sales in the deregulated market and then have them do it without NewEnergy and Powerweb. I drafted a confidentiality agreement for NewEnergy and Bell Atlantic that mirrored Powerweb's agreement with NewEnergy, including the ten-year term.

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM * Pg 5/8
06/15/2004 16:30 FAX 609 569 8149        KINKO'S                                                    ☒005

17. Mr. McGeown told me that there were existing confidentiality agreements in place with Bell Atlantic stemming from the commodity contracts NewEnergy had with Bell Atlantic and that those agreements would cover Powerweb's concepts of energy and capacity sales. I relied on Mr. McGeown's representation in allowing him to disclose Energy Technology Information to Jeremy Metz at Bell Atlantic.

18. Over the course of the relationship with NewEnergy, I had many meetings, telephone calls and email communications with Mr. McGeown and others at NewEnergy in which I explained the Energy Technology Information in detail. I explained how the Omni-Link system and business strategies worked. I explained how to price the deal, i.e. the sharing of the revenue generated between the customer and NewEnergy. I also gave NewEnergy a list of companies that would be prime candidates for the Omni-Link system, with whom Powerweb had previous relationships.

19. Shortly after signing the Confidentiality Agreement, I visited Jim Curnyn in NewEnergy's New York office. During that visit, I showed the Omni-Link software to Mr. Curnyn using Mr. Curnyn's desktop computer. I showed Mr. Curnyn over thirty different Omni-Link applications or engines, including curtailment. At that same visit, Mr. Curnyn showed me NewEnergy's software, Webjoules, and its capabilities. Mr. Curnyn showed me the system that was installed at TrizecHahn. At that time, October 1999, NewEnergy's Webjoules was only capable of showing day-old energy usage information in hourly intervals. It did not include a curtailment module or possess the capabilities of Omni-Link even with respect to energy usage information, as Omni-Link was offering live (i.e. contemporaneous) energy usage information to the customer.

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM * Pg 6/8
06/15/2004 16:31 FAX 609 569 8149    KINKO'S    ☒006

20. A week or two after my visit to Mr. Curnyn's office, I returned to NewEnergy's offices in New York to meet with Mr. Curnyn, Mr. McGeown, and Brian Hayduk. During that visit, I demonstrated the Omni-Link software to Messrs. Curnyn, McGeown and Hayduk.

21. NewEnergy was also supplied with passwords to access the Omni-Link software and explore it at leisure.

22. In late 1999 or early 2000, I took Mr. McGeown to see an installation of the Omni-Link system at a Bell Atlantic facility. We met in a conference room where I showed Mr. McGeown design schematics. After going over and explaining the schematics, we went to the installation sight for a tour of the major components, including the house service board. Then I had my mechanic open the panels around the house service board to allow Mr. McGeown to verify the current transformer connection. Mr. McGeown was shown that the connection was split-core, which permitted it to be installed without having to shut off the electrical service to the building. Next, Mr. McGeown was shown the connections to the generators which permitted the generators to be controlled remotely. Then, Mr. McGeown was shown the server to demonstrate how the information was transmitted back to the server, and finally how the server was addressed for access to the Internet.

23. The information conveyed to Mr. McGeown at the tour coupled with the lists of hardware components that was given to NewEnergy enabled NewEnergy to put the hardware pieces together and effectively build the hardware portion of the Omni-Link system without Powerweb's assistance.

24. Curtailment events cannot be demonstrated live at a person's convenience because they involve seeing the Omni-Link system react to actual price data and actually running

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM  *Pg 7/8
08/15/2004 16:31 FAX 609 569 8149                KINKO'S                                                      ☒007

generators. In order to demonstrate to Messrs. Curnyn, McGeown and Hayduk that the Omni-Link system was capable of handling curtailments, curtailment events transacted through an installed Omni-Link system were recorded and then replayed for NewEnergy.

25. In furtherance of the partnership between NewEnergy and Powerweb, Mr. McGeown wanted to bring Powerweb and Omni-Link to other business units at AES. Accordingly, he directed me to send materials to Peter Scarpelli at AES CILCO ("CILCO"), a sister company of NewEnergy. I sent Mr. Scarpelli the materials as requested, including a demonstration CD, with the understanding that CILCO was bound by the Confidentiality Agreement.

26. I recall following up with Mr. Scarpelli after I sent him the materials. Because the goal of those communications was to get CILCO to purchase the Omni-Link system, I conveyed detailed information about the Omni-Link system, including its capabilities and how it operated. Our discussions progressed far enough that I sent him a draft contract, similar to the one Powerweb and NewEnergy had signed for Bell Atlantic ("Bell Atlantic Agreement").

27. Following an extensive pilot program, Baltimore Gas & Electric Company ("BG&E") signed a three-year license agreement with Powerweb to roll-out the Omni-Link system to certain BG&E customers.

28. BG&E modified the original specifications for the Omni-Link software several times following the pilot during the first six-months of the roll-out. Each time BG&E modified the specifications, Powerweb had to rewrite portions of Omni-Link to accommodate those changes. The modifications and resulting redesigns caused some delay in getting portions of the Omni-Link applications online and operating as BG&E wanted.

Received 06/15/2004 05:13PM in 03:02 on line [15] for 145 WORKSRV2 printed B00F662A on 06/15/2004 05:16PM * Pg 8/8
06/15/2004 16:31 FAX 609 589 8149        KINKO'S                                                    @008

29. However, in a letter dated October 21, 2002, I asked BG&E to acknowledge in writing that all functions of the Omni-Link software were performing to BG&E's satisfaction and in compliance with the license agreement, and in early November 2002, I received BG&E's written acknowledgement to that effect.

30. Ruth Kiselewich of BG&E called me to discuss the lawsuit between Powerweb and NewEnergy, BG&E's sister company. During the conversation, Ms. Kiselewich told me that it would be in both our interests for Powerweb to drop its claims against NewEnergy. I declined.

31. Only after that conversation, in January 2003, did BG&E raise a concern about the cost of the Omni-Link software. BG&E suggested that the only way to save the relationship was to forfeit the license fee and for Powerweb to provide its services for free. Powerweb could not afford to give its services away.

32. BG&E then terminated the contract. At the time of termination, there were fifteen BG&E customers online with the Omni-Link system and another five were in various stages of set up.

I understand that the statements in this declaration are made subject to 28 U.S.C. § 1746, and as such, I declare under the penalty of perjury that the foregoing is true and correct.

_____
Lothar E.S. Budike, Jr.

Dated: June 15, 2004