IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CONSTELLATION NEWENERGY, INC., | : |
| | : |
| Plaintiff, | : Civil Action No. 02-CV-2733 (HB) |
| | : |
| v. | : |
| | : |
| POWERWEB TECHNOLOGIES, INC., | : |
| | : |
| Defendant. | : |

**PLAINTIFF, CONSTELLATION NEWENERGY INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION *IN LIMINE*
TO EXCLUDE SPECULATIVE AND UNFORESEEABLE DAMAGES
RELATING TO ENERGY MANAGEMENT SERVICES**

$93 million of the lost profits which Powerweb is claiming is based on a product -- energy management services -- which is not the subject matter of any contractual document in this case. Rather, Powerweb's bloated claims are the product of improperly speculative calculations based on unsupported claims that Powerweb would have had an opportunity to cross-market additional products to NewEnergy's customers which were not foreseeable when the contracts at issue were executed. Indeed, cross-marketing of other products is not a subject matter of any of the contracts at issue in this case and was never the discussion of negotiations. The alleged damages sought for energy management services are, in short, sheer fantasy -- the result of which is a claim for damages so inflated that it exceeds 100 years' worth of Powerweb's revenues.

I.   **FACTUAL BACKGROUND**

During the Spring and Summer of 1999, Powerweb attempted to market its Omni-Link Energy Efficiency System to Bell Atlantic, first directly, and then in connection with one of Bell

DSB:976573.2/AES003-158567

Atlantic's energy providers, NewEnergyEast, which had recently been acquired by AES.[1]  The Omni-Link System supposedly combined energy efficiency and control elements with remote information technology.  Powerweb promoted its Omni-Link system as a "load management" tool that could assist customers in managing their energy consumption, either by reducing consumption or by using back-up generators to reduce the demand for electricity from the grid.  After several meetings and some internal discussions, the parties agreed to proceed towards a joint-marketing effort to sell Powerweb's hardware and software to Bell Atlantic for use with a particular load management program (Active Load Management) offered by the local electricity grid, the Pennsylvania, New Jersey, Maryland Interconnection ("PJM").  NewEnergy and Powerweb proceeded according to normal business procedures:  a non-disclosure agreement ("NDA") was signed, a letter of intent was signed, and the parties participated in a limited due-diligence process.  Ultimately, the parties executed an agreement to jointly market the Omni-Link product to Bell Atlantic, which was intended to permit Bell Atlantic to participate in the ALM program (the "Bell Atlantic Agreement").  In addition, the parties entered into a separate agreement by which Powerweb could bring prospective customers to NewEnergy and try to do similar deals within a one year time period (the "Customer Marketing Agreement").  Powerweb has no counterclaim regarding this contract.

Bell Atlantic decided not to purchase Omni-Link or to participate in the program which Powerweb and NewEnergy were proposing.  The Bell Atlantic Agreement and the Customer Marketing Agreement expired, according to their terms, by February, 2001.

This lawsuit started as a collections matter in which NewEnergy sought the return of $100,000 which had been given to Powerweb pursuant to the terms of the Bell Atlantic

---

[1] AES NewEnergy was sold to the plaintiff, Constellation NewEnergy, in the fall of 2002.

Agreement to develop a project implementation plan for Bell Atlantic.  In response to NewEnergy's effort to recover its money, Powerweb has asserted numerous counterclaims seeking damages in excess of $100 million based on a collection of specious theories and has proffered the testimony of two purported experts, Dr. Peter Fox-Penner of the Brattle Group and Constantinos Pappas, CPA, Powerweb's accountant and chief financial analyst.[2]

Dr. Fox-Penner's report addresses certain alleged load management damages claims.  While Powerweb has no legal bases for these claims, and these damages claims suffer from many of the same problems present here, none of the load management damages claims are at issue in this motion.[3]

The present motion seeks the exclusion of Powerweb's claims for over $93 million related to the sale of a different product -- energy management services.  Energy management services permit customers access to an internet site which provides energy price and consumption information.  Pappas Dep., 186:21 - 187:6, attached hereto as Exhibit E.  According to Mr. Pappas, Powerweb could have received additional profits "if it had the opportunity to sell its energy management services to all NewEnergy customers."  Pappas Report at 1, attached hereto as Exhibit C.

Powerweb's contracts with NewEnergy, however, relate to the Omni-Link load management system which Powerweb wanted to sell to Bell Atlantic and other customers.  There is no mention of these additional energy management services in any of the relevant contracts or

---

[2]  Dr. Fox-Penner's report and supplemental report are attached hereto as Exhibits A and B, respectively.  Mr. Pappas' report and supplemental report are attached hereto as Exhibits C and D, respectively.  NewEnergy has filed a motion to exclude the reports and testimony of Mr. Pappas, which is incorporated herein by reference.

