**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 02-CV-2733 (HB) |
| | : | |
| v. | : | |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF CONSTELLATION NEWENERGY,
INC.'S MOTION *IN LIMINE* TO EXCLUDE THE EXPERT TESTIMONY AND
<u>EXPERT REPORTS OF CONSTANTINOS PAPPAS, CPA</u>**

If Gus Pappas is qualified to provide expert testimony on lost profits, then anyone is.

Constantinos "Gus" Pappas has been Powerweb's accountant since he passed his CPA exam four years ago. When he submitted his lost profits analysis in March of this year, he was listed on Powerweb's website as its chief financial officer. After Mr. Pappas was criticized by one of NewEnergy's experts for his lack of independence, Powerweb changed his designation to chief financial analyst. Mr. Pappas has no specialized knowledge, training, or experience in the fields of lost profits analysis, damages calculations, economic forecasting or cost accounting, and he has never served as an expert witness. In fact, the first expert report he ever saw was the one he wrote after two weeks of work in March of this year. Unencumbered by the standards of the profession, and armed only with the unsupported representations and assumptions of his boss, Mr. Pappas manages to calculate over $100 million in alleged lost profits through an unreliable methodology which bears no resemblance to the well-established standards for economic analysis of lost profits.

Rule 702 and *Daubert* require more than that.

## I.    BACKGROUND

### A.    Relevant Facts

During the Spring and Summer of 1999, Powerweb attempted to market its Omni-Link Energy Efficiency System to Bell Atlantic, first directly, and then in connection with one of Bell Atlantic's energy providers, NewEnergyEast, which had recently been acquired by AES.[1]  After several meetings and some internal discussions, the parties agreed to proceed towards a joint-marketing effort targeted at and limited to selling the Omni-Link system to Bell Atlantic. Thereafter, according to normal business procedures; the parties executed a non-disclosure agreement ("NDA") and a letter of intent.[2]  The parties then participated in a limited due-diligence process.  Ultimately, the parties executed an agreement to attempt to market jointly the Omni-Link system to Bell Atlantic ("Bell Atlantic Agreement"), intended to permit Bell Atlantic to participate in the Active Load Management program, a program which had been offered by the Pennsylvania, New Jersey, Maryland Interconnection ("PJM").[3]  The ALM program had been offered to customers of regulated utilities for many years, providing credits to energy consumers who agreed to consume less energy (either by running back-up generators or by reducing demand) during periods of high energy demand.  In addition, the parties entered into a separate agreement by which Powerweb could bring prospective customers to NewEnergy and try to do similar deals ("Customer Marketing Agreement").[4]  Powerweb has not asserted a counterclaim regarding this contract.

---

[1]    Budike-2, attached as Exhibit A; Budike-6, attached as Exhibit B.  AES NewEnergy was sold to the plaintiff, Constellation NewEnergy, in the fall of 2002.

[2]    Budike-8, attached as Exhibit C; PW-78, attached as Exhibit D.

[3]    PW-5, attached as Exhibit E.

[4]    NE-38, attached as Exhibit F.

Ultimately, Bell Atlantic decided not to purchase Omni-Link or to participate in the program which Powerweb and NewEnergy were proposing, and both the Bell Atlantic Agreement and the Customer Marketing Agreement expired, by their terms, by February, 2001.

### B.    Overview of Powerweb's Damages Claims

Powerweb has asserted damages claims based on several theories.

### 1.    Load Management

Powerweb has asserted that it is entitled to some or all of the profits which NewEnergy has made in the load management market not just for Bell Atlantic on the PJM, the subject of the Bell Atlantic Agreement, but around the country, and that it will make through 2009, despite a contract that expired in January, 2001.  Powerweb's economist, Dr. Peter Fox-Penner, has projected NewEnergy's expected load management profits on the assumption that the non-disclosure agreement is the equivalent of a 10 year non-compete.[5]

The alleged load management damages are not related to the technologies and business programs which were subject to the agreements executed by Powerweb and NewEnergy. Powerweb's claims rely on the supposition that NewEnergy's agreement not to pursue deals for ALM on the PJM with Bell Atlantic can be construed so broadly as to prohibit NewEnergy from participating in a vast array of load management programs around the country that did not even exist when the agreements between Powerweb and NewEnergy were executed.

Powerweb is also seeking to recover additional money for sales of  Omni-Link systems it claims it would have made if it were allowed to market its product to all of NewEnergy's load management customers around the country.  There was never any agreement between the parties which would have permitted Powerweb to market its products to NewEnergy's customers.  On

---

[5]    Report of Peter Fox-Penner at 6-7, attached as Exhibit G.

the contrary, NewEnergy only ever agreed to jointly market Omni-Link to Bell Atlantic and other Powerweb customers that Powerweb proposed and that were accepted by NewEnergy.  No such customers were found.

### 2.    Verizon Load Management

Powerweb is also seeking to recover from NewEnergy an amount equal to Verizon's [6] load management profits and sales of Omni-Link systems to Verizon.  These alleged damages flow from Powerweb's allegation that Verizon, then Bell Atlantic, should have entered a non-competition agreement, prohibiting Bell Atlantic from doing load management without Powerweb.  The undisputed testimony is that Verizon has no interest in Powerweb and independently hired a different vendor for its load management programs.[7]  Pappas did not review this testimony.

