IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 02-CV-2733 (HB) |
| | : | |
| v. | : | |
| | : | |
| POWERWEB TECHNOLOGIES, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
CONSTELLATION NEWENERGY, INC.'S MOTION *IN LIMINE*
TO EXCLUDE THE EXPERT TESTIMONY OF PETER FOX-PENNER**

Powerweb has the burden of proving the connection between the contracts at issue in this case and the damages it is seeking. Rather than proffering a liability expert to opine that NewEnergy somehow made use of Powerweb's trade secrets or the so-called "Energy Technology" protected by the parties' non-disclosure agreement, Powerweb simply hired an economist and instructed him to assume that it is so. Absent any factual support or expert testimony to establish the nexus between breach and damages, Dr. Fox-Penner relies on untenable assumptions or upon calculations based entirely on Mr. Pappas' unreliable opinions. This failure to grapple with the underlying facts renders Dr. Fox-Penner's testimony unreliable, misleading, and ultimately inadmissible.

**I.   BACKGROUND**

   **A.   Relevant Facts.**

As set forth in NewEnergy's Pretrial Memorandum, during the Spring and Summer of 1999, Powerweb attempted to market its Omni-Link Energy Efficiency System to Bell Atlantic; first directly, and then in connection with NewEnergy. As noted in the Pretrial Memorandum, the parties executed an agreement to jointly market the Omni-Link system to Bell Atlantic, to permit

Bell Atlantic to participate in a specific load management program ("Active Load Management" or "ALM") offered by a regional electricity grid,[1] the Pennsylvania, Jersey Maryland Interconnect ("PJM").[2]  As part of this contract, NewEnergy agreed that it would not pursue programs to offer ALM on the PJM, with companies in the telecommunications industry, "specifically Bell Atlantic."  *Id.*  As noted this was a one-year contract that expired on January 7, 2001.

In addition, the parties entered into a separate agreement by which Powerweb could bring prospective customers to NewEnergy and try to do similar transactions.  Powerweb and NewEnergy executed the Powerweb Customer Marketing Agreement on February 8, 2000, but Powerweb never brought any prospective customers to NewEnergy.  Powerweb has not asserted a counterclaim regarding this contract.

Ultimately, Bell Atlantic decided not to purchase Omni-Link or to participate in the program which Powerweb and NewEnergy were proposing.   Both the Bell Atlantic Agreement and the PWT Customer Marketing Agreement expired, by their terms, by February, 2001.

B.   **Dr. Fox-Penner's Damage Calculations.**

Dr. Fox-Penner was hired to make two damage calculations: (1) an estimation of NewEnergy's load management revenues between 2000 and 2009; and (2) an estimation of Verizon's load management profits between 2000 and 2009.[3]  The balance of the expectation damages which Powerweb is seeking have been calculated by Powerweb's outside account and

---

[1]   Electricity grids are divided into several regional Independent System Operators ("ISOs"), which facilitate the buying and selling of wholesale power.  Report of Dr. Peter Fox-Penner (hereinafter the "Fox-Penner Rep.") at 3.  A copy of Dr. Fox-Penner's report is attached as Exhibit A.

[2]   The Bell Atlantic Agreement is attached as Exhibit B.

[3]   Fox-Penner Rep. at 2.

chief financial officer or analyst,[4] Constantinos "Gus" Pappas. Mr. Pappas concluded that Powerweb, a company which has never shown a profit, would have earned $111,683,773, "but for" NewEnergy's conduct.[5] This figure was submitted to Dr. Fox-Penner, who adjusted all of the damage calculations to present value and presented them as his own.[6]

### 1. NewEnergy Load Management Programs.

Powerweb has asserted that it is entitled to some or all of the profits which NewEnergy has made by participating in eight energy programs offered by four regional ISOs.[7]

The Non-Disclosure Agreement, Bell Atlantic Agreement, and PWT Customer Marketing Agreement cannot be cobbled together in such a way as to create a nationwide, 10-year non-compete agreement. Undaunted by the facts, Dr. Fox-Penner has calculated load management damages until 2009, based on the assumption that any load management revenues, anywhere, generated from 1999 through 2009 are the appropriate basis from which to measure damages.[8] Powerweb's claims rely on the argument that NewEnergy's agreement not to pursue deals for ALM on the PJM with Bell Atlantic or other telecommunications companies for one

---

[4]   Powerweb's characterization of Mr. Pappas' title has recently changed from Chief Financial Officer to Chief Financial Advisor in response to a criticism of Mr. Pappas' independence which was leveled by Constellation NewEnergy's expert on accounting and lost profits calculations, Raymond F. Dovell, CPA.

