## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,       :
                                     :
                        Plaintiff,   :         Civil Action No. 02-CV-2733 (HB)
                                     :
     v.                              :
                                     :
POWERWEB TECHNOLOGIES, INC.,         :
                                     :
                        Defendant.   :

## CONSTELLATION NEWENERGY INC.'S PRETRIAL MEMORANDUM WITH RESPECT TO POWERWEB'S COUNTERCLAIMS

Pursuant to Local Rule of Civil Procedure 16.1(c) and the Court's Second Scheduling Order, plaintiff, Constellation NewEnergy, Inc. ("NewEnergy") submits its Pretrial Memorandum with respect to issues on which it is a counterclaim-defendant.

### I.    NATURE OF THE ACTION AND BASIS OF JURISDICTION

Powerweb Technologies, Inc.'s ("Powerweb") Counterclaims to NewEnergy's Second Amended Complaint seek damages against NewEnergy for breach of contract (Counts I, III), breach of fiduciary duty (Count V), fraudulent misrepresentation (Count VI), misappropriation of trade secrets (Count VII), tortious interference with prospective contractual relations (Count VIII), tortious interference with existing contractual relations (Count IX) and unfair competition (Count X).[1]

---

[1]    By Order dated July 8, 2004, the Court granted NewEnergy's Motion for Summary Judgment with respect to Powerweb's breach of contract counterclaim (Count II) and breach of the duty of good faith and fair dealing counterclaim (Count IV).  The motion was denied as to all other claims.

**EXHIBIT A**

Powerweb's counterclaims allege subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that it is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## II.    COUNTERSTATEMENT OF FACTS

Powerweb began its operations in 1997.   It is a closely-held company, owned primarily by Lothar ("Lou") Budike, Jr., and his father.   It was a controls company and had products that enabled its customers to control various aspects of a building's electrical functions, such as air conditioning.   Beginning in 1999, Powerweb started to try to repackage its controls systems to gain a share of the deregulated energy market.   Powerweb was one of many companies who thought an opportunity might exist to help commercial and industrial consumers take advantage of new strategies that were being offered by the non-regulated suppliers in the energy market.

In the Spring of 1999, Powerweb approached Bell Atlantic's New Jersey operations about installing it's "Omni-Link" controls system into Bell Atlantic's telephone switching stations.  These "central offices" were crucial parts of the telephone company's ability to process calls.  Because they were susceptible to power fluctuations, they had much built-in redundancy and, importantly, had back-up electrical generators.

Powerweb's plan was to install Omni-Link in Bell Atlantic's "central office" switching centers so that Bell Atlantic could participate in a program being offered on the regional electrical grid, the PJM Interconnection.   (At that time, "PJM" territory consisted of Pennsylvania, New Jersey, and Maryland).   Powerweb touted Omni-Link as being able to permit an end-user to decrease energy usage ("load management") in response to market demand (i.e., increased prices) either by decreasing power or by generating excess power such as by turning on generators.

Powerweb was not successful with its initial approach.  Powerweb's contact at Bell Atlantic, Jim Goodman, advised Powerweb to seek an energy company to stand behind Powerweb before Bell Atlantic would consider a contract that could affect its "central office" switching facilities and their back-up electrical generators.

In the Spring of 1999, NewEnergy was, and still is, an energy and energy services provider.  NewEnergy's business focus was to provide power and services in the same emerging marketplace Powerweb was beginning to explore.  NewEnergy was, at that time, providing electricity and other services to Bell Atlantic in the New York market.  In July, 1999, a few months after Powerweb's unsuccessful effort to place its Omni-Link system with Bell Atlantic, Powerweb sought out NewEnergy as an energy provider already known to Bell Atlantic.

From NewEnergy's perspective, Omni-Link was not a particularly novel idea.  Several of the autonomous affiliates of NewEnergy were independently selling load management and a wide array of other energy services, in addition to simply selling electricity.  Indeed, during July, 1999, before Powerweb even contacted NewEnergy,  NewEnergy  was implementing a controls system through another vendor with a large real-estate customer in New York--this system permitted the customer to monitor electrical usage through the internet and to make decisions about decreasing energy usage in its facilities as market prices increased during peak demand hours.

In any event, NewEnergy was interested in the potential to expand its relationship within Bell Atlantic, and Powerweb's proposition appeared logical.  In October 1999, after a few weeks of negotiation, NewEnergy entered into a Non-Disclosure Agreement with Powerweb for the limited purpose of performing due diligence so it could decide whether it wished to pursue an arrangement with Powerweb to distribute the Omni-Link system to Bell Atlantic.  As with most

such agreements, there were no "confidentiality" obligations applicable to any information already in the public domain.  Three NewEnergy employees then conducted a brief due diligence review of what Powerweb termed its "Energy Technology."   The purported "Energy Technology" consisted of hardware, software and capacity credit programs, none of which was unique to the industry.

