**EXPERT REPORT OF**
**RAYMOND F. DOVELL, CPA**

re:

**CONSTELLATION NEWENERGY, INC.**
v.
**POWERWEB TECHNOLOGIES, INC., et al.**

Prepared by: _Raymond Dovell_

Raymond F. Dovell, CPA
Nihill & Riedley, P.C.
The Public Ledger Building, Suite 800
150 Independence Mall West
Philadelphia, PA 19106
May 3, 2004



nihill & riedley
A Professional Corporation

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

COMPENSATION ................................................................ 1

QUALIFICATIONS ............................................................... 2

PROFESSIONAL STANDARDS ............................................ 2

    Rule 101, Independence ................................................ 2

    Rule 102, Integrity and Objectivity ............................. 3

    Rule 201, General Standards ........................................ 4

    Errors and Deficiencies in Mr. Pappas' Report ........... 5

    Gross Profit Margin ...................................................... 6

    Revenue Based on BGE Contract ................................ 8

    Powerweb's Costs Are The Same ................................ 8

    Penetration Rates for Energy Management Customers ... 9

    Monthly Revenues ........................................................ 9

    BGE Actual Results ...................................................... 10

    Verizon ......................................................................... 11

    Lost Contracts .............................................................. 11

    Time Value of Money .................................................. 12

CONCLUSION .................................................................... 12

EXHIBIT LIST



## INTRODUCTION

I have been engaged by Wolf, Block, Schorr and Solis-Cohen, LLP to review a report of lost profits prepared by Constantinos Gus Pappas, CPA ("Mr. Pappas"). Mr. Pappas states that his firm serves as Powerweb's independent Certified Public Accountants and was asked to take on this engagement at the request of Powerweb's Management. At the close of his report, Mr. Pappas provides his opinion on the amount of lost profits and states the lost profits *"present fairly, in all material respects, and with reasonable certainty the financial loss to Powerweb Technologies, Inc. as a result of the actions undertaken by Constellation NewEnergy, Inc."*

A CPA providing litigation services must comply with the applicable standards of the accounting profession contained in the American Institute of Certified Public Accountants Code of Professional Conduct ("AICPA Code of Conduct").[1] Mr. Pappas represents that he is a member of the AICPA. For the practice of litigation services, the applicable standards include: Rule 102, Integrity and Objectivity, and Rule 201, General Standards. I was asked to determine whether Mr. Pappas complied with the applicable professional standards.[2] In order to determine compliance with the General Standards, I reviewed Mr. Pappas' damage methodology and the documents listed in **Exhibit 1** of this report.

## COMPENSATION

Nihill & Riedley, P.C. is being compensated for my services at an hourly rate of $260.

---

[1] See Consulting Services Special Report 03-1, paragraph 7.
[2] See Consulting Services Special Report 03-1, paragraph 8.



File No. 24058
Page 2

## QUALIFICATIONS

Nihill & Riedley, P.C. is an accounting firm located in Philadelphia, P.A. I have been with the firm since 1987 and a shareholder of the firm since 1992. Prior to this, I was an Auditor and then a Special Agent for the U.S. Department of Labor. My responsibilities were to assist prosecutors during the investigation, indictment and sentencing of cases involving financial crimes. I also provided testimony at grand jury proceedings. For the past 16 years, I have been engaged as either a consulting or testifying expert in a wide range of cases involving commercial damages, fraud and environmental damages. My commercial litigation experience includes contract disputes, lost profits analysis, shareholder actions, purchase disputes, securities fraud and professional liability. I have also provided expert testimony in state and federal courts, arbitrations and grand jury proceedings. I have been a certified public accountant since 1987 and a certified fraud examiner since 1994. I am also a member of several professional accounting associations. My resume containing my qualifications and testimony by deposition and trial is attached as **Exhibit 2** to the report.

## PROFESSIONAL STANDARDS

### Rule 101, Independence

The AICPA Code of Conduct, Rule 101 states as follows: *"A member in public practice shall be independent in the performance of professional services as required by standards promulgated by bodies designated by Council."* [3]

---

[3] Council is the governing body of the AICPA.



nihill & riedley
A Professional Corporation

File No. 24058
Page 3

When performing litigation services, independence is generally not required. CPAs who lack independence can discuss the issue with the attorney and/or client as part of the engagement process. In his report, Mr. Pappas began by stating that his firm serves as Powerweb's independent Certified Public Accountants. However, Mr. Pappas is not independent in relation to Powerweb because he also serves as Powerweb's acting Chief Financial Officer ("CFO") (**Exhibit 3**). Indeed, Mr. Pappas, as acting CFO, is in a management position, making decisions on how to run the business. Mr. Pappas' report fails to disclose his management position with Powerweb and his reference to being independent is inaccurate.

