IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,  :
        Plaintiff,   :
              :
     v.       :    No. 02-CV-2733 (HB)
              :
POWERWEB, INC.,      :
        Defendant.  :

**O R D E R**

    AND NOW, this    day of      , 2004, it is hereby ORDERED

that Constellation NewEnergy, Inc.'s Motion in Limine to Exclude Speculative and Unforeseeable

Damages Relating to Energy Management Services is DENIED.

             BY THE COURT:

                            J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB, INC., | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW BY POWERWEB, INC. IN OPPOSITION
TO MOTION IN LIMINE BY CONSTELLATION NEWENERGY, INC.
TO EXCLUDE DAMAGES RELATING TO ENERGY MANAGEMENT SERVICES**

Powerweb, Inc. ("Powerweb") submits this memorandum in opposition to the motion in limine of Constellation NewEnergy, Inc. ("NewEnergy") to exclude Powerweb's claims for damages relating to energy management services. Powerweb's damages surrounding these services were foreseeable at the time the parties entered into their agreements and have been calculated by Constantinos Pappas, CPA to a reasonable certainty. For these reasons, NewEnergy's motion to exclude these damages should be denied.

**I.    BACKGROUND**

**A.    Relevant Facts**

In 1996, the electricity markets in various regions across the United States began to be deregulated, opening the door to competition and new methods of reducing energy costs. Because electricity cannot be stored, all generated power must be consumed instantaneously. This makes balancing supply and demand a constant challenge and causes electricity prices to be extremely volatile. During high demand periods, the wholesale price of electricity can fluctuate by as much as 1,000%. Powerweb designed a system that enables large commercial customers to

profit from this fluctuation by using their own emergency generators when prices are at their highest. Powerweb christened the system it created the "Omni-Link system."

NewEnergy agreed to enter into a series of joint ventures with Powerweb to license the Omni-Link system, first to Bell Atlantic Corporation ("Bell Atlantic Agreement"), and then to other customers ("Joint Venture Agreement"). Accordingly, Powerweb disclosed the details of its system to NewEnergy under a written agreement ("Confidentiality Agreement") that prohibited NewEnergy from unilaterally using or disclosing any of the information that Powerweb provided. NewEnergy then abandoned Powerweb, used the information to develop competing products and services of its own, and carelessly disclosed the information to others who also used it to become competitors of Powerweb. NewEnergy further interfered with Powerweb's existing customer contract with Baltimore Gas & Electric Co. ("BG&E"), precipitating the end of this relationship.

NewEnergy's wrongful conduct has resulted in serious economic injury to Powerweb by preventing Powerweb from reaping the full benefit of its development of the Omni-Link system and its contractual agreements to market and employ this system. As a result, Powerweb seeks to recover the present value of both the profits that Powerweb would have earned and the profits that NewEnergy has earned as a result of NewEnergy's breach of contract, unauthorized use and disclosure of Powerweb's confidential information, and interference with Powerweb's relationship with BG&E.

B.    **Energy Management Services**

Powerweb separates its lost profits calculations into lost load management profits and lost energy management profits.[1] "Load management" involves the curtailment of energy by customers over short periods of time in response to a price signal. This is achieved by the attachment of a device to the customer's electric meter that communicates with Powerweb's Omni-Link software, enabling the customer to know when to curtail.[2] Conversely, "energy management" refers to the ability of customers to save on power bills by tracking consumption via the internet with the help of the Omni-Link software.[3] Powerweb's Omni-Link system contained both of these capabilities at the time Powerweb entered into its contracts with NewEnergy.[4] The entire technology, including load management and energy management services, was protected by the Confidentiality Agreement.[5] Moreover, in addition to developing a specific initial product for Bell Atlantic, NewEnergy and Powerweb planned to market all of Powerweb's services to NewEnergy's customers nationwide.[6] NewEnergy's breach of its agreements through the improper use and disclosure of Powerweb's technology caused Powerweb to lose profits in both the load management and energy management aspects of its business, thereby entitling Powerweb to damages in each of these areas.

---

[1]    See Report of Constantinos Pappas, CPA, a copy of which is attached as Exhibit C to NewEnergy's brief. Mr. Pappas' supplemental report is attached to NewEnergy's brief as Exhibit D.

[2]    See Deposition of Constantinos Pappas, CPA, the relevant portions of which are attached hereto as Exhibit 1, at 175:11-18.

[3]    See Pappas Dep. at 186:22-187:6.

