IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB, INC., | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW BY POWERWEB, INC. REGARDING
CONTRACT INTERPRETATION AND THE PAROL EVIDENCE RULE**

**I.      INTRODUCTION**

Powerweb, Inc. ("Powerweb") submits this memorandum regarding the parol evidence rule and its application to this case in accordance with the Court's request.

There are a series of agreements between Powerweb and Constellation NewEnergy, Inc. ("NewEnergy") at the center of both NewEnergy's claims and Powerweb's claims. The key portions of these agreements that the parties dispute are the following: (1) the interpretation of Energy Technology Information in the Confidentiality Agreement; (2) NewEnergy's obligation not to use the Energy Technology Information; (3) whether the Bell Atlantic Agreement imposes a duty on Powerweb to refund the $100,000 paid to Powerweb by NewEnergy; and (4) whether any other duties of Powerweb were presently due and owing at the time the Bell Atlantic Agreement expired by its terms. Each of these provisions may be interpreted according to the plain language of the agreements. Therefore, these issues may be decided by the Court.

**II.     FACTUAL BACKGROUND**

In 1996, the electricity markets in various regions across the United States began to be deregulated, opening the door to competition and new methods for reducing energy costs.

Because electricity cannot be stored, all generated power must be consumed instantaneously. That makes balancing supply and demand a constant challenge and causes electricity prices to be extremely volatile. During high demand periods, the wholesale price of electricity can fluctuate by as much as 1,000%. Powerweb designed a system that enables large commercial customers to profit from that fluctuation by using their own emergency generators when prices are at their highest ("Omni-Link system").

### A. Confidentiality Agreement

In 1999 and 2000, NewEnergy agreed to enter into a series of joint ventures with Powerweb to license the Omni-Link system, first to Bell Atlantic Corporation ("Bell Atlantic"),[1] and then to other customers. Following extensive discussions regarding the need for and importance of protecting Powerweb's confidential information, the parties entered into the Confidentiality Agreement on October 11, 1999.[2] The Confidentiality Agreement prohibited NewEnergy from disclosing or using any of the described "Energy Technology Information" without Powerweb's consent for a period of ten years.[3] It provided that the duty of non-disclosure did not apply to any information that was already in the public domain or common knowledge, but included no such exemption for NewEnergy's own *use* of Energy Technology Information.[4]

As used in the Confidentiality Agreement, "Energy Technology" generally describes the Omni-Link system and its core elements: (a) hardware, (b) software, and (c) the

---

[1] Bell Atlantic is now know as Verizon. However, for convenience and clarity, it will be referred to in this memorandum as Bell Atlantic even after it changed its name to Verizon.

[2] Confidentiality Agreement, attached hereto as Exhibit A.

[3] Id.

[4] Id.

underlying contract mechanisms and business strategies.[5] The descriptions of those elements were general categories into which the information shared by Powerweb fell, not detailed lists of what was protected. The term Energy Technology Information encompassed the individual components, the system as a whole, the manner in which the pieces fit together and all of the confidential "information" about the system that Powerweb shared with NewEnergy.

In breach of the Confidentiality Agreement, NewEnergy used Powerweb's Energy Technology Information to develop competing products and services of its own and carelessly disclosed important aspects of the information to others who then used it to also become competitors of Powerweb. NewEnergy contends that the Energy Technology Information protected by the Confidentiality Agreement involves only the information provided to NewEnergy for purposes of conducting due diligence prior to the execution of the Bell Atlantic Agreement. NewEnergy also claims that its obligations not to use or disclose Powerweb's Energy Technology Information evaporated once any of it entered the public domain. Powerweb disputes both of those purported restrictions, because neither is contained within the Confidentiality Agreement. The parties also disagree on the definition of the term "use" in the Confidentiality Agreement. NewEnergy seeks to depart from the plain English meaning of this term despite the absence of any language in the agreement to support this contention.

B.  **Bell Atlantic Agreement**

On January 7, 2000, Powerweb and NewEnergy entered into a written contract to work together regarding a proposed installation of Powerweb's Omni-Link system at certain Bell Atlantic facilities in New Jersey ("Bell Atlantic Agreement").[6] The Confidentiality Agreement

---

[5]   <u>Id</u>. A more detailed description of these three components may be found in Powerweb's Memorandum of Law in Response to NewEnergy's Motion for Summary Judgment at 5-7.

