IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,    :
                    Plaintiff,    :
                           :
             v.           :          No. 02-CV-2733 (HB)
                           :
POWERWEB, INC.,                :
               Defendant.    :

## O R D E R

AND NOW, this        day of August, 2004, it is hereby ORDERED that Plaintiff, Constellation NewEnergy Inc.'s Motion in Limine to Exclude the Expert Testimony and Expert Reports of Constantinos Pappas, CPA (Doc. #118) is DENIED.

BY THE COURT:

_____
                                                   J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,   :
          Plaintiff,   :
                    :
      v.   :     No. 02-CV-2733 (HB)
                    :
POWERWEB, INC.,   :
          Defendant.   :

**MEMORANDUM OF LAW BY POWERWEB, INC. IN OPPOSITION
TO MOTION BY CONSTELLATION NEWENERGY, INC. TO EXCLUDE
<u>EXPERT TESTIMONY AND REPORTS OF CONSTANTINOS PAPPAS, CPA</u>**

Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.

Date:  August 6, 2004

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND ....................................................................................................1

III.  ARGUMENT.........................................................................................................2

    A.  Legal Standards for Admissibility of Expert Testimony....................................3

    B.  Powerweb's Damages Claims ............................................................................4

        1.  NewEnergy Installations ...........................................................................5

        2.  Bell Atlantic Installations..........................................................................7

        3.  BGE Contract .............................................................................................8

        4.  Other Lost Contracts ..................................................................................8

    C.  Mr. Pappas Satisfies All Requirements for Admissibility of Expert Testimony. ............9

        1.  Mr. Pappas Is Qualified to Perform His Calculations. ..............................9

        2.  Mr. Pappas's Testimony Is Reliable. .......................................................11

            a.  Mr. Pappas Based His Opinions on Sufficient Facts and Data. .......................12

            b.  Mr. Pappas's Testimony Is the Product of Reliable Principles and Methods. ............14

        3.  Mr. Pappas' Testimony Fits the Facts. ....................................................17

    D.  The Probative Value of Mr. Pappas' Testimony Will Not Be Outweighed by Confusion or Prejudice. ............18

IV.  CONCLUSION....................................................................................................19

## I.    INTRODUCTION

Powerweb, Inc. ("Powerweb") submits this memorandum in opposition to the motion filed in this action by Constellation NewEnergy, Inc. ("NewEnergy") to preclude the expert testimony and reports of Constantinos Pappas, CPA (Doc. #118).

NewEnergy attacks Mr. Pappas because he is Powerweb's accountant, as opposed to a professional witness for hire, claiming that a mere CPA is unqualified to do math. However, as Dr. Fox-Penner has testified, Mr. Pappas' intimate knowledge of Powerweb's cost structure makes him better able than a Ph.D. economist to make the calculations that he has contributed.[1]

NewEnergy also contends that Mr. Pappas lacks a sufficient basis for various opinions that he does not purport to express. Mr. Pappas will not be Powerweb's only witness. The asserted claims will not be proven by him alone. Other witnesses will address the liability and causation issues, and other aspects of Powerweb's damages. Accordingly, Mr. Pappas does not need to know any of the factual details recited by NewEnergy. His only role is to calculate certain numbers that flow from a given set of assumptions. Those assumptions will be established by Mr. Budike, Dr. Fox-Penner and other witnesses and exhibits.

## II.    BACKGROUND

In 1996, the electricity markets in various regions across the United States began to be deregulated, opening the door to competition and new methods for reducing energy costs. Because electricity cannot be stored, all generated power must be consumed instantaneously. That makes balancing supply and demand a constant challenge and causes electricity prices to be extremely volatile. During high demand periods, the wholesale price of electricity can increase

---

[1]    All citations are to Powerweb's appendix at A(tab). <u>See</u> Fox-Penner Dep. (A1) at 71:8-18 ("someone who was familiar already with Powerweb's costs and profits could render a more accurate opinion.").

by as much as 1,000%. Powerweb designed a system that enables large commercial customers to profit from that fluctuation by cutting back their consumption or using their own emergency generators when prices are at their highest ("Omni-Link system").

