1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

CONSTELLATION            :   CIVIL ACTION
NEWENERGY, INC.          :
        V.               :
POWERWEB TECHNOLOGIES,   :
INC, A-VALEY ENGINEERS,  :
INC., and LOTHAR E.S.    :
BUDIKE, JR.              :   NO. REPLACE
- - -



OCTOBER 22, 2003
CONFIDENTIAL
- - -

Oral deposition of LOTHAR E.S. BUDIKE, JR, held in the offices of Wolf, Block, Schorr & Solis-Cohen, LLP, 1650 Arch Street, Philadelphia, Pennsylvania 19103, commencing at 10:00 a.m., on the above date, before Amanda Dee Maslynsky-Miller, a Certified Realtime Reporter and Notary Public in and for the Commonwealth of Pennsylvania.
- - -

ESQUIRE DEPOSITION SERVICES
1880 John F. Kennedy Boulevard
15th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

EXHIBIT E

331

other general marketing purposes?

    A.    You know, I can't.

    Q.    Did you say to -- did you say to anybody at AES that, Before you show or market this product in any way, we need a nondisclosure with anybody in the audience, with anybody who was going to see it?

    MR. GARCIA:  You mean other than in the agreement?

BY MR. LANDAU:

    Q.    In -- separate and apart from Bell Atlantic, you at some point --

    A.    Other people?

    Q.    Let me take a step back.

    At some point you entered into a joint marketing agreement with AES NewEnergy?

    A.    Yes.

    Q.    And the purpose of that agreement, wasn't it, was to get beyond Bell Atlantic, but to market it to other --

    A.    Correct.

   Q.      -- entities?

   A.      Correct.

   Q.      Did you require before any marketing effort took effect that someone, either you or AES, was going to have a nondisclosure agreement with that entity to whom you were going to market Omni-Link?

         A.      It was my responsibility --

         MR. GARCIA:  I'm asking for a clarification.  Are you asking whether he asked for that in some way other than in the written agreements that we've already been talking about?

         MR. LANDAU:  Yes.

         MR. GARCIA:  Thank you.

         THE WITNESS:  In the joint marketing agreement, per se, it was my responsibility, because the way that the joint marketing agreement read was that I was to provide the customer lists in the initial concept, and then I would

Case 2:02-cv-02733-HB   Document 158-6   Filed 08/13/2004   Page 4 of 5
LOTHAR E.S. BUDIKE, JR.

337

that signature page is for the profit sharing agreement and not the right one.

I'm only looking for the date of the marketing, if you could just tell me the date.

MR. GARCIA: Would you like to borrow these copies?

MR. GLASER: February 8th.

MR. LANDAU: February 8th.

BY MR. LANDAU:

Q. In February of 2000, you were -- you were going to go beyond Bell Atlantic, is that correct, and try to have a joint marketing of Omni-Link to other customers?

A. End-use customers. That joint marketing agreement was for end-use customers, not suppliers or other business units.

Q. But there was a project developed separate and apart from Bell Atlantic where you were -- there was going to have to be some marketing other

Case 2:02-cv-02733-HB    Document 158-6    Filed 08/13/2004    Page 5 of 5
LOTHAR E.S. BUDIKE, JR.

338

than Bell Atlantic going on?

A. Correct. The joint marketing agreement was the whole intent of us taking this concept through their business units to end-use customers around the country.

So we needed to start doing business in other territories with other customers to start closing deals together.

Q. Now, let's look at Exhibit-27, the letter to Mr. Scarpelli. Explain to me what the origin of this letter is.

A. David McGeown told me that he needed to educate other business units around the country, one being -- one being a business unit that they operated in California, another business unit that they operated in Chicago.

Peter Scarpelli was the person that was Dave McGeown's contact at that business unit that handled this type of product.