[3]  NewEnergy intends to object to Powerweb's load management damages on numerous grounds, including that the load management programs for which Powerweb seeks to recover did not exist at the time Powerweb and NewEnergy entered into contracts.  Rather, they came into being in 2000 and in subsequent years and could not have been foreseeable at the time that the contracts at issue in this case were executed.

in any of the documents exchanged in due diligence.  Indeed, Powerweb's two energy management customers, Long Island Power and Potomac Energy, did not sign contracts for energy management until long after Powerweb's contracts with NewEnergy had expired. Regardless, Mr. Pappas first estimates that $31 million of the over $93 million in damages is for energy management services which Powerweb might have sold to NewEnergy's customers. Again, there is nothing in the record to support the proposition that NewEnergy would have ever permitted Powerweb to market its load management product to NewEnergy's customers, much less to permit Powerweb to cross-market NewEnergy's customers with its energy management product.  Indeed, the clear language of the Customer Marketing Agreement states that Powerweb's ability to market to NewEnergy's customer was solely within the discretion of NewEnergy.  Further, the Bell Atlantic Agreement relates only to load management at Bell Atlantic.

The remaining $63 million of the $93 million of Powerweb's damage claim for energy management services relates to 11 utility companies around the country with whom Powerweb claims it would have signed contracts if not for NewEnergy's breach of the Non-Disclosure Agreement.[4]  With respect to these utility companies, Powerweb is not seeking the value of the load management contracts which it alleged it would have signed, but rather the energy management profits Powerweb claims it could have made if it was permitted to cross-market customers of these utilities.  Putting aside issues of liability with respect to NewEnergy's responsibility for Powerweb's inability to market to these customers and with respect to the fact that the alleged lost contracts are between the 11 utilities and the third party companies (not

---

[4] Powerweb originally claimed lost profits for 13 lost utility contracts but reduced that number to 11 in its Supplemental Expert Report by Mr. Pappas.  Powerweb also revised its calculations, reducing load management profits for these contracts to $0 and increasing energy management profits from $9 million for 13 utilities to $63 million for only 11 utilities.

NewEnergy), there is no evidence in the record that Powerweb actively pursued or submitted bid proposals to these utility companies for load management or energy management.  Mr. Pappas' $63 million estimation was based entirely on Mr. Budike's unsupported representations.  Pappas Dep., 238:24 - 239:16, attached hereto as Exhibit F.

**II.    ARGUMENT**

Powerweb's claims for lost energy management damages do not flow from the Nondisclosure Agreement, the Bell Atlantic Agreement, or the Customer Marketing Agreement and were not foreseeable when those contracts were executed.  Under Pennsylvania law, consequential damages are distinct from ordinary damages that flow directly from breach of contract.  *LBL Skysystems, Inc. v. APG-Am., Inc.*, No. 02-5379, 2004 U.S. Dist. Lexis 9685, at *20 (E.D. Pa. May 25, 2004) (citing *Hadley v. Baxendale*, 9 Exch. 341 (1854)).  The elements for a consequential damages claim are "that defendant had reason to know of the special circumstances causing the loss and that the injury was foreseeable." *Id*.  Such damages must be reasonably foreseeable at the time the agreement was formed, not when the contract was breached.  *Id*. at *20-21; *McDermott v. Party City Corp*., 11 F. Supp. 2d 612, 625 (E.D. Pa. 1998).

In addition, though some level of uncertainty may be permitted in a damage calculation, "a lost profits calculus based solely on unsubstantiated speculation and conjecture cannot form the basis of recovery." *Atacs Corp. v. Trans World Communications*, 155 F.3d 659, 670 (3d Cir. 1998) (internal citation omitted) (vacating the district court's lost profits award and remanding for determination of restitution damages).  In addition to being unforeseeable, Powerweb's claims related to 11 lost contracts are wholly unsubstantiated and rely entirely on speculation and inadmissible hearsay.

### A.    Energy Management Services Lost Profits Should Be Excluded

Powerweb's alleged lost profit damages related to its energy management services for NewEnergy customers and for eleven other companies were not foreseeable at the time the parties entered into the contracts, and Powerweb should not be permitted to introduce evidence of such damages at trial.

At the time, Powerweb's entire focus was its Omni-Link Efficiency System which involved load management. It was not until the Bell Atlantic deal failed to materialize and Powerweb failed to generate business due to its overpriced product that Powerweb then began to focus on a scaled-back version of Omni-Link and less costly energy management services. Powerweb's shift to energy management services was not within the contemplation of the parties at the time they entered into the agreements. NewEnergy could not have foreseen in late 1999 and early 2000 that Powerweb would fail to find success with its load management services and shift its focus to energy management services. *See Fort Washington Res., Inc.*, 901 F. Supp. at 943 (finding no indication that damages were within contemplation of parties at time contract was formed). Accordingly, evidence of any such alleged damages should be excluded from trial. *See McDermott*, 11 F. Supp. 2d at 625 (reducing jury award by eliminating unforeseeable damages).

Underscoring this point is the fact that Powerweb had no agreement with NewEnergy to jointly market Powerweb's load management or energy management services to any of NewEnergy's customers. The Customer Marketing Agreement, executed on February 8, 2000, was limited specifically to customers that Powerweb brought to NewEnergy, not vice-versa. The clear language of this document rejects any argument by Powerweb that the parties intended a broader arrangement. Indeed, Powerweb has failed to even bring a claim under the Customer Marketing Agreement and cannot do so now. The only potential customer at issue is Bell

Atlantic, and there were never any expectations, negotiations, or agreements regarding the sale of Powerweb's energy management product to Bell Atlantic.