### 3.    Baltimore Gas & Electric ("BG&E")

Mr. Pappas has also attempted to estimate the amount of profits Powerweb would have made if BG&E had not opted out if its contract with Powerweb after one year.[8]  Mr. Pappas has relied on Powerweb's claim that this decision was the result of tortious interference on the part of NewEnergy, and not related to the ever expanding costs of Powerweb's product, the lack of customer interest, and shortcomings in Powerweb's technology, as reflected in documents produced by BG&E and testimony from BG&E's designee (neither of which were provided to Mr. Pappas).[9]

---

[6]    Verizon is the successor to Bell Atlantic.

[7]    Deposition of Jeremy Metz, 10:12 - 13:9, attached as Exhibit H.

[8]    Lost Profits Report of Constantinos Pappas, CPA at 3, attached as Exhibit I.

[9]    Deposition of Ruth Kiselowich, 134:14 - 136:2, attached as Exhibit J; Exhibit I at exhibit H.

**4.    Energy Management Services**

The balance of the damages which Powerweb is seeking is $93,791,654.  This number consists of lost profits which Powerweb believes it could have received from cross marketing its Energy Management Services - products which were not the subject of the Bell Atlantic or Custom Marketing Agreements.  Energy management services permit customers access to an internet site which processes energy price and consumption information.  Mr. Pappas has estimated over $31 million in sales to NewEnergy customers who might have purchased energy management services between 2000 and 2009 and over $62 million in lost sales of energy management services which Powerweb claims it could have sold to customers of 11 utility companies around the country that chose not to sign contracts with Powerweb.  Powerweb is not seeking to recover the value of these allegedly "lost contracts," but -- one step even more remote -- the energy management services it claims it would have sold by cross-marketing its energy management services to all of the customers of these utilities.

As discussed in NewEnergy's Motion to Exclude Speculative and Unforeseeable Damages Related to Energy Management Services, which is incorporated herein by reference, Powerweb's claim for lost sales of energy management services bears no relation to the agreements at issue in this case:  the Bell Atlantic Agreement and the non-disclosure agreement.  Powerweb will proffer no admissible evidence at trial on whether the eleven contracts exist, their terms, who else competed, or why Powerweb was not selected.

**C.    Mr. Pappas' Qualifications**

Mr. Pappas has no specialized knowledge, skill, experience, training or education in the calculation of lost profits.  Mr. Pappas is a CPA who has worked for Powerweb for four years.[10]

---

[10]    Exhibit B to the Pappas Report, attached as Exhibit I.

His only higher education is a bachelor's degree in business administration from Widener University in 1989.  Exhibit B to Pappas Report.  He has never taken any courses or continuing education classes which are related in any way to the work he performed for this engagement. Pappas Dep. 31:17-23, attached as Exhibit K.

This is the first time that Mr. Pappas has ever attempted to provide litigation support services.  *Id*. 26:7-11.  He has never conducted a lost profits analysis.  *Id*. 31:24-32:2.  He did not consult with any other accountants to give him guidance in the preparation of his report.  *Id*. 37:10-13.  In fact, the first damages report Mr. Pappas has ever seen was the report he wrote for Powerweb after two weeks of work in March, 2004.  *Id*. 37:10-13.

Even according to Powerweb's other expert, Dr. Fox-Penner, Mr. Pappas is not qualified to calculate Powerweb's lost profits:

> Q.    What particular skill or expertise do you think is necessary to predict or model the lost profits of a business?
>
> A.    I think you need to know some economics, a little bit of accounting, and you need to understand the particular business that you're modeling.
>
>    Broadly speaking, those, I think, are the core qualifications.
>
> Q.    At the Brattle Group, what is the typical background of qualifications of people like yourself who would do lost-profits calculations for Brattle Group's customers or clients?
>
> A.    The typical qualifications would include some kind of advanced degree from a business school or an economics department and some, I would say, relevant experience.

Fox-Penner Dep. 72:15-73:8, attached as Exhibit L.

### D.    Materials Relied Upon By Mr. Pappas

Mr. Pappas' issued two reports.  His first report listed six documents which he relied upon in reaching his conclusions, including one Powerweb load management contract (BG&E),

three Powerweb energy management contracts, the Bell Atlantic Proposal which was submitted in 2000 and a study commissioned by BG&E during its pilot program with Powerweb in 2001. In addition to these documents, Mr. Pappas relied on two spreadsheets which were provided to him by Dr. Fox-Penner. The balance of the information which Mr. Pappas relied upon to support his opinions comes exclusively from oral representations from Powerweb's president, Lothar Budike, Jr. He did not review any of the pleadings, any written discovery, or any deposition transcripts. Most important, he did not consider any of Powerweb's historical financial and tax information, the Non Disclosure Agreement, or the Bell Atlantic Agreement.