[5]   Supplemental Report of Dr. Peter Fox-Penner (hereinafter the "Fox-Penner Supp.") at revised Table 12 assuming MBR representations, attached as Exhibit C. Dr. Fox-Penner's supplemental report included parallel calculations, one assuming the truth of the factual representations contained in Dr. Rosenzweig's report and one assuming these representations to be false. For the purpose of this motion, it assumed that Dr. Rosenzweig's representations are accurate. Mr. Pappas' damage calculations are described in detail in Constellation NewEnergy's Memorandum of Law in Support of its Motion to Exclude the Expert Testimony of Constantinos Pappas, CPA. Revised Table 12 is reproduced on page 9.

[6]   Exhibit A at 41-43.

[7]   *Id.* at 39, Table 10.

[8]   *Id.* at 6.

year can be construed so broadly as to prohibit NewEnergy from participating in any energy program offered by any ISO around the country for 10 years.

Dr. Fox-Penner does not offer any opinions as to whether any relationship exists between ALM on the PJM and the various programs included in his damage calculations. ALM is an involuntary electricity, capacity credit program which the PJM has offered to regulated electricity customers for many years.[9] On the contrary, Dr. Fox-Penner's analyses consist almost entirely of voluntary curtailment programs and credit programs which were starting to be developed by various ISO's in deregulated states.[10] Based entirely on the bare assumption that NewEnergy's participation in these new curtailment programs constituted a breach of NewEnergy's obligation not to use Powerweb's "Energy Technology," Dr. Fox-Penner has estimated over $7 million in damages relating to NewEnergy's participation in curtailment programs (including Powerweb's alleged lost profits <u>and</u> disgorgement of NewEnergy's profits).[11]

In addition, Dr. Fox-Penner has also calculated over $1.8 million associated with profits earned by Verizon (the successor to Bell Atlantic). These alleged damages flow from Powerweb's allegation that NewEnergy shared Powerweb's "Energy Technology" with Bell Atlantic without obtaining a non-competition agreement.[12] Dr. Fox-Penner has estimated

---

[9] Deposition of Andrew Bakey, 55:15-18; 56:19-23. Relevant pages are attached as Exhibit D.

[10] Exhibit A at 5. Dr. Fox-Penner refers to all energy programs under the general term, Load Management or LM, and he uses the term curtailment interchangeably with LM. For purposes of this memorandum, we will use LM to refer to the Omni-Link System and the ALM program for which it was "specifically designed." "Curtailment" will be used to described the ISO-sponsored programs included in Dr. Fox-Penner's calculations which were developed after the agreements between Powerweb and NewEnergy were signed.

[11] Exhibit C, Table 12.

[12] Exhibit A at 7.

damages arising from Verizon's participation in five load management programs offered by the New York ISO and several electric utility companies, but not the PJM.[13]

Verizon's (formerly Bell Atlantic) profits did not inure to NewEnergy's benefit at all. Fox-Penner has assumed, without support, that Bell Atlantic used Powerweb's technology to participate in curtailment programs. There is not a shred of evidence to support this supposition. More to the point, the revenues generated were not on the PJM and were all earned after the expiration (February, 2001) of the one-year Bell Atlantic Agreement. Finally, the undisputed testimony in this case is that Verizon did not use Powerweb's technology, but rather a system offered by one of Powerweb's many competitors, Electrotech.