In January 2000, NewEnergy and Powerweb entered into the 2-page "Agreement for Bell Atlantic" (hereinafter, the "Bell Atlantic Agreement,") which was the parties' contract concerning a single potential transaction involving  Bell Atlantic.  The scope of the purported technology at issue and the proposed transaction were narrowly proscribed -- "This system is specifically designed for capacity sales under the Active Load Management Program ("ALM") of the Pennsylvania Jersey Maryland Interconnect ("PJM"), and to enable a customer to execute energy savings programs."   Bell Atlantic Agreement, p. 1.   By its terms the contract expired after one-year. The agreement clearly applied specifically to Bell Atlantic.  The only commercial limitations imposed upon NewEnergy was its promise not to pursue a specific program (Active Load Management), within a narrow geographic region (the PJM) (which does not include New York, New England, or any other region other than Pennsylvania, New Jersey, and Maryland), for a specific company in a specific industry ("agrees not to independently pursue this opportunity in the telecommunications industry, specifically, Bell Atlantic.").   Bell Atlantic Agreement, p. 2.

The transaction between the parties had the promise of being mutually beneficial: NewEnergy would be able to provide additional energy and services to Bell Atlantic; Powerweb would be able to install its Omni-Link system with a large end-user.

Unfortunately, Bell Atlantic decided it had no interest in the program. The system, as proposed, would have required Bell Atlantic to run its numerous back-up generators during periods of high regional demand (i.e., the hottest days in the summer when energy consumption and price skyrockets). Bell Atlantic had concerns about using its back-up generators for purposes other than emergency use. Bell Atlantic also had concerns about being classified as an energy generator, which would have potentially subjected it to a new layer of regulatory oversight. The internal hurdles were too great, and the transaction did not proceed. On this point, the parties agree.

What happened next is the subject of this dispute. Under the Bell Atlantic Agreement, NewEnergy agreed to fund project development costs of up to $100,000.00 so that Powerweb could create a detailed project implementation plan, a schedule, and an investment analysis of the Omni-Link application for installation at Bell Atlantic. NewEnergy retained the exclusive right to approve any expenditure of the $100,000. The only expenditure ever proposed was for $5,000. Powerweb, however, never delivered any work product to NewEnergy. After it became clear that Bell Atlantic had no interest in pursuing this opportunity, in the summer of 2000, NewEnergy asked for Powerweb to return the $100,000.

Rather than admitting that it had no right to retain the $100,000 and that it failed to deliver any detail or design, as called for in the contract, Powerweb accused NewEnergy of stealing its "Energy Technology," using it to create a competitive product, and disclosing it to third parties who also created competitive products. Ironically, Powerweb vacillated between accusing NewEnergy of stealing its product in the summer of 2000, and bidding on other business with NewEnergy some months later. This pattern of pounding the table one day and trying to do business the next is Powerweb's *modus operandi* with anyone it deems a competitor.

Here, despite initially accusing NewEnergy of stealing its ideas in September, 2000, Powerweb did not bring its alleged claims against NewEnergy until after NewEnergy brought suit to recover the $100,000 (May, 2002), and the court denied Powerweb's motion to dismiss (October, 2002). In between, Powerweb consistently tried to do business with NewEnergy and many other companies it accused of stealing its technology.

Putting aside Powerweb's motivations for bringing these claims, at trial, there will simply be no evidence that Powerweb ever showed anything of value to NewEnergy. The sum total of information provided was some generalized sales and marketing materials and some information (i.e. capacity for production) about Powerweb's vendors who sold it the various hardware components that comprise the Omni Link system. Moreover, there is no evidence that NewEnergy ever used this information. While not NewEnergy's burden, in trade secrets case, NewEnergy will show (and Powerweb will not be able to refute it without expert testimony) that NewEnergy already had in place or independently developed the technology that Powerweb purports (but has never clearly specified) was allegedly taken by Powerweb. NewEnergy's unrebutted evidence will also show that other competitors in the industry had, at the same time, similar products and ideas. The fact is that these competitive products (one example NewEnergy will highlight is RETX), were already present in the marketplace and that there was nothing secret or unique about Powerweb's "Energy Technology." As admitted by Powerweb, the hardware was either patented or consisted of off-the-shelf components; the software was insignificant; and the capacity credit programs were long-standing business principles.