## Rule 102, Integrity and Objectivity

The AICPA Code of Conduct, Rule 102 states as follows: *"In the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others."*

Powerweb represents to the public that Mr. Pappas has been its acting CFO since January 2003. As part of Powerweb's management, Mr. Pappas is not free of conflicts of interest. Further, he failed to disclose the entire extent of his relationship with Powerweb in his report. Mr. Pappas' objectivity is also questionable since it appears he simply adopted Powerweb's allegations without testing the reasonableness of Powerweb's assumptions. Since he is part of Powerweb's management, Mr. Pappas lacks objectivity. He also fails to perform any critical analysis of key assumptions. Therefore, Mr. Pappas did not comply with Rule 102 of the AICPA Code of Conduct.



nihill & riedley
A Professional Corporation

File No. 24058
Page 4

## Rule 201, General Standards

The AICPA Code of Conduct, Rule 201 states as follows: *"A member shall comply with the following standards and with any interpretations thereof by bodies designated by Council."*

A.   *"Professional Competence. Undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence."*

B.   *"Due Professional Care. Exercise due professional care in the performance of professional services."*

C.   *"Planning and Supervision. Adequately plan and supervise the performance of professional services."*

D.   *"Sufficient Relevant Data. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed."*

The General Standards apply to all services rendered by CPAs including litigation services.[4] Mr. Pappas' professional competence will be determined by the court and his compliance with the planning and supervision standard needs to be scrutinized through additional records (timesheets and billing records) and by testimony. However, based on my analysis of his report, Mr. Pappas failed to comply with the due professional care and sufficient relevant data standards.

Due professional care requires diligence and critical analysis of all work performed.[5] It appears that Mr. Pappas performed no critical analysis of his work. Rather, he accepted Powerweb's assumptions without performing any work to determine their reasonableness. This approach produces a gross profit margin of over 87%.

---

[4] See Consulting Services Special Report 03-1, paragraph 14.
[5] See Consulting Services Special Report 03-1, paragraph 18.

File No. 24058
Page 5

CPA's need to base conclusions and judgments on sufficient relevant data.[6] Tab H to Mr. Pappas' report shows his lack of compliance with this standard. Mr. Pappas reviewed only the following documents: four Powerweb contracts, the Bell Atlantic proposal and the EIM Market Study. In addition, he apparently used as references, Lothar Budike, the President of Powerweb and the Brattle Group for certain information. There is no reference at all to Powerweb's financial statements, tax returns, general ledgers or other accounting records of the company which are usually the documents CPAs rely upon when analyzing lost profits. Further, there is no reference to the historical performance of the company or its financial resources to support this projected growth of revenues. In my opinion, Mr. Pappas lacks the required objectivity and integrity and he failed to perform the necessary work to render the opinion he has in this case. Based on the documents available to date, I identified many errors and deficiencies in Mr. Pappas' report that demonstrate his non-compliance with the professional standards.[7]

**Errors and Deficiencies in Mr. Pappas' Report**

Mr. Pappas seems to perform a simple calculation by subtracting expenses from revenues to arrive at a gross profit margin which he claims represents Powerweb's lost profits. However, Mr. Pappas' calculations rely on many assumptions and the accuracy of his lost profits number depends on the reasonableness of these assumptions. Mr. Pappas apparently has done nothing to test the reasonableness of Powerweb's assumptions. Such tests would include analysis of accounting records, independent research and review of documents produced in discovery and transcripts of depositions. Documentary evidence is a critical element of all litigation services, including those involving lost profits. The primary source of documentary evidence is the plaintiff's business records.[8] The following errors and deficiencies in Mr. Pappas' report highlight the inaccuracy and unreliability of his conclusions.