[4]    See, e.g., Powerweb plan summary, attached hereto as Exhibit 2, at 5.

[5]    See Confidentiality Agreement (Exhibit 3), which protects the entire Omni-Link system and under which NewEnergy agrees not to use "any 'Energy Technology' information for any purpose." Exh. 3 at 1.

[6]    See, e.g., Confidentiality Agreement at 1.

C.    **Eleven Lost Contracts**

NewEnergy's breach of the Confidentiality Agreement through the improper disclosure of Powerweb's Omni-Link technology created competition before it would have arisen naturally.[7] As a result, Powerweb lost out to competitors during the bid process for eleven contracts.[8] Had NewEnergy kept Powerweb's information confidential, these other companies would not have been able to effectively compete with Powerweb to win these contracts. At the time NewEnergy and Powerweb entered into their agreements, others in the industry were interested in developing products similar to Powerweb's but lacked the technology.[9] Therefore, it was foreseeable that disclosure of Powerweb's technology and know-how would result in attempts by other companies to use this information to develop competing products.

In calculating Powerweb's damages based on these lost contracts, Mr. Pappas, one of Powerweb's experts, discussed the terms, scope and costs to Powerweb of Powerweb's eleven contract proposals with Lothar Budike, Jr., Powerweb's President.[10] Mr. Pappas also analyzed the terms and pricing of signed Powerweb agreements of the time period and used these agreements as a comparison.[11] Mr. Pappas then calculated the incomes Powerweb would have received from setup fees, license fees, new meter fees and hosting fees as well as the expenses of these contracts.[12] As Powerweb already had the capabilities in place to handle these additional contracts under its current overhead at the time the agreements would have been entered into, the

---

[7]    See Pappas Initial Report at REP000143.

[8]    See Pappas Initial Report at REP000143; Pappas Dep. at 236:18-24.

[9]    See, e.g., Deposition of Lothar Budike, Jr., the relevant portions of which are attached hereto as Exhibit 4, at 497:2-498:5, 501:16-24.

[10]    See Pappas Dep. at 236:18-24.

[11]    See Pappas Dep. at 231:16-232:4; Pappas Supplemental Report at REP000189.

[12]    See Pappas Initial Report at REP000143; Pappas Supplemental Report at REP000189.

expense of administering these contracts would have been minimal.[13] Mr. Pappas subtracted expenses from income to calculate the gross profit margins that Powerweb would have received from these eleven lost contracts.[14]

## II.    ARGUMENT

Where one party to an agreement breaches that agreement, the non-breaching party is entitled to recover damages that place it in the position it would have been in had the contract been performed as promised. Robert Billet Promotions, Inc. v. IMI Cornelius, Inc., No. Civ. A. 95-1376, 1998 WL 721081, at *17 (E.D. Pa. Oct. 14, 1998). These damages include general damages, as well as consequential damages in the form of lost profits. See AM/PM Franchise Ass'n. v. Atlantic Richfield Co., 584 A.2d 915, 920 (Pa. 1990). In order to recover for consequential damages, a party need only prove that the breaching party had reason to know of the circumstances responsible for the damages and that the damages were reasonably foreseeable. Id. at 921; Robert Billet Promotions, 1998 WL 721081, at *17. Foreseeability is determined at the time the contract was entered into. Robert Billet Promotions, 1998 WL 721081, at *17.

In addition, where damages are difficult to establish, an injured party need only prove the damages with "reasonable certainty." Atacs Corp. v. Trans World Communications, Inc., 155 F.3d 659, 669 (3d Cir. 1998). This standard "embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor" but "does not preclude an award of damages because of 'some uncertainty as to the precise amount of damages incurred.'" Id. at 669-70. "Doubts are construed against the breaching party." Id. at 669.

---

[13]    See Pappas Initial Report at REP000143 (explaining that "We do not take into account any other costs such as general and administrative due to the fact that Powerweb had all these overhead expenses in place and that the increase in business would not have changed those numbers.").

[14]    See Pappas Initial Report at REP000143.

At the time Powerweb and NewEnergy entered into the Confidentiality Agreement, the Bell Atlantic Agreement and the Joint Marketing Agreement, it was reasonably foreseeable that breach of these agreements by NewEnergy would result in lost profits to Powerweb. As Powerweb's Omni-Link System encompassed both load management and energy management components, it was foreseeable that disclosure of Powerweb's entire technology would cause Powerweb to sustain damages in both the load management and energy management aspects of its business. It was additionally reasonably foreseeable that the increased competition engendered by NewEnergy's failure to keep Powerweb's technology confidential would damage Powerweb's ability to enter into contracts on the favorable terms it enjoyed prior to the disclosure. Far from being "wholly speculative," Powerweb's damages calculations regarding these lost contracts rely upon admissible evidence to estimate these damages to a reasonable certainty.