[6]   Bell Atlantic Agreement, attached hereto as Exhibit B.

was incorporated into this agreement.[7] Under the Bell Atlantic Agreement, NewEnergy paid $100,000 to Powerweb for project development costs. Powerweb incurred engineering expenses in excess of that amount.[8] Thereafter, due to unforeseen environmental permitting issues, Bell Atlantic decided not to proceed with the project in New Jersey.[9] The Bell Atlantic Agreement then expired without any other projects being jointly undertaken.[10]

NewEnergy seeks to recover the entire $100,000 payment it made to Powerweb by contending that it did not authorize Powerweb's expenditures. Powerweb denies that contention and will present testimony that the entire amount was authorized. In any event, the Bell Atlantic Agreement did not require Powerweb to return any of the funds under any circumstances—NewEnergy's sole source of repayment was from profits that never materialized.[11] NewEnergy has *admitted* that Powerweb did not agree to return any of the $100,000 payment.[12] Indeed, NewEnergy had sought to include an obligation to return any unused funds, but Powerweb refused and the Contract was signed without such a requirement.[13] Thus, it makes no difference whether NewEnergy authorized the expenditures or not. Either way,

---

[7] Bell Atlantic Agreement at 2.

[8] See Deposition of Lothar Budike Jr., Exhibit C, at 560:4 – 561:23, 565:8-19; Deposition of Lothar Budike Sr., Exhibit D, at 133:21 – 134:4.

[9] See Second Amended Complaint at ¶32.

[10] See Second Amended Complaint at ¶33.

[11] Bell Atlantic Agreement at 2.

[12] See Deposition of Brian Hayduk, Exhibit E, at 68:9-15 ("Q. Well, does it say in here anywhere that [the $100,000] would be returned if it wasn't used for Bell? A. No."), 20-22 ("Q. Powerweb never agreed to that, did they? A. Not in – no.").

[13] On December 30, 1999, New Energy's Director of Energy Services, Mr. McGeown, sent an email message to Powerweb's President, Mr. Budike, saying "Note one small adder - got some feedback that we may want the unspent money back if we do not move forward on other deals." See Exhibit F. Mr. Budike responded by email on January 2, 2000, saying "I do not agree with the adder of yours, by giving money back says were not going to approach other deals together. I want a partner to approach other deals with, if that's not the case they let me know now." See Exhibit G. NewEnergy then signed the Contract on January 7, 2000 without the rejected provision. See Bell Atlantic Agreement.

Powerweb was entitled to keep the funds (in lieu of a previously negotiated prepayment of $500,000).[14]

**III.   ARGUMENT**

    **A.   The Law of Contract Interpretation.**[15]

Construction of a contract is a matter of law to be determined by the Court. See Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004). A court's overriding purpose in interpreting the terms of a contract is to effectuate the intent of the parties. See Metal Marketplace, Inc. v. United Parcel Serv., Inc., 733 F. Supp. 976, 978 (E.D. Pa. 1990) (citing Lower Frederick Twp. v. Clemmer, 543 A.2d 502, 510 (Pa. 1988)). "It is well-settled under Pennsylvania contract law that the meaning of a clear and unambiguous written contract and the intent of the contracting parties must be determined from the four corners of the contract." See Glenn Distribs. Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 300 (3d Cir. 2002). A court must "construe a contract as written and may not modify the plain meaning of the contract under the guise of interpretation." Tuthill v. Tuthill, 763 A.2d 417, 420 (Pa. Super. Ct. 2000), allocatur denied, 775 A.2d 808 (Pa. 2001). In accordance with the parol evidence rule, extrinsic evidence is not admissible to vary the terms of an integrated written contract. The Pennsylvania Supreme Court recently reaffirmed the application of the parol evidence rule:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement

---

[14]   See October 26, 1999 Letter of Intent, a true and correct copy of which is attached hereto as Exhibit H.

[15]   Both the Confidentiality Agreement and the Bell Atlantic Agreement contain choice of law provisions which state that the contract shall be interpreted in accordance with Pennsylvania law.

> between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

Yocca v. Pittsburgh Steelers Sports, Inc., No. 32 WAP 2003, 2004 WL 1618851, at *7 (Pa. July 20, 2004) (quoting Gianni v. R. Russell & Co., 126 A. 791, 792 (Pa. 1924)). Only where there is an ambiguity concerning the dispute of the parties may the court look beyond the plain meaning of the contract.[16] See Glenn, 297 F.3d at 300; Kripp, 849 A.2d at 1163.