NewEnergy agreed to enter into a series of joint ventures with Powerweb to license the Omni-Link system, first to Bell Atlantic Corporation ("Bell Atlantic"),[2] and then to other customers. Accordingly, Powerweb disclosed the details of its system to NewEnergy under a written agreement ("Confidentiality Agreement") that prohibited NewEnergy from unilaterally using or disclosing the information that Powerweb provided. NewEnergy then abandoned Powerweb, used the information to develop competing products and services of its own, and carelessly disclosed important aspects of the information to others who then used it to also become competitors of Powerweb.

Powerweb's counterclaims against NewEnergy seek recovery of lost profits during the ten-year period covered by the Confidentiality Agreement and under a three-year contract that NewEnergy induced Baltimore Gas & Electric Company ("BG&E") to terminate. Mr. Pappas is a member of the team of experts that calculated those lost profits for Powerweb.

## III.    ARGUMENT

NewEnergy's brief distorts Powerweb's claims and damages beyond recognition. The Confidentiality Agreement is not limited to Bell Atlantic, New Jersey, or ALM[3] on the PJM.[4] Nor did it expire in one year. It prohibits *any* use or disclosure without Powerweb's

---

[2]    Bell Atlantic is now known as Verizon. However, for convenience and clarity, it will be referred to in this memorandum as Bell Atlantic even after it changed its name to Verizon.

[3]    "ALM" stands for active load management, which is often used interchangeably with "curtailment." Both involve profiting from reductions of power usage at times of high demand.

[4]    PJM is a regional power authority. The initials stand for Pennsylvania, [New] Jersey and Maryland, which were the three states that it originally included. Delaware, Washington, D.C.,

consent for ten years.[5] The proposed Bell Atlantic project was expected to be the first in a series of agreements for customers across the country.[6] Powerweb wisely refused to disclose its confidential information for that project unless NewEnergy agreed not to use the information without Powerweb for *any customers anywhere* and not to leak it to potential competitors. NewEnergy breached both of those promises.

NewEnergy also attempts to rewrite the parties' ten-year agreement by contending that it did not cover load management ("LM") and energy management ("EM") services. To the contrary, Powerweb's Omni-Link system provides both LM and EM services, and NewEnergy was therefore precluded from providing either one without Powerweb.[7]

### A.    Legal Standards for Admissibility of Expert Testimony

The Federal Rules of Evidence embody a strong preference for admitting any evidence with the potential for assisting the trier of fact. Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997). In accordance with this preference, Federal Rule of Evidence 702, which governs the admissibility of expert testimony, adopts a liberal policy of admissibility. Id.

Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

and portions of Ohio, West Virginia and Virginia were added later. Chicago was also added this year.

[5]    Confidentiality Agreement (A2).

[6]    See Powerweb plan summary (A3) at 1 (NE000183); Joint Marketing Agreement (A4).

[7]    See Powerweb's Memorandum in Opposition to NewEnergy's Motion in Limine to Exclude Speculative and Unforeseeable Damages Related to Energy Management Services.

Fed. R. Evid. 702.

Thus, if expert testimony will assist the trier of fact, its admissibility turns on (a) whether the expert is qualified by knowledge, skill, experience, training or education; (b) whether the expert's testimony is based on sufficient facts or data; (c) whether the expert's testimony is the product of reliable principles and methods; and (d) whether the expert has reliably applied the principles and methods to the facts. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994), cert. denied sub nom. Gen. Elec. Co. v. Ingram, 513 U.S. 1190 (1995). These requirements are often referred to more concisely as qualifications, reliability and fit. Paoli, 35 F.3d at 741-43.

Mr. Pappas easily meets these standards. He is qualified to testify as an expert regarding lost profits and his proposed testimony is based on sufficient facts and data and reliable methods, and will assist the trier of fact. Thus, there is no basis for excluding Mr. Pappas' testimony under Rule 702.

### B.    Powerweb's Damages Claims

Powerweb's damages fall into the following nine categories:

| | |
|---|---:|
| NewEnergy New York curtailment | $4,662,334 |
| NewEnergy PJM curtailment | 2,514,164 |
| NewEnergy New England curtailment | 853,815 |
| NewEnergy California curtailment | 2,063,620 |
| Bell Atlantic curtailment | 1,840,125 |
| NewEnergy installations | 39,083,713 |
| Bell Atlantic installations | 1,888,710 |
| BGE contract | 1,359,920 |
| Other lost contracts | 63,174,217 |
| | $117,440,619 |