### B.    Damages Relating to the 11 Lost Contracts Should Be Excluded

Powerweb's greatest damages claim, $63 million, relates to 11 contracts with electric utility companies across the country which Powerweb claims would not have been signed "but for" NewEnergy's breach of its non-disclosure obligations.  Mr. Pappas has estimated that Powerweb would have received over $63 million in energy management profits from these utility companies, if they had executed contracts with Powerweb, as opposed to the third party companies.  As discussed above, all energy management damages should be excluded as unforeseeable.  In addition, any lost profits related to these utility companies should be excluded as wholly speculative and unsubstantiated.  At his deposition, Mr. Pappas testified as follows:

> Q.  Why do you think that Powerweb would have gotten, had a relationship with, any of those 13 customers?
>
> A.  From discussions with Mr. Budike that out of those 13, that they were the finalists in requests for bids for each of those utilities.
>
> Q.  Did you see any documents or correspondence between any of those companies and Powerweb that indicated they were even considering doing business with Powerweb?
>
> A.  No.
>
> Q.  Did you see one piece of paper that indicated that any of those companies even knew who Powerweb was?
>
> A.  No.
>
> Q.  You were just taking Mr. Budike's word on that one, too?
>
> A.  Yes, I did.

Pappas Dep., 236:18 - 237:12, attached hereto as Exhibit G.

Mr. Pappas estimated the number of end-use customers at each of these utilities which would purchase energy management services by merely assuming, without any analysis whatsoever, that Powerweb's ability to cross-sell its energy management services to these utilities would have been identical to its ability to market its two current customers. Mr. Pappas then assumes that Powerweb would have been paid three times as much for each customer of these utilities than it gets from the two utilities it currently services. Pappas Dep., 227:4-8, attached hereto as Exhibit H. Next, Mr. Pappas assumes that Powerweb will have no additional costs associated with servicing 11 utilities all over the country, along with their many thousands of end-use customers. Pappas Dep., 259:22 - 260:19; 283:7 - 285:5, attached hereto as Exhibit I. This is not surprising in light of Mr. Pappas' admissions that he does not even know the names of all of these utilities, nor is he even certain where all of them are located:

> Q. Do you know where Mid-America is located?
>
> A. No. I know who some of these companies are, yes.
>
> Q. What's DTE?
>
> A. I forget who that was.
>
> Q. What's NSTAR?
>
> A. North Star.
>
> Q. What is it?
>
> A. It is a utility company.
>
> Q. Where is it?
>
> A. I don't know.
>
> Q. What's Pinpoint?
>
> A. Pinpoint, I have no idea.
>
> Q. What's Allegheny?

    A.  Allegheny is another utility.

    Q.  Where is it?

    A.  Out west.

    Q.  Out west where?

    A.  I'm not sure.

    Q.  What's CILCO?

    A.  I don't recall.

Pappas Dep., 251:16 - 252:22, attached hereto as Exhibit J.

       Powerweb's alleged damages related to the "lost contracts" are thus wholly speculative and unsupported by evidence. The only possible evidence which Powerweb could offer to prove these claims would rely entirely on inadmissible hearsay. Powerweb's exhibit list and witness list do not contain a single admissible source which would prove that, had RETX and Silicon Energy not submitted bids to these utilities, Powerweb would have won these contracts. Mr. Budike does not have first-hand knowledge of the decision making processes undertaken by these utility companies, nor knowledge of the terms and processes for such alleged contracts. The only possible basis for his knowledge would be an out of court statement that this was so. Such testimony, of course, would be inadmissible under Fed. R. Evid. 801(c)("Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Powerweb's claims relating to the "Lost Contracts" can only be based on inadmissible hearsay, and should therefore be excluded.

### III. CONCLUSION

For the foregoing reasons, plaintiff, Constellation NewEnergy respectfully requests that the Court exclude Powerweb from offering evidence of speculative and unforeseeable damages relating to energy management services.

                                          Respectfully submitted,

                                          _____
                                          David E. Landau, I.D. #43341
                                          Matthew A. White, I.D. #55812
                                          Zachary C. Glaser, I.D. #85979
                                          Jennifer C. O'Neill, I.D. #89755

                                          Wolf, Block, Schorr and Solis-Cohen LLP
                                          1650 Arch Street, 22nd floor
                                          Philadelphia, PA 19103-2097
                                          (215) 977-2000

Dated: July 26, 2004

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2004, I caused a true and correct copy of Plaintiff, Constellation NewEnergy, Inc.'s Motion *in Limine* to Exclude Speculative and Unforeseeable Damages Relating to Energy Management Services, accompanying memorandum and proposed order to be served electronically upon:

> Kara Goodchild, Esquire
> SAUL EWING LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA  19102-2186

The document is available for viewing and downloading from the ECF system.  The exhibits will be served via first class mail.

s/JO416<br>
Jennifer C. O'Neill