### E.    Mr. Pappas' Lost Profits Reports

The speculative nature of Mr. Pappas' calculations is underscored by the fact that Mr. Pappas issued two reports -- the second one dramatically changing the calculations from the first. Mr. Pappas' assumptions and changing methodologies are wholly speculative and unreliable.

### 1.    Mr. Pappas' Assumptions

Mr. Pappas' analysis is based on the a number of key assumptions which Powerweb argues would have been true, "but for" NewEnergy's alleged breaches:

> **a.**    Powerweb would have been NewEnergy's 50/50 partner in all load management programs nationwide until 2009. Mr. Pappas provides no citation for this assumption. Specifically, he cites no contractual agreement which would allow Powerweb to partner with NewEnergy nationwide until 2009;

> **b.**    Powerweb would be permitted to market its Omni-Link System exclusively to all NewEnergy customers around the country until 2009. Again here, Mr. Pappas cites no document or testimony for the basis of this assumption;

> **c.**    In addition to load management services similar to those offered to Bell Atlantic and BG&E in 2000, Powerweb would have also been permitted to market a different product, energy management services (like those offered to Powerweb's two current customers), to all of NewEnergy's customers until 2009. Like the first two assumptions, there is no citation to the record, nor could there be

since energy management services was not the subject matter of any agreement between the parties;

**d.** Powerweb would have been awarded a contract for Verizon's load management services in New York (which Powerweb never bid on), and would been able to profit from curtailment and the sales of load management services to Verizon until 2009. Mr. Pappas makes this assumption although he did not review the testimony of Verizon;

**e.** BG&E would not have opted out of its contract either at the end of the first year (which it did) or the second year, and Powerweb would have been able to sell energy management services in addition to the load management services which it was providing until 2005. Mr. Pappas makes the assumption in that reviewing the BG&E deposition which flatly contradicts it;

**f.** 13 (and 11 in his supplemental report) contracts which were awarded by various utility companies to RETX and Silicon Energy would have been awarded to Powerweb (as opposed to other competitors); each of these 13 (or 11) utilities would have signed contracts identical to the contract signed by BG&E, but none of the utilities would opt-out of their contracts after one or two years and each of these utilities would have purchased energy management services from Powerweb in addition to load management. Mr. Pappas has reviewed no evidence of these contracts, because none exists.

### 2.    Mr. Pappas' First Methodology

For his first report, Mr. Pappas did not look at any Powerweb historical financial data, particularly its actual profits and losses (Powerweb has never made a profit). Moreover, Mr. Pappas did not review a single bid proposal to a potential Powerweb customer. Rather, he assumed that all potential Powerweb load management customers would sign contracts exactly like the BG&E contract. The revenue per customer derived from the BG&E contract was multiplied by the number of assumed load management customers provided by Dr. Fox-Penner.[11] Mr. Pappas' costs estimate provided for a profit margin of approximately 90%.

---

[11]    Dr. Fox-Penner's calculations are the subject of a separate motion *in limine*.

On the energy management services side, Mr. Pappas estimated the total number of energy management customers by multiplying the number of potential end-use customers by an estimated rate from a study prepared by BG&E for purposes that had nothing to do with Powerweb's lost profits.  In other words, this calculation was not based on Powerweb's historical data.  No Powerweb costs are associated with energy management.  The calculation is merely a guess.

### 3.    Mr. Pappas' Second Report

NewEnergy's experts critiqued the lack of sound professional methodology in Pappas' report, its lack of foundation in Powerweb's historical performance, and its reliance on the report generated for BG&E.  Although not permitted under the rules or by the court's scheduling order, Mr. Pappas' issued a new report, responding to several of the criticisms leveled by NewEnergy's experts.  Mr. Pappas abandoned both measures of damages for the alleged lost contracts.  Mr. Pappas' second set of calculations do not estimate any load management profits related to these allegedly lost contracts, but energy management profits from lost contracts rise from $9 million to nearly $63 million from only 11 (not 13) of the utilities.  He also inflated energy management services profits that he claims should have been derived from NewEnergy customers  from approximately $16 million to over $31 million.

Mr. Pappas has no experience or training in projecting costs or revenues or calculating damages for litigation.  Rather than rely on the established standards for his profession, and a wide array of critical documents needed for such a calculation, Mr. Pappas based his calculations on speculation and unsupported representations from the president of the company for which he works.  The result is a unreliable damage calculation that should not go before the jury.

II.    **ARGUMENT**

Under Federal Rule of Evidence 702, the Court is charged with the responsibility of acting as a gatekeeper to exclude unreliable expert testimony. *See id.* Advisory Committee Notes 2000 Amendments. When faced with a proffer of expert testimony the Court must determine pursuant to Federal Rule of Evidence 104 whether the expert is proposing to testify to (1) specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993). Federal Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principals and methods to the facts of the case.

The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000). Powerweb cannot meet this burden with respect to Mr. Pappas.