### 2. Dr. Fox-Penner's Present Value Calculations.

Dr. Fox-Penner was also asked to perform present value calculations for his damage estimates and for those calculations made by Mr. Pappas. At his deposition, Dr. Fox Penner admitted that he did not study or rely on Mr. Pappas' calculations, and he had no opinion as to whether they were derived to a reasonable degree of professional certainty.[14] Dr. Fox-Penner merely accepted Mr. Pappas' numbers, adjusted them for present value and included them in his report. *Id.* at 89:7-16.

## II. DR. FOX-PENNER'S CALCULATIONS RELY ON UNSUPPORTED ASSUMPTIONS AND INSUFFICIENT FACTS.

Under Federal Rule of Evidence 702, the Court is charged with the responsibility of acting as a gatekeeper to exclude unreliable expert testimony. *See id.* Advisory Committee Notes 2000 Amendments. When faced with a proffer of expert testimony the Court must determine pursuant to Federal Rule of Evidence 104 whether the expert is proposing to testify to

---

[13] Exhibit C, Revised Table 7.

[14] Deposition of Peter Fox-Penner, 74:7-25; 82:15-18. Relevant portions are attached as Exhibit E.

(1) specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993). Federal Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principals and methods to the facts of the case.

The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000). Powerweb cannot meet this burden with respect to Dr. Fox-Penner.

*Daubert's* reliability requirement requires expert testimony to be based on sufficient facts or data. *See* Fed. R. Civ. P. 702. "Courts must also assess whether the expert relied on data reasonably used by economic experts and had good grounds to rely on such data in drawing conclusions." *Total Containment, Inc. v. DAYCO Prods., Inc.*, 97-CV-6013, 2001 U.S. Dist. LEXIS 15838, *11 (citing *Oddi*, *supra*, 234 F.3d at 146; *Paoli*, 35 F.3d at 749). "[A]n 'expert's testimony [regarding future earnings loss] must be accompanies by a sufficient factual foundation before it can be submitted to the jury.'" *Elcock v. KMart Crop.*, 233 F.3d 734, 754 (3d Cir. 2000) (quoting *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983)).

The Supreme Court has underscored the requirement that the trial court consider reasonableness of both the underlying data and the expert's reliance upon it:

> Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).

In *Elcock*, the Third Circuit Court of Appeal discussed numerous cases in which expert opinions regarding future lost earnings were excluded due to insufficient factual bases. *Elcock*, 233 F.3d at 754-55 (citing *Gumbs,* supra, 718 F.2d at 98; *Benjamin v. Peter's Farm Condominium* Ass'n, 820 f.2d 640, 642-43 (3d Cir. 1987)). Similarly, in *Total Containment*, Judge Schiller noted several other courts which had "not hesitated to exclude an economic expert where their testimony is not supported by sufficient evidence or engaged in mere speculation." *Total Containment*, 2001 U.S. Dist. LEXIS 15838, *12-13 (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000); *Target Market Publishing v. ADVO, Inc.*, 136 F.3d 1139, 1143 (7th Cir. 1998); *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 17, 21-22); *JMJ Enters. v. Via Veneto Italian Ice, supra*, 1998 U.S. Dist. LEXIS 5098, at *18-20).

Dr. Fox-Penner's testimony is inadmissible because of his reliance on unsupported assumptions regarding the connection between the contracts at issue and the damages he calculated. His testimony also should not be permitted to bolster Mr. Pappas' analysis, as Dr. Fox-Penner did not review, study, or rely upon Mr. Pappas' calculations in any way.

      A.    **Dr. Fox-Penner's Calculations Regarding New Energy Load Management Profits Are Unreliable.**

Though Powerweb's Omni-Link system was "specifically designed" for the ALM program on the PJM to Bell Atlantic for one year, Dr. Fox-Penner's load management damage calculations include eight different programs, offered by 4 different regional ISOs.[15]

Dr. Fox-Penner simply ignores the actual contractual framework the parties agreed upon. His calculations for Load Management or curtailment programs ignore the one-year limitation of the Bell Atlantic Agreement, disregards the limited geographic area (the PJM), pays no heed to the industry-specific limitation (telecommunications, specifically Bell Atlantic), and fails to

---

[15]    Exhibit C at 39, Table 10.

specify whether any of the potential programs that are offered or might be offered in the future are in any way similar to the Active Load Management program for which the Omni-Link was designed.