The trial will also involve a sideshow in which Powerweb attempts to make NewEnergy responsible for Powerweb's failure to satisfy one of its customers, Baltimore Gas & Electric ("BG&E"). Powerweb cries "tortious interference." The testimony and documents will

demonstrate BG&E terminated Powerweb because of product malfunctions, high costs, and shoddy customer service.

Powerweb and NewEnergy had a limited relationship that was focused on providing one product (load management) to one customer (Bell Atlantic) in one industry (telecommunications) in one region (the PJM). It was a $100,000 transaction that never got off the ground. The parties did not have a general partnership; NewEnergy was not some type of equity or venture capital investor; NewEnergy did not agree to refrain from competition; and NewEnergy did not agree to include Powerweb as a 50/50 partner in all of its energy businesses. Yet, these are precisely the legal obligations that Powerweb wishes to foist on NewEnergy through its claims. Powerweb will ask the jury to throw away the contracts and in their place create a relationship that was never contemplated by NewEnergy or Powerweb.

Undeterred by the limited nature of the parties' relationship and by the fact that Powerweb never gave anything to NewEnergy that it used, Powerweb seeks five categories of damages, the scope of which is unrelated to the parties' contracts. NewEnergy will challenge each category at trial--they are all based on unsupported assumptions, non-existent facts, and questionable methodologies. As summarized below, NewEnergy specifically challenges various aspects of all of these damages in its motions *in limine*.

First, Powerweb seeks over $9 million relating to lost past and future profits derived from energy sales (Powerweb's expert refers to these as "curtailment revenues") made by NewEnergy in various regions of the country. Preliminarily, there is not one contract between the parties that would compel this result -- again the parties' actual agreement was limited in time (one year), geographic scope (Pennsylvania, New Jersey and Maryland), and for one industry segment

(telecommunications, and specifically, Bell Atlantic).[2]  Thus, there is no contract that gives Powerweb the right to NewEnergy's profits from energy sales in New York, New England, and California.

Even ignoring the lack of a factual predicate (which does not exist) on its face, these damages are a "double dip."  Powerweb tries to get its share of lost revenues in some hypothetical 50/50 revenue sharing agreement (again, which doesn't exist) and tries to disgorge NewEnergy's share as well.  So, Powerweb is taking the hypothetical 50/50 contract and turning it into one that give it all revenues.  Aside from the absurdity of this result, Powerweb's expert has made numerous assumptions about NewEnergy's actual sale and revenues, which are simply not supported by the facts.  NewEnergy will move *in limine* to preclude Powerweb's expert, Dr. Peter Fox-Penner, from testifying about these unreliable opinions.

Second, Powerweb seeks an additional $1.8 million of lost profits from sales of its Omni-Link system to Verizon.  The only expert who opines on this quantum is Constantinos "Gus" Pappas.  NewEnergy has separately moved to preclude Mr. Pappas as an expert -- he has no qualifications to render his opinions, and his methodology is unreliable.  Aside from these evidentiary issues, as a legal matter, these damages make no sense.  Powerweb never had an agreement with Bell Atlantic prohibiting it from using some third party for load management systems, yet this is precisely the nature of the damages Powerweb seeks.  So, because some third party (Electrotek) provided services to Bell Atlantic, Powerweb will ask the jury to recover $1.8 million from NewEnergy.  There is simply no legal basis for such damages.

---

[2]    This $9 million of damages includes $1.8 million of profits derived by Verizon (the successor to Bell Atlantic) for its own participation in curtailment programs.  Verizon's profits did not inure to NewEnergy's benefit and all flowed from a contractual relationship that Verizon formed with Electrotek (a competitor of Powerweb's) well after the expiration of the one-year Bell Atlantic Agreement.  Thus, there is no legal basis for these damages.

Third, Powerweb seeks to recover $1.36 million lost profits that it claims it should have recovered from its relationship with BG&E.   Again, these damages are presented only by Mr. Pappas and will be the subject of a motion *in limine* for preclusion.   These claimed damages ignore several key facts including, without limitation; that BG&E could terminate its 3-year contract with Powerweb at will (and did so); that BG&E's customers were dissatisfied with Powerweb's efforts to install load management; that BG&E's and Powerweb's costs were higher than anticipated; and that BG&E's customers did not want to pay the prices Powerweb wanted to charge.   Powerweb's expert did not factor any of these items into his damages calculation.