---

[6] See Consulting Services Special Report 03-1, paragraph 24.
[7] Michael Rosenzweig of NERA and Daniel Violette, Phd. of Summit Blue Consulting will also be filing expert reports which identify errors and deficiencies in Mr. Pappas' report.
[8] Guide to Litigation Support Services, Volume 1, Section 303.7, Practitioners Publishing Company.





nihill & riedley
A Professional Corporation

File No. 24058
Page 6

## Gross Profit Margin

Mr. Pappas' lost profits are stated as gross profit margins (revenues less cost of goods sold) because he presumes Powerweb's general and administrative costs would not change with this additional revenue. On its face, Mr. Pappas' calculations appear overly optimistic and impossible to achieve. His calculations add $87,876,350 of revenues for Powerweb, most being added over a 3 year period, and only $11,114,841 of costs for an overall gross profit margin of over 87%. Mr. Pappas' conclusion is not supported by any analyses or documents. The following are several issues relating to his gross profit margin assumption.

- Mr. Pappas fails to disclose Powerweb's historical gross profit margins and operating income percentages. In performing a lost profits calculation, a CPA should analyze each expense item of the company and assess whether the expense is fixed or variable.[9] Fixed costs generally remain the same regardless of revenue while variable costs vary with the company's revenue. However, most so-called fixed costs will increase when capacity increases sufficiently. When existing capacity will not support the projected revenues, estimated costs should include additional costs to expand capacity.[10] All variable expenses, as well as fixed expenses for additional capacity should be identified and deducted from the estimated revenues. Mr. Pappas performed no analysis of Powerweb's historical cost structure, and no analysis of the future costs required to support the significant increase in estimated revenues. For example, his approach does not take into account the layers of support that would be required for this projected revenue. He fails to add any expenses for sales and marketing, accounting, and software development.

- Mr. Pappas failed to analyze the four available contracts to identify the services that were required from Powerweb and estimate the costs for these services. Powerweb was responsible for the following: providing host servers; software development; IT infrastructure; labor to design, implement and launch the system; maintenance of the system;

---

[9] Guide to Litigation Support Services, Volume 1, Section 303.44, Practitioners Publishing Company.
[10] Litigation Services Handbook, The Role of the Accountant as Expert, Second Edition, Chapter 30.8.



nihill & riedley
A Professional Corporation

File No. 24058
Page 7

providing new releases of the system; and system support services. During the pilot program with Baltimore Gas and Electric Company ("BGE"), Powerweb was also responsible for design and execution of a marketing campaign. Mr. Pappas performed no analysis of the actual costs incurred by Powerweb for the four available contracts and for the pilot study for BGE.

- Mr. Pappas also failed to independently test his gross profit calculations to known competitors of Powerweb. The table below compares Mr. Pappas' profitability estimates with one of the company's competitors. Even though the competitor's revenues for this period were less than $10 million annually, the competitor experienced operating losses ranging from $7.2 million in 1999 to $28.2 million in 2000 due to substantial operating expenses. For example, this competitor increased its employee count from 67 at January 2000 to 201 employees in March 2001. This competitor invested heavily in their sales force resulting in their sales and marketing expenses increasing from $2.6 million to $16.5 million. In his calculations, Mr. Pappas excludes all of Powerweb's operating expenses. This is another indication that Mr. Pappas' calculations fail to consider all of Powerweb's costs.

| | Mr. Pappas | Silicon Energy [11] | | |
|---|---|---|---|---|
| | | **1999** | **2000** | **3 Months Ended 3/31/01** |
| Gross Profit Margin | 87% | 48% | 68% | 59% |
| Operating Expenses: | | | | |
|    Sales & Marketing | - | $2,600,000 | $16,520,000 | $4,577,000 |
|    Research & Development | - | 4,103,000 | 10,124,000 | 3,375,000 |
|    General & Administrative | - | 767,000 | 5,675,000 | 1,184,000 |
| *Total Operating Expenses* | - | *7,196,000* | *28,171,000* | *9,136,000* |
| **Operating Income <Loss>** | - | **<$7,200,000>** | **<$28,200,000>** | **<$6,600,000>** |

---

[11] Silicon Energy is a provider of energy management software solutions. It was acquired by Itron, Inc. in March 2003. Silicon Energy's total revenue was $520,000 for 1999, $6,148,000 for 2000, and $4,314,000 for the 3 months ended 3/31/01.



nihill & riedley
A Professional Corporation

## Revenue Based on BGE Contract

Mr. Pappas assumes that Powerweb's pricing for NewEnergy customers and the alleged 13 lost contracts would have been the same as the pricing for its contract with BGE. Mr. Pappas' assumption conflicts with the four contracts that Powerweb produced in discovery. During 2002, Powerweb entered contracts with BGE, Pepco Energy Services ("PES"), Potomac Electric Power Company ("Potomac"), and Long Island Lighting Company *dba* LIPA ("LIPA"). All four contracts contain different pricing and Mr. Pappas selected the BGE contract which provided for the highest revenue amounts for both the Server and Development Fee and the Annual License Fee, reflecting a bias in his calculations. The table below summarizes the pricing in the four contracts.