A.    **Powerweb's Damages Relating to Energy Management Services Were Foreseeable.**

Powerweb's lost profit damages related to its energy management services were foreseeable at the time the parties entered into the Confidentiality Agreement, the Bell Atlantic Agreement and the Joint Marketing Agreement. The record does not support NewEnergy's contention that Powerweb's marketing of energy management services as part of its Omni-Link System was not foreseeable at the time of contracting. In fact, energy management services were part of the Omni-Link system when the parties entered into their agreements. This is evidenced by a January 2000 NewEnergy document summarizing the "deal" between Powerweb and NewEnergy, which explains Powerweb's Omni-Link technology thusly:

> Powerweb Technologies has designed an interactive energy information system that is custom designed for the telecommunication industry and enables Bell

Atlantic to achieve operational efficiency within their existing facilities. This new energy information system is called Omni-Link.

Initially Omni-Link was designed for building automation systems and, *later, expanded* into translations for fire alarms, security alarms, and pressurized gas systems. *New Jersey Bell (Bell Atlantic) utilized this integrated software from Powerweb Technologies to monitor all Central Offices.*[15]

As shown by this description, Powerweb had already used its Omni-Link technology to allow internet monitoring at the time Powerweb contracted with NewEnergy. Such energy management services *are* a part of the Omni-Link System, and *were* a part of this system at the time of the parties' agreements.

Furthermore, the parties' deal was not limited to pitching a specific product to Bell Atlantic. Instead, the record shows that the parties contemplated cross-marketing Powerweb's technology to other NewEnergy regions and customers at the time they entered into their agreements. For example, the same Powerweb Deal Summary quoted above explains on the opening page:

It is worth noting that a critical element to Powerweb is an arrangement with NewEnergy to promote their OmniLink technology nationwide. The first step in this deal with Bell Atlantic is to trade PJM capacity credits and to shape loads to market prices. Once this deal is closed we intend to look for other uses of their technology among our customers and to promote it to other regions of NewEnergy.[16]

The Deal Summary further explains the "Powerweb Deal" as: "A marketing alliance with Powerweb, initially focusing on telephone companies, to promote their OmniLink remote control *and monitoring technology* for improved reliability, energy cost reduction and on site generation."[17] David McGeown, NewEnergy's representative, further expressed NewEnergy's desire to cross-market Powerweb's Omni-Link technology by email to Lothar Budike, Jr.,

---

[15]    Powerweb plan summary at 5 (emphasis added).

[16]    Powerweb plan summary at 1.

[17]    Powerweb plan summary at 1 (emphasis added).

Powerweb's President.[18] This evidence shows NewEnergy certainly had "reason to know," at the time of contracting, that breach of its agreements would result in a loss of energy management services profits to Powerweb. Furthermore, because the parties' deal involved marketing Powerweb's Omni-Link technology, which included energy management services, to NewEnergy's customers, it is reasonable to expect that NewEnergy's breach of its agreements would engender the aforementioned damages. Powerweb's lost profits from the loss of opportunity to market its energy management services to NewEnergy's customers were therefore foreseeable at the time of contracting.

Powerweb's lost profits arising from lost contracting opportunities with eleven other companies to whom Powerweb would have provided its services but for NewEnergy's breach of its nondisclosure obligations were also foreseeable at the time the parties entered into the Confidentiality Agreement. When the parties signed this agreement, other companies, a notable example of which is Silicon Energy, were seeking to develop products similar to Powerweb's Omni-Link System.[19] Powerweb had NewEnergy sign the Confidentiality Agreement in order to protect its confidential information from disclosure to the marketplace. It was certainly foreseeable, and NewEnergy had reason to know, at the time the parties signed this agreement, that disclosure of Powerweb's confidential information by NewEnergy would result in other companies attempting to use Powerweb's information to develop their own, competing products. In fact, this is what occurred.

---

[18]     See 2/27/00 email from David McGeown to Lothar Budike, Jr., attached hereto as Exhibit 5, at 1.

[19]     See Budike, Jr. Dep. at 497:2-498:5, 501:16-24.