The determination of whether an ambiguity exists is a question of law. See United States v. Pantelidis, 335 F.3d 226, 235(3d Cir. 2003) (citing Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir. 1991)); Kripp, 849 A.2d at 1164 n.5 (citing Easton v. Washington County Ins. Co., 137 A.2d 332 (Pa. 1957)). Under Pennsylvania law, a contract is ambiguous:

> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and *a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.*

Glenn, 297 F.3d at 300 (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir. 1995)) (emphasis added). Once the Court has interpreted that an ambiguity exists, the question of the meaning of the contract becomes a matter for the jury to determine. See Kripp, 849 A.2d at 1163 ("ambiguous writings are interpreted by the finder of fact") (citing

---

[16] The parol evidence rule, however, does not apply with its ordinary strictness where custom and usage to explain a term is concerned. Resolution Trust Corp. v. Urban Redevelopment Auth. of Pittsburgh, 638 A.2d 972, 975 (Pa. 1994). Evidence of custom in the industry or usage in the trade is always admissible in construing commercial contracts and does not depend on the existence of an ambiguity. See Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1193 (Pa. 2001).

Community College of Beaver County v. Society of the Faculty, 375 A.2d 1267, 1275 (Pa. 1977)).

      **B.**    **The Confidentiality Agreement**

At the outset of their relationship, Powerweb and NewEnergy entered into a Confidentiality Agreement for the purpose of allowing NewEnergy to review and evaluate Powerweb's confidential and proprietary information in order to determine whether the parties should embark upon a formal business relationship. The parties dispute the meaning of two aspects of the Confidentiality Agreement, Energy Technology Information and the agreement not to use Energy Technology Information.

      **1.**    **Energy Technology Information**

NewEnergy is bound by the Confidentiality Agreement not to use or disclose Powerweb's Energy Technology Information. While the parties disagree on the scope of the term Energy Technology Information, the mere disagreement of the parties does not render the term ambiguous. See Glenn, 297 F.3d at 300.

The term "Energy Technology" is defined by the Confidentiality Agreement through a series of recitals and is the collective term for the technologies, inventions and resale strategies owned or developed by Powerweb. The technologies, inventions and energy resale strategies are described as:

> . . . a number of energy sensing and energy reduction inventions comprised of gas sensing technologies, electronic metering devices, electricity control devices, and electricity consumption devices; and

> . . . a patented integrated translation software system (Omni-Link) which is utilized for energy information transfer, energy procurement, and facility based monitoring. Omni-Link is compromised of digital sensors, networking communication protocol, computer server configurations, and a graphical machine-man interface; and

> "stand-by generation" capacity credit programs which utilize the above mentioned technologies to sell back capacity on the open market as well as leverage energy procurement in deregulated electricity territories[.][17]

The final recital provides further clarification of what constitutes Energy Technology,

> PWT [Powerweb] corporate sales strategies, contracts, proposed licensing agreements, drawings, proposals, software patents, installation manuals, technical specifications, electrical diagrams, prototypes, or the like comprising of [sic] the Energy Technology . . .[18]

The plain meaning of "Energy Technology Information" is therefore information regarding the defined "Energy Technology."

The term Energy Technology Information may be vague, but it is not ambiguous. "The concepts of ambiguity and vagueness are distinct." Younis Bros. & Co. v. CIGNA Worldwide Ins. Co., 899 F. Supp. 1385, 1392 (E.D. Pa. 1995), aff'd, 91 F.3d 13 (3d Cir. 1996). The term Energy Technology Information is not reasonably susceptible to different constructions. To the contrary, its meaning, and the intent of the parties, may be discerned from the words of the Confidentiality Agreement. The term is very broad and intended to cover all of the confidential information that Powerweb shared with NewEnergy regarding the Energy Technology, whether it pertained to the included software, hardware or business strategies. Energy Technology Information is not limited to the whole of these elements, but includes each individual element as well. Indeed, there is nothing in the document to suggest any narrower meaning.[19] Thus, the only factual issue to be determined by the jury regarding what was covered is what information was shared by Powerweb.

---

[17] Confidentiality Agreement at 1.

[18] Confidentiality Agreement at 1.