Mr. Pappas participated in the calculation of the last four categories above. However, the customer and meter projections he used for the NewEnergy and Bell Atlantic

installations were provided by another expert, Peter Fox-Penner, Ph.D., who will independently support those projections.[8] Dr. Fox-Penner will also support the curtailment profits in the first five categories, independently of any testimony by Mr. Pappas.[9] The totals in all nine categories are also present values determined by Dr. Fox-Penner.[10] All Mr. Pappas did was calculate the net profits that Powerweb would have earned from setup fees, license fees, monthly access fees and equipment charges, given Dr. Fox-Penner's projections for NewEnergy and Bell Atlantic, given Powerweb's terminated contract with BG&E, and given Mr. Budike's anticipated testimony regarding contracts lost to RETX and Silicon Energy as a result of NewEnergy's improper disclosures to those companies.[11] As Dr. Fox-Penner has explained, Mr. Pappas was better able to calculate those amounts because, as Powerweb's accountant, he "was familiar already with Powerweb's costs and profits."[12]

Mr. Pappas' calculations for each of the four categories to which he contributed are summarized in the following sections.

### 1. NewEnergy Installations

The net profits from NewEnergy installations are based on Dr. Fox-Penner's estimates of NewEnergy's LM and EM business during the ten-year period covered by the Confidentiality Agreement. Because Powerweb's Omni-Link system provides both types of

---

[8]    See Fox-Penner Dep. (A1) at 92:18-93:10, 240:22-241:4.

[9]    See Fox-Penner Dep. (A1) at 91:22-92:3, 240:14-21.

[10]    See Fox-Penner Dep. (A1) at 74:12-25, 241:5-8.

[11]    See Mr. Pappas' initial report ("Initial Pappas Report") (A5) and supplemental report ("Supplemental Pappas Report") (A6).

[12]    See Fox-Penner Dep. (A1) at 71:8-18.

services, NewEnergy was obligated to pay Powerweb if it offered either service, whether it used Omni-Link to do so or not.[13]

In order to calculate the net profits that Powerweb would have earned from setup fees, license fees, monthly access fees and equipment charges relating to NewEnergy's LM business, Mr. Pappas needed to know how many customers there would be and how many electricity meters they would have. That data was provided by Dr. Fox-Penner, who will support those projections himself at trial. For NewEnergy's EM business, Mr. Pappas assumed that approximately 1,000 customers would have used Omni-Link in each ISO, based on a study by BG&E and other factors. Mr. Pappas then calculated the net profits that Powerweb would have earned from the LM and EM installations, using Powerweb's actual costs and charges for its existing customers.

In his supplemental report, Mr. Pappas adjusted some of the calculations in this category because, after his initial report was served, the Chicago ISO[14] was incorporated into the PJM ISO, thereby eliminating an annual per-ISO license fee,[15] and because Dr. Fox-Penner had revised some of his underlying projections to address criticisms by NewEnergy's expert and to take previously undisclosed data into account.[16] In addition, Mr. Pappas revised his assumed EM penetration rates,[17] because NewEnergy's expert objected to his previous assumption that approximately 1,000 customers would have used Omni-Link in each ISO. Instead, he assumed

---

[13]    See Joint Marketing Agreement (A4).

[14]    To implement the deregulation authorized by the Energy Policy Act of 1992, the Federal Energy Regulatory Commission encouraged the creation of regional transmission organizations to provide independent and neutral operation of the privately owned grids, thereby allowing competition on a level playing field in wholesale energy markets. Such an organization is known in the industry as an independent system operator, or "ISO."

[15]    See Supplemental Pappas Report (A6) at 1, ¶ a.

[16]    See Supplemental Pappas Report (A6) at 1, ¶ d.

[17]    See Supplemental Pappas Report (A6) at 1, ¶ c.

that 35%, then 42%, then 49% of NewEnergy's actual customers would have used Omni-Link, based upon a study of similar customers conducted previously by BG&E. The net result was an increase from $30,662,007 to $39,083,713.