A.    **Mr. Pappas is not qualified to testify as an expert.**

The Third Circuit Court of Appeals has declared: "An expert must have such skill, knowledge, or experience in the field as to make it appear that his opinion will probably aid the trier of fact in his search for truth." *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987) (holding that district court abused its discretion in allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire). A district court should refuse to allow an expert witness to testify if the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999) (citing *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 781 (3d Cir. 1996)). While the Third Circuit has

construed qualifications liberally, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman. . . ." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoted in *Elcock v. KMart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

Under even the most liberal construction of Rule 702's requirements, Mr. Pappas is not qualified to render opinions regarding lost profits. Mr. Pappas has no specialized knowledge, skill, experience, training or education which could assist the jury in understanding Powerweb's lost profits claims. Although Mr. Pappas has been a CPA for four years (after taking the test five times over a ten year period) merely being an accountant does not make Mr. Pappas a damages calculation expert. *See JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 97-CV-0652, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. Apr. 15 1998) (noting the sales projections and damage calculations go beyond the expertise of an CPA). His only higher education is a B.S. in business administration from Widener in 1989. Exhibit B to Exhibit I. He has never taken any courses or continuing education classes which are related in any way to the work he performed for this engagement. Exhibit K at 31:17-23.

Mr. Pappas has absolutely no experience in this field. Prior to this case, Mr. Pappas has never been hired to provide litigation support services. *Id*. 26:7-11. He has never conducted a lost profits analysis. *Id*. 31:24 - 32:2. He did not consult with any other accountants to give him guidance in the preparation of his report. *Id*. 37:10-13. In fact, the first damages report Mr. Pappas has ever seen was the report he wrote for Powerweb after two weeks of work in March, 2004. *Id*. 37:10-13. Mr. Pappas did, however, receive 20% of his annual revenues from Powerweb. *Id.* 42:21-43:5. This goes a long way towards explaining why Powerweb retained him in this case.

In a very recent appellate opinion interpreting New York law (which, like Pennsylvania, requires reasonable certainty in the calculation of lost profits), the Court of Appeals for the 10th Circuit focused on the proffered expert's "utter lack of any familiarity, knowledge, or experience with damages analysis" and affirmed a decision from a district court to exclude a proffered damages expert. *Lifewise Master Funding v. Telebank*, No 03-4086, U.S. App. LEXIS 13398, *29-30 (10th Cir. June 29, 2004). The same comment could be made of Mr. Pappas.

Since Mr. Pappas has no qualifications to perform sales or costs forecasting or lost profits analysis, his testimony will not be helpful to the jury, and he is not qualified to give expert testimony on the calculation of Powerweb's alleged lost profits.

### B.    Mr. Pappas' testimony will not be reliable.

*Daubert's* reliability requirement consists of two separate analyses: (1) whether the purported expert testimony is based on sufficient facts or data; and (2) whether the purported expert testimony is the product of reliable principles and methods. *See* FED. R. EVID. 702. Mr. Pappas' opinions fail in both considerations.

"Courts must also assess whether the expert relied on data reasonably used by economic experts and had good grounds to rely on such data in drawing conclusions." *Total Containment, Inc. v. DAYCO Prods., Inc.*, 97-CV-6013, 2001 U.S. Dist. LEXIS 15838, *11 (citing *Oddi*, *supra*, 234 F.3d at 146; *Paoli*, 35 F.3d at 749). "[E]xpert testimony that ignores existing data and is based on speculation is inadmissible." *Id.* at *16.

The Supreme Court has recently affirmed the requirement that the trial court consider reasonableness of both the underlying data and the expert's reliance upon it:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert.

> A court may conclude that there is simply too great an analytical
> gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).

There is abundant precedent to support the exclusion of proffered expert testimony which is not supported by sufficient facts or reliable methodology.  In *Elcock*, the Third Circuit confirmed that "although mathematical exactness is not required, [expert] testimony of a post-injury earning capacity must be based upon the proper factual foundation." *Elcock*, 233 F.3d at 754 (quoting *Benjamin v. Peter's Farm Condominium Owners Ass'n*, 820 F.2d 640, 643 (3d Cir. 1987)).  The Third Circuit concluded that the purported expert's damage model relied on assumptions unsupported by the record of past performance and ordered its exclusion.  *Id.* at 756.

Similarly, in *Total Containment*, Judge Schiller noted several courts which had "not hesitated to exclude an economic expert where their testimony is not supported by sufficient evidence or engaged in mere speculation." *Total Containment*, 2001 U.S. Dist. LEXIS 15838, *12-13 (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000); *Target Market Publishing v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 17, 21-22); *JMJ Enters. v. Via Veneto Italian Ice, supra*, 1998 U.S. Dist. LEXIS 5098, at *18-20 (noting the exclusion of a damages expert who failed to conduct independent market analysis in predicting future performance of a business)).

In *JRL Enterprises, Inc. v. Versus Procorp Assocs., Inc.*, 01-CV-2893, 2003 U.S. Dist. LEXIS 9397 (E.D. La.  June 3, 2003), the district court granted a motion *in limine* excluding an economic expert's report and testimony for failure to conduct any independent analysis of the data supplied to him by his client, failing to show that reasonable accountants would blindly accept such numbers, failing to properly test his theories and failing to provide a rate of error. *Id.* at 2003 U.S. Dist. LEXIS 9397, at *22-23.  That court noted the similarity between the expert

opinions excluded in that case and this Court's similar rulings in *Total Containment* and *JMJ Enterprises*. *Id.* at *22.