Freed from the confines of the actual facts, Dr. Fox-Penner's damages are based upon assumptions that have no support in the record.  For the damages expert to assist the fact finder, there must be some independent assessment of the underlying assumptions.  *See Elcock, supra*, 233 F.3d at 755 (quoting *Benjamin*, 820 F.2d at 642-643 (an "assumption, absent 'sufficient factual predicates,' was a 'castle made of sand.'") (internal citations omitted)).  Rule 702 requires more than what Dr. Fox-Penner gives this court -- damages based solely on Powerweb's rewriting of the parties' actual agreement.

**B.     Dr. Fox-Penner's Presentation of Damages Is Unreliable and Misleading.**

Table 12 of Dr. Fox-Penner's Supplemental Report purports to calculate all of Powerweb's alleged damages, adjusted to present value.  These calculations, however, are no more reliable than the raw damage calculations which Dr. Fox-Penner used.  Over $110 million of the total amount presented is Mr. Pappas' work product.[16]  At his deposition, Dr. Fox-Penner conceded that he did not study or rely on Mr. Pappas' calculations, and he had no opinion as to whether they were derived to a reasonable degree of professional certainty.[17]  In addition, Dr. Fox-Penner testified as follows:

> Q.   Do you have any opinion at all, any professional opinion at all, as to whether Mr. Pappas' calculations that are included within your report are reasonable?

---

[16]   One cannot assess this directly from the revised Table 12.  Unknown to Dr. Fox-Penner until the day of his deposition, this table incorrectly understated the calculations available from Mr. Pappas.  Exhibit E at 200:3-204:21.  He admitted that this table was incorrect and needed amendment.  *Id*.  No revised chart has been submitted.

[17]   Exhibit E at 74:7-25; 82:15-18.

> A. No; I have not studied his work.
>
> Q. Why did you permit his work to be included within your report?
>
> A. Well, as I think I have stated in my report, and as I have indicated in earlier answer, I wasn't able to estimate Powerweb's own profits associated with some of the activities. And we, basically, created an overall damages method by which I estimated a portion of the damages, he estimated a portion of the damages. And I simply take his numbers and add them to mine and present value them in order to produce a total for use in the proceeding.

Exhibit E at 74:12 - 25.

The "overall damage method" to which Dr. Fox-Penner referred is inherently misleading. Since Dr. Fox-Penner cannot vouch for the accuracy or integrity of any of the calculations performed by Mr. Pappas, he should not be permitted to "simply take" them and present them to the jury. In addition, Dr. Fox-Penner's present value calculations include multiple, conflicting theories of recovery.

REVISED TABLE 12
"REVISED INCLUDING ALL NEWENERGY REPRESENTATIONS"
TOTAL PRESENT VALUE OF ALTERNATIVE DAMAGE MEASURES

| CONCEPT | POWERWEB LOST PROFITS | NEWENERGY LM PROFITS AFTER SPLIT | BOTH DAMAGE MEASURES APPLY |
|---|---|---|---|
| **Curtailment Revenues** | $5,632,497 | $3,463,576 | $9,096,073 |
| New York | $2,363,987 | $2,276,468 | $4,640,455 |
| PJM | $1,366,783 | $1,125,504 | $2,492,285 |
| New England | N/A | N/A | N/A |
| California | $61,604 | $61,604 | $123,208 |
| Verizon New York | $1,840,125 | | $1,840,125 |
| **Sales and Service of PowerWeb's systems** | $36,164,853 | | $36,164,853 |
| Load Management Customers | $10,760,452 | | $10,760,452 |
| Energy Management Customers | $25,404,401 | | $25,404,401 |
| Verizon Load Management Systems | $1,888,710 | | $1,888,710 |
| **BGE Contract** | $1,359,920 | | $1,359,920 |
| BGE Load Management Contract | $1,041,392 | | $1,041,392 |
| BGE Energy Management Contract | $318,529 | | $318,529 |
| **Lost Contracts** | $63,174,217 | | $63,174,217 |
| Load Management Customers | $0 | | $0 |
| Energy Management Customers | $63,174,217 | | $63,174,217 |
| **Total NPV for PowerWeb's Lost Profits** | $108,220,197 | $3,463,576 | $111,683,773 |

Exhibit C, Table 12.