Fourth, Powerweb seeks $12 million in the sale of its Omni-Link platform to NewEnergy's customers on a nationwide basis.   Again, this quantum of damages is not the subject of any evidence, but is the subject of Mr. Pappas' opinions nevertheless.   It is the subject of the previously identified motion *in limine*.   But, separately, these damages are not legally or factually supportable.

By way of example, and without limitation, Powerweb did not have the <u>right</u> to sell its system to all of NewEnergy's customers anywhere.   Mr. Pappas assumed that NewEnergy would have paid multiple license fees (of $175,000 for each of the six geographic regions at issue) for this non-existent privilege.   And, perhaps most deficiently, Mr. Pappas assumed that Powerweb's incremental costs would have stayed constant as its revenues, across all these categories of damages, grew exponentially (hence causing lost profits to grow dramatically).

Fifth, the single largest category--over $93 million-- supposedly represents lost profits that Powerweb would have earned but for the conduct of NewEnergy.   This claim relates to a different product -- energy management services -- which is not the subject matter of any agreement between the parties.   Powerweb assumes that, had it provided load management to

NewEnergy customers and others, it would have cross marketing energy management services. According to Powerweb's convoluted argument, there were 11 companies that would have awarded work to Powerweb for load management, but, because NewEnergy permitted Powerweb's trade secrets to become known, the work went to competitors of Powerweb (RETX and Silicon Energy) instead. In addition to load management work Powerweb would have allegedly performed for these companies, Powerweb baldly asserts it would have also provided energy management services to these companies.

As a preliminary matter, Powerweb has produced no evidence that either RETX or Silicon Energy used any trade secret information from Powerweb. (This is not surprising given that Powerweb cannot establish that NewEnergy ever received any trade secret information from Powerweb, much less that NewEnergy used it). Putting aside this complete break of the causal chain, Powerweb has not produced one draft contract or any other documentary evidence that indicates it had even communicated with any of these companies for purposes of entering into a contract. Powerweb has not identified one witness from any of these companies who will come and testify that, in fact, Powerweb was even in the running for these contracts. Powerweb's damages expert, Mr. Pappas, did not have the benefit of any documentary support, and the sole source of information that caused him to estimate damages from these prospective contracts was a conversation that he had with Powerweb's majority shareholder, Lou Budike, Jr.

Significantly, Powerweb does not even seek lost profits for load management for these allegedly lost contracts. Rather, it seeks damages only for energy management services, which is not even in this case.

Of course, NewEnergy is deriving no benefit from any of these purported lost opportunities. These damages, putting aside for the moment the complete lack of any factual or

legal basis upon which to hold NewEnergy responsible, are completely speculative. Powerweb cannot show that those parties were even considering Powerweb for these contracts, what those third parties would have paid it had Powerweb been successful, and, whether Powerweb would have made any profit at all. Accordingly, they are the subject of an in limine motion.

As will be made clear by the experts that NewEnergy will call, assuming Dr. Fox-Penner and Mr. Pappas are permitted to testify, Powerweb's expert opinions are groundless.

The lost profits that Powerweb seeks to gain in litigation exceed 100 years' worth of its business' revenues. Undaunted by the fact that its five-year net income has ranged from a $50,000 loss to around $1,000,000 loss (on revenues around $1,000,000 annually), Powerweb will attempt to recover lost profits of $117 million, every penny of which is as speculative and out-of-reach as that which is associated with the lost profits derived from the supposedly 11 lost contracts.

## III.  SIGNIFICANT LEGAL ISSUES

Pursuant to the Court's Second Scheduling Order, NewEnergy identifies the following significant legal issues involving the claims asserted against it.

### A.  BREACH OF CONTRACT (COUNTS I, III).

1.  Whether NewEnergy can be liable for breach of the Non-Disclosure Agreement where Powerweb did not disclose to it any "Energy Technology," other than publicly known or available information. *See Hyman Co. v. Brozost*, 964 F. Supp. 168, 174 (E.D. Pa. 1997).

2.  Whether NewEnergy can be liable for breach of the Non-Disclosure Agreement where it did not use or reveal to others Powerweb's allegedly protected information. *See Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 567 (3d Cir. 2003).

3.      Whether NewEnergy can be liable for breach of the Non-Disclosure Agreement where NewEnergy independently developed its own technology and products. *See Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 567 (3d Cir. 2003).

4.      Whether NewEnergy can be liable for breach of the Bell Atlantic Agreement for conduct transpiring after the expiration of this one-year agreement. *See Glaberman Assocs., Inc. v. J. Kinderman & Sons*, No. 98-3711, 1999 U.S. Dist. Lexis 1931, at *8 (E.D. Pa. Feb. 25, 1999).