| POWERWEB CONTRACTS | | | | |
|---|---|---|---|---|
| **FEES** | **BGE** | **PES** | **POTOMAC** | **LIPA** |
| **Server and Development** | $240,000 * | $125,000 | $95,000 | $215,000 |
| **Annual License** | | | | |
| Year 1 | $175,000 | $    0 | $   0 | $25,000 |
| Year 2 | $175,000 | $ 75,000 | $25,000 | $25,000 |
| Year 3 | $175,000 | $ 75,000 | $25,000 | $25,000 |
| * The agreement for the pilot study with BGE contained Server and Development fees totaling $170,000. It is not clear from Mr. Pappas' report where he derived the $240,000 fee. | | | | |

## Powerweb's Costs Are The Same

Mr. Pappas assumes that Powerweb's costs for NewEnergy customers and for the alleged 13 lost contracts would be the same costs that Powerweb incurred with its current contracts. Again, Mr. Pappas performed no analysis of costs incurred on Powerweb's current contacts. Indeed, no accounting records were included on Mr. Pappas' list of reference materials (see Tab H of his report). Further, Mr. Pappas' assumption implies that all customer contracts would contain the same terms and require the same level of services from Powerweb. As shown in the above table, Powerweb's contacts did not contain the same terms.



nihill & riedley
A Professional Corporation

File No. 24058
Page 9

**Penetration Rates for Energy Management Customers**

Mr. Pappas assumes a penetration rate of 50% of the top power consumers (approximately 1000 customers in each ISO) that would purchase this product. He claims to consider the EIM Study and current penetration rates of current contracts as factors supporting his assumption. The EIM Study was prepared for BGE and contained the following qualifications: *"Demand for [the product] is highly contingent on BGE's ability to demonstrate savings and price the service below those savings"*, and *"The reported demand and revenue figures are tentative."* It appears that Mr. Pappas relies solely on this study because his report contains no analysis of the current penetration rates for current contracts. In fact, when estimating the energy management revenues for year 2 and 3 of the BGE contract, Mr. Pappas also relies on the same study. He fails to consider the actual penetration rate for BGE for energy management customers during the first year of the contract. This data should have been available to Mr. Pappas and he should be relying on actual data rather than estimates from the EIM Study.

**Monthly Revenues**

Mr. Pappas attempts to use the BGE contact to estimate monthly fee revenue, but he misinterpreted the contract provisions. Mr. Pappas states *"The monthly hosting fee per meter was $150."* However, Section 5.1.(c) of the BGE contract provides for a monthly hosting and server maintenance fee of $75 per subscribing customer. Since Mr. Pappas' meter count is significantly higher than his customer count, this error inflates his revenue estimates. For example, Mr. Pappas assumes that the number of NewEnergy customers in year 10 would be 176 with 628 meters. By applying the monthly fee to the meter count, Mr. Pappas' assumption inflates the estimated revenue by 261% in year 10. It is not clear from his report what additional components he has added to increase his monthly fee from $75 per customer to $150.



nihill & riedley
A Professional Corporation

File No. 24058
Page 10

## BGE Actual Results

Mr. Pappas makes a number of assumptions rather than relying on the actual results experienced by Powerweb in the BGE pilot study and in the first year of the BGE contact. Specifically, Mr. Pappas failed to consider the following information.

- The BGE pilot program lasted for about 17 months and at the time of contract execution in March 2002, Powerweb still had "problems" that had to be corrected.[12] Powerweb should have records showing the costs that it incurred over this 17 month period. However, Mr. Pappas performed no analysis of these records. Rather, he assigned a one-time cost to Powerweb of $20,000. Further, he failed to analyze the actual costs incurred in the first year of the contract. Instead, he assumed that program maintenance takes only two hours per month at a total cost of $200.

- For load management customers, Mr. Pappas assumes that Powerweb had 19 customers under contract or in the process of signing on when Powerweb was terminated and that Powerweb could perform this sales rate every six months. However, Mr. Pappas failed to consider documents produced by BGE. Indeed, a few days before the contract, BGE lowered its goal for 2002 for this product from 45 customers to 20 customers due to concerns raised by Harry Murphy and others (See BGE 05005). According to BGE, the actual number of customers was 15 with one customer requesting to exit the program (BGE 08756). Mr. Pappas' assumption is not supported by BGE's documents.