**B.    Powerweb's Damages Relating to the Eleven Lost Contracts Can Be Proven With Reasonable Certainty Based on Admissible Evidence.**

In addition to being foreseeable, Powerweb's lost profits related to its eleven lost contracts have been calculated to a reasonable certainty. Far from being "wholly speculative and unsubstantiated," these damages can be proven by admissible evidence.

Mr. Pappas performed Powerweb's damages calculations for lost profits based on the eleven lost contracts. NewEnergy challenges three aspects of Mr. Pappas' calculations: (1) his assumption that Powerweb's ability to cross-sell its energy management services to these eleven potential customers would have been identical to its ability to market to its two existing customers; (2) his assumption that Powerweb would have been paid more by these customers than by the utilities it currently services; and (3) his assumption that Powerweb would have no additional costs associated with servicing these additional customers.[20] To the extent NewEnergy's challenges are based on the inferences underlying Mr. Pappas' damages calculations regarding these lost contracts rather than on the calculations themselves, this argument is simply another spin on NewEnergy's motion to exclude the expert testimony and reports of Mr. Pappas. This "second bite of the apple" was rejected by the Eastern District of Pennsylvania in Robert Billet Promotions, 1998 WL 721081, at *17 (discarding defendant's challenge to inferences underlying calculations of consequential damages by plaintiff's expert, where the court had already held a Daubert hearing and determined that the expert had a reasonable basis for his opinion).

Even if the court views these challenges as critiques of Mr. Pappas' calculations rather than their underlying assumptions, NewEnergy's arguments are all easily answered. In performing his calculations regarding the eleven lost contracts, Mr. Pappas relied upon the

---

[20]    NE Mot. to Exclude at 8.

testimony of Powerweb's President regarding the services that would have been sold and the contract terms and costs.[21] Mr. Pappas also relied upon the actual terms of two other Powerweb utility contracts, which it successfully sold at the time of contracting.[22] The pricing of the lost contracts is higher than what Powerweb recently received because Powerweb's contention is that, without NewEnergy's breach, Powerweb would have enjoyed less competition and the consequent ability to demand a higher price for its product than it does today. Therefore, Powerweb's agreements as they existed previously are more accurate comparisons of the contract terms Powerweb would have enjoyed without a breach than is the revenue Powerweb received from a single contract in 2004. Examination of these prior contract terms, coupled with the testimony of Powerweb's President regarding the services he would have sold, costs incurred and the contract terms he pitched to the eleven lost customers is enough to show Powerweb's lost profit damages for these eleven contracts to a reasonable certainty.

NewEnergy further contends that "[t]he only possible evidence which Powerweb could offer to prove these claims would rely entirely on inadmissible hearsay."[23] This is simply not the case. Ample evidence will be presented to prove that NewEnergy leaked Powerweb's confidential information to RETX and Silicon Energy. As explained above, Lothar Budike, Jr., Powerweb's President and the creator of the proposals to the eleven companies, can and will testify to his own experience in the marketplace and to the substance and terms of his proposals. He will also testify that each of the lost contracts was awarded to either RETX or Silicon Energy and that neither one could have performed the contracted services without access to Powerweb's confidential information. This testimony is not hearsay. Additionally, the contracts Powerweb

---

[21]    See Pappas Dep. at 236:18-24.

[22]    See Pappas Dep. at 231:16-232:4.

[23]    NE Mot. to Exclude at 9.

actually executed constitute further admissible evidence of the types of deals Powerweb was able to enter into during this time period.

**III.    CONCLUSION**

For the foregoing reasons, NewEnergy's motion to exclude Powerweb's damages claims that relate to energy management services should be denied in its entirety.

Respectfully submitted,


RG574


Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.

Date:   August 6, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,   :
                  Plaintiff,   :
                         :
          v.              :         No. 02-CV-2733 (HB)
                         :
POWERWEB, INC.,             :
                  Defendant.   :

## CERTIFICATE OF SERVICE

       I hereby certify that true and correct copies of the foregoing proposed Order and

memorandum were filed electronically today and are available for viewing and downloading

from the ECF system. They were served upon counsel for Constellation NewEnergy, Inc. by

notice of electronic filing, addressed to:

           David E. Landau, Esquire
           Wolf, Block, Schorr and Solis-Cohen, LLP
           1650 Arch St., 22nd Floor
           Philadelphia, PA 19102
           dlandau@wolfblock.com

                            _____RG574_____
                            Rudolph Garcia, Esquire

Date:  August 6, 2004