[19] Despite NewEnergy's efforts to segregate out anything that was in the public domain from the definition of Energy Technology Information, the Confidentiality Agreement contemplates that Energy Technology Information may include information in the public domain or common knowledge. Rather than carving out such information from the definition of Energy Technology

### 2. NewEnergy's Obligation not to use Energy Technology Information

The Confidentiality Agreement provides, in part:

> 1. Upon Execution of this Agreement, a confidential relationship shall arise between PWT [Powerweb] and NEE [NewEnergy] and their representatives, NEE and their representatives agrees to hold the Energy Technology Information in confidence and not to disclose the same to anyone, *also NEE and their Representatives further agrees not to use any Energy Technology information for any purpose, unless and until PWT offers a written agreement authorizing NEE and their representatives to use the "Energy Technology" information.*[20]

The term "use" is not subject to two different reasonable meanings. The common meaning of "use" is "to put into service; employ" or "to avail oneself of."[21] This is the meaning employed by the agreement. There is no evidence in the agreement that the parties intended an interpretation other than the normal meaning of the word or that the parties intended to limit NewEnergy's obligation to non-use of non-public information.[22] Indeed, the plain language of the agreement forbids NewEnergy from using *any* Energy Technology Information for *any* purpose. The fact that Powerweb shared the Energy Technology Information with a specific transaction in mind does not limit the prohibition on use to that transaction. Such an interpretation flies in the face of the very idea of a confidentiality agreement. The court need not hear extrinsic evidence regarding the parties' intent with respect to "use."

---

Information, the Confidentiality Agreement relieves NewEnergy of its obligation to maintain the confidentiality of such information.

[20] Confidentiality Agreement, at 1, ¶1 (emphasis added).

[21] American Heritage Dictionary, 3d Ed. (1994).

[22] NewEnergy contends that its obligation not to use Powerweb's Energy Technology Information was extinguished once this information entered the public domain. However, while the agreement notes in a subsequent paragraph that NewEnergy has no obligation to keep confidential information *already* in the public domain, the agreement does not remove NewEnergy's confidentiality obligations where an aspect of Powerweb's Energy Technology Information enters the public domain after the agreement is signed. Moreover, the public-domain exception explicitly applies only to disclosure of the information, not to its "use" by NewEnergy. Whether it became publicly available or not, NewEnergy agreed not to use it for ten years.

C.     **Bell Atlantic Agreement**

On January 7, 2000, Powerweb and NewEnergy entered into the Bell Atlantic Agreement, under which they agreed to work together regarding a proposed installation of Powerweb's Omni-Link system at certain Bell Atlantic facilities in New Jersey. The parties dispute two portions of this agreement: (1) whether the contract obligated Powerweb to refund the $100,000 payment made to Powerweb by NewEnergy; and (2) whether Powerweb's duty to complete a project implementation plan, schedule and investment analysis of the Omni-Link application for Bell Atlantic was conditioned upon entering into the contemplated contracts with Bell Atlantic.

1.     **$100,000 Payment**

The only provision of the Bell Atlantic Agreement that discusses the payment of $100,000 to Powerweb states the following:

> NEE [NewEnergy] agrees to fund project development costs of up to One Hundred Thousand Dollars (100,000.00) for Powerweb to create a detailed project implementation plan, schedule and investment analysis of an Omni-Link application for Bell Atlantic. NEE will deposit the funds with Powerweb within ten (10) business days after execution of this agreement. Allocation and use of the funds will be subject to the sole approval of NEE in advance. If Bell Atlantic does not proceed with the project unused funds will be allocated to joint development of other opportunities. These development funds will be repaid from the first project payments made by Bell Atlantic to either PWT [Powerweb] or to NEE. The specific form of repayments will be determined and agreed upon with both parties before the final contract negotiations with Bell Atlantic.[23]

The plain language of this paragraph, including what the paragraph *does not say*, evidences the intent of the parties. While this paragraph contemplated that NewEnergy would be repaid out of amounts received from Bell Atlantic or other customers, it did not require Powerweb to return any of the funds itself if no customer payments were ever received. There is no ambiguity.

---

[23]    Bell Atlantic Agreement at 2.

NewEnergy cannot introduce evidence in an effort to add such a "cash refund" requirement to the plain language of the agreement. The terms of the parties' deal cannot be altered by the addition of a clause that does not exist in the contract. Where the parties engaged in an arms' length transaction, they must be held to the express terms of their written agreement.