### 2. Bell Atlantic Installations

Powerweb gave NewEnergy a confidentiality agreement for Bell Atlantic to sign that mirrored the one between Powerweb and NewEnergy.[18] However, NewEnergy's Director of Energy Services told Powerweb's President that Bell Atlantic had already signed such an agreement. In reliance on that representation, Powerweb allowed NewEnergy to disclose the confidential information to Bell Atlantic.[19] Unfortunately, the representation was a complete and utter falsehood.[20] Because the information was disclosed with no protections in place, Bell Atlantic later used it to reap curtailment profits without either Powerweb or NewEnergy.[21]

Mr. Pappas has calculated the net profits that Powerweb would have earned from the curtailment activities undertaken by Bell Atlantic. To do so, he assumed the same business terms that were established by the Bell Atlantic Agreement and used Powerweb's actual costs.[22] The numbers of meters and locations were supplied by Dr. Fox-Penner, who will support those independently at trial.[23] Mr. Pappas made no change to this category of damages in his supplemental report.

---

[18]   See Budike Dep. (A7) at 458:15-24.

[19]   See Budike Affidavit (A8) at ¶17.

[20]   See Metz Dep. (A9) at 61:4-19; 62:2-22.

[21]   See Metz Dep. (A9) at 10:13-24.

[22]   See Initial Pappas Report (A5) at 4, ¶ III.1.a-b.

[23]   See Initial Pappas Report (A5) at 4, ¶ III.1.c.

### 3.    BG&E Contract

After a successful pilot program was completed, BG&E signed a three-year contract with Powerweb.[24] However, during the first year, NewEnergy was acquired by BG&E's parent company, the Constellation Energy Group. NewEnergy then used the BG&E contract as leverage to try to force Powerweb to drop its counterclaims.[25] When Powerweb refused, BG&E terminated the contract.[26]

Mr. Pappas calculated the profits that Powerweb would have earned from setup fees, license fees, monthly access fees and equipment charges if the contract had not been terminated.[27] He assumed a customer penetration rate that was based on a study that BG&E had conducted and Powerweb's actual experience before the contract was terminated. Mr. Pappas made no change to this category of damages in his supplemental report.

### 4.    Other Lost Contracts

The Confidentiality Agreement prohibited NewEnergy from disclosing Powerweb's confidential information to anyone else. However, NewEnergy disclosed it to RETX and Silicon Energy, both of whom then used it to become competitors of Powerweb.[28] As a result, Powerweb has lost thirteen contracts to those companies that they would not have been able to perform without NewEnergy's improper disclosures.

Mr. Pappas has calculated the net profits that Powerweb would have earned from setup fees, license fees, monthly access fees and equipment charges under those lost contracts. In his initial report, he assumed the same penetration rates as Dr. Fox-Penner had provided for

---

[24]    See Budike Dep. (A7) at 687:12-688:8; 694:24-695:1.

[25]    See Budike Dep. (A7) at 693:18-694:9; Kiselewich Dep. (A10) at 124:9-19, 127:1-3.

[26]    See Budike Dep. (A7) at 688:14-19.

[27]    See Initial Pappas Report (A5) at 3, ¶ II.2.a.

[28]    See Budike Dep. (A7) at 655:20-657:15.

NewEnergy's installations.[29] However, NewEnergy's expert criticized Mr. Pappas for assuming that Powerweb's penetration would have matched NewEnergy's. Accordingly, he revised that assumption in his supplemental report, and instead used Powerweb's actual penetration rates with its existing customers.[30] The net effect of that more accurate assumption was an increase from $36,282,037 to $63,174,217.

**C.      Mr. Pappas Satisfies All Requirements for Admissibility of Expert Testimony.**

Mr. Pappas' testimony is admissible, because he is qualified to give the opinions he states and his methods are reliable and fit the facts. See Paoli, 35 F.3d at 741-45.

**1.      Mr. Pappas Is Qualified to Perform His Calculations.**

The third circuit "liberally" construes the requirement that experts possess knowledge, skill, experience, training, or education in the area on which they render their opinions. Paoli, 35 F.3d at 741. Indeed, its view on this has been expressed as follows: "We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." Id. Thus, it has been held to be an abuse of discretion to exclude opinions "simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate." Id.

Despite this low threshold for expert qualifications, NewEnergy contends that Mr. Pappas should be precluded from rendering an opinion because this is the first time he has served as an expert witness.[31] Under that proposed standard, retirement of the last expert who has testified thus far would bring about the extinction of all expert testimony forevermore. That

---

[29]     See Initial Pappas Report (A5) at 3, ¶ IV.1.d-e.

[30]     See Supplemental Pappas Report (A6) at 1, ¶ e-f.