Like the proffered experts in these cases, Mr. Pappas' testimony is inadmissible due to its insufficient factual support and the lack of reliability in the methodology employed.

### 1.    Mr. Pappas' Opinions Lack Sufficient Factual Support

During two years of discovery in several courts and numerous states, tens of thousands of documents were produced in this case. Powerweb's Pretrial Memorandum lists 312 documents which it may use as exhibits in attempting to prove its counterclaims. During the two weeks that Mr. Pappas spent preparing his first lost profits report, he reviewed just six of them. Exhibit H to Exhibit I. Other than spreadsheets from Dr. Fox-Penner with predictions of Verizon's meters and penetration rates for NewEnergy load management customers, most of the information which Mr. Pappas used as the basis for over $100 million in alleged damages came entirely from conversations Mr. Pappas had with Mr. Budike. *Id.*

Mr. Pappas failed to list any treatises or authoritative sources in either of his reports. Mr. Pappas did testify at his deposition that he relied upon a three book set of binders entitled *Litigation Support Services* published by the Practitioners Publishing Company. Exhibit K at 32:13-20. Specifically, Mr. Pappas stated that he relied upon Volume I, § 300, entitled *Lost Profit Analysis Involving Closely Held Businesses. Id.* 156:15-22. This chapter states that: "[d]ocumentary evidence is a critical element of all litigation services, including those involving lost profits. The primary source of documentary evidence is the plaintiff's business records." Dovell Report, p.5, attached as Exhibit M, citing *Guide to Litigation Support Services, Vol. I*, § 303.7, Practitioners Publishing Company (hereinafter, "P.P.C.").

The following chart compares categories of documents which accountants should consider when conducting lost profits analysis to what Mr. Pappas did:

| Documents To Be Used In<br>Lost Profits Analysis | Mr. Pappas' Materials Relied Upon |
|---|---|
| The plaintiff's petition, the defendant's answer, all counterclaims, and all third-party demands (P.P.C. § 303.7(a)). | Q. Did you review the Complaint and Counterclaim and the pleadings in this case?<br>A. No; those were explained to me by Mr. Budike and Mark Chupka of the Brattle Group. (Exhibit K at 166:2-6). |
| The answers to all interrogatories and requests for production of documents of all parties to the proceeding.<br>(P.P.C. § 303.7(b)). | Q. Did you review the interrogatory answers?<br>A. No.<br>(Exhibit K at 166:7-18). |
| Transcripts of the deposition testimony of all parties and witnesses.<br>(P.P.C. § 303.7(c)). | Q. Did you review any deposition transcripts?<br>A. No.<br>(Exhibit K at 166:19-21) |
| The plaintiff's financial and tax information for a period of five years before the breach or tort occurred and for all subsequent periods through the present, including income tax returns, financial statements, trial balances and general ledgers, accounts receivable and payable, business plans and financial forecasts, etc.<br>(P.P.C. § 303.7(d)). | In response to NewEnergy's motion to compel the production of these financial and tax documents, Powerweb stated:<br><br>"Mr. Pappas did not consider the specific documents sought by NewEnergy."<br><br>Powerweb's Memorandum of Law in Response to Constellation NewEnergy's Motion to Compel Documents, fn.1.[12] |

At other points in his deposition, Mr. Pappas acknowledged several instances where he should have reviewed documents but failed to do so. For example, Mr. Pappas testified that he has never seen the Non-Disclosure Agreement in this case, but that his understanding of it came

---

[12] Mr. Pappas testified at his deposition that he did consider Powerweb's financial documents in preparing his lost profits report. Exhibit K at 157:14-25. Mr. Pappas specifically described documents such as tax returns, trial balances, receivables and payables, which he referred to in order to refresh his memory about Powerweb's general and administrative expenses. *Id.* 159:4-160:13. Mr. Pappas also described how reviewing Powerweb's general ledger assisted him in calculating lost profits. *Id.* 161:21-162:8. Apparently, according to Powerweb's motion papers, this testimony was not true.

from Mr. Budike: "I have an understanding of it as being a nondisclosure agreement for ten years, and that they are going to partner up and be able to sell Omni-Link based on that. Exhibit K at 106:8-11.

When asked whether he believed he should have personally reviewed the non-disclosure agreement, Mr. Pappas responded as follows:

> Q.      . . . I asked you whether you thought it was a good idea to go look at the contract or not?
>
> A.      Yes, it probably would have been a good idea to go look at the contract.
>
> Q.      Why didn't you?
>
> A.      It just never crossed my mind.

Exhibit K at 108:9-15.

In addition to the pleadings, written discovery, deposition transcripts, documents[13] and contracts[14] which Mr. Pappas acknowledges he should have seen but did not, Powerweb failed to provide Mr. Pappas with any business plans or projections which were assembled by or for Powerweb during the relevant time period. As stated above, accountants performing lost profits calculations should request business plans and financial forecasts from their clients. P.P.C. § 303.7(d)(8).

> Q.      So one of the things that the treatise talks about that you said was authoritative is looking at business plans and financial statements of the company; right?