The first column on this table presents Powerweb's alleged lost profits. The second column purports to represent NewEnergy's load management profits. The final column adds Powerweb's alleged lost profits (expectation damages) to NewEnergy purported profits (restitution) in a manner which would represent an impermissible double-recovery. Under Pennsylvania law, expectation damages are the preferred basis of damages when lost profits can be calculated with reasonable certainty. *Atacs Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998) (citing *Trotsky v. Civil Serv.* Comm'n, 652 A.2d 813, 817 (Pa. 1995)). When a court cannot calculate lost profits with certainty, reliance damages are appropriate, putting an aggrieved party into the position it would had the contract never been made. *Id.* (citing *DePaolo v. DeRomo*, 31 A.2d 158, 161 (Pa. 1943)). The restitution damages contained in the second column of Dr. Fox-Penner's chart is an equitable relief which is available as an alternative to traditional contract damages. *Id. at 679-70.*

At his deposition, Dr. Fox-Penner admitted that had NewEnergy committed no breach and Powerweb earned all of the alleged lost profits it is seeking, Powerweb would not be entitled to recover NewEnergy's profits in addition to its own.[18] Dr. Fox-Penner's present value chart calculates damages bases on alternative contract damage theories. Accordingly, it can serve no end other than to cause the confusion and unfair prejudice.

    **C.**    **Permitting Dr. Fox-Penner to Testify Will Cause Confusion and Mislead the Jury**

In *Elcock*, the Third Circuit discussed the dangers of permitting expert testimony on economic damages which is not supported by a sufficient factual predicate:

> Given the realities of litigation, the opinion of a witness impressed by the court with the label of 'expert' may carry great weight with a lay jury, particularly in matters as complex as lost future earnings

---

[18]    Exhibit E at 215:16-24.

>assessments. Permitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the jury, the very dangers which Rule 403 defends.

*Elcock, supra*, 233 F.3d at 756.

Permitting Dr. Fox-Penner to testify regarding lost profit calculations unconnected to the facts at issue in this case would confuse the real issues in this case and be unfairly prejudicial. Further, permitting Dr. Fox-Penner to present Mr. Pappas' work as his own would be extremely misleading, the prejudice of which will far outweigh any possible probative value of this proffered testimony. Powerweb has chosen to engage a patently unqualified and biased expert (Pappas) calculate the vast majority of its damages. It should not be permitted to pass these highly dubious conclusions off as the work product of a person who at least has superficial qualifications to perform such calculations.

### III.    CONCLUSION

For the foregoing reasons, the expert reports and testimony of Dr. Peter Fox-Penner should be excluded pursuant to Federal Rules of Evidence 403 and 702.

>Respectfully submitted,
>
>WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP
>
>
>_____
>David E. Landau
>Matthew A. White
>Zachary C. Glaser
>Jennifer C. O'Neill
>1650 Arch Street, 22nd Floor
>Philadelphia, Pennsylvania 19102-2097
>(215) 977-2000
>
>*Attorneys for Plaintiff,*
>*Constellation NewEnergy, Inc.*

Dated: July 26, 2004

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2004, I caused a true and correct copy of the foregoing *Motion in Limine to Exclude the Expert Testimony of Dr. Peter Fox-Penner* to be served electronically upon:

>Kara Goodchild, Esquire
>SAUL EWING LLP
>Centre Square West
>1500 Market Street, 38th Floor
>Philadelphia, PA  19102-2186

The document is available for viewing and downloading from the ECF system.  The exhibits have been served via first class mail.

 /s/ Zachary C. Glaser<br>
Zachary C. Glaser