5.      Whether the Non-Disclosure Agreement can be construed to be a ten-year non-competition agreement, regardless of the lack of any such term and regardless of the fact that such information and technology was publicly available or already in use by NewEnergy. *See United States v. Boro Developers, Inc.*, No. 96-5498, 1997 U.S. Dist. Lexis 182523, at *10-11 (E.D. Pa. Nov. 20, 1997).

6.      If, in the event the Non-Disclosure Agreement can be construed as a non-competition agreement, whether there was either adequate consideration for such a contract or a meeting of the minds for such a contract. *See Hahnemann Med. Ctr. and Hosp. of Phila. v. Hubbard*, 406 A.2d 1120, 1122 (Pa.  Super. Ct. 1979) (stating that "the very essence of an agreement is that the parties mutually assent to the same thing."); *George W. Kistler v. O'Brien*, 347 A.2d 311, 313 (Pa. 1975).

**B.      BREACH OF FIDUCIARY DUTY (COUNT V).**

1.      Whether a fiduciary relationship can exist absent weakness, dependence or trust on one side and an overmastering influence on the other. *See Ellis v. Steck Mfg. Co., Inc.*, No. 00-3761, 2001 U.S. Dist. Lexis 21053, at *22 (E.D. Pa. Dec. 19, 2001); *Kligman v. Advanced Polymer Sys., Inc.*, No. 00-580, 2001 U.S. Dist. Lexis 15854, at *24 (E.D. Pa. Oct. 2, 2001); *Paul J. Muller Assocs., Inc. v. Transamerica Occidental Life Ins.*, No. 90-3128, 1991 U.S.

Dist. Lexis 18489, at *10 (E.D. Pa. Dec. 23, 1991) (no fiduciary duty exists when cannot show clearly that the parties dealt on unequal terms).

      2.     Whether a fiduciary duty can exist for an expanded, nationwide profit-sharing arrangement, where the parties' written agreements mandated a transaction that applied to implementing one product (load management), for one customer (Bell Atlantic), in one region (the PJM), for one year. *See Richardson v. Walsh Constr. Co.*, 334 F.2d 334 (3d Cir. 1964).

      3.     Whether a fiduciary duty can arise from the execution of a series of commercial agreements in which one party maintains its exclusive proprietary interest in and exclusive control over its technology, which was the subject matter of the enterprise. *See Snellbaker v. Hermann*, 462 A.2d 713, 716 (Pa. Super. 1981).

      4.     Whether a claim for breach of fiduciary duty is cognizable when the damages sought flow from contracts negotiated by sophisticated parties to an arms-length, commercial transaction. *See Levert v. Phila. Int'l Records*, No. 04-CV-1489, 2004 U.S. Dist. LEXIS 11825, at * 18-19 (E.D. Pa. April 9, 2004).

    C.     **FRAUDULENT MISREPRESENTATION (COUNT VI).**

      1.     Whether, under Pennsylvania law, a claim for fraudulent misrepresentation can be asserted where the purported misrepresentation is not contained in the parties' fully integrated written contracts. *See HCB Contractors v. Liberty Place Hotel Assocs.*, 539 Pa. 395, 399; 652 A.2d 1278, 1279 (Pa. 1995); *see also 1726 Cherry St. Partnership v. Bell Atlantic Props.*, 653 A.2d 663, 664 (Pa. Super. Ct. 1995).

      2.     Whether NewEnergy can be liable for fraudulent misrepresentation where it made no (a) intentional (b) false and (c) material misstatement to Powerweb with respect to the Non-Disclosure Agreement. *See Lind v. Jones*, 135 F. Supp. 2d 616 (E.D. Pa. 2001).

3.    Whether Powerweb can prove justifiable reliance on NewEnergy's alleged representations in light of the totality of information available to Powerweb at the time of the purported misrepresentations. *See Coleman v. Sears*, No. 01-87J, 2003 U.S. Dist. Lexis 24646 (W.D. Pa. Dec. 29, 2003).

**D.    MISAPPROPRIATION OF TRADE SECRETS (COUNT VII).**

1.    Whether NewEnergy can be liable for misappropriation of trade secrets where the "gist of the action" is a claim for a purported breach of the Non-Disclosure Agreement. *See Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 106 (3d Cir. 2001); *see also Etoll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14, 2002 Pa. Super. 347 (2002).

2.    Whether NewEnergy can be liable for misappropriation of trade secrets where the information alleged to be a trade secret is publicly available information. *See Mateson Chem. Corp. v. Vernon*, No. 96-7914, 2000 U.S. Dist. Lexis 6208, at *28 (E.D. Pa. May 9, 2000).