- For energy management customers, Mr. Pappas makes an assumption that there will be a 50% penetration rate based on the EIM Study and current penetration rates of current contracts. However, as stated earlier, Mr. Pappas fails to make any reference or perform any analysis of the actual penetration rate for the first year of the BGE contract.

- Mr. Pappas also uses his standard pricing assumptions for revenue estimates, but the BGE contract required the submission of invoices for the monthly fees. Mr. Pappas failed to perform any analysis of the actual billings to BGE under the contract.

---

[12] See BGE contract, Exhibit A for the problems that had to be corrected.



- Mr. Pappas also failed to consider the issues that BGE had with Powerweb's performance under the contract and the extent to which they increased Powerweb's costs. Further, due to the fees required in the BGE contract, BGE estimated that the Powerweb product would have a six year negative Net Present Value of $500,000 (BGE08774). In other words, BGE's present value of its expenditures on the Powerweb product would be $500,000 higher than the present value of its revenues derived from BGE's customers subscribing to the product. This is the same pricing structure that Mr. Pappas used in his revenue estimates for NewEnergy customers and the alleged 13 lost contracts. He failed to evaluate whether Powerweb could actually achieve these higher prices from other potential customers, and whether these customers could generate sufficient revenues from the product to cover Powerweb's fees.

## Verizon

Mr. Pappas assumes that the terms of a proposal submitted on April 24, 2000 to Bell Atlantic for New Jersey reflect the revenue that Powerweb would earn from Verizon's load management activity in New York during 2002. However, he offers no correlation between the alleged Verizon's load management activity in New York and the activity being discussed in the New Jersey proposal. Without knowing the nature of the load management activity at Verizon, Mr. Pappas has no reasonable basis to assume that the fees for this activity would be identical to fees in the April 24, 2000 proposal.

## Lost Contracts

Mr. Pappas states as follows: "As a result of the premature competition, Powerweb lost 13 contracts." He reaches this conclusion by relying solely on Powerweb's allegation. Mr. Pappas failed to perform any independent research of the industry, competitors and market conditions. Further, Mr. Pappas assumes that all 13 potential customers will execute an identical contract with pricing terms exactly the same as the BGE contract. Mr. Pappas fails to provide any reasonable basis for this assumption. Indeed, he performed no analysis of the 13 proposals and



the terms contained therein. These 13 proposals are not even included in his list of reference material. Further, he failed to establish that the 13 customers required all the services contracted for with BGE and that these 13 potential customers would pay the same prices as stated in the BGE contract. Finally, Powerweb's contracts with PES, Potomac and LIPA demonstrate that customers did not negotiate the same pricing terms with Powerweb.

### Time Value of Money

Mr. Pappas' opinion that his lost profits present the financial loss to Powerweb is inaccurate. The damage computation must adjust the lost profits to the date of the trial to account for the time value of money.[13] This adjustment is accomplished by determining a discount rate which is applied to projected lost profits. The discount rate has two components: 1) a risk-free rate of return for safe investments; and 2) a risk-adjusted rate to account for risks or uncertainties.[14] Mr. Pappas projects lost profits to the year 2009 without discounting these amounts to the present. This is another reason that Mr. Pappas' calculations are inaccurate.

### CONCLUSION

In my opinion, Mr. Pappas failed to comply with the professional standards of the AICPA. He states that he is independent and at the same time, Powerweb represents to the public that Mr. Pappas has been the acting CFO since January 2003. This conflict of interest, his failure to disclose this relationship in his report, and his lack of objectivity, demonstrates Mr. Pappas' failure to comply with Rule 102 of the AICPA Code of Conduct. Further, his failure to perform any critical analysis of his work and to obtain sufficient relevant data to support his conclusions demonstrates Mr. Pappas lack of compliance with Rule 201 of the AICPA Code of Conduct.