### 2. Project Implementation Plan and Other Tasks

Powerweb and NewEnergy further dispute whether the duties of Powerweb to create a project implementation plan, schedule and cost analysis of an Omni-Link application for Bell Atlantic, design an Omni-Link system for Bell Atlantic and provide post installation software and hardware maintenance of the Omni-Link system had arisen by the time the Bell Atlantic Agreement expired. There are two portions of the Bell Atlantic Agreement that discuss these duties.

The only portion of the Bell Atlantic Agreement that refers to the design and post-installation maintenance of the Omni-Link system is a paragraph regarding profit distribution.[24] This paragraph states:

> The specific form of profit distribution will be determined and agreed upon with both parties before the final development of contracts with Bell Atlantic. In these contracts
>
> **Powerweb will be responsible for:**
>
> (i)  creation of a detailed project implementation plan, schedule and cost analysis;
>
> (ii) turnkey Design Engineer Procure Construct (EPC) of an Omni-Link system; [and]
>
> (iii) post installation software and hardware maintenance of the Omni-Link system.[25]

---

[24]   NewEnergy agrees that this is the intent of this paragraph. See NE Response to Powerweb's Motion for Summary Judgment at 3-4.

[25]   Bell Atlantic Agreement at 1 (emphasis in original).

There is no ambiguity in this paragraph. The prefatory phrase "[i]n these contracts," refers to the anticipated future "contracts with Bell Atlantic." The unambiguous meaning of the quoted language is that the anticipated future agreements with Bell Atlantic would include a provision requiring Powerweb to perform the listed tasks, not that Powerweb was obligated by the current contract to perform them. The parties agree that no such agreements were reached with Bell Atlantic.[26] Thus, Powerweb could not have breached the promise to include the specified requirements in any such nonexistent agreements.

In addition to the foregoing paragraph, the obligation to create a project implementation plan arises in the previously quoted contract section regarding the payment of $100,000. Here, the agreement states: "NEE [NewEnergy] agrees to fund project development costs of up to One Hundred Thousand Dollars (100,000.00) for Powerweb to create a detailed project implementation plan, schedule and investment analysis of an Omni-Link application for Bell Atlantic."[27] Wherever reasonable, contract terms should be interpreted as consistent with each other. Sunbeam Corp v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1193 (Pa. 2001). Therefore, this clause must be read in conjunction with the paragraph regarding profit distribution, which imposes the identical duty of creating "a detailed project implementation plan, schedule and investment analysis." Just as the duty to create a project implementation plan is a future obligation in the profit distribution paragraph, the identical duty in a subsequent paragraph is also a future obligation.

The interpretation that the time for completing the project implementation plan had not arrived at the time the agreement expired is also the only logical interpretation of this

---

[26] See, e.g., Deposition of Brian Hayduk, Exhibit E, at 101:10 – 102:18; Deposition of David McGeown, Exhibit I, at 153:5 – 154:18; see also Second Amended Complaint ¶¶ 31 and 32.

[27] Bell Atlantic Agreement at 1.

clause. Powerweb used the $100,000 it was given by NewEnergy to do an engineering study in furtherance of an eventual project implementation plan. However, it would be impossible to *complete* a detailed project implementation plan, schedule and cost analysis before some agreement was reached on what the project would entail (i.e., number of buildings, locations, etc.). That never occurred. NewEnergy has not disputed this. Because Bell Atlantic decided not to proceed and never signed any subsequent agreements, the time for completing a project implementation plan, design and post-installation support for the Omni-Link system for Bell Atlantic never arrived. The court need not hear extrinsic evidence regarding these duties of Powerweb, as the only reasonable, consistent interpretation of these clauses is that the completion of these duties was contingent upon an event that did not occur.

## IV.   CONCLUSION

Interpretation of the terms of the Confidentiality Agreement and the Bell Atlantic Agreement is a matter of law to be determined by the Court.

Respectfully submitted,

RG574

Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.

Date:   August 6, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CONSTELLATION NEWENERGY, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 02-CV-2733 (HB) |
| | : | |
| POWERWEB, INC., | : | |
| Defendant. | : | |

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing memorandum was filed electronically today and is available for viewing and downloading from the ECF system. The memorandum was served upon counsel for Constellation NewEnergy, Inc. by notice of electronic filing, addressed to:

> David E. Landau, Esquire
> Wolf, Block, Schorr and Solis-Cohen, LLP
> 1650 Arch St., 22nd Floor
> Philadelphia, PA 19102
> dlandau@wolfblock.com


                                                                  RG574
                                            Rudolph Garcia, Esquire

Date: August 6, 2004