[31]     See NewEnergy's Brief at 11.

absurd result cannot be what Rule 702 intends. There must be a first time for all experts, no matter how accomplished they may later become.

NewEnergy glosses over the fact that Mr. Pappas is a CPA and, as such, clearly has the knowledge, skill, experience, training, and education necessary to do the limited calculations he performed. After all, the more challenging aspects of Powerweb's damages analysis were performed by a Ph.D. economist, not Mr. Pappas, such as projecting curtailment revenues and reducing amounts to present value.[32] By and large, Mr. Pappas performed mathematical calculations, which a CPA is certainly competent to perform. Moreover, his experience as Powerweb's accountant makes him uniquely qualified to analyze Powerweb's profits.

The cases NewEnergy relies upon are readily distinguishable. For example, NewEnergy attempts to analogize this situation to the one faced by the tenth circuit in Lifewise Master Funding v. Telebank, No. 03-4086, 2004 U.S. App. LEXIS 13398 (10th Cir. June 29, 2004). There, a district court's exclusion of testimony was affirmed based on the expert's "utter lack of any familiarity, knowledge, or experience with damages analysis." Id. at *29-*30. That expert was not an accountant, and the court emphasized that he took no accounting or finance courses when rendering his opinion. Id. at *29. In contrast, Mr. Pappas is an accountant and has the professional expertise necessary to perform the calculations he made.

NewEnergy's reliance on a tenth circuit opinion reveals the paucity of cases in which a court has excluded expert testimony on the basis of qualifications. In the only case

---

[32]    Dr. Fox-Penner did *not* testify that Mr. Pappas is unqualified, as NewEnergy erroneously asserts. See NewEnergy's Brief at 6. All he said was that to "predict or model the lost profits of a business," one needs "to know some economics, a little bit of accounting, and you need to understand the particular business that you're modeling." Id. Mr. Pappas has those qualifications. Moreover, he is not modeling the lost profits by himself. The more challenging economic aspects were handled by Dr. Fox-Penner, not Mr. Pappas.

within this district that NewEnergy has cited, the court noted that expert qualifications are liberally construed and "if qualifications were the only shortcoming, [the expert's] testimony might be admissible." JMJ Enters, Inc. v. Via Veneto Italian Ice, Inc., No. 97-0652, 1998 U.S. Dist. LEXIS 5098, at *15-*16 (E.D. Pa. Apr. 15, 1998), aff'd, 178 F.3d 1279 (3d Cir. 1999).

This case is much closer to the facts in Main Street Mortgage, Inc. v. Main Street Bancorp, Inc., 158 F. Supp. 2d 510 (E.D. Pa. 2001) (Van Antwerpen, J.). There, a CPA was held to be qualified to testify as a damages expert, even though it was the first time he had worked on a case concerning the industry in question. Id. at 513. Indeed, the court specifically held that "his background as a CPA and experience in analyzing financial data are sufficient to qualify him to testify on lost profits." Id.

Rejection of expert testimony on the basis of qualifications is clearly the exception, not the rule. NewEnergy provides no reasonable justification for application of that exception here. Nor can it, as the work that Mr. Pappas did is well within the professional qualifications of a CPA, and lack of prior litigation experience has no bearing on this issue.

## 2.    Mr. Pappas's Testimony Is Reliable.

Just as in Main Street Mortgage, Mr. Pappas is not testifying as a liability expert or opining that the losses were caused by the allegedly wrongful conduct. He simply calculates the net profits lost based on a clearly stated set of assumptions. NewEnergy will no doubt do its best to refute those assumptions. Ultimately, the jury will either accept them or reject them. If they accept the assumptions, Mr. Pappas's calculations will help them decide how much to award. If a particular assumption is rejected, the jury may simply disregard the calculations that are based on that assumption. See Main Street Mortgage, 158 F. Supp. 2d at 517 (citing In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999)).

"[A]n expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." Paoli, 35 F.3d at 742. The Third circuit has explained the low standard this imposes as follows:

> The evidentiary requirement of reliability is lower than the merits standard of correctness. . . . A judge will often think that an expert has good grounds to hold the opinion that he or she does even though the judge thinks that the opinion is incorrect. As Daubert indicates, the focus . . . must be solely on principles and methodology, not on the conclusions that they generate. The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result. . . .

> [T]he reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. The ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.