---

[13]     Mr. Pappas' report seeks approximately $1.5 million dollars related to Powerweb's contract with Baltimore Gas & Electric, yet other than the contract and the EIM survey, Mr. Pappas did not review a single piece of paper produced by BG&E. Exhibit K at 214:25 - 215:5. Further, Mr. Pappas did not read the deposition testimony of BG&E's representative, Ruth Kiselewich. *Id.* at 214:212-24.

[14]     In addition to the non-disclosure agreement and the other contracts between Powerweb and NewEnergy which Mr. Pappas has never reviewed, Mr. Pappas' report calculates several million dollars in damages related to Verizon's efforts to participate in load management and energy management services programs, yet Mr. Pappas testified that he has never seen any contract that Verizon ever had with any company with respect to load management or energy management services. Exhibit K at 227:3-7.

> A.     Right.
>
> Q.     Mr. Budike didn't tell you that he actually had a business plan for the very same period that you are calculating lost profits right?
>
> A.     That's correct.
>
> Q.     [This] Business plan that was prepared in part by McManus & Miles, who is an investment banker; right?
>
> Q.     Right?
>
> A.     Right.
>
> Q.     Would that have been useful for you to know about before you did your analysis?
>
> A.     Yes, it would have been.
>
> Q.     Would you like to have seen the assessments and assumptions that McManus & Miles and Navigant put together before you did your analysis?
>
> A.     Yes, I would have.

Exhibit K at 265:16 - 266:21 (objections omitted).

Perhaps the most glaring example of Mr. Pappas' failure to base his opinions on sufficient data relates to the largest single source of alleged lost profits, the "Lost Contracts" from which Powerweb allegedly lost almost $63 million.  Mr. Pappas confirmed at his deposition that this entire section was based only on Mr. Budike's representations:

> Q.     Why do you think that Powerweb would have gotten, had a relationship with, any of those 13 customers?
>
> A.     From discussions with Mr. Budike; that out of those 13, that they were the finalists in requests for bids for each of those utilities.
>
> Q.     Did you see any documents or correspondence between any of those companies and Powerweb that indicated they were even considering doing business with Powerweb?
>
> A.     No.

Q.      Did you see one piece of paper that indicated that any of those companies even knew who Powerweb was?

A.      No.

Q.      You were just taking Mr. Budike's word on that one, too?

A.      Yes, I did.

Exhibit K at 236:18 - 237:12.

In lieu of documentary evidence, independent research, or generally accepted economic methods, Mr. Pappas report is based, almost entirely, on unsupported representations from the president of the company for whom he works and assumptions which Mr. Pappas was not qualified to make.  An example of this sort of assumption arose when he attempted to explain how he came to opine that the structure of all of the energy management services contracts Powerweb would have won from the 13 utilities around the country would have been identical to the contract which Powerweb had with its two "sole" customers:

Q.      Why did you assume that these 13 contracts would behave similarly to LIPA and PEPCO?

A.       Because I assumed that energy customers are energy customers, and energy customers would like to save money.  And if you can penetrate 1 percent in New York, you could probably penetrate 1 percent in Los Angeles.

Q.      You just made that assumption?

A.      I made that assumption.

Q.      You didn't rely on any expert opinion in that; right?

A.       No.

Q.      You are not an expert in the energy industry, are you?

A.      No.

Exhibit K at 235:5-236:4 (objection omitted).

Mr. Pappas made another, similarly unsupported assumption when he attempted to calculate the amount of money Powerweb would have made per end-use customer for its energy management services:

> Q.    You assumed that Powerweb would receive $75 per month per end-user for energy services?
>
> A.    Correct.

Exhibit K at 275:10-13.

The assumption that Powerweb would receive $75 per end-use customer for its energy management services (which represent 85% of Powerweb's damage claims) completely ignores the fact that Powerweb currently receives only $25 per end-use customers from for energy management.[15]

Finally, in all of Mr. Pappas' damage models, he assumes that no customer will ever cancel (or decline to renew) its contracts. This assumption has no support and is inconsistent with the facts in this case. Mr. Pappas never considered the testimony of BG&E's representative, Ruth Kiselewich, who testified that BG&E availed itself of an opt-out provision in Powerweb's contract based on the extremely high price which Powerweb charged and deficiencies in Powerweb's products and services. Exhibit J at 192:14-193:8. Accordingly, Mr. Pappas' assumptions bear no relation to the factual record in this case, and his testimony should be executed.

### 2.    Mr. Pappas' Opinions Are Not Based on Reliable Principles or Methods

"While the proponent of an expert need not prove that his or her opinions are correct, it must prove, by a preponderance of the evidence, that his or her testimony is reliable." *Total*

---

[15]    Q.  The historic and actual payments that Powerweb were receiving was one-third of what you assumed in your model; right?
A.  The -- yes, correct.
Exhibit K at 277:4-8 (objection omitted).