3.    Whether NewEnergy can be liable for misappropriation of trade secrets where Powerweb fails to prove any receipt of or use by NewEnergy of the purported trade secret information. *See Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 567 (3d Cir. 2003).

4.    Whether NewEnergy can be liable for misappropriation of trade secrets where NewEnergy independently developed its own energy information and load managment product. *See Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 567 (3d Cir. 2003).

5.    Whether a misappropriation of trade secrets claim can go forward where Powerweb offers no expert testimony concerning the existence or use of any purported trade secret technology.

E.    **TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS (COUNT VIII).**

1.    Whether Powerweb can proceed with a claim for tortious interference with prospective contractual relations where it proffers no evidence of any prospective relationships. *See W.G. Nichols, Inc. v. Ferguson*, No. 03-824, 2004 U.S. Dist. LEXIS 7331, at *44 (E.D. Pa. Apr. 21, 2004).

2.    Whether NewEnergy can be liable for tortious interference with prospective contractual relations when Powerweb cannot show with reasonable probability that it would have been awarded particular contracts "but for" NewEnergy's alleged wrongful conduct. *See W.G. Nichols, Inc. v. Ferguson*, No. 03-824, 2004 U.S. Dist. Lexis 7331, at *44 (E.D. Pa. Apr. 21, 2004).

3.    Whether NewEnergy can be liable for tortious interference with Powerweb's prospective contractual relations with Bell Atlantic/Verizon by participating in a transaction between Verizon and Electrotek after the expiration of the Exclusive Agreement. *See Glaberman Assocs., Inc. v. J. Kinderman & Sons*, No. 98-3711, 1999 U.S. Dist. Lexis 1931, at *8 (E.D. Pa. Feb. 25, 1999).

F.    **TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS (COUNT IX).**

1.    Whether the termination provision in Powerweb's contract with Baltimore Gas & Electric qualifies the contract as terminable at will, under Maryland law. *See Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 118 (Md. 1994).[3]

---

[3]    In its motion for summary judgment, NewEnergy argued that Powerweb's tortious interference claim regarding BG&E is subject to Maryland law. Since Powerweb has not contested this point, it is assumed that Maryland law applies.

2.      Whether under applicable Maryland law, NewEnergy can be liable for tortious interference with a terminable, at-will contract. *See Macklin v. Robert Logan Assocs.*, 639 A.2d at 117.

3.      Whether liability for tortious interference can be imputed to NewEnergy where the alleged wrongful conduct was by an agent of the parent company of NewEnergy and the third party. *See Triple Crown Amer., Inc. v. Biosynth AG*, No. 96-7476, 1997 U.S. Dist. 14740, at *7, n.2 (E.D. Pa. Sept. 17, 1997) (dicta).

**G.      UNFAIR COMPETITION (COUNT X).**

1.      Whether NewEnergy can be liable on an unfair competition claim that does not allege any type of commercial disparagement, confusion of origin, or any of the cognizable causes of action recognized under Pennsylvania law for the tort of unfair competition. *See ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622 (E.D. Pa. 2003); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002) ("[C]ommon law cause of action for unfair competition in Pennsylvania mirrors the Lanham Act's section 43(a) cause of action for unfair competition . . . .").

2.      Whether NewEnergy can be liable on an unfair competition claim where the sole basis of Powerweb's unfair competition claim is that NewEnergy has breached some other duty in tort. *See ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622 (E.D. Pa. 2003); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1995 U.S. Dist. Lexis 4005, at *6 (N.D. Ill. Mar. 29, 1995) (applying Pennsylvania law and recognizing that Pennsylvania courts have not expanded unfair competition to encompass general public policy concerning fair commercial practices).

3.      Whether NewEnergy can be liable for unfair competition where the "gist of the action" is a claim for breach of the parties' integrated, written contracts. *See Clairol, Inc.*

*v. Boston Discount Ctr., Inc.*, 608 F.2d 1114, 1120 (6th Cir. 1979) (recognizing that the gist of the action of all unfair competition claims is fraud) (citation omitted); *Williams v. Hilton Group, PLC*, No. 99-2024, 2003 U.S. Dist. LEXIS 7580, at *15 (W.D. Pa. March 13, 2003) (stating that alleging misconduct or an ulterior motive in inducing an agreement does not convert a contract claim into a fraud claim); *see also Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002)* (applying economic loss doctrine to preclude a fraud claim).