---

[13] Litigation Services Handbook, Chapter 30.10.
[14] Guide to Litigation Support Services, Volume 1, Sections 303.70 and 303.71.



nihill & riedley
A Professional Corporation

File No. 24058
Page 13

It is also my opinion that the wording of Mr. Pappas' opinion is misleading. Mr. Pappas' opinion implies that he performed analyses and tests to confirm the reasonableness of the underlying assumptions. As stated in my report, he failed to perform any critical analysis. In fact, his list of reference materials includes only a small number of documents and no reference at all to the accounting records of Powerweb. Mr. Pappas' report represents little more than a mathematical calculation by Powerweb that is not based in financial reality. His calculations are based almost entirely on Powerweb's allegations and assumptions. Mr. Pappas does not provide any independent, objective analysis of the reasonableness of these assumptions. His mathematical calculations do not require an expert opinion. Due to his non-compliance with professional standards, Mr. Pappas has no basis to offer an opinion on lost profits.[15]

RFD/ep

---

[15] See Consulting Services Special Report 03-1, Appendix E, depicting the "Testimony Pyramid" for a CPA expert (**Exhibit 4**).



nihill & riedley
A Professional Corporation

## LIST OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Documents Reviewed |
| 2 | Curriculum Vitae of Raymond F. Dovell, CPA |
| 3 | Powerweb's Website Tab on its Executive Team |
| 4 | Testimony Pyramid for a CPA Expert |



nihill & riedley
A Professional Corporation

<u>**Exhibit 1**</u>

<u>**DOCUMENTS REVIEWED**</u>

1. Mr. Pappas' Report dated 3/31/04

2. AICPA Code of Professional Conduct and Bylaws

3. Litigation Services and Applicable Professional Standards, Consulting
   Services Special Report 03-1

4. Litigation Services Handbook, The Role of the Accountant as Expert, Second Edition;
   R.Weil, M. Wagner and P. Frank

5. Guide to Litigation Support Services, Volume 1, Practitioners Publishing Company

6. Defendants' Amended Answer, Affirmative Defenses and Counterclaims
   To Plaintiff's Second Amended Complaint

7. Powerweb's website (www.2powerweb.com)

8. Bell Atlantic Proposal dated 4/24/00

9. License Agreement with BGE dated 11/4/00

10. License Agreement with BGE dated 3/31/02

11. License Agreement with Potomac dated 4/23/02

12. License Agreement with PES dated 3/15/02

13. License Agreement with LIPA dated 4/26/02

14. EIM Market Potential Study dated 10/5/01

15. BGE Documents

    ➢ Powerweb Exhibit 165 and 166
    ➢ Kiselewich Exhibit 5
    ➢ BGE 00417-418
    ➢ BGE 05005
    ➢ BGE 03692-93
    ➢ BGE 03668
    ➢ BGE 00399
    ➢ BGE 00386
    ➢ BGE 00383
    ➢ BGE 08774-77
    ➢ BGE 08709-13
    ➢ BGE 08714-20
    ➢ BGE 08756-68
    ➢ BGE 00328-29

16. Itron Inc.'s website (www.itron.com)

17. Silicon Energy's website (www.siliconenergy.com)

18. Silicon Energy's Registration Statement, Amended No. 1, Form S-1, filed on 7/18/01

# <u>RAYMOND F. DOVELL, C.P.A., C.F.E.</u>

## <u>EXPERIENCE:</u>

1992 – present     <u>**Principal**</u> - Nihill & Riedley, P.C.

1987 - 1991     <u>**Associate**</u>

The firm concentrates its practice in forensic accounting.

Forensic accounting engagements have focused on fraud, misapplication of funds, diversion of assets, theft of tax receipts, and questionable transactions. Insurance matters have included reinsurance arbitration, inventory analysis and business interruption claims. Commercial litigation cases involving investigation and damage analysis have included accounting malpractice, class action, bankruptcy, contract disputes, securities litigation, shareholder disputes and bank litigation. Engagements have also included providing expert testimony and grand jury testimony.

Environmental engagements have included investigations of past costs claims; analysis of government oversight claims; preparation and analysis of private party cost claims; insurance coverage disputes; volumetric allocations; cost allocations; contract disputes; PRP searches; and analysis of ability to pay issues. Engagements have also included providing expert testimony.

1985 - 1987     <u>**Special Agent**</u> - U.S. Department of Labor, Office of Labor Racketeering.

Planned, conducted and supervised financial investigations involving violations of various federal and state statutes. Major cases focused on financial crimes and required testimony at grand jury proceedings. Assisted attorney during the investigation, indictment and sentencing of criminal cases.

1983 - 1985     <u>**Auditor**</u> - U.S. Department of Labor, Office of Audit.

Planned, conducted and supervised a national audit of state Unemployment Insurance agencies. Briefed appointed state officials on audit findings to aid in the development of new state legislation. Assisted in the design and drafting of a national audit report summarizing audit findings developed in twelve states.