Id. at 744 (internal citations and quotes omitted). Thus, "a judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." Id. at 744-45.

Consequently, the Court need not determine whether Mr. Pappas' opinions are correct, or whether Powerweb will prevail at trial with respect to his stated assumptions. Any concerns along those lines are more appropriately addressed by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." Daubert at 596.

### a.     Mr. Pappas Based His Opinions on Sufficient Facts and Data.

As explained in his report, Mr. Pappas reviewed contracts with BG&E and three other major customers to verify Powerweb's normal setup fees, license fees, monthly access fees

and equipment charges, so he could accurately calculate those same charges for the various categories of damages.[33] He also reviewed the Bell Atlantic proposal to determine how the profits were to be distributed for that aspect of the damages.[34] He also reviewed the EIM study conducted by BG&E to help him predict the penetration rates for certain of the damages.[35] He did not need to review Powerweb's historical financial and tax information, because he created those records himself, as Powerweb's accountant, and was already familiar with Powerweb's costs and profits.[36] It also was not necessary for him to review any pleadings, discovery

---

[33]    See Initial Pappas Report (A5) at Exhibit H.

[34]    Id.

[35]    Id.

[36]    See Deposition of Constantinos Pappas, CPA (A11) at 157:14-160:13. NewEnergy's claim that in response to NewEnergy's motion to compel the production of the financial and tax documents of Powerweb that Mr. Pappas considered, Powerweb stated, "Mr. Pappas did not consider the specific documents sought by NewEnergy" (NewEnergy's Brief at 15), is misleading. The documents NewEnergy sought in its motion, which was denied, were the following:

> [A]ny materials in your possession, custody or control, or in the possession, custody or control of Pappas and Company, Certified Public Accountants, LLC, which were your [sic] created, edited, reviewed or considered between 1999 and the present in connection with your work as Powerweb's Certified Public Accountant and/or acting Chief Financial Officer of Powerweb, and which report or reflect Powerweb's profits, revenues or expenses between 1999 and the present including, but not limited to:
>
> (a)    Powerweb's tax returns;
> (b)    Powerweb's financial statements;
> (c)    Powerweb's trial balances;
> (d)    work papers from Pappas and Company related to Powerweb's profits, revenues and expenses;
> (e)    Powerweb's cash receipts and disbursement journals; and
> (f)    Powerweb's general ledger.

NewEnergy Motion to Compel at 2. In response to this extremely broad request, Powerweb stated:

> While Mr. Pappas did not consider the specific documents sought by NewEnergy, he did rely on his general knowledge and his familiarity with Powerweb's business and finances. NewEnergy is free to inquire as to the extent of that knowledge and whether it is sufficient to allow him to determine that the facts and assumptions contained in his report are reasonable.

Powerweb Response to Motion to Compel at n.1. This answer is in accordance with Mr. Pappas' deposition testimony.

responses, documents or testimony relating to the numerous issues of liability and causation, because none of that was pertinent to his limited role, which focused exclusively on damages.

Moreover, Mr. Pappas does not need an adequate basis for opinions that he does not state. Powerweb's entire case will not be established by Mr. Pappas. For example, he does not express any opinion about whether Powerweb would have received the lost contracts if NewEnergy had not leaked the confidential information to RETX and Silicon Energy. That will be established separately by Mr. Budike and other witnesses. Mr. Pappas has merely calculated the profits that Powerweb would have earned from those contracts, so the jury will know how much to award if they conclude that Powerweb has proved that aspect of its claims.[37]

### b.    Mr. Pappas's Testimony Is the Product of Reliable Principles and Methods.

For Mr. Pappas to be allowed to testify to his opinions at trial, the Court need not find that Mr. Pappas' principles and methods are the only methods that could be used to determine Powerweb's lost profits, or even that his opinions are factually correct. The Court must only find that Mr. Pappas' opinions are reliable. Because Mr. Pappas has "good grounds" for his opinions, he should be permitted to testify to them at trial.

It should be noted at the outset that while NewEnergy admits that the eight criteria for determining the reliability of expert testimony set forth by the Third Circuit in <u>Paoli</u> are not a good fit for non-scientific testimony, NewEnergy nonetheless uses these criteria to challenge Mr.