*Containment,* 2001 U.S. Dist. LEXIS 15838, at *10 (citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994)). The Supreme Court and the Third Circuit have set forth a non-exhaustive list of eight criteria to determine the reliability of expert testimony:

1.      whether a method consists of a testable hypothesis;

2.      whether the method has been subject to peer review;

3.      the known or potential rate of error;

4.      the existence and maintenance of standards controlling the technique's operation;

5.      whether the method is generally accepted;

6.      the relationship of the technique to methods which have been established to be reliable;

7.      the qualifications of the expert witness testifying based on the methodology; and

8.      the non-judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing *Paoli*, 35 F.3d at 742, n.8).

As has been commented upon numerous times in this jurisdiction, "these factors were designed to test the reliability of scientific methods of proof." *Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*, 95-CV-1376, 1998 U.S. Dist. LEXIS 4235, at *6 (E.D. Pa. Apr. 2, 1998); *accord Protocom Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 473, 477 (E.D. Pa. 2001). In the context of more technical testimony, like the validity of an accountant's assessment of contractual damages, the *Daubert* approach must be applied in a more general manner. *Robert Billet Promotions*, 1998 U.S. Dist. LEXIS 4235, *6 (internal citations omitted) (finding that the Court must consider which of the factors are applicable in an effort to determine whether the expert's opinions are based on "good grounds").

1.     **Mr. Pappas' Opinions Cannot Be Tested**

a.     **Mr. Pappas Did Not Review or consider Powerweb's Financial Data.**

Mr. Pappas' lost profits calculations exist in a vacuum.  They are neither related to Powerweb's historical performance nor to Powerweb's numerous competitors.  According to Mr. Pappas, Powerweb has no track record of ever making profits in its business.  Exhibit K at 152:14-19.  In fact, Powerweb has reported significant financial losses in every year since 1996.  According to Mr. Pappas, none of these losses had anything to do with NewEnergy.  *Id*. 154:17-156:7.  According to Mr. Pappas, none of these losses were relevant to the lost profits analysis he performed.  *Id*. 159:24-160:8.  Despite the fact that Powerweb has never been able to make money selling its products and services, Mr. Pappas assumed that Powerweb would have been extraordinarily profitable.  Since Mr. Pappas has not even used Powerweb's financial history as a basis for his models, this testimony cannot be tested.

b.     **Mr. Pappas Did Not Consider or Review Comparable Companies in the Marketplace.**

Similarly, Mr. Pappas' conclusions cannot be tested against comparable companies in Powerweb's industry because Mr. Pappas performed no market analysis.  Although Powerweb's other expert, Dr. Fox-Penner, agreed that Powerweb had competitors, Mr. Pappas candidly admitted that his calculations did not even consider Powerweb's position in its market.  Pappas Dep. 256:25 - 257:5.  In the summer of 2001, Powerweb circulated a private placement memo to raise capital.  In this memo, Powerweb admitted it has competitors, "each of which is in a similar stage of business development as Powerweb."  NAV00002-65 at NAV00014, attached as Exhibit N.

Mr. Pappas flatly conceded that his model ignores competitors who could have won bids for the 13 utilities, and he concedes that other competitors could have bid against Powerweb for

Verizon's business. Exhibit K at 290:12-291:14. Similarly, Mr. Pappas assumes that utilities would have paid the amounts necessary to support his claims without doing anything to study whether the market would support such rates. *Id*. 293:9-17. This is especially misleading in light of Dr. Fox-Penner's admission that Powerweb would not have had the ability to set its own prices in its market. Exhibit L at 234:10-19.

### 2. Mr. Pappas' Opinions Have Not Been Subject to Peer Review

Given Mr. Pappas' total lack of knowledge, training, or experience in performing lost profits calculations, one might expect that he sought the assistance of peers in calculating Powerweb's lost profits. He did not. Exhibit K at 37:10-13.

### 3. Mr. Pappas Does Not Provide a Known or Potential Rate of Error

Similarly, Mr. Pappas did not even consider a rate of error. The lack of a known or potential rate of error was considered a significant factor in excluding economic reports in such cases as *JRL Enterprises*, 2003 U.S. Dist. LEXIS 9397, at *23 ([the expert's] theory cannot be tested, and the rate of error is not known."), and *Otis v. Doctor's Assocs., Inc.*, 94-CV-4227, 1998 U.S. Dist. LEXIS 15414, at *14 (N.D. Ill. Sept. 10, 1998) ("Otis has not provided the court with the known or potential rate of error in Carlie's calculations.").

### 4. Mr. Pappas' Calculations Do Not Conform to the Generally Accepted Standards in His Industry

As discussed at length in the expert report submitted by Raymond F. Dovell, CPA, of Nihill and Riedley, a CPA performing litigation services must comply with standards of the profession as set forth by the American Institute of Certified Public Accountants (AICPA).[16] The General Standards set forth in the AICPA Code of Conduct apply to all CPAs rendering litigation support services, including professional competence, due professional care, planning

---

[16]    Exhibit M, at 1.

and supervision and sufficient relevant data.[17]  Mr. Pappas' supplemental report does not rebut

this critique.  Due professional care, as defined by the AICPA, requires diligence and critical

analysis of all work performed -- more than merely accepting his client's assumptions and

representations.  Exhibit M at 4.  A CPA must also base conclusions on sufficient relevant data -