      H.     DAMAGES.

      1.     Whether Powerweb can recover unforeseeable consequential damages related to energy management services, certain load management services and other business opportunities where its contracts with Powerweb were narrow and limited.  *See LBL Skysystems, Inc. v. APG-Am., Inc.*, No. 02-5379, 2004 U.S. Dist. Lexis 9685, at *20 (E.D. Pa. May 25, 2004) (citing *Hadley v. Baxendale*, 9 Exch. 341 (1854)).

      2.     Whether Powerweb's alleged damages are too speculative in nature to be recoverable.  *See Deaktor v. Fox Grocery Co.*, 475 F.2d 1112 (3d Cir. 1973).

**IV.     ITEMS OF MONETARY DAMAGE.**

     None; NewEnergy does not seek damages on Powerweb's counterclaims.   NewEnergy will request its costs and such fees that the Court deems just and proper.

**V.     NewEnergy's Witness List.**

     NewEnergy anticipates calling the following witnesses to testify in its defense. NewEnergy may revise this list in light of the witnesses Powerweb intends to call.

      1.     David McGeown
                3 Kathleen Place
                Bridgewater, NJ 08807

2.    Deirdre Lord
       Constellation NewEnergy, Inc.
       551 Fifth Avenue, Suite 400
       New York, NY 10176

3.    Brian Hayduk
       Constellation NewEnergy, Inc.
       551 Fifth Avenue, Suite 400
       New York, NY 10176

4.    Richard Card
       Constellation NewEnergy, Inc.
       551 Fifth Avenue, Suite 400
       New York, NY 10176

5.    Peter Langbein*
       Constellation NewEnergy, Inc.
       750 East Pratt Street
       Baltimore, MD 21202

6.    Jim Robison
       Constellation NewEnergy, Inc.
       1333 N. California Blvd., Suite 470
       Walnut Creek, CA 94596

7.    Doug Short*
       Constellation NewEnergy, Inc.
       800 Boylston Street
       Boston, MA 02116

8.    James Curnyn*
       18 Brick Hill Road
       Somers, NY 10589

9.    Kirk Hampton*
       12848 Foley Street
       Victorville, California 92392-7426

10.   Keith Mistry
       Energy Tracking, Inc.
       141 Lanza Avenue
       Building 12, Floor 3
       Garfield, NJ 07026

11.   Michael Rosenzeig (Expert)
       NERA
       1255 23rd Street, NW

Suite 600
Washington, DC 20037

12.  Daniel Violette (Expert)
     Summit Blue Consulting
     1722 14th Street, Suite 230
     Boulder, CO 80302

13.  Ray Dovell (Expert)
     Nihill & Riedley
     The Curtis Center
     Suite 720 East
     Independence Square West
     Philadelphia, PA 19106

14.  John Reynolds
     PJM Interconnection
     955 Jefferson Avenue
     Valley Forge Corporate Center
     Norristown, PA 19403

15.  Ruth Kiselewich*
     Baltimore Gas & Electric
     2900 Lord Baltimore Drive
     Baltimore, MD 21244

16.  Andrew Killeen
     Baltimore Gas & Electric
     2900 Lord Baltimore Drive
     Baltimore, MD 21244

17.  Stephen Fernands
     CES
     215 South Broad Street, 10th Floor
     Philadelphia, PA 19107

18.  Jim Goodman*
     4147 Amblestone Way
     Southport, NC 28461

19.  Lothar Budike, Jr.*
     Powerweb
     415 East Baltimore Pike
     Media, PA 19063

20.  Andrew Bakey*
     Powerweb

             415 East Baltimore Pike
             Media, PA 19063

21.     Joseph Bonner*
           Powerweb
           415 East Baltimore Pike
           Media, PA 19063

22.     Martin Anderson*
           124 North Village Lane
           Chadds Ford, PA 19317

23.     Peter Scarpelli*
           RETX
           41 Perimeter Center East, Suite 225
           Atlanta, GA 30346

24.     Ross Malme*
           RETX
           41 Perimeter Center East, Suite 225
           Atlanta, GA 30346

25.     Jeremy Metz*
           Verizon
           1095 Avenue of the Americas
           New York, NY 10036

26.     Representatives of some or all of the 11 companies claimed as "lost contracts" in Pappas' Supplemental Report

27.     Andrew Singer* (deposition testimony only)

28.     NewEnergy reserves the right to call any witnesses listed by Powerweb.

    *For these witnesses, NewEnergy may also designate portions of their deposition testimony for inclusion at trial.