## <u>EDUCATION AND PROFESSIONAL AFFILIATIONS</u>

➢     B.S. - Accounting, LaSalle University

➢     Certified Public Accountant licensed in Pennsylvania



nihill & riedley
A Professional Corporation

**RAYMOND F. DOVELL, C.P.A., C.F.E.**
**Page 2**

➢    Certified Fraud Examiner, Association of Certified Fraud Examiners

➢    Member, American Institute of Certified Public Accountants

➢    Member, Pennsylvania Institute of Certified Public Accountants

➢    Fellow, New Jersey Society of Certified Public Accountants

## TESTIMONY AT TRIAL OR BY DEPOSITION

➢    American Cyanamid Company and Rohm and Haas Company v. 3M Corporation, et al
      (United States District Court for the District of Rhode Island) 2003

➢    United States of America v. E.I. du Pont de Nemours and Company, Inc.
      (United States District Court for the Western District of New York) 2003

➢    Medical Consultants Network, Inc. et al v. Patricia B. Maloney, et al
      (Court of Common Pleas, Delaware County) 2002

➢    Signature Combs, Inc. (f/k/a AMR Combs, Inc.) et al v. United States of America, et al
      (United States District Court for the Western District of Tennessee) 2002 and 2003

➢    Rohm and Haas Company v. American Cyanamid Company, et al
      (United States District Court for the District of New Jersey) 2002

➢    Six C's Corporation, et al v. Clement & Muller, Inc., et al
      (Court of Common Pleas, Delaware County) 2002

➢    Accucorp, Inc., et al v. Kalish, Inc.
      United States District Court for the Eastern District of Pennsylvania) 2002

➢    United States of America v. Rohm and Haas Company, et al v. John Cucinotta, et al
      (United States District Court for the District of New Jersey) 1998, 1999, and 2000

➢    Olin Corporation v. Fisons PLC, et al
      (United States District Court for the District of Massachusetts) 1999

➢    In re: Greenbrier Industries, Trustee v. United States of America
      (United States Bankruptcy Court – District of New Jersey) 1998

➢    Nancy S. duPont, et al v. Gruntal & Co., Inc., et al
      (Court of Common Pleas of Philadelphia County) 1998



nihill & riedley
A Professional Corporation

**RAYMOND F. DOVELL, C.P.A., C.F.E.**
**Page 3**

> Rohm and Haas Company v. Continental Casualty Company, et al
> (Court of Common Pleas of Philadelphia County) 1997

> General Electric v. Buzby Bros., et al
> (United States District Court for the District of New Jersey) 1997

> In the Matter of the Woodlands Alternative Dispute Resolution, 1996

> United States of America v. Atlas Minerals and Chemicals, Inc., et al
> (United States District Court for the Eastern District of Pennsylvania) 1994

> Olsen v. Brandolini, et al
> (United States District Court for the Eastern District of Pennsylvania) 1994

> County of Bucks, et al v. Cogan, et al
> (Court of Common Pleas of Bucks County) 1994

> Commonwealth of Pennsylvania v. Mary Cogan
> (Court of Common Pleas of Bucks County Criminal Division) 1992

> Arbitration Between Employers Reinsurance Corp., et al and Admiral Insurance Co.
> (United States District Court for the District of New Jersey) 1990

> Lott Group, Inc., et al v. Pennsylvania Manufacturers Association Insurance Co.
> (United States District Court for the Eastern District of Pennsylvania) 1989



nihill & riedley
A Professional Corporation



**POWERWEB**

HOME | ABOUT US | CONTACT | TECHNOLOGY | INTEGRATION PROCESS | BUSINESS ‹

POWERWEB OVERVIEW   MISSION STATEMENT   CORPORATE HISTORY   EXECUTIVE MA

## EXECUTIVE MANAGEMENT



**Lothar (Lou) Budike, Jr., President & Founder** - Lothar Budike, Jr. is Powerweb Technologies' founder and president. He is a leader in the energy information systems market with more than 10 years of systems design, engineering, and implementation experience in the power industry. He has been the owner and President of Powerweb Technologies or its predecessors, or Camtel, since 1991. Mr. Budike directly manages the Company's long range planning and engagement delivery operations. He was the leading force behind the design and development of the Omni-Link™ platform and holds three patents on it. Prior to founding the Company, Mr. Budike was an electrical engineer working for the Arco Chemical Company in Newton Square, Pennsylvania and Scott Paper Company in Philadelphia, Pennsylvania. Mr. Budike has also worked on the aircraft carrier USS Kittyhawk for the United States Department of Defense. Mr. Budike has a BS in Mechanical Engineering from Drexel University and holds a Computer Science, IT degree from the Wireless Institute of Philadelphia.