---

[37]    Mr. Pappas' assumptions that Powerweb would receive $75 per end-use customer for its energy management services and that these customers would not cancel their contracts during each three-year term are commensurate with Powerweb's view that without NewEnergy's disclosure of certain aspects of Powerweb's technology, Powerweb would have enjoyed less competition and a greater ability to command its own price in the marketplace than it does today. In fact, two of Powerweb's early contracts did charge $75 per end use customer. NewEnergy's disagreement with Powerweb's underlying premise is a subject for cross-examination, not a reason to exclude Mr. Pappas' testimony.

Pappas' accounting.[38] However, an issue such as whether Mr. Pappas' opinions have been "subject to peer review" holds much less significance where, as here, Mr. Pappas is performing basic accounting, than it would if he were positing a new, untested scientific theory.

NewEnergy's additional arguments in this section mirror the criticisms it sets forth in the previous section. For example, NewEnergy argues in several different ways that Mr. Pappas did not review or consider Powerweb's financial data, analyze Powerweb's historical performance or perform a critical analysis of Mr. Budike's opinions. In terms of Powerweb's financial data, as previously stated, Mr. Pappas used his general knowledge of Powerweb's finances from his role as an outside accountant for Powerweb in forming his opinions.[39] In addition, Mr. Pappas did rely upon the testimony of Mr. Budike, as Powerweb's President, for certain factual details of Powerweb's claims in this litigation and certain aspects of Powerweb's business, such as the services that would have been sold under Powerweb's eleven lost contracting opportunities.[40] Mr. Pappas did not rely solely on Mr. Budike's opinion, as NewEnergy claims. Furthermore, some reliance on Mr. Budike's opinion does not render Mr. Pappas' testimony unreliable. See Tormenia v. First Investors Realty Co., 251 F.3d 128, 135 (3d Cir. 2000) ("Rule 702 does not require that experts . . . eschew reliance on a plaintiff's account of factual events that the experts themselves did not observe."). Indeed, the most logical source of information about Powerweb's business, other than the financial documents with which Mr. Pappas already was familiarity, would be Powerweb's President.

To verify the accuracy of the information provided by Mr. Budike, Mr. Pappas relied upon the facts and data addressed in the previous section of this memorandum. Therefore,

---

[38]    NewEnergy Brief at 20-24.

[39]    See Pappas Dep. (A11) at 157:14-160:13.

[40]    See, e.g., Pappas Dep. (A11) at 98:25-99:5, 236:18-24.

Mr. Pappas did not blindly accept Mr. Budike's representations regarding damages. However, Mr. Pappas had the right to accept Mr. Budike's *liability* representations without analysis, because these representations are outside the scope of Mr. Pappas' expertise and are consequently not within the scope of information upon which he opines.

Mr. Pappas' calculations furthermore do not ignore Powerweb's historical performance. As previously mentioned, Mr. Pappas relied upon executed contracts of Powerweb to verify Powerweb's typical license fees, setup fees, equipment charges and costs and used these numbers to make his damage calculations. Mr. Pappas also relied upon the Bell Atlantic proposal and an EIM study conducted by BG&E during its relationship with Powerweb and drew upon his own knowledge of Powerweb's finances in making his calculations. These are all marks of Powerweb's business history.

However, under the facts of this case, historical performance alone is not a reliable basis for determining all of Powerweb's damages. When Powerweb provided information regarding its Energy Technology Information to NewEnergy under the Confidentiality Agreement, it was offering a product that was ahead of what others in the industry were capable of offering. Had NewEnergy not improperly disclosed Powerweb's technology, other companies would not have been able to compete with Powerweb as soon as they in fact did. Therefore, Powerweb's lost profits must rely not on a present picture of Powerweb's position in the marketplace, but on an examination of Powerweb's position had the disclosure not occurred. The fact of disclosure and its effect upon Powerweb's market power will be established by Powerweb's liability witnesses and does not impact the admissibility of Mr. Pappas' damages calculations. It is reasonable for Mr. Pappas to accept Powerweb's liability

assumptions and to calculate what Powerweb's lost profits would be *if* a jury finds those assumptions to be correct.

Personal knowledge of a company's finances, discussions with the president and an examination of the company's contracts are all reliable methods by which to determine that company's lost profits. By utilizing all of these methods, Mr. Pappas has shown that his opinions are based upon "good grounds." To the extent NewEnergy disagrees with Mr. Pappas' methods, it may assert its disagreement through its opposing experts and through cross-examination. However, Mr. Pappas' opinions meet the standards of Rule 702.

### 3.    Mr. Pappas' Testimony Fits the Facts.

In addition to reliability, Rule 702 requires that expert testimony have the requisite "fit" or relevance to assist the trier of fact. See Paoli, 35 F.3d at 742-43. In order to meet the fit requirement, the testimony must connect the witness's conclusions, based on a reliable methodology, to an issue presented in the case. Id. at 743. As the third circuit has explained: "The same standard of reliability extends to the step in the expert's analysis that 'fits' his or her conclusions to the case at hand. Once again, we emphasize that the standard is not that high." Id. at 745.

NewEnergy has a different view of the facts and criticizes Mr. Pappas because he does not assume that their version is correct. NewEnergy's sole argument that Mr. Pappas' opinions lack the requisite "fit" is that "Mr. Pappas' conclusions are based entirely upon speculative and unrealistic assumptions which he accepted at face value from his client."[41] That is not a "fit" issue under Daubert, particularly given that Mr. Pappas is not opining on any of the liability issues. While Mr. Pappas may have accepted Mr. Budike's opinions regarding liability

---

[41]    NewEnergy Brief at 24.

in performing his damages calculations, the testimony of Mr. Budike was only one factor Mr. Pappas used to understand Powerweb's general profits, costs and contracting terms. Mr. Pappas checked Mr. Budike's testimony against the terms of actual Powerweb contracts and his own knowledge of Powerweb's financial documents.

Mr. Pappas' opinions are clearly relevant and will assist the jury in understanding Powerweb's lost profits. If the jury disagrees with Powerweb's contentions regarding liability, it will be free to adjust the weight it gives to Mr. Pappas' damages calculations accordingly. However, "the inquiry made by a court . . . is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied." Id. at 744 (quoting Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Therefore, the admissibility of Mr. Pappas' opinions is not challenged by the fact that they do not address liability and are limited to calculations of specific damages.

### D. The Probative Value of Mr. Pappas' Testimony Will Not Be Outweighed by Confusion or Prejudice.

Federal Rule of Evidence 403 "is rarely appropriate as a basis of pre-trial exclusion, because a judge cannot ascertain potential relevance until that judge has a virtual surrogate for a trial record." Paoli, 35 F.3d at 747. Rule 403 requires the court to balance the probative value and need for an item of evidence against the harm likely to result from its admission. Fed. R. Evid. 403. A party seeking to exclude evidence under Rule 403 faces a fairly high standard, as there is a presumption of helpfulness in performing this balancing test. Paoli, 35 F.3d at 746. Notice and the opportunity of the opposing party to present its own experts is also relevant in determining whether to exclude evidence under this rule. Id.

Mr. Pappas' opinions are highly probative in addressing how Powerweb calculates the lost profits it would have earned from NewEnergy and Bell Atlantic installations,

the BG&E contract and eleven other lost contracts. Indeed, Mr. Pappas' familiarity with Powerweb's costs and profits places him in a unique position to assist the jury in understanding Powerweb's lost profit damages. The danger of prejudice to NewEnergy by allowing Mr. Pappas' testimony is minimal, as NewEnergy plans to produce experts of its own to contest Mr. Pappas' calculations and will have the additional opportunity to cross-examine Mr. Pappas. There is no reason to exclude Mr. Pappas' testimony under Rule 403.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny NewEnergy's motion in its entirety.

Respectfully submitted,


RG574


Rudolph Garcia, Esquire
Kara H. Goodchild, Esquire
Kristin L. Calabrese, Esquire
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(215) 972-1961; -7187; -7533
Attorneys for Powerweb, Inc.


Date:   August 6, 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSTELLATION NEWENERGY, INC.,   :
       Plaintiff,   :
             :
      v.       :      No. 02-CV-2733 (HB)
             :
POWERWEB, INC.,      :
       Defendant.   :

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing proposed order and memorandum were filed electronically today and are available for viewing and downloading from the ECF System. They were served upon counsel for Constellation NewEnergy, Inc. by notice of electronic filing to:

> David E. Landau, Esquire
> Wolf, Block, Schorr and Solis-Cohen, LLP
> 1650 Arch St., 22nd Floor
> Philadelphia, PA 19102
> dlandau@wolfblock.com

                            RG574
                     Rudolph Garcia, Esquire

Date:  August 6, 2004