- not just six documents out of thousands.  *Id.* at 5.  Powerweb's financial and tax documents

undisputedly are the documents upon which CPA's normally base lost profits calculations.  *Id.*

By failing to analyze Powerweb's historical performance as a basis for his calculations,

Mr. Pappas' methodology fails to conform to the standards in his industry.  As Mr. Dovell notes

(and Pappas does not rebut), a CPA performing lost profits calculations should "analyze each

expense item of the company and assess whether the expense is fixed or variable."  *Id.* at 6

(citing P.P.C. § 303.44).  "When existing capacity will not support the projected revenues,

estimated costs should include additional costs to expand capacity."  *Id.* at 6.[18]  For example, in

the offering memo which Powerweb created with its investment bankers in 2001, Powerweb's

admits to needing $20 million in investment to "build the infrastructure and hire the experienced

staff needed to assure the highest quality execution of Powerweb's plan and the acquisition of

new contracts."  Exhibit N at NAV00011.

By contrast, Mr. Pappas merely accepted Mr. Budike's representation that costs would

hold constant over 10 years as the business went from being completely unprofitable to earning

over $100 million in profits.  Exhibit K at 259:22-260:19; 283:7-285:5.  As noted by Mr. Dovell,

Mr. Pappas "fails to add any expenses for sales and marketing, accounting and software

development."  Exhibit M at 6.  Mr. Pappas' blind acceptance of Powerweb's representations

---

[17]     References provided in report of Raymond F. Dovell, CPA, Exhibit M at 4.

[18]     Citing Litigation Services Handbook, The Role of the Accountant as Expert, Second Edition, Chapter 30.8.

leads to a 91% profit margin which "does not reflect reality."  Violette Supplemental Report,

attached as Exhibit O, at ¶¶ 8-9.  According to Dr. Violette, a reasonable profit margin for

energy management services would be "around 10%."  *Id.*

### C.    Mr. Pappas' Calculations Will Not Be Helpful to the Jury

The final Rule 702 criterion is "fit."  Expert testimony is relevant if it will 'assist the trier

of fact to understand the evidence or to determine a fact at issue.'"  *JMJ Enterprises*, 1998 U.S.

Dist. LEXIS 5098, at *25 (quoting *Daubert*, 509 U.S. 579).  "Where, as here, lost profits are at

issue, 'an expert's testimony should be excluded as speculative if it is based on unrealistic

assumptions regarding' a party's future prospects."  *Supply & Building Co. v. Estee Lauder Int'l,*

*Inc.*, 95 CV-8136, 2001 U.S. Dist. LEXIS 20737, at *13 (S.D. N.Y Dec. 13, 2001) (quoting

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citing *Gumbs v. Int'l*

*Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983)).

Mr. Pappas' conclusions are based entirely on speculative and unrealistic assumptions

which he accepted at face value from his client.  This lack of critical analysis falls well short of

the standards in Mr. Pappas' profession.  During his deposition, Mr. Pappas testified about the

three levels of critical analysis that accountants employ when performing professional services:

> There are three levels of service for accounting services.  One is a
> compilation . . . which all you do is take the financial statements
> and put them on paper.  There is a review, which refers to a more
> qualitative and quantitative inspection of the financial statements.
> And then there is an audit, which means you go and tick and flick
> every number.

Exhibit K at 130:12-23.

When confronted with his total reliance on Powerweb's representations and the lack of

supporting documentation, Mr. Pappas candidly admitted that his calculations would not rise to

even those applied to a compilation -- the lowest standard for accountants.

*Id.* 239:20-241:6.

**D.      Mr. Pappas' Testimony Would Cause Confusion and Unfair Prejudice**

"'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.'" *JMJ Enterprises*, 1998 U.S. Dist. LEXIS 5098, at *25-26 (quoting *Daubert*, 509 U.S. at 595).  Mr. Pappas' testimony consists of little more than Mr. Budike's opinions and representation and simple arithmetic.  It has very little, if any probative value.  However, under the guise of expert testimony, Mr. Pappas' testimony and his vastly inflated calculations are extremely prejudicial. Accordingly, Mr. Pappas' testimony should be excluded under Fed. R. Evid. 403.

**III.    CONCLUSION**

For the foregoing reasons, the expert reports and testimony of Constantinos Pappas, CPA should be excluded pursuant to Federal Rules of Evidence 403 and 702.

Respectfully submitted,

WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP

_____

David E. Landau
Matthew A. White
Zachary C. Glaser
Jennifer C. O'Neill
1650 Arch Street, 22nd Floor
Philadelphia, Pennsylvania 19102-2097
(215) 977-2000
*Attorneys for Plaintiff, Constellation NewEnergy, Inc.*

Dated:  July 26, 2004

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on July 26, 2004, I caused a true and correct copy of the foregoing *Motion in Limine to Exclude the Expert Testimony and Expert Reports of Constantinos Pappas, CPA* to be served electronically upon:

> Kara Goodchild, Esquire
> SAUL EWING LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA 19102-2186

The document is available for viewing and downloading from the ECF system. The exhibits have been served via first class mail.

_____/s/ Zachary C. Glaser_____
Zachary C. Glaser