## VI.   NEWENERGY'S EXHIBIT LIST

    NewEnergy's exhibit list as it relates to Powerweb's counterclaims is attached as Exhibit A. NewEnergy may revise or supplement its exhibit list in light of the exhibit list submitted by Powerweb and in light of additional documents that may become available to NewEnergy from some or all of the 11 companies listed as "lost contracts" in Pappas' Supplemental Report.

**VII.    ESTIMATE OF TRIAL DURATION**

NewEnergy expects that the trial on all claims and counterclaims will take 7-10 days.

**VIII.    SPECIAL COMMENTS**

Pursuant to the Court's Second Scheduling Order, NewEnergy notes the following:

**A.    OBJECTIONS TO ADMISSIBILITY (OTHER THAN RELEVANCE).**

NewEnergy objects to selected exhibits identified by Powerweb in Exhibit D to its

Pretrial Memorandum.  *See* Exhibit B which is attached hereto.

Pursuant to Federal Rule of Civil Procedure 26(a), NewEnergy objects to testimony by

Lothar Budike, Jr. on the subject of Powerweb's monetary damages.  Mr. Budike was not

identified by Powerweb as a witness who would testify on this issue.

Pursuant to Federal Rules of Evidence 701 and 702, NewEnergy further objects to any

proffered expert testimony at trial by Lothar Budike, Jr. or Andrew Bakey for the reasons set

forth in NewEnergy's Motion *in Limine* to preclude expert and/or opinion testimony by Mr.

Budike and Mr. Bakey, filed contemporaneously with this Pretrial Memorandum.

NewEnergy reserves the right to assert objections to Powerweb's exhibits and witnesses.

**B.    OBJECTIONS TO EXPERT QUALIFICATIONS.**

NewEnergy objects to the admissibility of any testimony by Powerweb's expert,

Constantinos Pappas, to render any opinion on Powerweb's damages.  In support of its challenge

to Mr. Pappas' NewEnergy relies upon its Motion *in Limine* to exclude Mr. Pappas' testimony,

filed contemporaneously with this Pretrial Memorandum.

NewEnergy objects to the admissibility of testimony by Powerweb's expert, Dr. Peter

Fox-Penner.   In support of its challenge, NewEnergy relies upon its Motion *in Limine* to exclude

Dr. Fox-Penner's testimony, filed contemporaneously with this Pretrial Memorandum.

In addition, NewEnergy objects to any expert opinion testimony by Mr. Budike and Mr. Bakey. Powerweb did not identify them as experts nor did Powerweb provide NewEnergy with expert reports in accordance with the Federal Rules and the Court's Scheduling Order. In support of its objection, NewEnergy relies upon its Motion *in Limine* to preclude expert and/or opinion testimony by Mr. Budike and Mr. Bakey, filed contemporaneously with this Pretrial Memorandum.

### C. MOTIONS *IN LIMINE*.

NewEnergy has filed four motions *in limine* with the Court contemporaneously with this Pretrial Memorandum. The motions seek the following relief:

1. Exclusion of any testimony by Powerweb's damages expert, Constantinos Pappas, or, in the alternative, a *Daubert* hearing on the admissibility of such testimony under Federal Rule of Evidence 702.

2. Exclusion of any testimony by Powerweb's damages expert, Peter Fox-Penner, or, in the alternative, a *Daubert* hearing on the admissibility of such testimony under Federal Rule of Evidence 702.

3. Exclusion of any expert and/or opinion testimony by Lothar Budike, Jr. and Andrew Bakey.

4. Exclusion of any evidence on consequential damages and speculative damages.

**D.    OTHER ISSUES.**

NewEnergy respectfully requests a *Daubert* hearing on the proffered expert testimony of

Constantinos Pappas and Dr. Peter Fox-Penner.

Respectfully submitted,

_____ s/DL422 _____
David E. Landau, I.D. #43341
Matthew A. White, I.D. #55812
Zachary C. Glaser, I.D. #85979
Jennifer C. O'Neill, I.D. #89755

Wolf, Block, Schorr and Solis-Cohen
LLP
1650 Arch Street,  22nd floor
Philadelphia, PA 19103-2097
(215) 977-2000

Dated:  July 26, 2004

## CERTIFICATE OF SERVICE

I certify that on July 26, 2004, I caused a true and correct copy of Constellation NewEnergy, Inc.'s Pretrial Memorandum With Respect to Powerweb's Counterclaims to be served electronically upon:

> Kara Goodchild, Esquire
> SAUL EWING LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA  19102-2186

The document is available for viewing and downloading from the ECF system.

s/JO416
Jennifer C. O'Neill