**Gus Pappas, CPA, Chief Financial Officer** - Gus Pappas joined Powerweb Technologies in January 2003 as acting Chief Financial Officer. Mr. Pappas has a BS in Accounting from Widener University. He was employed at Group Travel Unlimited as a Controller and was Staff Accountant for Kirifides & Co Public Accountants. He held the position of Manager for the Mid-Atlantic region of Howe & Co. Certified Public Accountants before starting his own accounting firm. Mr. Pappas is licensed in the state of Pennsylvania, is a certified CPA, and is a long-term member of the PA Institute of Certified CPAs as well as the American Institute of CPAs. Mr. Pappas has concentrated his expertise in technology-based companies, working with several Fortune 1000 companies, facilitating technology consulting, technology based tax work, accounting work, and technology related venture funding.

**James W. Shaw, Senior Vice President** - James Shaw is a senior executive experienced in providing investment banking, financial and operational advisory services to emerging growth companies in the communications and information



**Omni - Link**

ELECTRICAL UTILITY INDUS

LIGHTING INDUSTRY

BUILDING CONTROLS INDU

**Recent News >>**

- June 1st, 2003 - Powerweb Energy Services to Partner Jersey to Provide Energy In Services

- April 18, 2003 - Powerweb ‹ Island Power & Light (LIPA) Demand Response product Summer 2003

technology ("CIT") industries.   Mr. Shaw has developed, structured and placed financial products and managed a number of companies since the 1970's, including Municipal Leasing Corporation and Memorex Computer Corporation. He has obtained more than $2 billion in project financing for 50 enterprises since 1995 through ICap Corporation, and is also a member of the University of Baltimore's Information, Science and Research Council (ISRC), which represents over 100 high tech companies in the Baltimore region.

**Joe Bonner, Vice President of IT** - Joseph Bonner joined Powerweb Technologies in April 2000 as Vice President of Information Technologies. Mr. Bonner brings over 15 years of Management Information Systems (MIS) experience with specialized expertise in e-based scaleable solutions. Mr. Bonner has spent a large portion of his career as Director of MIS for Mercedes-Benz. Mr. Bonner is experienced in a wide variety of application integration software languages. He has a BS in Computer Science from Pennsylvania State University.

**Roger Adelman, Ph.D., Vice President of Engineering** - Dr. Adelman has a long and rich career that spans nearly forty years in academic and industrial experience as an individual contributor, an inventor, a teacher and a manager. Dr. Adelman earned a Masters Degree in Mechanical Engineering from the University of Illinois and an MBA and a Ph.D. in Mechanical Engineering from the University of Cincinnati. He has worked in the Materials and Process Technology Lab at GE, held the position of Vice President at CTL Dixie, then Director at Metcut Research and taught at the University of Cincinnati before founding his own Silicon Valley communications company, SyberSay Communications. He continues to design, build and market specialty instrumentation and serves as a consultant to Powerweb Technologies.

**Dave Wissel, Vice President of Wireless Solutions** - David Wissel has been involved with wireless, analog, digital and antenna design for over 20 years. His design skill set ranges from the high volume consumer products arena to commercial and military design areas. He has worked on products from the low Mhz region to over 10 Ghz and has successfully led teams of other engineers in product development. Mr. Wissel holds a BSEE degree (Communications Major) from the University of Cincinnati. R. W. (Bob) Blankley, Director of Operations - Bob Blankley's career has spanned 40 years with positions in Military Electronics, Materials Engineering, land based Combustion Turbines and Digital Controls. He is a graduate of Widener University (evening Division) with a B.S. in Engineering Science. Bob has been with Powerweb Technologies for three years and has managed and installed numerous RF utility meter monitoring and lighting installations.

© Copyright 2003 Powerweb, Inc. All rights reserved.

CONSULTING SERVICES
SPECIAL REPORT 03-1



# Litigation Services and Applicable Professional Standards

*Member Innovation Team*

LITIGATION SERVICES AND APPLICABLE PROFESSIONAL STANDARDS                    **19**

**APPENDIX E**

**TESTIMONY PYRAMID**

Consistent with AICPA professional standards, Rule 702 of the Federal Rules of Evidence requires that expert testimony be based upon sufficient facts or data, be the product of reliable principles and methods, and that the principles and methods be reliably applied to the facts of the case. Graphically presented, the testimony pyramid might be as follows:

